**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 1:16CR143** |
| | ) | |
| **MOHAMAD JAMAL KHWEIS** | ) | **The Honorable Liam O'Grady** |
| | ) | |
| **Defendant.** | ) | **Hearing Date: April 12, 2017** |

**DEFENDANT'S REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS**

COMES NOW the Defendant, Mohamad Jamal Khweis, and offers the following Reply to the Government's Opposition to the Defendant's Motion to Suppress.

## BACKGROUND

The factual allegations and characterizations that pervade the first six pages of the Government's brief are heavily disputed, will be sufficiently challenged at trial, and are wholly irrelevant to the question of whether Constitutional violations occurred in this case.[1] *The inculpatory statements to which the Government repeatedly refers are inherently unreliable because they were elicited at a time when the Government knew Mr. Khweis was desperate to escape his confinement in the Kurdish prison*. It was obvious he would have said anything to return home. Indeed, Mr. Khweis first recounted his innocuous reasons for his travel. It was not until after repeated admonishments of the need to be consistent, admit to a crime, or face the likelihood of languishing in a Kurdish prison, that the current story evolved. This was the theme of the agents' statements to

[1] For example, the statement that Mr. Khweis "wanted to be a suicide bomber" is presented out of context, because it fails to mention that Mr. Khweis also told the FBI that he only provided this answer because he was concerned that he was being "tested."

Khweis over weeks of interrogations and the context in which he provided the story the Government presents in its brief.

The Motion before the Court is not about how monstrous the Government may paint Mr. Khweis. After all, Ernesto Miranda himself was accused of kidnapping and raping an intellectually disabled eighteen-year-old woman. Leading with a picture of the twin towers, which is entirely irrelevant to the matter at hand, the Government attempts to sway this Court through prejudicial effect rather than by strong legal argument.[2] Mr. Khweis is innocent until proven otherwise.

The matters before the Court in this motion are three Constitutional violations. One, the Government violated Mr. Khweis' right to prompt presentment under 18 U.S.C. §3501 and the *McNabb-Mallory* Rule. Two, Mr. Khweis' statements and consent to search his phones were the product of coercion in violation of the Fifth and Fourth Amendments. Three, Mr. Khweis' statements were elicited in violation of *Missouri v. Seibert* through the use of a technique designed to undermine the Fifth Amendment and *Miranda* warnings. In this narrow universe of case-law, heavily reliant on district court opinions to establish precedent, the questions before this Court are far too critical to be evaluated on the characterization of unchallenged, unreliable statements and irrelevant sensational images.

[2] Mr. Khweis' electronics contained hundreds of images including pictures of pop stars, and soccer players.

## ARGUMENT

### I. The Government violated Mr. Khweis' right to prompt presentment under 18 U.S.C. §3501 and the *McNabb-Mallory* Rule

The Government argues it "had no control or decision-making authority regarding the logistics of these visits." ECF No. 110 at 18, 24. Yet, there was a clear *quid pro quo*, and nearly every request was granted. The FBI sought "unlimited access" to Khweis, day or night. Received. The FBI sought delay in presenting Khweis to a Kurdish Judicial Officer in order to establish an attenuation time. Received. The FBI sought a different Kurdish official for the clean team interrogations. Received. The FBI sought a different location for the clean team interrogations. Received. The Kurds sought to sit in on the U.S. interrogations and be kept apprised of Mr. Khweis' statements. Received. The FBI sought release of Mr. Khweis to U.S. custody. Received.[3]

In fact, new evidence, electronic communications among FBI employees shows the host nation, DoD, Department of State, and the FBI were all part of the "team," but the FBI was the lead:

| | | | |
|---|---|---|---|
| 3/22/2016 11:46 | ALAT[redacted] | FBI Employee | thanks..and great host nation support and good dod ..dos integration..all are part of the team |
| 3/22/2016 11:46 | FBI employee | ALAT[redacted] | absolutely! |
| 3/22/2016 11:47 | ALAT[redacted] | FBI Employee | we are def the lead. i ask 99% of the questions so our US stuff is def priority, then Dod does their thing |

[3] This motion relates to Mr. Khweis' statements, consent to search, and the fruits thereof provided during interrogations conducted by the U.S. Should the Government intend to introduce statements made solely to Kurdish officials, this would be subject to a later motion, if necessary, once the defense is able to ascertain to whom the statements were made, under what circumstances, where, and when. The Kurdish investigative reports to which the Government referred in its Response are unsigned and do not adequately provide this information. *See* ECF No. 110 at 10.

To argue that the Government had *no control* over this process, is undermined by the facts.

In an attempt to show the contrary, the Government cites to part of an email sent the day after Mr. Khweis' arrest. ECF No. 110 at 24. The full text of the email, however, reads:

> "We were advised that Mohammad Khweis was arrested by the Peshmerga and turned over to Erbil CTD. We obtained permission to interview him. When we arrived at CTD, we were escorted into Gen [] office. He advised us that no US personnel would have access to him no[r] would we have access to the phones. He was upset with a recent issue where no information was shared with them by US personnel holding an ISIS[] subject in Iraq. Peshmerga were being attacked with chemical weapons and the US was not sharing intelligence. After discussing the situation with him, he agreed to provide me access to the detainee for 1 hour, and also agreed to let us rip the phones in their presence and return the phones to them (which [] and [] did last night). **Just wanted you to understand the difficulties that existed *initially*. We now have unlimited access [to Mr. Khweis] and they welcome us there any day or night since we are collaborating with them. Sharing information with them going forward on Khweis is critical to success.**

(emphasis added).

Thus, this email doesn't show a lack of continued U.S. control in the least. It shows that the Kurds initially halted the U.S.'s control of Khweis' interrogations because they believed that the FBI had breached their end of the working arrangement. It shows that so long as U.S. Law Enforcement shared information with the Kurds, the U.S. would have "unlimited access" to Mr. Khweis. *See also* March 15, 2016 DoD email, "The Kurdish General] is more than willing to cooperate as usual….A great example of what a 10 plus year relationship does for us."

After denying a working arrangement, the Government goes on to argue that "coordination in international terrorism between U.S. officials and foreign authorities is

unquestionably a desired expectation." ECF. No. 110 at 34. However, *the clean team interrogations* – those statements the Government seeks to introduce at trial – were not the product of "coordination between U.S. official and foreign officials" conducting counter terrorism work because at that point, that was neither the U.S. nor the Kurdish Government's objective. The U.S. clean team was there only to obtain admissible evidence against Khweis at a criminal trial, and the Kurds just wanted the U.S. to take him off their hands.

At that point, prior to the clean team's arrival, the Kurdish Regional Government sought to have Mr. Khweis removed from their prison, or else they would be required to place him in their judicial system, and the U.S. sought his continued detention at CTD without the Kurds placing Mr. Khweis into their judicial system. The U.S. and the Kurdish Regional Government were not "cooperating to achieve a solution" because the U.S. and foreign objectives were not aligned. *Id.* (citing *United States v. Coppola*, 281 F.2d 340, 344 (2d Cir. 1960)). While the Kurds wanted Mr. Khweis removed soon, the U.S. wanted him to stay weeks longer to allow the clean team to extract a confession that could be used against Mr. Khweis at a criminal trial. Any "coordination" would have been the Kurdish Government acquiescing to the FBI's request to conduct clean team interrogations.[4]

Indeed, the Government acknowledges that, "a small selection of United States government email communications in this case reflect pressure placed on the FBI by

---

[4] Furthermore, a "coordination" to unconstitutionally extract a *Mirandized* confession after six weeks of unlawful detention cannot be considered a "desired expectation."

Kurdish authorities to bring the investigation to a premature conclusion."[5] The Government argues, however, that "these communications simply, at best, create 'mere suspicion or conjecture' of an improper collusion between the governments to undermine the defendant's prompt presentment rights." ECF No. 110 at 20.

Mere suspicion is a "hunch" or a "feeling" that something is amiss. This case presents, not a "sense" of improper collusion to undermine presentment, and not even one isolated email. The improper collusion to undermine presentment is in cold, hard, black-and-white evidence repeated from April 7, 2016 (immediately at the end of the tainted interviews) to May 28, 2016 shortly before Mr. Khweis returned home.

The "small selection" of emails are as follows:

- April 7, 2016 – "The Kurds put big pressure on me today to get the clean team piece working. They want it started in approximately 10 days otherwise he will be put in their court system, be represented by council, [sic] and our ability to communicate with him will be extremely difficult (if at all). They can't extend this any longer without producing him to the court."

- April 8, 2018 – "The [FBI] needs to interview him with a clean team ASAP, complaint him immediately, extradite him, follow up with all the 'good to know' [inquires] in the US, ***and stop the Kurds from having to do what they legally have to do*** (start him in their prosecution system)…People just have to understand that one day they may call me and say, the judge order them to produce him in court and then we are screwed." (emphasis added)

- April 10, 2016 – "KRG CTD provided me 7 days (but I can get up to 10) until the clean team interviews start, otherwise they will need to turn Khweis over to the court. He will be transported from the area and assigned an attorney. I'm not sure how we will get access (or if based upon his atty) after that point. ***They really want to help us but the [International Committee of the Red Cross] is now meeting with Khweis … and the clock is ticking to get him to a court….*** It is no longer just us and CTD monitoring his progress through the system. Just so you understand, ***the [Red Cross] has sent a letter to President [] advising him of their concern with the treatment of detained individuals, so the government …***

[5] The clean team interviews, in which the FBI hoped Mr. Khweis would recount the *same information* he previously provided the taint team, can hardly be considered an "investigation" in any sense of the word.

***told me this week they will not ask for extensions form the court if they order him to appear."*** (emphasis added).

- April 12, 2016 – "[L]et me know if the clean team will not be here by the 19th. We will possibly have to turn him over to the court as that is the limit to the 10 days I asked for. If that happens, we'll have to stop the clean team from coming out until we sort out if the judge/defense attorney will let us have access and I'll have to find out where they send him to. ***As I stated, they don't want him held without appearing before a judge and getting an attorney when the [Red Cross] comes back."***

- April 20, 2016 - "***Essentially [the Kurds] are tired of delaying their processes to accommodate [United States Government].*** This stems from Human Rights Org scrutiny they get and pressure from their judiciary to put the person into their system."

- May 6, 2016- "Is there any update on possible charges, kurds called me yesterday but I reminded the [top Kurdish official] gave us until next Friday."

- May 19, 2016 – "He is going to ask me when they can deport him. If it is several weeks, he will crush me."

- May 23, 2016 – "CTD is still holding him waiting for our word"

- May 28, 2016 – "[T]he bottom line is we need to move [Mr. Khweis] out of the Kurdish region and to the U.S. by June 8 or Mr. Khweis risks being moved to another Kurdish venue and then an entire separate set of due process protocols will take place…."

Despite the overwhelming evidence to the contrary, the Government argues Mr. Khweis was held "under the lawful authority of Kurdish officials." ECF No. 110 at 21, 31, 36 (citing no authority). This is argument is misplaced for two reasons. First, Mr. Khweis wasn't held pursuant to *any* law, including Kurdish or Iraqi law. There were no charges filed against him in either system, and the U.S. continued to request that the Kurdish Government refrain from charging Mr. Khweis.

Second, the Iraqi law requires that Mr. Khweis be presented before a judge within 24 hours of his detention. *See U.S. Department of State, 2015 Country Reports on Human Rights Practices Iraq,* April 13, 2016, ("The constitution prohibits 'unlawful

detention' and mandates that authorities submit preliminary documents to a competent judge within 24 hours of arrest, a period that may extend in most cases to a maximum of 72 hours.") (hereinafter, *State Dept. Country Report*).[6]

Indeed, the emails above openly show that Mr. Khweis was beyond the bounds of lawful Kurdish hold:

- The [FBI] needs to interview him with a clean team ASAP, complaint him immediately, extradite him, follow up [later in the U.S.] ***and stop the Kurds from having to do what they legally have to do*** **(start him in their prosecution system)**.
- ***They really want to help us but the [International Red Cross] is now meeting with Khweis … and the clock is ticking to get him to a court….*** It is no longer just us and CTD monitoring his progress through the system.
- ***they don't want him held without appearing before a judge and getting an attorney when the [Red Cross] comes back.***

Mr. Khweis was held pursuant to *no* legal authority. His detention was illegal in both systems in order to accommodate FBI interrogations.

The *Bin Laden* case presents several key differences from Mr. Khweis' situation. First, the defendants were not U.S. citizens, and their detention in Kenyan custody was two weeks. *See United States v. Bin Laden,* 132 F. Supp. 2d 198, 206 (S.D.N.Y. 2001). Second, and importantly, the defendants in *Bin Laden* were held lawfully under Kenyan law, (which authorizes that individuals suspected of a capital offense may be held for fourteen days after arrest) and pursuant to *Kenyan charges*. *Id.* at 205, 208. Thus, the defendants in *Bin Laden* were at least held under *some* legal authority, and pursuant to foreign charges.

---

[6] Available at https://www.state.gov/j/drl/rls/hrrpt/2015/nea/252925.htm (last accessed March 26, 2016).

Similarly, in *Abu Ali*, the defendants were held pursuant to a *Saudi Government Order*, a fact the Fourth Circuit relied on when ruling in favor of the government.[7] *United States v. Abu Ali*, 528 F.3d 210 (4th Cir. 2008) ("[A]though [the defendant] disputes the district court's finding that he was held 'pursuant to a Saudi government order,' he offered no credible evidence that the Saudis held, or continued to hold, him so that the United States officials could evade their constitutional duties.").

Mr. Khweis, on the other hand, remained in a legal no man's land through the course of his clean team interrogations *at the request of FBI agents*. The U.S. requested Mr. Khweis' detention, but refrained from bringing formal charges against him in the United States until they extracted a confession that could be used against him at a criminal trial. The FBI agents requested that the Kurds refrain from charging Mr. Khweis as well. The FBI acknowledged that once Mr. Khweis was charged in the Kurdish system, he would receive a "separate set of due process rights," and "then we are screwed." *See supra* p. 5-6. Thus, the FBI sought to prevent Mr. Khweis from entering *any* legal system until the end of the clean team interrogations. *See* April 8, 2016 FBI email ("The [FBI] needs to interview him with a clean team ASAP, complaint him immediately, extradite him, follow up with all the 'good to know' [inquires] in the US, ***and stop the Kurds from having to do what they legally have to do*** (start him in their prosecution system)…"(emphasis added). Requesting the delay from the Kurds was "driven by a desire to undermine the defendant's right to a prompt presentment" in any court. *See* Gov. Br., ECF No. 110 at 34.

[7] Saudi officials also conducted the questioning.

The Government argues that it had no "obligation to act." ECF No. 110 at 25. While this may be true as a general matter, the Government certainly cannot attempt to *prevent* an individual from receiving his due process rights in one system or the other. In other words, the FBI can elect not to act in a foreign jurisdiction, but if it acts, the acts must be lawful.

In this case, U.S. law enforcement was obligated to act because U.S. law enforcement *acted* to request Mr. Khweis' continued detention. As 18 U.S.C. §3501(c) states:

> (c) In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or *other detention* in the custody of *any law-enforcement officer* or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate judge or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or *other detention*: Provided, That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate judge or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge or other officer.

(emphasis added); *see also United States v. Bin Laden,* 132 F. Supp. 2d 198, 208-09 (S.D.N.Y. 2001) ("…the purpose of the rule (to ensure that the federal government does not improperly conspire with other agencies to evade the requirements of Rule 5(a)) seems equally applicable in the international context.").

To adopt the Government's position would mean that U.S law enforcement across the globe could request that foreign or local governments detain U.S. Citizens for indefinite periods of time for the purposes of inducing a confession to be used at a

criminal trial because it is not "obligated to act." *cf. United States v. Abu Ali*, 528 F.3d at n.5 ("Whatever the precise formulations, the existence of the 'joint venture' exception itself is based on the assumption that *Miranda* must apply to any portion of an overseas interrogation that is, in fact or form, conducted by U.S. law enforcement….To hold otherwise permits United States law enforcement officers to strip United States citizens abroad of their constitutional rights simply by having foreign law enforcement officers ask the questions. This cannot be the law.") (citing *United States v. Bin Laden*, 132 F. Supp. 2d at 187).

This conduct – holding Mr. Khweis for several additional weeks or months, to extract a confession to be used against him at a criminal trial – be it *by* the United States or *at the request of* the United States is expressly prohibited by statue and by precedent. *United States v. Corley*, 556 U.S. 303, 309, 320 (2009). ("[D]elay for the purpose of interrogation is the epitome of unnecessary delay…. [W]e have always known what custodial secrecy leads to. No one with any smattering of the history of 20th-century dictatorships needs a lecture on the subject, and we understand the need even within our own system to take care against going too far.") (internal quotations omitted).

The Government additionally argues that it was allowed to "investigate" this matter. Certainly. Not a reasonable person in this country would argue that it is undesirable for U.S. law enforcement to investigate potential criminal activity. But these investigations must be conducted *lawfully.*[8] Mr. Khweis makes no assertion that the numerous subpoenas requested for internet history, email accounts, social media

---

[8] Additionally, these inculpatory statements were not made upon belief of an imminent threat. The lead FBI interrogator himself acknowledged as much in an email on April 1 2016, stating that there is "much more to get from him, but there does not appear to be an exigent threat…."

accounts, (those known absent Mr. Khweis' statements or phone) financial information, school records, business records, employment records, DMV records, etc. were part of an unlawful investigation. Mr. Khweis also does not deny that he could be interviewed for the purpose of *intelligence gathering.* The "investigation" however, cannot consist of a lengthy detention for the purpose of extracting a confession to be used against him at a criminal trial.

The Government further asserts that prior to May 11, the United States had "no ability" to bring the defendant before a United States Magistrate Judge. ECF No. 26. This assertion is flatly contradicted by the *numerous* emails which indicated the Kurds wanted him out of their custody well before May 11, and prior to the clean team interviews. *See* emails *supra* p. 5-6. The Government asserts that "it is sheer folly to suggest that one FBI Special Agent had the authority or the ability to control the actions of senior members of the Kurdistan Regional Government." Yet, that very ability was touted by this very Agent. On April 26, 2016, the lead FBI interrogator wrote:[9]

I have a solid plan to sell [redacted] but he is out tomorrow. I will see him on Thursday. If all falls apart with him, I have a trump card to play at senior levels...so I'm pretty sure we will get our way in the end. [redacted]

The agent continued in another email that day:

I decided to go see General [redacted] tomorrow and leverage my relationship with him to see if he will cut us some slack on the Friday deadline we are currently on. He and I have fortunately done some good things together, so I think he will want to help me. However, if he is being told by a judge that the deadline is Friday, we may have a problem. I'll let you know tomorrow.

The agent wrote in a third email that day:

**I will do that. Thank you [redacted] I have a detailed plan to convince [redacted] of the importance of allowing us the two week period you describes. I'm getting some help from his staff and others. I also have a Plan B if he is reluctant. I work closely with his boss. I'd prefer not to go over his head as I need to work closely with him on the next American, but I will if needed.**

[9] These emails were not included in Mr. Khweis' initial motion.

Then on April 28, 2016, the lead FBI interrogator wrote:

> I had to meet with the VP up here ([redacted]) today to get approval. He approved and we told General [redacted] I'm helping [redacted] with another project so he kinda is cool with me. I just hate meeting super-senior government officials. He's number 2 [redacted] but was really cool to me. So we are good with 2 more weeks.

Certainly logistical concerns of transporting Mr. Khweis were likely present at some level.[10] However, the reason for the 40-day delay from March 14 to April 23 (the period from arrest until the end of the substantive clean team interrogations) related in absolutely no way to logistical considerations of transportation, and there is absolutely no evidence to suggest as much. Instead, the delay was to elicit a confession, keep it consistent, and extract it during *Mirandized* interviews so that it could be used against Mr. Khweis in his criminal trial.

The Government argues that *Miranda* warnings obviate the need for presentment. ECF No. 110 at 29-30. As an initial matter, Mr. Khweis did not voluntarily waive his *Miranda* rights, given the factors described in the original motion and again in this Reply. Even assuming *arguendo,* however, that he did, this assertion fails. The Government set forth almost this exact argument in *Corley* using §3501(a) (as opposed to *Miranda* warnings) to argue that if a confession is voluntarily made, "it entirely eliminates *McNabb-Mallory* with its bar to admitting even a voluntary confession if given during an unreasonable presentment delay." This argument was expressly rejected. *Corley v. United States*, 556 U.S. 303, 304 (U.S. 2009).

---

[10] The Government argued in its Response that the FBI agent's May 16, 2016 email to the consular requesting that she reiterate to Mr. Khweis that a decision had not been made regarding his return home was accurate because that statement related to the logistics of the foreign transfer of custody, not the criminal charges. As to this one email only, Mr. Khweis does not disagree, that this could be an appropriate interpretation. However, it does not change the analysis in this case.

The Supreme Court found that, "[t]he Government's reading renders § 3501(c) nonsensical and superfluous. If subsection (a) really meant that any voluntary confession was admissible, then subsection (c) would add nothing; if a confession was 'made voluntarily' it would be admissible, period, and never 'inadmissible solely because of delay,' even a delay beyond six hours." *Id.* The Court went on to explain, "the terms 'inadmissible' and 'involuntary' are not synonymous. Congress used both in (c), and this Court 'would not presume to ascribe this difference to a simple mistake in draftsmanship.' There is also every reason to believe that Congress used the distinct terms deliberately, specifying two criteria that must be satisfied to prevent a confession from being 'inadmissible solely because of delay': the confession must be '[1] made voluntarily and . . . [2] within six hours [of arrest].'" *Id.* (internal citations omitted).

The Supreme Court's ruling on this point was clear, "**The Government's position would leave the Rule 5 presentment requirement without teeth, for if there is no *McNabb-Mallory* there is no apparent remedy for a presentment delay**. The prompt presentment requirement is not just an administrative nicety... Without *McNabb-Mallory*, federal agents would be free to question suspects for extended periods before bringing them out in the open, even though 'custodial police interrogation, by its very nature, isolates and pressures the individual,' inducing people to confess to crimes they never committed." *Id.* at 305 (citing *Dickerson v. United States*, 530 U.S. 428, 435) (emphasis added).

The Government asks this Court to replace the prior §3501(a) argument in *Corley* with an argument as to *Miranda* warnings, but apply the same reasoning that was

expressly rejected in *Corley.*[11] The Government argues that because Mr. Khweis was *Mirandized,* the three-month delay in presentment (to *any* court) was waived.[12] As *Corley* stated, "[t]he Government's position would leave the Rule 5 presentment requirement without teeth, for if there is no *McNabb-Mallory* there is no apparent remedy for a presentment delay." *Id.*

For a confession to be admissible, it must be *both* voluntary *and* within six hours of arrest (or period to be reasonable considering the means of transportation and the distance to be traveled). Any other reading would nullify §3501(c), and would allow "federal agents…to question suspects for extended periods of time" as long as they repeatedly *Mirandize* them, even though 'custodial police interrogation, by its very nature, isolates and pressures the individual,'" and induces individuals to confess to

---

[11] It is important to note that the Supreme Court remanded *Corley* notwithstanding the fact that Corley confessed only after (twice) signing a form waiving his *Miranda* rights. The Government, in *Corley,* however, did not argue this constituted a waiver of presentment. Therefore, the Court did not consider the *Miranda* argument, but did remand despite a *Miranda* waiver.

[12] The Government cites to several non-binding cases to suggest that post-*Corley* this argument still applies. ECF No. 110 at 30. These cases are significantly distinguishable. In *United States v. Hector*, the court was careful to repeatedly highlight that the "statements were not made during or as a result of the unreasonable delay in presentment." 2013WL 2898078 at *13 (N.D. Ga. Jan. 29, 2013). In *Brown v. United States,* the defendant was detained on a warrant (thus, a neutral fact-finder evaluated defendant's detention) and the defendant provided a statement two days after the warrant was obtained. 979 A.2d 630 (D.C. 2009). In *United States v. Phillips*, the defendant was held on state charges (with no improper collusion to delay presentment) and the federal agents questioned him the day after his arrest for seven days. 2015 WL 2341981, at *1-2 (W.D. La. May 13, 2015, aff'd 2016 WL 4394545 (5th Cir. Aug. 17, 2016). Conversely, however, in *United States v. McDowell*, a post-*Corley* decision, the defendant signed a specific Rule 5(a) waiver. 687 F.3d 904 (7th Cir. 2012). This is significant because if a *Miranda* waiver sufficed to also waive presentment, this type of Rule 5 waiver would be unnecessary. Other post-*Corley* decisions treat the presentment and *Miranda* inquires separately. *See United States. v Gonzalez,* 769 F. 3d 159 (2nd Cir. 2014); *United States v. Thompson,* 2011 U.S. Dist. LEXIS 103471, 2011 WL 4055400 (S.D. Fla. Sept. 13, 2011); *United States v. Jacques*, 784 F. Supp. 2d 48 (D. Mass. May 9, 2011).

crimes they never committed." *Id; see also Brown v. United States,* 979 A.2d 630, n. 8 (D.C. 2009) (citing *Everetts v. United States* 627 A.2d 981, 985 (D.C. 1993) ("reliance on *Miranda* waiver becomes weaker as the length of pre-presentment detention grows[,] necessarily impl[ying] that at some point unjustified delay in presentment may trump all other factors in the ultimate voluntariness determination."). Additionally, it is important to note that the agents' own report indicates that Mr. Khweis repeatedly requested to return home, even if it meant going home to face criminal charges. In essence, *Mr. Khweis was begging for presentment, not waiving it.*

## II. Mr. Khweis' statements and consent to search his phones were the product of coercion in violation of the Fifth and Fourth Amendments.

At the same time the Government argues it had "no control" over Mr. Khweis' detention, it argues that it tightly oversaw the conditions of his confinement. The Fifth and Fourth Amendments require that neither a confession nor consent to search be "coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth v. Bustamonte*, 412 U.S. 218, (1973). Mr. Khweis did not raise allegations of prison abuse in his initial brief. It was evident enough that he desperately wanted to depart the Kurdish prison. Despite the lack of argument on this point, the government raised allegations that Mr. Khweis was treated wonderfully while in Kurdish custody. The Government cited to the various amenities Mr. Khweis received, and that he was visited by the International Red Cross. ECF No. 110 at 40. These is proactive allegations are a distraction. Even if Mr. Khweis was detained the "hotel Kurdistan," the FBI was all the while violating the Constitution. Being well-treated in confinement, even if true, doesn't eviscerate the fact that it *was* confinement, far from home, in a Kurdish prison, the anticipated length of which was entirely unknown.

Furthermore, despite the Government's argument on this point, significant doubts persist regarding the treatment of detainees in the Kurdish prisons, especially those accused of terrorism offenses. The emails show that the Red Cross was *concerned* about treatment of detainees at the prison, and for good reason. *See Email from FBI ALAT* ("[T]he [Red Cross] has sent a letter to President [] advising him of their ***concern with the treatment of detained individuals.***") (emphasis added). Although it is not imperative to the Court's analysis in this matter, Kurdish officials have been known to torture and abuse suspected ISIS fighters in captivity, including children. *See* Human Rights Watch Report, *KRG: Children Allege Torture by Security Forces* July 29, 2017 ("Erbil – Seventeen children detained since July 2016 by the Kurdistan Regional Government (KRG) on suspicion of involvement with the Islamic State, also known as ISIS, say that government security forces tortured or otherwise abused them in detention.").[13]

This abuse is detailed in the State Department's own Country Report for Iraq. The State Department's report states:

> ***The Human Rights Ministry confirmed that allegations of torture and systematic abuses were pervasive within prisons and detention centers.*** International human rights organizations documented ***credible cases of torture and abuse*** in facilities of the Ministry of Interior and to a lesser extent in detention facilities of the Ministries of Justice and Defense, ***as well as in facilities of the KRG. The Iraqi High Commission for Human Rights (IHCHR) noted that torture cases were underreported because many detainees did not file complaints due to fear.*** HRW contended that widespread torture and systematic abuses continued in detention facilities and reported several instances of torture and rape of detainees.

*State Dept. Country Report* (emphasis added).

[13] Available at https://www.hrw.org/news/2017/01/29/krg-children-allege-torture-security-forces (last accessed March 26, 2016).

Even more critically, the U.S. State Department's Report indicates that the Kurdish Regional Government *authorizes* torture for suspected terrorism offenders. It explains, "The KRG's antiterrorist law allows abusive interrogation under certain conditions, and such practices reportedly occurred in some detention facilities of the KRG's internal security unit, the Asayish, and the intelligence services of the major political parties…." *Id.*

To the extent the Government argues the above-referenced reports were from a different prison, Mr. Khweis argues that abuse was a pattern of practice, and that *no* report has been issued regarding the CTD prison, perhaps because of these practices. *See State Dept. Country Report* ("The KRG generally allowed international human rights NGOs and intergovernmental organizations to visit convicted prisoners and pretrial detainees *but occasionally delayed or denied access to some individuals, usually in cases involving terrorism*.) (emphasis added). The Red Cross is the only organization known to have examined the CTD facility, and the Red Cross expressed concern. Unfortunately, Red Cross detention reports for any country are shared only with the authorities of that country.

Any allegations of wonderful treatment in the Kurdish prison by the Kurdish officials themselves would be no less self-serving than the Government would undoubtedly attribute to Mr. Khweis' statements on this matter. Short of locating and transporting every Kurdish official with whom Mr. Khweis had contact, the U.S. has no

way to know for certain how he was treated in Kurdish custody.[14] U.S. Officials were not there when he laid down his head at night. U.S. officials were not there when he was ushered out of the interrogation rooms. U.S. officials were not there for every encounter with Kurdish officials.

Rather than engage in an unnecessary debate on this issue, this Court can focus on coercive elements known and undisputed. Mr. Khweis endured a lengthy detention, weeks of interrogations, admonishments that he must be truthful in whether a crime was committed if he wanted a chance to ever return home while he was held a Kurdish prison. The cases the Government cites to show "mere presence of some potentially coercive factors" are a far cry from Mr. Khweis' coercive circumstances. *See* ECF No. 110 at 45-46. Defendant Shi spent four days in a storage compartment. Mr. Khweis didn't spend four days in a storage compartment, he spent almost three months in a Kurdish prison. Defendant Berghuis was interrogated for three hours while seated in straight back chair. Mr. Khweis wasn't interrogated for three hours, he was interrogated for many hours over six weeks. Defendant Vallar was arrested at 6:30 a.m., handcuffed for an hour, and forced to listen to audio tapes implicating him in the crime. Mr. Khweis wasn't handcuffed for an hour, he languished in a Kurdish prison for weeks. Mr. Khweis wasn't shown videos for hours, he was shown image after image on this phone for almost a month. Defendants Gaddys and Burson were intoxicated and fatigued. Mr. Khweis wasn't intoxicated, he was frightened, told he may never see his family again, and was

[14] The Government relies on photographs taken 85 days after Mr. Khweis was initially detained. Furthermore, some types of abuse would not be visible in photographs. For example, in the Human Rights Watch Report, only five of the seventeen children interviewed had visible marks of the abuse.

unsure of his overall fate. *See* ECF No. 110 at 45-46. Rather than bolster its claim of voluntariness, these cases undermine it.

The factors upon which the Government rests its position – a well-lit room, no visible injuries, drinks, snacks, laughter, and cigarettes – are trivial compared with the threat of never again returning home, never again seeing family, and an entirely unknown fate resting in the hands of captors.

By the time Mr. Khweis finally received his *Miranda* warnings he had been held in a Kurdish prison for over four weeks, he never saw any neutral fact-finder, he was advised he *didn't* have the right to remain silent, he had already provided statements to the FBI over three weeks of interrogations, he was admonished that he must be consistently truthful (and implicitly, incriminating) if he wanted the opportunity to return home which resulted in his statements changing from benign to inculpatory. Contrary to the Government's assertion, Mr. Khweis doesn't argue that couldn't *understand* the *Miranda* warnings. *See* ECF No. 48-49. Mr. Khweis argues that given the above factors, these warnings were meaningless. He would have said or signed anything to go home.

The Government argues that the lead FBI interrogator's statement, "that he could not make any promises, that he may not be charged, and that he may not return to the United States" are "precisely the types of statements that are *not* coercive." ECF No. 110

at 38.[15] Had the lead FBI interrogator simply stated that he "could not speak to those questions," perhaps the coercion would be arguable. The lead FBI interrogator did not limit himself to that, however. The lead FBI interrogator said exactly what the Government alleges would be improper. *See* ECF No. 110 at 38 ("Had the FBI ALAT promised the defendant that he would be released from another foreign entity's custody if he agreed to provide intelligence-related information the defendant would now be arguing that he only spoke to the FBI because he was specifically promised something in return.").

Indeed, the lead FBI interrogator went several steps further than a "no comment" response to Mr. Khweis' desperate inquiries. He advised Mr. Khweis that implicating himself and being consistent would expedite his return home. *See* FBI Reports 3/15/16-3/31/16. For example, on March 31, 2016, the lead FBI Interrogator reported:

> KHWEIS wanted to know what timeline was [for returning to U.S.], and was advised that **a decision would not be made until the US had collected and evaluated all the evidence in order to assess if charges were merited**. KHWEIS wanted to know how long that would take. [The lead FBI Interrogator] did not commit to an answer, indicating it would

[15] The Government also distinguishes the *Hernandez* case because the defendant in *Hernandez* spoke only Spanish and requested an attorney. While true, the voluntariness of the consent to search was analyzed separately from the *Miranda* violation. *United States v. Hernandez*, 2015 U.S. Dist. LEXIS 114979, *20-*21, 2015 WL 5007821 (W.D.N.C. July 28, 2015). In the consent to search inquiry, the Government argued that the agents spoke to the defendant in Spanish, they did not threaten him or make promises, the defendant consented to search both verbally and in writing, he was present at his apartment so that he could revoke his consent at any time, and the defendant consented to the search of one phone but not the other. Nevertheless, in holding that defendant's consent was involuntary, the court focused heavily on the defendant's custody. The court stated "Perhaps the consideration that warrants most scrutiny is the fact that the locations where Defendant gave verbal and written 'consent' were (1) in custody while at the police station and (2) in custody in a patrol car in front of the apartment residence to be searched right before the search was conducted, respectively. The distinction between in custody consent in a public location and in custody consent in the confines of a police station is important." *Id.*

> still take a couple of weeks to vet the information he provided. **[The lead FBI Interrogator] advised that it takes time to verify the information he provided, particularly on those occasions when he did not tell the truth…."[The lead FBI Interrogator] also stated that his story had to be consistently truthful in order for investigators to determine if a crime has been committed.**

(emphasis added).

These statements are abundantly clear –the only chance that you have of getting away from the Kurds and returning to the U.S. is if you implicate yourself in a crime and keep your story consistent.

## III. Mr. Khweis' statements were elicited in violation of *Missouri v. Seibert* through the use of a technique designed to undermine the Fifth Amendment and Miranda warnings.

The Government argues that the two-step interrogation was not used to undermine the *Miranda* warnings in this case. ECF No. 110 at 56. This claim is contradicted by significant evidence. First, the purpose of the initial interrogations may have been intelligence-gathering in part, but they most certainly also included deliberate attempts to elicit a confession. For example, an email from an FBI employee detailed to DoD to a DoD employee states in relevant part, "The ALAT feels that Khweis is at a tipping point, and will likely cop to joining ISIS during tomorrow's interrogation/interview." The ALAT himself send in a 3/15/16 email, "CTD loves us right now and we have him cracking a little more each time." New evidence, an electronic message from the lead FBI interrogator stated:

| | | | |
|---|---|---|---|
| 3/22/2016 11:40 | ALAT[redacted] | FBI Employee | hell, you could be in the room. it has been a textbook case of getting a guy from a complete lie to a confession...he showed all the classic symptoms and i applied the approaches that would get to him. he will not let me down now, we have a good mutual understanding |

More importantly, any argument the Government may have had on this point initially, fails because of the later email evidence: A DoD email on 3/31/16 that states, "We don't necessarily have any SDRs, [i.e. specific inquiries] but ***figured one last session of familiar faces will keep his story on track/constant."*** (emphasis added). This is law enforcement *admitting* that the purpose of the final interviews was not to ask specific questions, or unearth new information, but instead, it was to *keep his story on track/constant.* This also was not one isolated email exchange. The lead FBI Interrogator himself admitted this, stating on 3/26/16, ***"We had a great interview with Khweis today. He would not stop talking… He is going to be very easy to deal with from a clean team perspective."*** (emphasis added); and on 4/7/16, the "***extensive time we took getting [Khweis] comfortable with telling the truth will make it far easier for subsequent interviews here and in the US***." (emphasis added).

Finally, and most significantly, the day of the first clean team interrogation, in the FBI electronic messages, the lead FBI interrogator states:

| | | |
|---|---|---|
| 4/20/2016 13:30 ALAT[redacted] | FBI Employee | i reall tee'd him up for these guys i think..we'll see when i talk to [redacted] but tht is th intel guys job. obliterate all his lies and get hijm comfortable with the truth. i'm sure he will back up a little on them after sitting for a week but as long as they got through miranda that is great. i'm on a 7 day deadline with krg ctd |

This evidence above presents no alternative reading. It shows the taint team spent weeks "cracking" Mr. Khweis, to get him comfortable with the truth, then met with him a few final times, as a "final set of familiar faces" to ensure his story remained "constant," and to "tee him up" for the clean team. Despite the Government's accusation, it is not Mr. Khweis who is attempting to rewrite history.

The case-law cited by the Government barely begins to scratch the surface of the measures law enforcement used to extract a *consistent* confession from Mr. Khweis in

this case. *See* ECF No. 110 at 57. Three weeks of relentless interrogations in which the lead FBI interrogator admitted that he was "cracking" Mr. Khweis, getting him comfortable with telling the truth, and "lining him up" for the clean team is hardly akin to the *Elstad* chance encounter that unintentionally produced an inculpatory statement.

In fact, it is because the two-step interrogation *was* a deliberate attempt to circumvent *Miranda*, the FBI knew it had to undertake curative measures. *Missouri v. Seibert*, 542 U.S. 600, 622 (2004). Therefore, following the tainted interrogations, the FBI employed several additional steps. The agents' attempts to "clean" the Constitutional violations incurred by the tainted interrogation, however, were insufficient to relieve the taint of the Constitutional violation. The FBI waited ten days to commence the clean interrogations with a new set of FBI agents. Instead of this period acting as an "attenuation period" for the purposes of the *Missouri v. Seibert* analysis, however, this period *furthered the coercive effect* of Mr. Khweis' detention. Mr. Khweis believed he had lost his chance to help himself return home. Anyone in his position would easily believe that the agents had given up and left, and that this "attenuation period" was actually his new fate. Thus, the attenuation period prescribed in the prevailing case-law was insufficient to clean the taint of the prior interrogations. It only furthered the coerciveness rather than ameliorate it.

**CONCLUSION**

WHEREFORE, for the foregoing reasons, Mr. Khweis respectfully requests the Court grant his Motion to Suppress.

Respectfully submitted,
MOHAMAD KHWEIS
By Counsel

_______/s/________________
Jessica N. Carmichael, Esq.
Virginia Bar No. 78339
HARRIS, CARMICHAEL, & ELLIS, PLLC
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
(703) 684-7908
jcarmichael@harriscarmichael.com

_______/s/___________
John K. Zwerling, Esq.
Virginia Bar No. 8201
ZWERLING/CITRONBERG, PLLC
114 N. Alfred Street
Alexandria, VA 22314
703-684-8000
703-684-9700 (F)
jz@zwerling.com

_______/s/_________________
Phoenix Ayotte Harris, Esq.
Virginia Bar No. 76009
HARRIS, CARMICHAEL, & ELLIS, PLLC
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
(703) 684-7908
pharris@harriscarmichael.com

**CERTIFICATE OF SERVICE**

I, hereby certify, that on the 3rd day of April, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following and all parties to this action:

Dennis Fitzpatrick, Esq.
United States Attorney's Office
2100 Jamieson Ave
Alexandria, VA 22314
(703) 299-3700
Email: dennis.fitzpatrick@usdoj.gov

Raj Parekh, Esq.
US Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
703-299-3700
Email: raj.parekh@usdoj.gov

Colleen Garcia, Esq.
US Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
703-299-3700
Email: colleen.e.garcia@usdoj.gov

/s/
Jessica N. Carmichael, Esq.