IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:16CR143 |
| | ) | |
| MOHAMAD JAMAL KHWEIS, | ) | The Honorable Liam O'Grady |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S POST-HEARING SUPPLEMENTMENTAL MEMORANDUM

COMES NOW the Defendant, Mohamad Jamal Khweis, by and through his attorneys and offers the following post-hearing supplemental memorandum in support of his Motion to Suppress.

1. *Missouri v. Seibert*, 542 U.S. 600 (2004).

The Government engaged in significant efforts attempting to convince the Court that the purpose of Agent Connelly's interviews was strictly intelligence-gathering. While that may be true for the initial interviews, Agent Connelly and others' statements toward the end of the tainted interviews show that the final sessions were to keep Mr. Khweis' statements on track, consistent, and incriminating. In the email and IM communications, the success of the last few meetings was discussed relative to the ease at which the clean team would be able elicit a confession.

As early as March 26th, Agent Connelly noted that the extensive time he spent with Mr. Khweis was worthwhile because it got Mr. Khweis' "comfortable" with his statements, and would "make it far easier for subsequent interviews here and in the US."

In another email he said Mr. Khweis was "lined up perfectly for the clean team."[1]  In yet another email, on April 7th, Agent Connelly stated, "We had a great interview with Khweis today…. He is going to be very easy to deal with from a clean team perspective." And again in an IM message Agent Connelly said he "tee'd him up" for the clean team, and went on to state, "tht is the intl guy's job.  obliterate all his lies and get hijm [sic] comfortable with the truth.  i'm sure he will back up a little on them after sitting for a week but as long as they got through miranda that is great."  In Agent Connelly's 302 reports, he admonished Mr. Khweis that before a decision was made on whether he could return home, DOJ and the Federal Courts had to determine if a *crime* had been committed, and that his story had to remain consistent.

These were not isolated, one-off, remarks.  The sentiment that the success of the tainted interviews related to the ease of a subsequent *Mirandized* confession was repeated over and over in Agent Connelly's communications, and in others' communication as well.  The Department of Defense email explicitly states that by March 31st, there were no specific inquires to be made of Mr. Khweis, but one more session of familiar faces would keep his story on track and constant.  To ask the Court to disregard *numerous* indicia of this goal, because one IM is "inartfully" drafted, would be asking the Court to simply ignore repeated fact at a time when an individual is likely being most candid. These are not all "inartful" emails, these are hard, clear evidence of the motive and goals of the interrogators during the final few tainted interviews.  Thus, the Court should proceed under the *Seibert* analysis.

---

[1] Using the phrase, "lined up" implies that intent, rather than a passive observation.

2

Under *Seibert*, and simply approaching this matter logically, advising Mr. Khweis that the prior, forty hours of statements could not form the basis for criminal charges would be critical to ensuring Mr. Khweis' *Miranda* warnings had an effect. Instead, Agent Connelly's admonishments implied exactly the opposite. He repeatedly advised Mr. Khweis that his statements would be vetted by DOJ and the Federal Courts to determine if a crime had been committed and that would be his ticket home. Thus, a warning that "we are starting anew" would not counter Agent Connelly's prior admonishment. In essence, even with these modified *Miranda* warnings, Mr. Khweis would still believe that *all* of his statements were being vetted to determine if U.S. criminal charges were warranted. Thus, the curative measures were insufficient because the "curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the modified *Miranda* warning and of the *Miranda* waiver." *Seibert,* 542 U.S. at 622.

The Government asserts that a warning that the statements are "likely inadmissible" would be problematic. However, a statement that "*your prior statements cannot be used as a basis for obtaining criminal charges*," would be accurate, avoid the problems to which the Government refers, *and* most importantly, would have allowed Mr. Khweis to actually conceptualize the difference between his first set of statements and the clean team interrogations. Without any such warning, the *Miranda* warnings had little, if any, effect.

2. *Moran v. Burbine,* 475 U.S. 412 (1986)

The *Burbine* analysis should not be so strictly construed as to this type of situation in which the Government was able to unilaterally prohibit an attorney from accessing his

3

client.  The first contact between Mr. Zwerling and the Assistant United States Attorney was on April 7, 2016.  Mr. Zwerling was not even notified of his client's location until May 9, 2016, and even then, the notification was for the incorrect prison.  A member of the taint team, RSO Song, was responsible arranging the travel to and from CTD.  Notably, Agent Connelly attributed most of his inability to access Mr. Khweis to the CTD officials, whereas the Consular's office attributed the delays to travel difficulties which were arranged by the RSO.  The coordination and delays of these visits outlined in the original Motion and at the hearing, appears too convenient to be coincidental, and this case presents facts too unique to fit squarely within the *Burbine* analysis.

3.  *Additional Presentment Argument*

Mr. Khweis submits that CTD Official #1's testimony that Mr. Khweis had been brought to Court, seen a judge, and assigned a Kurdish attorney is completely incredible.  The testimony was self-serving, disputed by the all the emails and reports from the US Government, and was repeatedly contradicted by Agent Connelly's live testimony.  In fact, it was only a few days prior to the motion to suppress hearing, after the Government interviewed CTD Official #1, that the defense first heard any suggestion from the Government that Mr. Khweis was held pursuant to a Kurdish judge's order.  On April 19, 2016, when the U.S. Government sought additional time for the clean team interrogations, U.S. Officials did *not* go before a Judge, but instead appealed to a top General of the KRG CTD.  Furthermore, verification of CTD Official #1's testimony is extremely difficult, if possible at all, because he would not or could not, provide a last name of the Judge, the address of the Court, or the name of the Kurdish attorney, and he indicated that all the documents were sealed.

Importantly, whether Mr. Khweis saw a judge is a factor, but it is not dispositive in this case, because the heart of the analysis is whether the local government had a joint or parallel interest in the suspect's continued detention, or whether the detention was primarily at the U.S. Government's request. *See United States v. Abu Ali*, 528 F.3d 210, 227 (4th Cir. 2008) ("…the Saudi government had an ***independent interest*** in, and in fact acted independently in, detaining [the defendant]) (emphasis added); *United States v. Bin Laden*, 132 F. Supp. 2d 198, 210 (S.D.N.Y. 2001) (discussing the Kenyan's independent motive, and their ***joint*** investigation with the U.S.) (emphasis added).  A local criminal charge is only one element to be considered in that analysis.

In Mr. Khweis' case, unlike *Bin Laden* and *Abu Ali*, it is abundantly clear that after April 10th, the Kurdish Government did *not* want, and had no independent interest in, Mr. Khweis' continued detention at the CTD prison.  The intelligence-gathering had come to an end.[2]  The email evidence, FBI reports, and live testimony, show that by as early as April 7th, the Kurds sought to have Mr. Khweis removed from the CTD prison – either to start his process in a Kurdish court, or to deport him.  Both possibilities were

---

[2] This is evidenced, in part, by the fact that Agent Connelly, who was responsible for the intelligence-gathering, did not read any of the clean team reports, nor did he ask about them.  Had he believed they contained any additional intelligence information, he certainly would have requested to review those reports.  In fact, he admitted during the hearing that he was "done" with Mr. Khweis after his interviews were complete:

Q. So you didn't want to see if there was any more
intelligence possibly in their –

A. I didn't -- I didn't -- there is so much to do in Erbil,
when we're done with him and we move on, there is plenty of
other work to be done.

contemplated in the evidence. The Kurdish investigation was also complete.[3] In fact, the individual who attended the clean team interviews was a translator who, according to Agent Martinez, "didn't really serve a role in the interviews." The Kurds were not interested in, and they did not understand why the United States insisted on, Mr. Khweis's continued detention at the CTD prison.[4]

       Thus, regardless of whether the Court finds that Mr. Khweis had seen a judge, *all* of the evidence, including the testimony of CTD Official #1, shows that the *only* reason Mr. Khweis remained at the CTD prison from April 10 – June 8 was because the United States prevailed upon the Kurdish Government to keep him there so they could have continued access for clean interrogations. **From March 31 (when the email states there are no more "SDR"s [specific inquiries]) to April 23 (the last substantive clean team interrogation) US government used the CTD prison as a temporary local detention site, holding Mr. Khweis,** *not* **while it attempted to file charges,** *not* **while it**

---

[3] Testimony of CTD Official #1:
Q. Did I hear you correctly when you said your investigation basically ceased in mid-April?
A. Correct.
Q. And that would have been after Mike's questions and before Victoria's, Agent Martinez?
A. Yes, correct.
…
Q. Is it fair to say you didn't use the information from Agent Martinez in your investigation?
A. No. I did not even ask anything about what they might have asked him.
*Draft Transcripts* p. 210

[4] Testimony of Agent Connelly:
"It's just, why there is a stop? Why is there a no access. And they just didn't understand how we are trying to, we are -- we're trying to protect *Miranda* in a way. And they did, they had a problem with that. They thought that this should have been done -- that there shouldn't have been that attenuation period."
*Draft Transcripts* p. 398

**attempted to negotiate transfer, and *not* while it worked on travel logistics – the Government didn't ask for these things until after the end of the substantive clean team interrogations. Instead, this requested hold and this delay, was a U.S. requested delay for the purpose of interrogation to elicit a confession that could be used in a criminal trial. By law, "delay for the purposes of interrogation is the epitome of unnecessary delay," and Mr. Khweis' statements must be suppressed.** *See United States v. Corley,* **556 U.S. 303, 309 (2009).**

                                                      Respectfully submitted,
                                                      MOHAMAD JAMAL KHWEIS
                                                      By Counsel

                                                      _____/s/_____
                                                      Jessica N. Carmichael, Esq.
                                                      Virginia Bar No. 78339
                                                     HARRIS CARMICHAEL & ELLIS
                                                     1800 Diagonal Road, Suite 600
                                                     Alexandria, Virginia 22314
                                                     (703) 684-7908
                                                     jcarmichael@harriscarmichael.com

                                                     _____/s/_____
                                                     John K. Zwerling, Esq.
                                                     Virginia Bar No. 8201
                                                     ZWERLING/CITRONBERG, PLLC
                                                     114 N. Alfred Street
                                                     Alexandria, VA 22314
                                                     703-684-8000
                                                     703-684-9700 (F)
                                                     Email: jz@zwerling.com

                                                     _____/s/_____
                                                     Phoenix Ayotte Harris, Esq.
                                                     Virginia Bar No. 76009
                                                     HARRIS CARMICHAEL & ELLIS
                                                     1800 Diagonal Road, Suite 600
                                                     Alexandria, Virginia 22314
                                                     (703) 684-7908
                                                     pharris@harriscarmichael.com

## **CERTIFICATE OF SERVICE**

I, hereby certify, that on the 28th day of April, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following and all parties to this action:

Dennis Fitzpatrick, Esq.
United States Attorney's Office
2100 Jamieson Ave
Alexandria, VA 22314
(703) 299-3954
Email: dennis.fitzpatrick@usdoj.gov

Raj Parekh, Esq.
US Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
703-299-3700
Email: raj.parekh@usdoj.gov

Colleen Garcia, Esq.
US Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
703-299-3700
Email: colleen.e.garcia@usdoj.gov

_____/s/_____
Jessica N. Carmichael, Esq.