## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 1:16-cr-143 |
| | ) | Hon. Liam O'Grady |
| MOHAMAD JAMAL KHWEIS, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

## MEMORANDUM OPINION

This matter comes before the Court on the Defendant's Motion to Suppress. (Dkt. No.

105). A hearing was held in this matter on April 12–13, 2017. Defendant seeks to suppress

statements made to United States agents while Defendant was detained in a Kurdish prison in

Erbil, Iraq on the grounds that: (1) Defendant was not promptly presented to a United States

Magistrate Judge; (2) his statements were the product of Government coercion; (3) his

statements were obtained in violation of the his right against self-incrimination and right to

counsel. Defendant also seeks to suppress the search of his cellular phones during the detention.

For the reasons set forth below, the Court DENIES Defendant's Motion.

### I. Background

The Court makes the following factual findings relevant to the Motion.[1]

The Defendant, Mohamad Jamal Khweis, is a twenty-seven year old United States

citizen. Prior to the events set forth below, Defendant was a resident of the state of Virginia.

In December 2015, Defendant sold a number of his belongings and purchased a one-way

ticket to London, United Kingdom. After spending a few days in London, Defendant traveled to

---

[1] "Motions to suppress fall into the class of issues that are decided by the court and not the jury" and "[i]n the course of deciding a motion to suppress, the district court may make findings of fact." *United States v. Stevenson*, 396 F.3d 538, 541 (4th Cir. 2005).

the Netherlands, and from there to Turkey.  After traveling in Turkey for a few days, Defendant

crossed the Syrian border and ultimately traveled to Iraq.  Three months after entering Syria, on

March 14, 2016, Defendant was captured by Kurdish Peshmerga fighters near Sinjar Mountain in

a Kurdish-controlled region of Iraq near the Syrian border.  Following his capture by the

Peshmerga, Defendant was transported to a Kurdish Counter-Terrorism Directorate ("CTD")

detention center in Erbil, Iraq.  The same day that Defendant was detained by the Peshmerga,

Department of Defense employees learned that the Peshmerga had captured an American citizen

and that the CTD would provide detailed information on the detainee the following day.  The

Federal Bureau of Investigations ("FBI") Assistant Legal Attaché for Iraq, Michael Connelly,

learned about Defendant's detention the same day.[2]

The following day, March 15, 2016, United States Department of State Consular Officer

Mark Jasonides visited Defendant.  Jasonides inquired as to Defendant's well-being and

provided Defendant with a fact sheet pertaining to his rights under the Iraqi legal system.  The

fact sheet advised among other things that, "[i]n Iraq, the usual expectations of presumption of

innocence, the right to remain silent, and proof of criminal activity 'beyond a reasonable doubt'

do not apply."  Gov. Exh. 36.  It also detailed that "[b]efore charges are filed, your period of

detention depends on the maximum possible sentence for the crime.  In any event, it should not

exceed 6 months – but there are instances in which this has occurred."  *Id.*  Elsewhere the fact

sheet advised that "the reality is that the detention can be open-ended and people can be detained

up to a year without trial."  *Id.*  In conjunction with the fact sheet, Jasonides provided Defendant

---

[2] The Kurdistan Region Security Council publicized Defendant's detainment in Erbil two days after his arrest.  The Council released a statement over social media on March 16 announcing that Defendant is in the Kurdistan Region being questioned by relevant security authorities and was being provided the care afforded to him under international and local law.  The Defendant was also interviewed at the detention center by a Kurdish news channel on March 17.  The statement and the interview noted that Defendant was apprehended attempting to enter Kurdistan from the ISIS stronghold of Mosul, Iraq.  The publications further noted that Defendant was accompanied in his travels through Turkey and Syria by an unnamed Iraqi woman.

with a list of lawyers who practice in the Kurdistan region of Iraq. Jasonides also presented

Defendant with a Privacy Act waiver. The Privacy Act waiver permitted the State Department to

communicate with Defendant's family, friends, attorney (if retained), members of the media, his

employer, and any other individuals he identifies. The Defendant signed the Privacy Act waiver

and added only his parents to the waiver during the March 15, 2016 visit. Jasonides observed

that Defendant was stressed and complained of gastrointestinal distress but was otherwise in

good health.

The same day, Connelly visited the CTD detention center to interview Defendant.

Connelly testified that a presiding Kurdish general initially refused the FBI's request to access

Defendant and the electronic devices he was carrying when arrested. The Kurdish general was

disappointed by the Government's failure to provide military intelligence obtained from an

earlier ISIS detainee held by the United States. Ultimately, the Kurdish general permitted

Connelly to interview Defendant for one hour and to make copies of the contents of his

electronic devices. The interview occurred in an office in the detention facility and was attended

by State Department Regional Security Officer Eric Song, State Department Cultural Liaison

Ahmed Wali, and Kurdish CTD Official #1.[3] Defendant was not handcuffed during the

interview and was brought into and out of the interview room by Kurdish authorities.

Connelly testified that because his access to Defendant might be limited, he made the

decision with his supervisors to interrogate Defendant for intelligence purposes without

providing him *Miranda* warnings. Connelly acknowledged that this approach might jeopardize

any future United States criminal prosecution, but Connelly believed that Defendant could

provide valuable intelligence about ISIS facilitation networks, organizational structure, and

fighters.

---

[3] CTD Official #1's name has been redacted in compliance with the Classified Information Procedures Act.

Following the initial one-hour interview, Connelly asked the Kurds for permission to continue interviewing Defendant. This request was granted. Connelly later noted in an email to other FBI agents "the difficulties that existed initially" but concluded that "[w]e now have unlimited access [to Defendant] and [CTD] welcome us there any day or night since we are collaborating with them. Sharing information with them going forward on [Defendant] is critical to success." Gov. Exh. 64.

Connelly conducted ten additional interviews over the next month. A second interview occurred on March 15 followed by interviews on March, 17, 18–19, 20, 23, 26, 31 and April 7 and 10. Connelly testified that Kurdish officials periodically prevented him from accessing Defendant, which resulted in the breaks in the interview schedule. The Kurdish authorities brought Defendant to and from each meeting without restraints. Connelly did not collect booking photos, fingerprints, or DNA samples from Defendant directly or from the Kurdish authorities. Connelly testified that on at least one occasion, CTD Official #1 ended the interview early. All of the interviews were conducted at the CTD detention center in Erbil and were attended by Connelly, CTD Official #1, and RSO Song. The meetings were occasionally attended by Department of Defense officials. None of the participants were visibly armed. Defendant was not shackled during the interviews and the Government provided Defendant soft drinks, snacks, and cigarettes. Connelly testified that no interview lasted more than half a day and Defendant was given the option to take breaks when he needed.

The Government did not advise Defendant of his *Miranda* rights before any of these interviews. Electronic communications between Connelly and another FBI employee on March 22, 2016 indicate that the FBI asked 99% of the questions during the interviews. The FBI and the CTD shared information obtained during the interviews and the FBI asked questions of

4

Defendant at the behest of the Kurdish authorities.  Connelly testified that Defendant repeatedly admitted to not being fully truthful at various stages of the interviews, resulting in a "reset" of the interview process.  Over the course of the interviews, Defendant described his efforts to join ISIS, identified other ISIS members he encountered while in the organization, and explained his understanding of the ISIS operations in the region.  The Government does not seek to admit the statements made during these interviews in their case-in-chief.

During Connelly's interviews, Defendant asked whether he would be charged and extradited to the United States.  Defendant expressed a desire to return to the United States for prosecution rather than remain in the Kurdish or Iraqi justice system.  Connelly advised Defendant during a number of the interviews that no promises could be made by the FBI about prosecutions because those decisions could only be made by the United States Department of Justice and the United States courts.  Connelly told Defendant that the charging process was dependent on the FBI's evaluation of the evidence.  Connelly also advised Defendant that his story had to be consistently truthful in order for investigators to determine if a crime had been committed.

While the interviews were ongoing, Connelly and other intelligence agents discussed Defendant's cooperation in emails.  On March 22, 2016, Connelly described the interviews as "a textbook case of getting a guy from a complete lie to a confession . . . he will not let me down[.]" Gov. Exh. 58.  In an email on March 26, 2016, Connelly stated that Defendant "is now very comfortable talking about everything . . . [h]e wants to cooperate fully with the US." Def. Exh. A.  Connelly also "told him again today that a decision has not been made whether to charge and/or extradite him." *Id.* Connelly explained that "[t]his was time very well spent because the extensive time we took getting him comfortable with telling the truth will make it far easier for

subsequent interviews here and in the US." Def. Exh. A. In a March 31, 2016 email, a

Department of Defense employee informed Connelly that the Department would attend the

upcoming interview, did not have any specific inquiries to discuss, but opined that a final session

of familiar faces would keep Defendant's story consistent. On April 7, 2016, Connelly reported

to other FBI agents that during the most recent interview "[Defendant] would not stop talking in

an attempt to fill in gaps he previously created. He is going to be very easy to deal with from a

clean team perspective." Gov. Exh. 41. Finally, on April 8, 2016, shortly before the culmination

of his interviews, Connelly commented to other intelligence agents via email that "[Defendant] is

lined up perfectly for the clean team." Gov. Exh. 60. Connelly's interviews ended on April 10,

2016 and neither he nor any other Government officials involved in those interviews contacted

Defendant after that date.

CTD Official #1 testified that his office conducted its own investigation at the same time

as the United States interviews. Pursuant to Kurdish law, CTD Official #1 contacted an

investigative court as soon as Defendant arrived at the CTD detention center to authorize

Defendant's detention on alleged violations of Iraqi and Kurdish law.[4] The investigative court

provided authorization for detention. CTD Official #1 testified that on March 27, he presented

Defendant to the investigative court, at which point Defendant was advised of his right to an

attorney, which he declined. CTD Official #1 testified that he could not provide any

documentation of the court visit or the full name of the presiding judge because this information

was protected under the law. The investigative court subsequently re-authorized Defendant's

continued detention. CTD Official #1 testified that the detention authorization had to be

---

[4] CTD Official #1 testified that Defendant was detained on two offenses: participating in a terrorist organization (a violation of Kurdish law) and traveling in the region without adequate documentation (a violation of Iraqi law).

renewed approximately every fifteen days and that renewals were obtained for the duration of Defendant's time in the CTD detention center.

As Connelly's interviews were coming to a close, on April 7, 2016, he advised other agents via email that he was receiving pressure from the Kurds to "get the clean team piece working." Gov. Exh. 41. Connelly expressed concern that if Defendant was transferred from CTD custody to the Kurdish court system, the FBI's ability to communicate with him would be extremely difficult. *See id.* The next day, Connelly followed up that a Kurdish Judge may order the CTD to "produce [Defendant] in court and then we are screwed." Gov. Exh. 60. Connelly advised that "The [FBI] needs to interview him with a clean team ASAP, complaint him immediately, extradite him, follow up with all the . . . [further inquiries] in the US, and stop the Kurds from having to do what they legally have to do" by prosecuting him. *Id.* Connelly indicated in the same email that the "[FBI] will not commit to charging him" at this point. *Id.*

During this same time period, Defendant's parents sought legal representation for their son. On April 7, 2016 they retained John Zwerling, present defense counsel, for Defendant. Because Mr. Zwerling was not listed on Defendant's Privacy Act waiver (signed on March 15, 2016), the State Department was initially unable to give Mr. Zhwerling any information about the location or status of his client. The State Department Consular Office scheduled to meet with Defendant on April 18, 2016 but was told by United States law enforcement that CTD official #1 objected that the proposed visit date was not good for the Kurds. The Consular Office responded that Saturday or Sunday of that week would be fine too. The State Department Consular Office ultimately visited with Defendant on April 23, 2016 at which point Mr. Zhwerling was added to Defendant's Privacy Act waiver. Two days later, Mr. Zhwerling was contacted by the State Department regarding Defendant's location.

7

On April 20, 2016, FBI Special Agents Victoria Martinez and Brian Czekala and a Kurdish translator met with Defendant. This interview was conducted in a different interrogation room in the CTD Erbil detention center than Connelly's interviews and none of the Kurdish officials present at Connelly's interviews participated. The agents advised Defendant of his *Miranda* rights orally and in writing before the interview. The advice of rights form stated that "[y]ou do not need to speak with us today just because you have spoken with others in the past." Gov. Exh. 53. Agent Martinez testified that Defendant was further advised that his family had retained counsel in the United States on his behalf.[5] The Defendant waived his *Miranda* rights before the interview orally and in writing. Defendant also consented to the search of his cellphones and other electronic equipment. Gov. Exh. 49. Agents Martinez and Czekala conducted two further interviews on April 21 and 23. The agents advised Defendant of his rights before each interview and Defendant again waived his rights orally and in writing. The Defendant made a number of inculpatory statements during these interviews which the Government seeks to admit as evidence in its case-in-chief.

The same day that the *Mirandized* interviews began, Connelly commented to another FBI employee via electronic messaging that he "reall tee'd [Defendant] up for these guys i think. . . tht is th intel guys job. obliterate all his lies and get hijm comfortable with the truth." (grammar and spelling original). Gov. Exh. 59. However, the agents had no access to any information obtained during Connelly's interviews. Connelly testified that his only interaction with the Martinez and Czekala was assisting them with logistics into and out of Erbil.

Following further status requests from the Kurdish authorities during the *Mirandized* interviews, counsel for the Government provided a letter to a general in the Kurdistan Regional

---

[5] This specific advice is not reflected on the "advice of rights" form. The form does state that "an American-trained attorney is available to you. However, our ability to provide you access to him may be limited by the decisions of the local authorities." Gov. Exh. 53.

8

Government Security Council dated April 28, 2016. Gov. Exh. 72. The letter explained that the United States anticipated filing terrorism-related and possibly other charges within the next two weeks. The same day, Connelly informed Government counsel that he provided the letter to the chief of staff of the general and CTD agreed to provide any assistance required. Gov. Exh. 69. Connelly reported that he was careful not to request Defendant's detention solely on the United States' behalf but only if Kurdish law permitted it. Connelly stated in the email that he received assurances that continued detention prior to transfer to the court was permissible under the law. Connelly added that the Chancellor of the Kurdistan Regional Government Security Council endorsed the continued detention but impressed upon Connelly that after two more weeks the Kurdish investigation would be complete and transfer to Kurdish court would be likely.

On May 11, 2016, the Government filed a sealed Complaint against Defendant in the Eastern District of Virginia. Consular Officers met with Defendant to assist him in completing an application for a new passport because he no longer possessed the one he had used to leave the United States. The application was completed on May 19, 2016. Owing to delays in obtaining visas for the pilots who would transport Defendant out of Erbil, Defendant was not formally handed over to United States custody until June 8, 2016. During the flight back to the United States on June 8, Defendant initiated conversation with Agent Martinez and another FBI agent on board. The agents apprised Defendant of his *Miranda* rights and the advice of rights form orally and in writing. Defendant waived those rights and spoke with the agents. During this conversation, Defendant made a number of inculpatory statements which the Government seeks to admit as evidence in its case-in-chief. At some point during the conversation, Defendant invoked his right to remain silent. At this point, the agents ceased questioning. Later during the flight, Defendant reinitiated conversation with the agents.

9

Defendant was subsequently arraigned in this Court. Following discovery, Defendant filed the present Motion to suppress his *Mirandized* statements and the searches of his phones.

## II. Legal Standard

The burden of proof in a motion to suppress is on the party who seeks to suppress the evidence. *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981). Once the defendant establishes a basis for the motion, the government bears the burden of proving the admissibility of the challenged evidence by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n. 14 (1974).

## III. Discussion

The Defendant has advanced four grounds for suppression of some or all of his statements and the fruits thereof. First, the Government unreasonably withheld Defendant's presentment before a magistrate judge in order to elicit a confession. Second, Defendant's confessions were the involuntary product of Government coercion. Third, the Government violated Defendant's right against self-incrimination by intentionally circumventing the *Miranda* warnings with a two-stage interrogation process. Fourth, Defendant's right to remain silent and right to counsel were violated during the June 8 interview on the flight back to the United States. The memorandum addresses each of these grounds in turn.

### A. Presentment Violation

Rule 5 of the Federal Rules of Criminal Procedure requires that "[a] person making an arrest outside the United States must take the defendant without unnecessary delay before a magistrate judge, unless a statute provides otherwise." Fed. R. Crim. P. 5(a)(1)(B). "[A] confession must be suppressed if (1) it was made prior to the arrestee's presentment to a magistrate judge; (2) the presentment to a magistrate judge was unreasonably or unnecessarily

10

delayed; and (3) the confession was made more than six hours after the arrest or detention." *United States v. Claridy*, 601 F.3d 276, 284–85 (4th Cir. 2010); *see also* 18 U.S.C. § 3501(c). This exclusionary rule applies even if the confession is voluntary. *McNabb v. United States*, 318 U.S. 332, 345 (1943); *Mallory v. United States*, 354 U.S. 449, 455 (1957). But the six hour time limitation does not apply if the delay is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available magistrate judge or other officer. 18 U.S.C. § 3501(c).

Critically, the "prompt presentment guarantee applies only to actions undertaken by domestic authorities." *United States v. Abu Ali*, 528 F.3d 210, 226 (4th Cir. 2008). Stated another way, the "duty to present a person to a federal magistrate does not arise until the person has been arrested for a federal offense." *United States v. Alvarez-Sanchez*, 511 U.S. 350, 358 (1994).

In this case, Defendant was not charged with a federal offense until May 11, 2016. Dkt. No. 1. Prior to May 11, 2016, the Government had not determined whether charges would be brought. This hesitation was no secret to the Kurdistan Regional Government or Defendant. Agent Connelly noted in an April 8, 2016 email to other FBI agents involved in the intelligence-gathering efforts that no charging decision had been made. Gov. Exh. 60. Agent Connelly repeatedly advised the Kurdish authorities that the United States had not made a charging determination. *See, e.g.*, Gov. Exh. 41 ("I told [the Kurdish official] we can't make any decisions on charging until our clean team comes in."). Department of Justice attorney Raj Prakesh subsequently wrote a letter to a general in the Kurdistan Region Security Council on April 28, 2016 advising that the United States "anticipated filing terrorism-related and possibly other charges within the next two weeks." Gov. Exh. 70. Agent Connelly also repeatedly

11

advised Defendant during his interviews that no charging decision had been made.  Hearing Tr. 363:18-365:6.

Defendant was not formally handed over from Kurdish to United States custody until June 8, 2016.  *See* Gov. Exh. 28A, B.[6]  Agent Connelly attributed the month-long delay between charging and extradition to logistics challenges.  These challenges are reasonable in light of the evidence that Defendant needed a new passport in order to complete extradition, all of the agents participating in the extradition were required to obtain visas to enter Iraq, and Erbil is near an active warzone which is not easily accessed by United States transport vessels.

The absence of federal charges ordinarily settles the presentment challenge.  *See Alvarez-Sanchez*, 511 U.S. at 358; *Abu Ali*, 528 F.3d at 226.  Because there were no charges filed until May 11 and the additional delay in extraditing Defendant is justified, the presentment challenge fails.

Defendant endeavors to escape this conclusion by arguing that a certain portion of the detention by Kurdish authorities should be imputed to the United States because the two countries were engaged in an illicit working arrangement to undermine Defendant's presentment right.  This argument is not supported by the evidence elicited during the suppression hearing.

It is well established that federal officials may not collude with state officers to circumvent federal presentment requirements.  *See, e.g., Anderson v. United States*, 318 U.S. 350, 356, (1943) ("[T]he fact that the federal officers themselves were not formally guilty of illegal conduct does not affect the admissibility of the evidence which they secured improperly through collaboration with state officers.").  The Fourth Circuit Court of Appeals has applied this

---

[6] The translation of the Kurdish document lists the date of transfer as June 8, 2016.  However, the same date is translated from the Kurdish elsewhere as June 7, 2016.  *Compare* Gov. Exh. 27A, B.  The difference of a day is immaterial to the Court's finding so the Court relies on the parties' representation that the handover occurred on June 8.

standard in the context of a working arrangement between foreign and domestic law enforcement. *See Abu Ali*, 528 F.3d at 226. Under this doctrine, the defendant bears the burden of presenting evidence of an illicit working arrangement. *See Alvarez-Sanchez*, 511 U.S. at 359 ("[A] confession obtained during such a period of detention must be suppressed if the *defendant* could demonstrate the existence of improper collaboration between federal and state or local officers.") (emphasis added); *see also United States v. Bin Laden*, 132 F. Supp. 2d 198, 209 (S.D. N.Y. 2001), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177 (2d Cir. 2008) ("To satisfy their burden, the [d]efendants must show that the Government made deliberate use of [foreign] custody to postpone their presentment requirements.").

To the Court's knowledge, only two courts have analyzed the existence of a working arrangement in the context of a foreign detention. The court in *Abu Ali* identified the elements necessary to sustain a "working arrangement" claim: (1) the foreign government lacked an independent interest in or independent basis for detaining the defendant; (2) the foreign government lacked its own interest in interrogating the defendant; (3) the foreign government "held, or continued to hold, the defendant so that United States officials could evade their constitutional duties." *Id.* at 227.

Based on this standard, the court in *Abu Ali* found that the facts did not support the existence of a working arrangement between Saudi Arabian and American authorities to avoid presentment. Saudi authorities arrested the defendant in 2003 in Medina, Saudi Arabia, on suspicion of involvement in a terrorist cell. *Id.* at 224. The Saudi authorities notified the FBI that they had arrested the defendant but denied the FBI's request to interview him. *Id.* at 225. Instead, the Saudi government undertook interrogations without a probable cause determination or *Miranda* warnings to the defendant. *Id.* at 226. The defendant made a number of inculpatory

statements during the interrogations. *Id.* at 225. After negotiations between the governments, the Saudi authorities acquiesced to asking six questions provided by the FBI. *Id.* Other than consular visits, the United States had no access to the defendant during this period of Saudi Arabian detention. *Id.* The defendant was ultimately indicted by a United States grand jury in 2005 on terrorism-related offenses, handed over to United States authorities, repatriated, tried, and found guilty. *Id.* at 226. The defendant's statements during his Saudi Arabian detention were used against him at trial. *Id.*

The defendant challenged the introduction of this evidence during trial on, among other grounds, the failure to timely present him before a magistrate judge. *Id.* As discussed above, the court of appeals affirmed the district court's finding that there was no evidence of an illicit working arrangement between the United States and Saudi Arabia to bypass presentment. *Id.* The court found that the defendant had failed to challenge the district court's finding that the arrest and detention was "pursuant to a Saudi government order" based on Saudi Arabia's "own information and interest in interrogating the defendant[.]" *Id.* at 227. The Court also affirmed the district court's finding of no evidence that the Saudis "held, or continued to hold [the defendant] so that United States officials could evade their constitutional duties." *Id.* Accordingly, the court affirmed the district court and rejected the presentment challenge.

In *United States v. Bin Laden*, the Southern District of New York found that there was no improper working arrangement between Kenyan and American authorities to prevent presentment for two defendants on terrorism-related charges. 132 F. Supp. 2d at 211. The defendants were detained by Kenyan authorities and interrogated for twelve days on suspicion of involvement in bombings in Nairobi. *Id.* at 203. Kenyan law permitted their detention for up to fourteen days after arrest without presentment. *Id.* at 205. United States authorities dominated

14

the interrogations, asking the majority of the questions put to the defendants, though Kenyan law enforcement was present throughout. *Id.* at 209. The American officials apprised the defendants of their *Miranda* rights before undertaking the interrogations. *Id.* at 203. They also advised one of the defendants that they were not interested in any prior statements he made to Pakistani officials before his detention in Kenya. After the twelve-day interrogation, the United States government charged the defendants. *Id.* at 204. Both defendants moved to suppress the statements made in Kenya on the grounds that the United States government failed to promptly present them before a magistrate judge. *Id.* at 206.

The court found that "early and significant involvement of the Americans in the investigation of these Defendants makes this case a closer 'working arrangement' call than many others." *Id.* at 209-210. Nevertheless, the court found that the use of Kenyan interrogation and detention procedures, rather than FBI practices, evinced Kenyan rather than United States control of the interrogation. For example: the identification parade was conducted in conformity with Kenyan law and at the direction of Kenyan officials; the defendants were not handcuffed when transported and interrogated; and they were not fingerprinted until well into the interrogation process. *Id.* In addition, the FBI agent in charge of the investigation testified that American agents did not conduct investigations independent of the Kenyan authorities and that he believed he had no authority to make arrests. *Id.* Finally, the court found "[t]he assertion that the Americans secretly controlled the whole investigation is significantly undermined" in part because one defendant told the FBI agents that he would admit his involvement in the terrorist acts if he would be tried in the United States but the FBI made no guarantees about his extradition. *Id.* at 210. The court found that "in the midst of a time-sensitive investigation . . . [i]f the American officials had actually been in control . . . they would most likely have

15

immediately guaranteed an American prosecution." *Id.* For these reasons, the court denied the motion to suppress the statements made during the Kenyan detention.

Defendant contends that the collaboration between Kurdish and American officials in this case exceeds the amount in *Abu Ali* and *Bin Laden* and warrants the suppression of his statements and the fruits thereof. Defendant argues that the email communications between Agent Connelly and other United States Government employees exposes the improper extent of American influence over the Kurdish detention. While acknowledging that the Government has an interest in collaborating with foreign countries to collect intelligence, Defendant contends that the Government's working arrangement with the Kurds turned illicit near the end of Connelly's interviews and continuing through the *Mirandized* interviews. Defendant argues that, by this time, the Government no longer had an intelligence interest in interviewing him, the Kurdish authorities no longer had an interest in detaining him without prosecution, and the FBI improperly pressured the Kurdish authorities to continue his detention to further the United States investigation. On Defendant's reading, the Kurdish government acted as a mere facilitator of the American investigation whereby the Government could maximize its investigatory efforts and delay its compliance with United States law.

The Government counters that there was no illicit working arrangement with the Kurdish authorities and this case falls squarely within the facts and reasoning of *Abu Ali* and *Bin Laden*. The Government represents that it had no role in Defendant's apprehension by the Kurds and only began its investigation of Defendant after it learned of the arrest. In addition, Kurdish authorities were conducting their own investigation under their own laws and also sought counter-terrorism intelligence from Defendant. While the Government acknowledges that it coordinated with Kurdish authorities to conduct the intelligence-gathering interviews, this

coordination was not an attempt to violate United States law; it was in furtherance of the FBI's counter-terrorism mandate.  The Government notes that it had to request permission from Kurdish authorities to see Defendant on each of the seventeen visits.  Further, Kurdish officials controlled the location, the date, the time of day, and the length of the visits.  None of the FBI's procedures were followed: e.g. Defendant was transported to interrogation rooms from his holding cell at CTD Erbil without restraints; Defendant was not fingerprinted, DNA swabbed, or photographed pursuant to FBI policy; and Kurdish authorities transferred Defendant to and from interviews with FBI.  The Government also contends that a Kurdish document signed by the FBI contemporaneous with the transfer of custody from the Kurds to the FBI evinces the Kurds' knowledge of the custodial rights they were relinquishing.  Gov. Exh. 28A.  The translated document states that Defendant "was handed over to the representative of the FBI" on June 8, 2016.  Gov. Exh. 28B.  The Government acknowledges that certain emails demonstrate that United States officials applied pressure on Kurdish authorities.  The Government contends that these communications, at best, create "mere suspicion or conjecture" of an improper collusion between the governments to undermine the defendant's prompt presentment rights.  The Government maintains that Defendant was at all times lawfully held pursuant to Kurdish law and in furtherance of potential Kurdish prosecution.

The evidence elicited during the hearings places this case substantially within the scope of *Abu Ali* and *Bin Laden* in four important respects.  First, the arrest was effected by foreign authorities pursuant to the laws of the foreign nation.  Second, the foreign authorities had an independent basis to interview the defendant.  Third, foreign police practices were employed as opposed to FBI procedures.  Fourth, the detention was a lawful exercise of the power of the foreign sovereign.  These substantial similarities reinforce the Court's assessment, *supra*, that

Defendant's presentment rights were not violated.  The Court addresses each of these considerations in turn.

First, Defendant's arrest was initially effected by foreign authorities with their own interest in Defendant's detention just as in *Abu Ali* and *Bin Laden*. *See Abu Ali*, 528 F.3d at 224 ("Abu Ali was arrested by the Mabahith" based on suspected involvement in the al-Faq'asi terrorist cell.); *Bin Laden*, 132 F. Supp. 2d at 202 ("Defendant Odeh was detained by Pakistani immigration authorities . . . . The basis for Odeh's detention by Pakistani authorities was his alleged use of a false passport."). Specifically, Defendant was detained on investigation of participation in a terrorist organization and traveling without proper documentation in violation of Kurdish and Iraqi law.  Hearing Tr. 112:3-8.  The United States was not notified that Defendant was in Kurdish custody until after the arrest.  Hearing Tr. 112:9-23; *see Abu Ali*, 528 F.3d at 225 ("Following Abu Ali's arrest by the Saudi authorities, the FBI was notified of his suspected involvement in the al-Qaeda cell in Saudi Arabia[.]").

Second, the Kurdish authorities, like the Saudis in *Abu Ali*, had their own continued interest in detaining and interrogating Defendant and interrogated him outside of the presence of the FBI.  Hearing Tr. 141:3-142:20 (describing CTD Official #1's March 14 interview of Defendant); 184:17-19 ("Q. How many times after March 15 did you interrogate Mr. Khweis out of the presence of the U.S. Agents? A. [CTD Official #1] Maybe five, six times, more or less."); *see Abu Ali*, 528 F.3d at 224 ("Abu Ali was then flown from Medina to Riyadh, where he was interrogated by the Mabahith."). While CTD Official #1 testified that his investigation basically ceased in mid-April, Hearing Tr. 212:11-13, the evidence shows that his superiors believed the investigation would be complete only two weeks after April 28. *See* Gov. Exh. 69 ("Chancellor [REDACTED] decided that Khweis will remain in the custody of CTD for two more weeks . . .

18

after that point, since logical investigation by the [Kurdistan Regional Government] regarding
exigent threats will be complete, he would likely be transferred[.]").[7]  Furthermore, CTD Official
#1 expressly testified that a trial date was not set for Defendant in criminal court "because the
investigation stages had not been completed yet." Hearing Tr. 200:14-17. Critically, Connelly
reported in an email to counsel for the Government that he "was careful not to ask that Khweis
be detained solely at our request, but rather only if Kurdish law permitted it. They assured me
continued detention prior to transfer to the court was permissible under their law." Gov. Exh. 69.
This answer is consistent with CTD Official #1's testimony that all of the Kurdish detention was
permitted by law. Hearing Tr. 197:7-9. It is also consistent with the fact sheet provided to
Defendant when his detention began. *See* Gov. Exh. 36.

Third, the investigation was governed by local customs and procedures. The Kurdish
authorities set the date, duration, and logistics of FBI access to Defendant. *See Bin Laden*, 132
F. Supp. 2d at 210 (finding lack of compliance with FBI procedures probative of the lack of a
working arrangement); *Abu Ali*, 528 F.3d at 225 (limiting FBI questioning of defendant). Agent
Connelly testified that Kurdish authorities would end interviews with Defendant when they saw
fit and routinely blocked Connelly's access to Defendant. *See, e.g.*, Hearing Tr. 302:6-303:13.
The defendant was not restrained when transported by Kurdish authorities to and from the
interview rooms and was not fingerprinted, DNA swabbed, or photographed as he would be if
interviewed solely in FBI custody. Hearing Tr. 327:9-328:11; *see Bin Laden*, 132 F. Supp. 2d
198, 210 ("[T]he Court is persuaded of the Kenyans' control of the investigation by several facts

---

[7] Connelly goes on to state that Defendant "would likely be transferred to the Investigative Court." Gov. Exh. 69.
This statement is facially inconsistent with CTD Official #1's testimony that Defendant had already been presented
to the Investigative Court but would subsequently be presented to the *Criminal* Court. The Defendant reads this as
an error evincing that Defendant was *never* presented to any Kurdish court. But a more plausible explanation is that
Connelly misstated the name of the court out of unfamiliarity with the intricacies of the Kurdish court system. *See,
e.g.*, Hearing Tr. 409:8-10 ("So when they say court to me, I know there is like an there is [sic] Investigative Court,
there is a Criminal Court. So I am not versed in their system.").

which evidence a departure from traditional FBI practices[.]"). The fact that the FBI exerted dominance over the substance of the meetings with Defendant does not contravene the Kurdish control or warrant the finding of a working arrangement. *Compare Bin Laden*, 132 F. Supp. 2d at 209, *with Abu Ali*, 528 F.3d at 225 (limiting the FBI to submitting six questions to be asked of the detainee by Saudi authorities).

Fourth, the testimony elicited at the hearing revealed that Defendant, just like the detainees in *Abu Ali* and *Bin Laden*, was held pursuant to local law until he was handed over to United States authorities. *See Abu Ali*, 528 F.3d at 227 ("[A]lthough he disputes the district court's finding that he was held 'pursuant to a Saudi government order,' he offered no credible evidence that the Saudis held, or continued to hold, him so that United States officials could evade their constitutional duties."); *see also Bin Laden*, 132 F. Supp. 2d at 205 ("Odeh was in incommunicado Kenyan custody from August 14 – August 27, 1998. Under Kenyan law, individuals suspected of a capital offense may be held for fourteen days after arrest.").

CTD Official #1 testified that no one can be detained in Kurdish custody without a court order. Hearing Tr. 97:9-10. He further testified that because Defendant was brought to the CTD detention center outside of the regular hours, his boss notified an investigative court judge over the phone to approve the detention, and formal paperwork was submitted the next day. Hearing Tr. 109:20-111:14. The formal paperwork permitted two weeks of detention after which CTD Official #1 testified that Defendant was brought before an investigative judge on March 27. Hearing Tr. 114:7-114:15. CTD Official #1 testified that the practice required by law was to send a memo to the investigative judge after each two-week period of detention;[8] the judge reviewed the file and decided whether to reauthorize continued detention for an additional two

---

[8] CTD Official #1 later clarified on cross-examination that "[i]t's 15 days. Sometimes it's 12 or 13 depending upon what day of the week or the weekends it falls on. But it can't be more than 15, but it could be 15, 13, or 12." Hearing Tr. 196:14-16.

weeks, with detention renewals permitted in this fashion up to a maximum of six months. Hearing Tr. 120:5-14, 121:10-15; *see* Gov. Exh. 36 at 2 ("[T]he period of detention depends on the penalty for the crime. The reality is that the detention can be open-ended and people can be detained up to a year without trial."), *id.* at 3 ("Before charges are filed, your period of detention depends on the maximum possible sentence for the crime. In any event, it should not exceed 6 months[.]"). CTD Official #1 testified that reauthorization was obtained on March 29. Hearing Tr. 120:10-14. While CTD Official #1 testified that he could not recall how many subsequent authorizations were obtained, he stated that the entire term of detention from March 14 to June 8 was with permission of the court. Hearing Tr. 197:7-9.

The Court finds that CTD Official #1's testimony about Defendant's detention is credible. CTD Official #1's inability to provide Kurdish court documents evincing Defendant's presentation before the Kurdish investigative judge or the reauthorization of his detention does not undermine CTD Official #1's credibility as a witness or, in the absence of evidence to the contrary, call into question the legality of Defendant's detention. CTD Official #1 provided detailed information about the presentment process. *See, e.g.*, Hearing Tr. 114:9-11 (identifying the exact day that Defendant appeared before a Kurdish investigative judge). Where CTD Official #1 was unable to provide detailed information, e.g., about court records and the full name of the presiding judge, he explained that Kurdish law prohibited these disclosures. Hearing Tr. 185:7-22. The Court has no authority to compel the production of Kurdish court documents and is in no position to opine on the foreign law prohibiting disclosure. Furthermore, CTD Official #1 was forthright in his testimony even though he did not appear to fully understand the differences between American and Kurdish law. *See, e.g.*, Hearing Tr. 210:13-212:5 (explaining CTD Official #1's confusion about attenuation and *Miranda* requirements). Finally, other than

21

Connelly's misstatement about Kurdish court to which the Defendant would be subjected, which the Court regards as a misstatement born of Connelly's unfamiliarity with Kurdish criminal procedure, *see supra* n. 7, Defendant mustered no evidence contradicting CTD Official #1's testimony about the detention or the rules prohibiting him from disclosing Kurdish court documents. For these reasons, the Court finds CTD Official #1's testimony credible.

Taking into consideration the foregoing, Defendant's presentment challenge fails. Defendant's presentment right did not attach until he was formally charged by the United States on May 11, 2016 and the delay of his extradition until June 8, 2016 was reasonable under the circumstances. Furthermore, there is no factual basis to conclude that the United States engaged in an illicit working arrangement to deprive Defendant of his right to prompt presentment. Consequently, the Court finds that there was no violation of the presentment requirement which would warrant suppression of Defendant's statements or the fruits thereof.

### B. Voluntariness

Defendant contends that even if his presentment right was not violated, the statements made to Agents Martinez and Czekala, and the fruits of those statements, should be suppressed because they were involuntary.

"[I]n cases involving involuntary confessions, [the Supreme Court] enforces the strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973) (citations omitted). "A statement is involuntary within the meaning of the Due Process Clause when it is 'extracted by . . . threats or violence' or 'obtained by . . . direct or implied promises' or 'the exertion of . . . improper influence.'" *United States v. Ayesh*, 702 F.3d 162, 168 (4th Cir. 2012) (omissions in

original) (quoting *Hutto v. Ross*, 429 U.S. 28, 30 (1976)). "The test for determining whether a statement is involuntary under the Due Process Clause is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired' because of coercive police conduct." *United States v. Cristobal*, 293 F.3d 134, 140 (4th Cir. 2002) (quotations and citations omitted). "To determine whether a defendant's will has been overborne or his capacity for self-determination critically impaired, courts must consider the 'totality of the circumstances,' including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Id.*

Defendant argues that he was particularly susceptible to coercion and, based on the totality of the circumstances, the confessions were involuntary. He was held far from home for more than two months, in a place where he did not speak the language, and desperately wanted to return home.[9] As a result, Defendant was easy prey for the Government's representations during interviews that he could only be charged by the United States, and thereby extradited, after the Government had gotten all of the information and confirmed that Defendant's story was consistent. During the suppression hearing, Defendant sought to elicit testimony that the terms of his confinement were coercive because he was not able to regularly access the bathroom, lacked air conditioning in his cell, and the prison was infested with bugs.

The Government counters that the totality of the circumstances does not support a finding of coercion. For all three April 2016 *Mirandized* interviews, the Government and Kurdish attendees wore casual clothes and did not visually display weapons. The interviews were conducted in a well-lit conference room and the door remained open for the duration of the

---

[9] The Defendant also alleges that the International Red Cross had expressed concern about unsafe conditions and abusive practices in Iraqi and Kurdish prisons. Whatever the veracity of these accusations, Defendant advised the Government and the State Department Consular Office that he was not abused and the Government contemporaneously remarked that Defendant was in good spirits during interviews.

interviews. In addition, the Government inquired as to Defendant's well-being during the interviews, provided him snacks and cigarettes, and afforded him breaks during the questioning.

Defendant counters that "a well-lit room, no visible injuries, drinks, snacks, laughter, and cigarettes – are trivial compared with the threat of never again returning home, never again seeing family, and an entirely unknown fate resting in the hands of captors." Dkt. No. 118 at 20. In Defendant's view, these latter concerns were caused by the Government and created the coercive environment. Defendant argues that he was not prevented from understanding the words in the *Miranda* warnings but that he "would have signed anything to go home." *Id.*

Defendant concedes that the objective circumstances of his detention "a well-lit room, no visible injuries, drinks, snacks, laughter, and cigarettes" do not support an involuntariness argument. Defendant's other allegations about the coercive effect of his conditions were not supported by the evidence. CTD Official #1 testified that Defendant was provided private restroom facilities whereas many defendants were held in rooms without the same private facilities. Hearing Tr. 133:15-22. He further testified that Defendant was moved to a different cell because the first cell had air conditioning issues. Hearing Tr. 132:9-15. Finally, the bug "infestation" amounted to one cockroach which appeared during an interview between Defendant and Agent Martinez. Hearing Tr. 585:16-586:5. No witness testified to any other evidence of bugs in the prison. Defendant failed to muster any evidence contrary to this testimony. The evidence of Defendant's confinement does not support the argument that the testimony was involuntarily coerced.

Defendant's alternative reliance on the fact that he feared he would never return home and would suffer an unknown fate in Kurdish custody in no way renders his statements involuntary. An involuntariness challenge "requir[es] some sort of 'state action' to support a

claim[.]" *Colorado v. Connelly*, 479 U.S. 157, 165 (1986).  Defendant imposed upon himself the

very coercive circumstances which he now blames on the Government.  *See United States v.*

*Mashburn*, 406 F.3d 303, 310 (4th Cir. 2005) ("Any coercion that Mashburn may have felt was

not the product of official action, but rather the consequence of the severity of the offenses he

chose to commit.").  Defendant chose of his own accord to sell his belongings and travel to Syria

and Iraq.[10]  His conduct strongly suggests that he did not expect to return home to see his family.

While Defendant protests that he had a change of heart about his desire to return home, the

Government cannot be blamed for Defendant's initial detention in a foreign land, far removed

from family and friends.  *See United States v. Wolf*, 813 F.2d 970, 975 (9th Cir. 1987) ("There

was nothing exceptional about the duration or location of the questioning [in Mexico by Mexican

authorities], and it certainly is not unusual for a suspect to have no family or friends present.").

Connelly's only remaining allegedly coercive acts were representations that Defendant

could not be promised repatriation to the United States and that he needed to be truthful in his

statements.  But "government agents may validly make some representations to a defendant or

may discuss cooperation without rendering the resulting confession involuntary."  *United States*

*v. Shears*, 762 F.2d 397, 401 (4th Cir.1985).  There was nothing improper about Connelly's

truthful statement that he could not promise extradition.  That decision could only be made by

federal prosecutors.  Furthermore, Connelly did not render the interrogation involuntary by

encouraging Defendant to be truthful.

---

[10] The Court makes no factual findings as to Defendant's entry into Iraq.  Whether Defendant made this trip in the company of a woman with family in Mosul, Iraq, *see* Gov. Exh. 31 (describing these events to a Kurdish TV station) or because he was seeking to join ISIS in Syria and was ultimately transferred to Iraq for training, his presence in Iraq is a product of his decisions and not those of any government involved in his interrogation.

25

Accordingly, the Court finds that Defendant's oral statements and written acknowledgment of rights and authorization to search electronic devices was not the product of Government coercion.

## C. *Miranda* Violation

Defendant also contends that the inculpatory statements, and the fruits thereof, should be suppressed because they were obtained through a direct attempt to undermine the effectiveness of *Miranda* warnings.

"Recognizing that the pressure and isolation inherent in custodial interrogation could overcome the resilience of a suspect otherwise not inclined to incriminate himself, the Supreme Court in *Miranda* 'conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained.'" *United States v. Mashburn*, 406 F.3d 303, 306 (4th Cir. 2005) (quoting *Missouri v. Seibert*, 542 U.S. 600, 608 (plurality opinion)). While a simple failure to administer *Miranda* warnings may not "so taint the investigatory process that a subsequent voluntary and informed waiver is ineffective", a deliberate two-step questioning technique—non-*Mirandized* interrogation followed by *Mirandized* interrogation—may warrant suppression. *Seibert*, 542 U.S. at 620 (Kennedy, J., concurring) (quoting *Oregon v. Elstad*, 470 U.S. 298 (1985)).[11] "If that strategy is deliberately employed, postwarning statements related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statements are made." *Mashburn*, 406 F.3d at 309. "Curative measures should be designed to ensure that a reasonable

---

[11] The *Seibert* decision divided the Supreme Court and Kennedy's concurrence in the judgment represents the holding of the Court. *Mashburn*, 406 F.3d at 309.

person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver. For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning . . . [a]lternatively, an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring).

Defendant argues that the *Miranda* warnings in this case were undermined by the use of a two-step interview process consisting of intentionally non-*Mirandized* interviews to set up Defendant to confess in subsequent *Mirandized* interviews. Defendant points to electronic communications between Connelly and other Government agents which suggest that a purpose of the non-*Mirandized* interviews was lining up Defendant's story for the subsequent *Mirandized* interviews. Defendant also contends that the delay between the two sets of interviews aggravated, rather than attenuated, his sense of isolation and desire to make inculpatory statements in order to secure return to the United States.

The Government does not dispute that Defendant was subject to two phases of interviews—before and after he was apprised of his *Miranda* rights. However, the Government argues that the two-step interview process was not deliberately used to undermine the *Miranda* warning. Rather, it was used to demarcate the intelligence-gathering efforts of the FBI from the subsequent, *Mirandized* criminal-investigation efforts. In addition, the Government contends that even if the process risked undermining the warnings, the Government took sufficient steps to attenuate any possible adverse impacts. Those curative steps included: a ten day attenuation period between the two sets of interviews; no overlap in Kurdish or American participants in the interviews; the relocation of the *Mirandized* interrogations to a different interview room in the

27

Erbil CTD detention center; and the Government expressly advised Defendant during the *Miranda* warnings that they were not interested in the substance of his prior statements.

The evidence presented in the hearing establishes that the FBI did not engage in an intentional scheme to undermine the effectiveness of subsequent *Miranda* warnings. The decision to not *Mirandize* Defendant before the first interview was driven by intelligence-gathering needs, Connelly's later braggadocio about the success of the interviews did not overturn the original justification or affect the later *Mirandized* interviews, and Connelly had good reason to continue interviewing Defendant even after obtaining substantial intelligence. The Court explores these issues in detail below.

The FBI learned that a United States citizen was arrested on suspicion of terrorism, in an active war zone, near ISIS-controlled territory. These facts present unique intelligence opportunities for the United States. Connelly acknowledged during the hearing that there were risks to not *Mirandizing* Defendant before beginning interviews but that he had to make a split-second decision. Hearing Tr. 274:4-18. Connelly noted that at the time he believed he might only have limited access to Defendant because he was in Kurdish custody.[12] Hearing Tr. 273:17-23. Connelly also expressed concern that Defendant had traveled from the United States to Iraq without U.S. detection, possibly through the use of a hitherto unknown facilitation network. Hearing Tr. 274:15-21. Connelly testified that he did not take the decision to undertake un-*Mirandized* interviews lightly. He acknowledged that there was substantial risk in his approach that the inadmissibility of the information he obtained, coupled with the limited access to Defendant, might scupper any subsequent prosecution. Agent Connelly balanced future criminal prosecution against the need for intelligence dictated the interrogation strategy and determined

---

[12] The facts bear out this concern. The Kurdish authorities rebuffed Connelly's initial interview request, subsequently limited Connelly to only an hour-long interview of Defendant, and only after receiving actionable intelligence did the Kurdish authorities permit Connelly to continue his interrogations at their discretion.

that the latter was a higher priority. This subjective intent is highly probative of whether *Miranda* was intentionally undermined. *See United States v. Moore*, 670 F.3d 222, 230 (2d Cir. 2012) ("There is no subjective evidence of intent here—no testimony, for example, by any officer of an intent to use a two-step technique, nor any evidence that such intent was reflected in a police report."); *United States v. Thomas*, 664 F.3d 217, 223 (8th Cir. 2011) ("[T]he district court credited Grunder's testimony that he did not believe he had probable cause to arrest Thomas at the time law enforcement arrived at the house . . . Grunder asked questions to establish probable cause, not to circumvent Miranda warnings.").

Connelly's subsequent emails about how he "tee'd up" Defendant, "obliterate[d] his lies", and "lined him up" for the clean team do not disturb this conclusion. Connelly testified that he sent the aforementioned emails to other members of the FBI intelligence team—not the *Mirandizing* team. Hearing Tr. 341:1-345:11. Similarly, Connelly never shared the reports of his intelligence-gathering interviews with the *Mirandizing* team. The absence of any shared personnel, information, or impressions of the interviewee between the first and second interview teams substantially undermines the claim of a coordinated effort to circumvent *Miranda*. *See Missouri v. Seibert*, 542 U.S. at 621 (Kennedy, J., concurring) (finding a *Miranda* violation where the same officer conducted both sets of interrogations and "relied on the defendant's prewarning statement to obtain the postwarning statement used against her at trial"); *see also United States v. Sweets*, 526 F.3d 122, 130 (4th Cir. 2007) (finding no *Miranda* violation where "Detective Glenn, who had not been involved in the earlier process of finding and arresting [defendant]" conducted the *Mirandized* interview); *United States v. Capers*, 627 F.3d 470, 477 (2d Cir. 2010) (recognizing the rule that the police have not engaged in a deliberate two-step to

circumvent *Miranda* "where different officers questioned the suspect at different locations . . . and the second officer was not aware of the suspect's previous inculpatory statement").

Finally, Connelly testified that his statements about teeing up Defendant and that Defendant was lined up for the clean team were his assessments of Defendant's present truthfulness rather than statements of intent about the purpose of the un-*Mirandized* interviews. Hearing Tr. 378:13-379:21. The Court is convinced that Connelly had reason to doubt Defendant's credibility because of the numerous times that Defendant revised his story during the interviews. Taking into consideration the course of Defendant's interrogation, Connelly and the Department of Defense's persistent interviewing to be sure that Defendant's story was consistent and truthful is a sign of careful tradecraft, not malicious intent.

Because *Miranda* was not deliberately undermined, the "subsequent administration of *Miranda* warnings should suffice to remove the conditions that precluded admission of the earlier statement." *Oregon v. Elstad*, 470 U.S. 298, 314 (1985). Special Agents Martinez and Czekala provided Defendant a *Miranda* warning orally and in writing before each of the interviews conducted in Erbil on April 20, 21, and 23. Hearing Tr. 522:3-4. The Agents also advised Defendant that his parents had retained a United States-based attorney on his behalf. Hearing Tr. 522:5-17. The Agents also explained that their appearance was independent of any earlier investigation by the FBI or Kurdish authorities and they reviewed an advice of rights/*Miranda* form with Defendant which stated the same. Hearing Tr. 522:20-524:24. Defendant signed the form before each of the three interviews. Gov. Exh. 46-48. In light of Agents Martinez and Czekala's extensive warnings "the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights."

*Elstad*, 470 U.S. at 314. Consequently, the Court finds that there has been no violation of the Fifth Amendment right against self-incrimination and suppression is not warranted.

### D. Suppression of the June 8 Interview

During the hearing, Defendant argued for the first time that the June 8 interview conducted on a military transport plane en route to the United States was improperly undertaken and his statements during the flight should be suppressed. Specifically, Defendant notes that by June 8, the Government was aware that Defendant had been formally charged and that his counsel had advised the Government not to interrogate him anymore.

The parties filed supplemental briefing to address this issue. In their briefing, the Government counters that the June 8 interview was proper and Defendant's argument is squarely foreclosed by *Moran v. Burbine*, 475 U.S. 412 (1986).

In *Moran*, the defendant's sister obtained legal assistance for her brother while he was detained by the police. *Id.* at 416. The retained counsel contacted the police and advised that his client should not be interviewed further. *Id.* At no point was the defendant aware that his sister had obtained representation for him. *Id.* The Supreme Court held that the police's failure to inform the defendant of his attorney's telephone call did not deprive him of information essential to his ability to knowingly waive his *Miranda* rights. *Id.* at 421-22. Furthermore, the Court held that the police did not violate respondent's Sixth Amendment right to counsel. *Id.* at 428-29. That right had not attached because the challenged police conduct occurred prior to respondent's arraignment. *Id.*

Defendant counters that *Moran* should not be applied to the unique facts of this case. Specifically, Defendant contends that the delays in notifying Defendant of his available counsel

31

"appears too convenient to be coincidental" and that the Government was able to unilaterally prohibit Defendant's counsel from reaching him.  Dkt. No. 138, at 3-4.

This case falls squarely within the facts and reasoning in *Moran*.  The Government was not obliged to pass on Defense counsel's message to his client.  Even without this information, Defendant was capable of and did waive his right to remain silent or consult with an attorney before the June 8 interview.  *See Moran*, 475 U.S. at 421-22.  The Supreme Court has "never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights" and the police in *Moran* did not even tell the defendant that counsel had been retained on his behalf. *Moran*, 475 U.S. at 422.  Here, the FBI agents on the flight advised Defendant that a United States-based lawyer had been retained on his behalf.  The additional information provided to Defendant is the only substantial difference between the case at bar and *Moran* and it only strengthens the finding that the right was voluntarily waived.

For these reasons, the Court concludes that Defendant voluntarily waived his right to remain silent and to speak with counsel during the June 8 hearing.

### IV. Conclusion

For the foregoing reasons, the Court DENIES Defendant's Motion.

_____
Liam O'Grady
United States District Judge

June ___, 2017
Alexandria, Virginia