IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Action No. 1:16-cr-143 |
| | ) | Hon. Liam O'Grady |
| MOHAMAD JAMAL KHWEIS, | ) | |
| | ) | |
| *Defendant*. | ) | Sentencing: October 13, 2017 |

**UNITED STATES' RESPONSE IN OPPOSITION TO THE DEFENDANT'S MOTION
FOR JUDGMENT OF ACQUITTAL OR, ALTERNATIVELY, A NEW TRIAL**

The United States of America, by and through undersigned counsel, respectfully opposes Mohamad Khweis's ("the defendant") motion for judgment of acquittal or, alternatively, for a new trial. Dkt. No. 220. Viewing the evidence in the light most favorable to the government, the record amply supports each of the defendant's three counts of conviction. Likewise, because the jury's verdict was not against the weight of the evidence, the defendant is unable to establish that there has been a miscarriage of justice warranting a new trial.

The defendant raises numerous issues in his post-verdict motion. However, his pleading is not supported with evidence, and ultimately ignores virtually the entire body of evidence elicited at trial. Accordingly, the government is compelled to file a lengthy response to properly clarify the factual record in this case.

## I.      INTRODUCTION & LEGAL STANDARD

### A.  Procedural History

On January 5, 2017, a federal grand jury returned a three-count Superseding Indictment charging the defendant with conspiring to provide material support or resources to the Islamic State ("ISIS") in violation of 18 U.S.C. § 2339B (Count One); providing material support or

resources to ISIS, also in violation of 18 U.S.C. § 2339B (Count Two); and possessing, using and carrying firearms in violation of 18 U.S.C. § 924(c)(1)(A) (Count Three).  Following a jury trial in this Court, the defendant was found guilty on June 7, 2017 of all three counts set forth in the Superseding Indictment.  The defendant is scheduled to be sentenced on October 13, 2017. Following the jury's verdict, the Court stated that it will hear arguments regarding the defendant's post-trial motions, if any, on the date of sentencing.  *See* Trial Tr. 1293:1-4.

The defendant spends the bulk of his motion arguing, pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29"), that the evidence was insufficient to support the jury's verdict as to each of the three counts of conviction.  *See generally* Dkt. No. 220 at 3-20.  In addition, the defendant also alleges, as to Counts One and Two, that 18 U.S.C. § 2339B violates the First Amendment and is unconstitutionally vague as applied to the defendant's conduct in this case.  *Id.* at 20-21.  Finally, the defendant's requests a new trial pursuant to Federal Rule of Criminal Procedure 33 ("Rule 33") by claiming that this Court erred in admitting his ISIS intake form and an ISIS camp roster that included his name and status as a "Fighter" with 19 other ISIS fighters.  *Id.* at 20 n.6; Gov. Exs. 29A-B and 30A-B.  Contrary to the defendant's unsupported legal assertions, the law supports the jury's guilty verdict on all three counts.

**B.  The Rule 29 Standard**

Rule 29 permits a judgment of acquittal only if the government's evidence is insufficient to sustain a conviction.  Fed. R. Crim. P. 29.  In reviewing the sufficiency of the evidence, the Supreme Court has stressed that "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial.  A reviewing court may set aside the jury's verdict on the ground of insufficient evidence *only if no rational trier of fact could have agreed with the jury*."  *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per

curiam) (internal quotation marks omitted) (emphasis added); *see also United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997) (noting that defendant challenging the sufficiency of the evidence "bears a heavy burden" (internal quotation marks omitted)).

In evaluating a motion for a judgment of acquittal, the Court views the evidence in the light most favorable to the government, "consider[s] circumstantial as well as direct evidence and allow[s] the government the benefit of all reasonable inferences from the facts proven to those sought to be established." *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982). Likewise, "it is the province of the jury to weigh the credibility of competing witnesses." *Perry v. New Hampshire*, 132 S. Ct. 716, 723 (2012) (quoting *Kansas v. Ventris*, 556 U.S. 586, 594 n* (2009)).  As such, a reviewing court is "not entitled to weigh the evidence or to assess the credibility of witnesses, but must assume that the jury resolved all contradictions in favor of the Government." *United States v. Romer*, 148 F.3d 359, 364 (4th Cir. 1998) (citations and internal quotation marks omitted).  Reversal of a conviction for insufficient evidence is "confined to cases where the prosecution's failure is clear." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc) (quoting *Burks v. United States*, 437 U.S. 1, 17 (1978)).

### C.  The Rule 33 Standard

Under Rule 33 of the Federal Rules of Criminal Procedure, the district court, upon a defendant's motion, may vacate a jury's verdict of guilt and order a new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  The defendant's burden under Rule 33 is substantial, and a district court "should exercise its discretion to grant a new trial sparingly."  *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003) (internal quotation marks omitted); *see United States v. Gambin*o, 59 F.3d 353, 364 (2d Cir. 1995) ("[T]he standard for granting [a Rule 33] motion is strict.").

The question under Rule 33 is whether the court's evaluation of the evidence adduced at trial "weighs so heavily against the verdict that it would be unjust to enter judgment." *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985)). "The test is whether it would be a manifest injustice to let the guilty verdict stand." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). In other words, to grant relief under Rule 33 the district court must conclude that it would be a "miscarriage of justice" not to overturn the jury's determination of guilt. *United States v. Shipp*, 409 F.2d 33, 36-37 (4th Cir. 1969); *see also United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005) (reiterating that to grant a Rule 33 motion "[t]here must be a real concern that *an innocent person may have been convicted*" (emphasis added)).

## II. THERE IS AMPLE EVIDENCE TO SUPPORT THE JURY'S VERDICT ON COUNT THREE PURSUANT TO THE *PINKERTON* THEORY OF LIABILITY

### A. Evidence Supporting Possession of a Firearm in Furtherance of the Terrorism Conspiracy, and Using or Carrying a Firearm During and in Relation to the Terrorism Conspiracy

The predominant flaw with the defendant's firearms "in furtherance of" argument is that he mischaracterizes Count One of the Superseding Indictment – conspiracy to provide material support or resources to ISIS – which serves as the underlying "crime of violence" for Count Three – the § 924(c) firearms charge. The defendant claims that, "in order for the evidence to be sufficient on Count III, the Government must prove that a co-conspirator, used or carried a firearm to advance or promote *Mr. Khweis' agreement to provide material support*" (emphasis in original). Dkt. No. 220 at 5. The defendant's misplaced assertion is tantamount to an argument that this entire conspiracy was solely a cordoned-off effort to get him into the terrorist organization. He also argues that "no evidence" was presented to the jury demonstrating that firearms were used or carried to further this cordoned-off effort. *See id.* However, even under

this cramped and incorrect interpretation of the law as it applies to Counts One and Three, the government elicited significant evidence that firearms were used, carried, and/or possessed to further the defendant's agreement to provide himself and services to ISIS.

As the evidence at trial demonstrated, firearms were abundant and essential for the operation of the ISIS criminal conspiracy that the defendant deliberately joined.  *See United States v. Hassan*, 742 F.3d 104, 140 (4th Cir. 2014) ("To convict [the defendant] on count one [conspiring to violate 18 U.S.C. § 2339A], the government was obliged to prove: (1) that he entered into a conspiracy; (2) that the objective thereof was to provide material support or resources . . . ." (citations omitted).  The Fourth Circuit's application of the law of conspiracy in *Hassan* is perfectly consistent with this Court's instruction on the law of conspiracy.  With respect to Count One, the jury was instructed that the government was required to prove the following elements, *inter alia*, beyond a reasonable doubt: "First, that there was an agreement between two or more persons to provide material support or resources to a designated foreign terrorist organization.  Second, that the defendant became a member of the conspiracy knowingly of its object and intending to help accomplish it."  Trial Tr. 1200:10-16.  Accordingly, the appropriate legal framework to evaluate the § 924(c) count is in relationship to the conspiracy the defendant knowingly joined.  The government was required to prove a conspiracy – "that is, an agreement between two or more persons to engage in illegal activity."  *Hassan*, 742 F.3d at 140 (citing *United States v. Burgos*, 94 F.3d 849, 857–58 (4th Cir.1996) (en banc)).  *See also United States v. Boyd*, 209 F. App'x 285, 289 (4th Cir. 2006) (holding that the government presented sufficient evidence to show that defendant possessed firearms in furtherance of "the overarching crack cocaine distribution conspiracy," even if there was no evidence that the defendant actually took the firearms to Washington, D.C. and traded them for crack cocaine).

With the appropriate conspiracy framework established, the relevant inquiry is whether the evidence sufficiently established that other co-conspirators used or carried firearms during and in relation to the conspiracy or whether other co-conspirators possessed firearms in furtherance of the conspiracy, and were either of those acts reasonably foreseeable to the defendant.  *See United States v. Blackman*, 746 F.3d 137, 141 (4th Cir. 2014) ("The *Pinkerton* doctrine provides that a defendant is liable for substantive offenses committed by a co-conspirator when their commission is reasonably foreseeable and in furtherance of the conspiracy." (internal quotation and citation marks omitted)).  In other words, under *Pinkerton* "so long as the partnership in crime continues, the partners act for each other in carrying it forward."  *Blackman*, 746 F.3d at 141 (citing *Pinkerton v. United States*, 328 U.S. 640, 646 (1946)).  *See also Whitener v. United States*, No. 3:14-CV-600-MOC, 2016 WL 2932833, at *7 (W.D.N.C. May 19, 2016) ("*Pinkerton* liability suffices to support a defendant's conviction, even where the quantum of proof on an aiding-and-abetting theory may be lacking.") (citing *Blackman*, 746 F.3d at 141).  The Fourth Circuit law with respect to § 924(c) under *Pinkerton* co-conspirator liability is firmly established.  *See, e.g.*, *United States v. Wilson*, 135 F.3d 291, 304-05 (4th Cir. 1998) (defendant may be convicted of a charge for using or carrying firearm during and in relation to drug trafficking offense on the basis of a co-conspirator's use of gun if the use was in furtherance of the conspiracy and was reasonably foreseeable to defendant).

As described below, firearms further a terrorist organization's cause in countless ways.  In fact, firearms are essential to the existence of the terrorist organization.  For example, in order to operate like a nation state, and be "an active military and terrorist organization" who "has to move fighters around the battlefields," ISIS raises an army and attracts foreign fighters who "could also become average combatants interested in in engaging in conventional kinds of

6

violent conflict." Trial Tr. 805:25-806:1; 808:20. The terrorist organization's reliance on firearms is analogous to the drug trafficking organization's reliance on firearms. In *United States v. Lomax*, the Fourth Circuit found sufficient evidence to sustain a § 924(c) conviction by reflecting on "the numerous ways in which [possession of] a firearm might further or advance drug trafficking." 293 F.3d at 705.

> For example, a gun could provide a defense against someone trying to steal drugs or drug profits, or it might lessen the chance that a robbery would even be attempted. Additionally, a gun might enable a drug trafficker to ensure that he collects during a drug deal. And a gun could serve as protection in the event that a deal turns sour. Or it might prevent a transaction from turning sour in the first place. Furthermore, a firearm could help a drug trafficker defend his turf by deterring others from operating in the same area.

*Id.* Importantly, however, "whether the firearm served such a purpose is ultimately a factual question" to be decided by the fact finder – in this case, the jury. *Id.* (citations omitted). Here, the firearms were used by the defendant's ISIS co-conspirators to maintain and expand its caliphate. The non-exhaustive list of the evidence relied upon by the jury includes: (1) the Libyan ISIS member who was shot in the head fighting for ISIS that the defendant cared for when he returned from the battlefield; (2) the defendant's fellow ISIS recruits who were receiving sniper training; (3) the Iraqis, with whom the defendant resided, who were sent to a different location in Syria to receive military training from ISIS on how to fight in their home countries; (4) the ISIS transporters and leaders carrying firearms to protect themselves and the organization; and (5) the engagement of "war" against the organization's opponents. *See infra*.

With respect how the firearms furthered, advanced, or promoted the defendant's agreement to provide himself and services to the terrorist organization, the non-exhaustive list of the evidence relied upon by the jury includes: (1) the defendant knew that ISIS expanded its caliphate by violence, and he nonetheless wanted to see it and "be part of it" (Trial Tr. at 531:1-

10; 954:13-16); (2) the defendant was transported to an ISIS safe house in Syria in a vehicle with

ISIS members, at least one of whom was armed with a "rifle" (*Id.* at 550:4-15; 730:9-12); (3)

every ISIS leader the defendant saw was carrying and guarding the homes in which he was

residing with weapons (*Id.* at. 1085:12-17); (4) some of the ISIS recruits that underwent ISIS-

directed religious training with the defendant "were tasked with armed guard duty at checkpoints

for ISIS to control those checkpoints" (*Id.* at 562:13-15); and (5) An ISIS camp roster that was

recovered in Mosul, Iraq indicated that the defendant received an allowance or stipend, contains

fields for weapons that, even if left blank for the defendant, provided the jury with a reasonable

inference that his co-conspirators use firearms to further the organization's violent objectives,

and the form listed the defendant's "[c]urrent mission" for ISIS as a "Fighter." *Id.* at 490:25-

491:5; Gov. Exs. 30A-B.

    In sum, the firearms allowed the defendant to be a part of the then-expanding caliphate,

which was being controlled by armed ISIS guards.  The firearms allowed the defendant to enter

Syria (a country that he admitted on cross-examination had its borders closed) and provide

himself to ISIS.  The armed ISIS members who guarded ISIS safe houses allowed the defendant

to remain protected while he resided in those homes, which in turn allowed him to continue

undergoing his ISIS indoctrination training, and also allowed him to continue providing services

to the organization.  The firearms allowed the defendant to care for wounded ISIS fighters as

they returned from the battlefield.  The fact that the use of those firearms may have furthered

ISIS's military objectives generally, as the defendant argues in his motion (*see* Dkt. No. 220 at

5), is irrelevant to the analysis here given that the organization's objectives and the defendant's

objectives are not mutually exclusive.  For example, co-conspirators using firearms to protect the

organization while the defendant is a member clearly serves both interests (*e.g.*, the defendant

cannot provide himself or services to the organization if he falls victim to an attack on an ISIS safe house in which he is residing), and the Fourth Circuit has repeatedly recognized that it is sufficient to establish that the purpose of the firearm was to "protect or embolden" the defendant. *United States v. Sullivan*, 455 F.3d 248, 260 (4th Cir. 2006) (citing *United States v. Lipford*, 203 F.3d 259, 266 (4th Cir. 2000)).

In addition to the above-described evidence of how firearms were continuously being used to advance or promote the conspiracy while he was an ISIS member for 2.5 months, the use, carrying, or possession of firearms by his ISIS co-conspirators was clearly foreseeable to the defendant even before he traveled overseas. For example, the defendant told the FBI in *Mirandized* interviews that he knew, even before he departed the United States, that "ISIS members would undergo military training"; by joining ISIS, "weapons training was a possibility"; if he was asked, he would be willing to undergo weapons training; and he understood that ISIS recruits "who were unskilled were likely destined for military training and to fight," which involved weapons training; and that, approximately one month before he traveled overseas to join ISIS, he knew that ISIS claimed responsibility for the November 13, 2015 attacks in Paris, France, during which ISIS operatives used firearms and explosives to kill upwards of 100 civilians. *See* Trial Tr. 532:5-24; 577:13-14; 631:16-23; 742:3-13. Indeed, during his ISIS intake process, the defendant told a senior ISIS official that he was unskilled. *Id.* at 552:12-16. The numerous images of ISIS fighters using, carrying, or possessing firearms that the defendant viewed on his phone shortly before he voluntarily joined the terrorist organization provides strong corroboration of those statements. *See infra* Part II.B; Gov. Ex. 4. On cross-examination, the defendant attempted to minimize his conduct by indicating that he did not "recall making those statements, those exact statements," but acknowledged knowing, prior to

entering Syria, that engaging in weapons training in ISIS-controlled territory was a possibility "[f]or somebody who was interested in that." *Id.* at 955:23-956:6.

### B. There is More than Sufficient Direct and Circumstantial Evidence in the Record Demonstrating that the Weapons Observed by the Defendant Fall Within the Statutory Definition of Firearms

For the first time ever, the defendant makes the incredible argument that the omnipresent firearms he observed on numerous occasions and admitted were being used by ISIS in Syria and Iraq throughout his 2.5 months as an ISIS member in a war zone could have been "fake" weapons that "were carried for show only." *See* Dkt. 220 at 9. He makes this claim notwithstanding the fact that the evidence at trial demonstrated that he provided himself and performed various services on behalf of a lethal terrorist organization that seeks to expand its territory by force and violence – the very same organization that the defendant admitted was providing his cohabitants with military and sniper training – and notwithstanding the fact that the defendant and other ISIS fighters with whom he was residing in multiple safe houses were being protected by armed ISIS members.

The trial record is replete with both direct and circumstantial evidence that a reasonable fact finder could accept as adequate and sufficient to support a conclusion that the firearms used, carried, and/or possessed by the defendant's co-conspirators were, in fact, firearms as correctly defined in the jury instructions. *See* Trial Tr. 1209:13-17. In addition to eyewitness testimony, the government provided sufficient circumstantial evidence through a "proof of a chain of facts and circumstances indicating the existence of" that fact. *Id.* at 1188:22-23. The Fourth Circuit has repeatedly observed that "'circumstantial evidence is not inherently less valuable or less probative than direct evidence' and may alone support a guilty verdict." *United States v. Martin*, 523 F.3d 281, 289 (4th Cir. 2008) (citing *United States v. Williams*, 445 F.3d 724, 731 (4th

Cir.2006)).  *See also Holland v. United States*, 348 U.S. 121, 140 (1954) ("Circumstantial

evidence . . . is intrinsically no different from testimonial evidence.").

It is also well established in the Fourth Circuit that expert testimony is not required to

support a conviction under § 924(c), and that lay eyewitness testimony to the presence of a

firearm is sufficient.  *See United States v. Jones*, 907 F.2d 456, 460 (4th Cir. 1990).  The firearm

supporting a § 924(c) conviction need not be seized or offered into evidence to sustain such

conviction.  *United States v. Jeffers*, 570 F.3d 557, 566 n. 6 (4th Cir. 2009) (citing *Jones*, 907

F.2d at 460)).  Absent some indication that the firearm was a fake – and there was none here –

lay eyewitness testimony that a firearm was carried or used is sufficient.  *See United States v.

McNeal*, 818 F.3d 141, 149 (4th Cir. 2016) (rejecting defendants' argument that the government

failed to produce expert testimony that the firearms brandished were capable of expelling a

projectile because expert testimony is not necessary to prove a § 924(c) conviction "absent some

indication that the firearm was a fake.").  Courts have rejected the notion that the government

must disprove the theoretical possibility that a gun was a fake or replica, as suggested by the

defendant (Dkt. No. 220 at 9).  *See United States v. Jones*, 16 F.3d 487, 491 (2d Cir. 1994) ("The

mere possibility that the object seen by witnesses may have been a sophisticated toy or other

facsimile does not necessarily create a reasonable doubt, nor is the government required to

disprove that theoretical possibility.") (citations omitted); *United States v. Hunt*, 187 F.3d 1269,

1270–71 (11th Cir. 1999) (a § 924(c) conviction may be sustained by lay witness testimony that

a defendant carried or used a gun, and that this need not be shown to a scientific certainty).

Under this standard, it is clear that the evidence admitted at trial was more than sufficient

that the firearms used, carried, and possessed by the defendant's co-conspirators were, in fact,

firearms.  At the outset of the trial, the jury heard testimony from a Kurdish Peshmerga soldier

who captured the defendant on March 14, 2016 in a war zone in Northern Iraq.  Evidence admitted during trial established that, at that point, the defendant had been a member of ISIS in Iraq and Syria for approximately 2.5 months.  *See* Trial Tr. 739:6-12; 777:8-19.  The Peshmerga soldier explained that ISIS "kill[s] people," and in his area, "they have killed some 6,000 people of the Yazidi group."  Trial Tr. 124:21-22.  He provided the jury with eyewitness testimony from the battlefield, explaining that when he observed the defendant, the defendant was coming from the direction of Tal Afar and the villages near there, which was "all ISIS occupied territory."  *See id.* 125:23-126:20; 128:22-25; 149:5-13.  Significantly, the Peshmerga soldier testified that he first encountered the defendant in "no man's land," which is "considered ISIS area," and that he had to act quickly to retrieve the defendant and come back to his "own area because **there are lots of ISIS snipers**."  *Id.* at 147:7-11; 169:21-23.  "Sniper" according to Webster's Dictionary means "a marksman who shoots at people from a concealed place."  *Merriam Webster*, http://www. webster-dictionary.org/definition/sniper (last visited Aug. 15, 2017).  The jury, using common sense, had a sufficient basis to conclude that snipers located in ISIS-controlled territory – the same area in which the defendant himself was a member of ISIS – do not "shoot" at Peshmerga military soldiers with toy or replica firearms.

The following testimony was elicited at trial from FBI Special Agents Victoria Martinez and/or Brian Czekala, both of whom conducted *Mirandized* interviews with the defendant in Iraq in April 2016, regarding the firearms used, carried, and/or possessed by the defendant's ISIS co-conspirators:

- The defendant admitted, after being told by an ISIS facilitator to watch out for land mines and bombs near the Turkish-Syrian border, that he was transported to an ISIS safe house in Raqqa, Syria in an SUV with ISIS members, at least one of whom was armed with a "**rifle**" (Trial Tr. 548:17-24; 550:4-15; 730:9-12);

- **Every ISIS safe house** in which the defendant resided throughout his approximately 2.5 months in Syria and Iraq **contained firearms** and he saw "many ISIS members holding weapons, including ISIS leadership" (*Id.* at 564:16-19; 577:13-15; 741:1-8);

- At the second safe house in Syria, the defendant met representatives of an ISIS external operations group, "**commando military type of group**," known as "Jaysh Kalifa," that would take ISIS recruits and train them on how to conduct attacks in their countries of origin. While the defendant claimed he did not volunteer for Jaysh Kalifa, he stated that another American with whom he resided had gone off to receive training from the group, and he learned that the training involved firearms, specifically, "that **they also shot weapons**" (*Id.* at 733:17-734:12; 1118:5-11);

- At the third safe house in Syria, the defendant resided with three ISIS members from Iraq who he learned "had recently traveled into Syria to receive **military and weapons training** in order to go back to Iraq and fight" (*Id.* at 560:2-17);

- In Mosul, Iraq, where the defendant resided for approximately 25 days and accompanied injured ISIS fighters to the hospital, he stated that his fellow ISIS recruits "would eventually go off and be transferred for military weapons training, and some of the recruits were transferred for **sniper specific training**." ISIS instructed the defendant that his next step was military training (*Id.* at 562:6-20; 736:8-23);

- Also in Mosul, Iraq, some of the ISIS recruits that underwent ISIS-directed religious training with the defendant "were tasked with **armed guard duty** at checkpoints for ISIS to control those checkpoints" (*Id.* at 562:13-15);

- In Tal Afar, where the defendant spent approximately 30 days in a "katiba," which was described as "an ISIS neighborhood or military battalion," the defendant stated there "were fighters coming and going from the town" and fighters would frequently come in and leave his house. The defendant stated that "he spent a lot of time with ISIS fighters," and that he cared "for wounded ISIS fighters, including one that was **shot in the head** and paralyzed" who the defendant said "was hurt while fighting as an ISIS member" (*Id.* at 564:15; 565:3-6; 739:6-12); and

- In fact, the defendant stated "[t]here were **so many fighters** coming and going that **weapons were kind of laying around**," and as such, "[h]e would often just organize them and keep them out of the way," and gave one example of **seeing a rifle** on a couch and moving it so that he could sit down (*Id.* at 564:21-565:1; 741:15-18).

13

Additionally, the jury heard testimony that, before the defendant decided to leave the United States and join ISIS, he knew that ISIS is a terrorist organization (*Id.* at 529:4-19); that ISIS was expanding its so-called caliphate by violence (*Id.* at 531:4-5; 954:13-18); that ISIS members would undergo military training and that, if asked, he would be willing to participate in military training (*Id.* at 577:11-20); that ISIS conducts military and terrorist operations in Syria and Iraq (*Id.* at 526:16-18); that ISIS plans and launches attacks against its enemies, which includes the United States and other countries (*Id.* at 531:17-24); and that, approximately one month before he traveled overseas to join ISIS, the defendant admitted that he knew ISIS claimed responsibility for the November 13, 2015 attacks in Paris, France, during which ISIS operatives used firearms and explosives to kill upwards of 100 civilians (*Id.* at 532:5-24). Willliam Braniff, a terrorism expert, testified that ISIS "is the most lethal terrorist organization in the world," and has been since 2014, killing over 9,000 individuals annually since then (*Id.* at 799:12-14; 800:14-18). According to empirical data for the years 2014 and 2015, ISIS has "engaged in over 100 attacks per month on average, which is more than three per day. It is an exceptionally high operational tempo for terrorist organizations" (*Id.* at 800:22-25).

Separate and apart from Agent Martinez and Agent Czekala's extensive testimony about the firearms, the defendant testified at trial that he was transported to the first ISIS safe house in Syria in an SUV with three men, one of whom he saw armed with a rifle (*Id.* at 996:20-997:5); that before he arrived at that safe house, he was told to put his phone on airplane mode and to take the batteries out because the satellite may detect the signal, and could lead to him and his fellow ISIS members being killed by an air strike (*Id.* at 997:9-18); that he observed a weapon in the first ISIS safe house in which he resided (*Id.* at 865:23-25); that he was residing with Iraqis who were sent to a different location in Syria to receive military training from ISIS on how to

fight in their home countries (*Id.* at 1078:8-1079:6); that he resided in Mosul, Iraq with ISIS for a number of weeks and observed at least three ISIS leaders carrying firearms on their person (*Id.* at 1085:4-11); that he resided in Tal Afar, Iraq for 30 days in an ISIS-controlled area with fighters who were carrying firearms (*Id.* at 1089:21-1090:11); and that every ISIS leader he saw was carrying and guarding the homes in which he was residing with weapons (*Id.* at. 1085:12-17). Based on this testimony, the jury had a sufficient basis to conclude that members of such a violent and lethal organization, particularly one that is concerned about being killed by air strikes, are not carrying "fake" firearms "for show only." *See* Dkt. No. 220 at 9.

In fact, the defendant's Samsung phone, which he possessed when he was captured by the Peshmerga, contained a portion of a video that, according to FBI Special Agent Ryan Lamb, depicted ISIS flags and "a number of individuals brandishing firearms." Trial Tr. 352:1-5; Gov. Exs. 11B and 4 (slide 80). Agent Lamb also testified that he had received firearms training in connection with his employment at the FBI. *Id.* at 290:19-21. Agent Czekala, who is assigned to a counterterrorism squad at the FBI and has investigated attacks, murders, and kidnappings overseas, testified that the same ISIS video showed "a bunch of men holding what appears to be AK-47 rifles or some kind of variant of a Kalashnikov rifle," and that the defendant received the video from one of his fellow ISIS members who claimed he was in the footage of the video. *Id.* at 505:7-18; 576:1-24. The defendant admitted during cross-examination that the video was sent to him while he was with ISIS. *Id.* at 1054:12-16.

Furthermore, Agent Lamb identified numerous images on the defendant's phones that depicted firearms, based on his training and experience investigating terrorist organizations, including ISIS. For example, Agent Lamb identified the following relevant images in Government's Exhibit 4, many of which were either stored on the defendant's phone shortly

before he traveled to ISIS-controlled territory or while he was actually with ISIS: slide 30 (fighters holding automatic weapons with the ISIS logo branded on the photograph); slide 31 (two or three soldiers carrying automatic weapons with the ISIS logo branded); slide 39 (two individuals, one masked, carrying automatic weapons); slide 41 (fighter carrying a weapon with the ISIS flag flying behind him); slide 48 (ISIS news agency banner that has an individual with a mask holding an automatic weapon); slide 49 (image of a propaganda video with two fighters holding weapons); slide 50 (soldiers walking through a ravine with the ISIS branding on the bottom, one of whom has an automatic firearm); slide 51 (machine gun mounted on the back of a pickup truck (it appears the machine gun is being fired) with the ISIS branding); slide 53 (Islamic State radio banner that has a masked individual with a firearm); slide 55 (Islamic State banner for the province of Raqqah that has an individual wearing a hood holding a firearm); slide 59 (Islamic State banner for the province of Hims that has an individual with a hood holding a firearm); slide 63 (an individual posing next to the ISIS flag holding what appears to be an AK-47 firearm); slide 67 (mass grave, individuals holding assault rifles, and what appear to be people that have been killed); and slide 79 (image of two fighters holding firearms).  *See generally* Trial Tr. 325:13-349:24; Gov. Ex. 4.

Of those images, the defendant admitted during cross-examination that slides 30, 31, 39, 49, 50, 51, 55, and slide 63 all contain firearms, even agreeing that slide 49 shows two individuals with what appear to be "semi or automatic weapons" in a "shooting" position (Trial Tr. 1037:5-9); that slide 51 shows a masked individual "shooting" a firearm; (*Id.* at 1038:16-18); and that slide 63 shows an ISIS fighter with an "AK-47" (*Id.* at 1040:24-1041:2).  While these particular images are not images of the firearms that the defendant observed his co-conspirators possessing and carrying while he was with ISIS, this evidence, as well as the testimony

concerning the defendant's extensive research about ISIS before and while he was with ISIS, provided a sufficient basis for the jury to reasonably conclude that the defendant has the requisite knowledge to identify actual firearms when he sees them, and evidence that the defendant knowingly joined the conspiracy with full knowledge that his co-conspirators used, carried, and possessed firearms in furtherance of their criminal objectives.

Additionally, Kurdish CTD Official #1, a Captain in the Regional Council on Security for the Kurdistan Regional Government who has been investigating terrorism offenses in Northern Iraq for nearly nine years, and who presided over the defendant's detention following his capture, testified that his region is "living in a state of war." *Id.* at 376:25-377:1; 436:18-19.  He explained that ISIS took control of Mosul, Iraq in June 2014, that ISIS still controlled Mosul in December 2015 into the beginning of 2016, and that ISIS controls the borders of Mosul with checkpoints, patrols, and "armed people stationed there." *Id.* at 433:15-434:16.  William Braniff further testified that Mosul "is a horrifically violent place by just about any empirical measure." *Id.* at 823:5-6.  He added that, "the last five years have been the most lethal and active years of terrorism on record," and that the most violent places have included Syria and Iraq. *Id.* at 823:9-12.  Finally, Mr. Braniff noted that ISIS operates like a nation state, and as such, has established an army that it needs to feed and clothe. *Id.* at 805:23-806:2.

Colonel Fadhil Arkan, a commander of a tactical unit in the special operation for the Counterterrorism Service of the Republic of Iraq, where he has worked for 11 years, testified that ISIS took control of the city of Mosul in Iraq in June 2014 "by force." *Id.* at 215:15; 216:3-11. Beginning in October 2016, his forces began retaking Mosul from ISIS, and during that campaign, they found a number of ISIS documents in February 2016 in a house that ISIS previously converted to an office building. *Id.* at 215:25-218:17.  Among the documents were

the defendant's ISIS intake form, which listed his "specialty before jihad,"[1] along with an ISIS

camp roster that included the defendant's name and status as a "fighter" (or "combatant") with

19 other ISIS fighters.  *Id.* at 218:3-5; Gov. Exs. 29A-B and 30A-B.  Both documents have fields

for "Weapons capable of using," and "Date joined (or assigned to) the army."  Gov. Exs. 29A-B

and 30A-B.  Additionally, the defendant's ISIS application form includes fields for "Military

Camp," "Type of Weapon," "Rifle," and "Pistol."  Gov. Exs. 29A-B.  While all of these fields

were blank, the evidence suggests, *inter alia*, that the particular ISIS group the defendant had

joined, "The Islamic State Soliders' Bureau Eastern Region" (*see* Gov. Ex. 29B), uses rifles and

pistols, even if the form does not indicate that the defendant was assigned one, and that this

specific ISIS group does, in fact, assign its members to military camps in preparation of joining

its army.  The jury, using common sense, had a sufficient basis to conclude from this

documentary evidence that no army in the world, particularly one that is seeking to expand its

land by force and the commission of terrorist attacks, uses toy or replica pistols and rifles.

Whether the defendant described the "size of the firearm, its color, weight, whether it was

loaded, automatic, ever fired, etc.," as he argues in his motion (*see* Dkt. No. 220 at 10), is

irrelevant given the overwhelming amount of testimonial and documentary evidence supporting

the jury's verdict, and is also not required.  The Fourth Circuit's decision in *United States v.*

*Partman*, 568 F. App'x 205, 210 (4th Cir. 2014) is instructive and squarely addresses the

defendant's arguments.  There, the Court acknowledged that "[t]he basis for Partman's

conviction is unusual because no firearm was recovered and no witness testified to seeing

Partman with a firearm in any relevant instance."  *Id.*  However, the Fourth Circuit indicated that

---

[1] Mr. Braniff testified that, for modern terrorist organizations, "jihad is an individual duty to engage in violence to advance their beliefs."  *Id.* at. 794:5-12.  Agent Lamb testified that "jihadi," in the context of search results found on one of the defendant's phones, which contained a number of terrorism-related images, "usually means fighter."  *Id.* at 320:13-321:23.

the evidence, which was limited to the defendant's own admissions regarding his possession of firearms to witnesses, rather than a witnesses' description or observation of those firearms, was sufficient to sustain the jury's § 924(c) guilty verdict. *See id.* at 211-12.  Similar to the defendant's argument here, the Court noted that "Partman argues that his conviction cannot stand because no evidence was presented to establish where or when his firearm was found or what condition it was in (easily accessible, loaded, illegally possessed, etc.)." *Id.* at 210.  In no uncertain terms, the Fourth Circuit rejected that argument and stated the following:

> It is clear, however, that these factors can only reasonably be considered when a firearm is seized, and as we held in *Jeffers*, a possession conviction can be sustained even if no firearm is recovered.  Partman's conviction does not rely in any way on seizure or physical evidence of a firearm, and accordingly **the physical attributes of the firearm** the jury concluded Partman possessed **are simply irrelevant.**" *Id.* at 210-11 (emphasis added).

As the Court stated, "[i]n sum, given the deference accorded credibility determinations and viewed in the light most favorable to the government, we find that the facts here, including Partman's own words, provide sufficient evidentiary support for the jury verdict." *Id.* at 212.

The evidence here is significantly stronger than that which the Fourth Circuit examined in *Partman*.  Given that the defendant was an ISIS member in Syria and Iraq for 2.5 months, was captured in a war zone where ISIS snipers are located, and had several pictures on his phones of ISIS fighters with firearms, including semi and automatic weapons, the jury had a sufficient basis to "to draw from the facts which [they] find have been proved such reasonable inferences" and conclude that, the defendant's statements to the FBI, as well as his in-court testimony describing his eyewitness accounts of the firearms, met the definition of firearms as they were so instructed. *See* Trial Tr. 1186:2-4; 1209:13-17.  Additionally, the defendant did not only see one firearm, on one occasion, for a short period of time (as is typical in bank robbery cases and other cases cited by the defendant (*see* Dkt. 220 at 8-9), where the risk of potentially mischaracterizing an object

in a waistband is certainly greater than mischaracterizing firearms possessed, used, and carried

by a terrorist organization in a war zone).  Rather, the defendant repeatedly observed numerous

firearms throughout his time with ISIS, as firearms were present in every ISIS safe house in

which he resided, and carried by every ISIS leader that he saw.  Finally, the defendant's

observations were also corroborated by other individuals who testified at trial, including a

Peshmerga soldier and a Kurdish counterterrorism investigator.  The defendant's observations

were further corroborated by his ISIS forms that were recovered from Mosul, Iraq, and the

above-described ISIS video showing individuals brandishing AK-47 rifles.

### C.  Corroborating Evidence Beyond the Defendant's Admissions that Clearly Support the § 924(c) Conviction

The defendant's assertion that he cannot be convicted under § 924(c) because there is no

independent corroboration, other than his own statements, that there were actual firearms present

is inaccurate (*see supra*) and a misapplication of the relevant law.  As the trial record reflects, the

defendant's argument overlooks a number of other sources of evidence that corroborate his

statements and dovetail with his continuous observations of numerous firearms while he was a

member of ISIS in Syria and Iraq for 2.5 months.

The Supreme Court has recognized that, "[i]t is a settled principle of the administration of

criminal justice in the federal courts that a conviction must rest upon firmer ground than the

uncorroborated admission or confession of the accused" made after commission of a crime.

*Wong Sun v. United States*, 371 U.S. 471, 488-89 (1963).  Still, "the Supreme Court has

cautioned that since this corroboration rule 'infringe[s] on the province of the primary finder of

facts, its application should be scrutinized lest the restrictions it imposes surpass the dangers

which gave rise to them.'"  *United States v. Abu Ali*, 528 F.3d 210, 234-35 (4th Cir. 2008)

(quoting *Smith v. United States*, 348 U.S. 147, 153 (1954)).

In *Abu Ali*, the Fourth Circuit explained that in years past, courts and commentators disagreed as to the amount and quality of corroboration required. Some mandated that corroboration provide independent proof of the *corpus delicti*, or of commission of a crime; others followed a more flexible "trustworthiness" approach. *Abu Ali*, 528 F.3d at 235. The Supreme Court resolved the dispute in *Opper v. United States*, 348 U.S. 84 (1954), by rejecting the *corpus delicti* rule and adopting the trustworthiness approach, which it found to be the "better rule." *Id.* at 93. Under that rule, the United States must "introduce substantial independent evidence which would tend to establish the trustworthiness of the [defendant's] statement." *Id.* But this "corroborative evidence need not be sufficient, independent of the [defendant's incriminatory] statements, to establish the *corpus delicti*." *Id.*; *see also Abu Ali*, 528 F.3d at 237 ("the *Opper* Court instructed that '[i]t is sufficient if the corroboration supports'—not establishes—'the essential facts admitted,' and that corroboration need only '*tend* to establish'— not establish—'the trustworthiness' of the confession." (emphasis in original)); *Wong Sun*, 371 U.S. at 489 (noting "extrinsic proof [i]s sufficient which merely fortifies the truth of the confession, without independently establishing the crime charged" (internal quotation marks omitted)).

The Fourth Circuit squarely analyzed and summed up how the "trustworthiness" approach applies in court, allowing for independent evidence to bolster the confession itself:

> Independent evidence adequately corroborates a confession if it "supports the essential facts admitted sufficiently to justify a jury inference of their truth;" the facts admitted "plus the other evidence besides the admission must, of course, be sufficient to find guilt beyond a reasonable doubt." *Opper*, 348 U.S. at 93, 75 S.Ct. 158. Thus, "**corroborative evidence does not have to prove the offense beyond a reasonable doubt, or even by a preponderance**, as long as there is substantial independent evidence that the offense has been committed, and the evidence as a whole proves beyond a reasonable doubt that [the] defendant is guilty." *Smith*, 348 U.S. at 156, 75 S.Ct. 194. The government must establish each element of an offense but may do so "by independent evidence *or*

corroborated admissions," and one "**mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense through the statements of the accused.**"  *Id.* (emphasis added).

*Abu Ali*, 528 F.3d at 237.  The Fourth Circuit has "defined 'substantial evidence' as 'evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt.'"  *United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005).  If the evidence "supports different, reasonable interpretations, the jury decides which interpretation to believe."  *United States v. Murphy*, 35 F.3d 143, 148 (4th Cir. 1994).

Here, the defendant claims there was insufficient evidence for the jury to have concluded that he is guilty of Count Three because the government "presented no independent corroborating evidence" that the § 924(c) offense was committed and that there "was no evidence," other than the defendant's admissions, on this count of conviction.  Dkt. No. 220 at 10.  The evidence presented at trial plainly demonstrates that this is not a case in which the government obtained a conviction based on the defendant's confession that he was a member of ISIS and that he generally saw firearms overseas, with nothing more.  The defendant fails to account for a laundry list of corroborating evidence that firmly establishes the trustworthiness of the statements that were admitted at trial.  To name just a small sampling of many examples:

- The defendant's statements about his fellow ISIS recruits in Iraq receiving "sniper specific training" (Trial Tr. 736:21-23) is corroborated by Peshmerga Official No. 1's testimony about "lots of ISIS snipers" being present in the area in which he first encountered the defendant (*Id.* at 169:21-23).  Additionally, Peshmerga Official No. 1's eyewitness testimony that the defendant was coming from the direction of Tal Afar (*Id.* at 128:24) corroborates the defendant's admissions about that city, which he observed was ISIS-controlled with armed fighters and guards while he was there (*Id.* at 564:8-15; 741:6-10).

- The defendant's statements about some of his fellow ISIS recruits in Mosul, Iraq who were tasked with "armed guard duty" (*Id.* at 562:13-15) at ISIS checkpoints to control the city is corroborated by Kurdish CTD Official No. 1's testimony that that ISIS controls the borders of Mosul with checkpoints, patrols, and "armed people stationed there" (*Id.* 434:14-16).  William Braniff further testified that

Mosul "is a horrifically violent place by just about any empirical measure" (*Id.* at 823:5-6).

- The defendant's observations of ISIS members possessing or carrying "rifles" and the presence of firearms in every ISIS safe house in which he resided (*Id.* at 564:18-19) is corroborated by the defendant's ISIS application form, which contained fields for "Military Camp," "Type of Weapon," "Rifle," and "Pistol," and "Date joined the army." Gov. Exs. 29A-B. This documentary evidence is further corroborated by Kurdish CTD Official No. 1's testimony about "living in a state of war" (Trial Tr. 436:18-19); Col. Arkan's testimony about ISIS taking control of Mosul "by force" (*Id.* 216:9-11); and William Braniff's testimony about ISIS's establishment of an army (*Id.* at 806:1).

- Agent Lamb and Agent Czekala's testimony about the ISIS video recovered from the defendant's phone, which showed "a number of individuals brandishing firearms" (*Id.* at 352:3-5), and in particular, holding "what appears to be AK-47 rifles or some kind of variant of a Kalashnikov rifle" (*Id.* at 576:15-17) also corroborates the defendant's eyewitness testimony about the firearms and "so many fighters coming and going" (*Id.* at 564:21-23) given that the defendant received the video, while he was with ISIS, from one of his fellow ISIS members who claimed he was in the footage of the video (*Id.* at 576:18-24; 1054:12-16).

- The defendant's continuous observations of firearms while he was with ISIS is corroborated by the numerous images stored on the defendant's phones of ISIS fighters with firearms, including "semi or automatic weapons," which demonstrates the defendant's knowledge and familiarity with those weapons. *See id.* at 1037:5-6; Gov. Ex. 4. As summarized above, Agent Lamb's testimony regarding many of those images, in which he identifies specific types of firearms in certain images, is also compelling corroborating evidence. *See generally* Trial Tr. 325:13-349:24.

The defendant's reliance on *United States v. Stephens*, 482 F.3d 669 (4th Cir. 2007) is misplaced. *See* Dkt. No. 220 at 11-12. In *Stephens*, there was *no* additional evidence, other than the defendant's own out-of-court statements, establishing his connection to a drug conspiracy or drug trafficking crime. *See Stephens*, 482 F.3d at 673. The court therefore held that, absent corroborating evidence that the defendant was engaged in the drug trade, his conviction for using a firearm in connection with a drug trafficking crime was infirm. *Id.* In this case, the government presented far more evidence at trial that established a connection between the defendant and his firearms conviction, and does not rest entirely on the defendant's statements as

demonstrated by the above-described testimonial and documentary evidence, as well as the

defendant's testimony at trial, which largely corroborated the agents' testimony about the

firearms – and which is clearly different than an extrajudicial confession and nothing more – as

was in the case in *Stephens*. *See, e.g.*, *United States v. Lehmann*, 613 F.2d 130, 133 (5th Cir.

1980) (holding that the defendant's statements in court admitting he had purchased his gun in

New Orleans could corroborate his previous admission to customs agents regarding the same fact

in establishing the defendant's interstate transportation of the firearms).

In addition to the above-described evidence corroborating the defendant's observations of

his co-conspirators carrying and using firearms while he was a member of ISIS, the government

presented the jury with extensive corroboration of the defendant's statements regarding his

knowledge of ISIS, his travel to ISIS-controlled territory, and his communications with ISIS

facilitators/recruiters. For example, the forensic analysis of the defendant's phones, which

included the images described above and a plethora of other violent images that were presented

at trial, corroborates the defendant's statements that he knew ISIS engages in terrorism before he

voluntarily entered ISIS-controlled territory. *See, e.g.*, Trial Tr. 942:7-943:3. The jury viewed

the defendant's overseas wireless network connection data points, and Google/Internet search

history, DMV records, car rental records, airline records, bank records, email records, social

media records, all of which corroborated his statements and demonstrated how he made it from

his couch in Alexandria, Virginia to an ISIS safe house in Raqqa, Syria, within a few weeks. *See*

Gov. Exs. 4 (slides 13-18 and 20-24), 46-49A, 50A-51, 53-54, 57-70, 74; Trial Tr. 1056:15-18.

The defendant's statements about his interest in serving as a fighter and/or suicide

bomber for ISIS were corroborated through the ISIS documents recovered in Mosul, and his

Facebook and Twitter records that showed the creation of the username "iAGreenBirdiA" while

the defendant was in Turkey, which the defendant acknowledged is used by ISIS and other

violent terrorist groups to reference martyrdom, violent jihad, and suicide operations. *See* Gov.

Exs. 61-62; Trial Tr. 540:5-9. The government also corroborated the defendant's statements

about contacting certain individuals affiliated with ISIS while in Turkey to seek assistance in

completing his journey to the Islamic State through the use of records from Twitter. The jury

viewed a private Twitter message that the defendant sent to an individual who appeared to be

recruiting foreign fighters for ISIS, asking whether that individual used a specific encrypted

social media platform, because the defendant "knew that individuals affiliated with ISIS would

feel more comfortable talking to [him] over Telegram than Twitter." *See* Gov. Ex. 66; Trial Tr.

984:22-25; *see also United States v. Cox*, 218 F. App'x 257, 258 (4th Cir. 2007) ("[W]hile a

conviction cannot rest entirely on an uncorroborated extrajudicial confession, the extrinsic

corroborating proof need only tend to show the trustworthiness of the confession.") (citing

*United States v. Norman*, 415 F.3d 466, 470-71 (5th Cir.2005), which held that, once the

confession is sufficiently corroborated, the confession as a whole is admissible, and some

elements of the offense may be proven entirely on the basis of the confession).

     The above independent evidence fortifies the truth of the defendant's admissions about

the firearms that he observed, and establishes the trustworthiness of those statements. *See Abu*

*Ali*, 528 F.3d at 237-38 (distinguishing *Stephens* and recognizing, in a terrorism case that relied

heavily on the defendant's confessions to the crimes, that "the independent evidence does not

prove Abu Ali's guilt of any crime, but this is not necessary," because the "independent

evidence, including the translation, documents, and books found in the Saudi safehouses and in

Abu Ali's Saudi dorm room and Virginia home, 'tend[s] to establish the trustworthiness' of his

confession . . . and thus supports the jury's conviction of him" for four terrorism-related

offenses).  The independent corroborating evidence here is significantly greater and more powerful than the Fourth Circuit reviewed in *United States v. Partman*, 568 F. App'x 205, 210-12 (4th Cir. 2014).  There, as described in more detail above, the Court affirmed the defendant's § 924(c) conviction, which was largely based on the defendant's own admissions even though no firearm was recovered, no witnesses testified to seeing the defendant with a firearm, and there was no description of a firearm.  *See id.*  For all of these reasons, the Court should not vacate the jury's verdict on Count Three.

### D.  18 U.S.C. § 924(c)(3)(B) is not Unconstitutionally Vague

The defendant claims that the jury's guilty verdict on Count Three should be vacated in light of the Supreme Court's decision in *Johnson v. United States*, 135 S. Ct. 2551, 2563 (2015), which held "that imposing an increased sentence under the residual clause of the Armed Career Criminal Act [ACCA]," in 18 U.S.C. § 924(e)(2)(b)(ii), "violates the Constitution's guarantee of due process" because the ACCA's residual clause is unconstitutionally vague.  *See* Dkt. No. 220 at 13-14.  The defendant's claim lacks merit because *Johnson* is inapplicable to § 924(c)(3)(B).

As Judge Cacheris noted earlier this year in a case in which the defendant previously pled guilty to one count of 18 U.S.C. § 924(c), where the underlying "crime of violence" involved providing material support to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B, "[t]his Court declines to read between the lines of *Johnson* today to invalidate 18 U.S.C. § 924(c)(3)(B) as unconstitutionally vague," because "the Fourth Circuit declined to address the constitutionality of § 924(c)(3)(B), noting that the United States Supreme Court had no occasion to review that provision when deciding *Johnson*."  *Martinez-Guillen v. United States*, No. 1:11-CR-90, 2017 WL 86324, at *2 (E.D. Va. Jan. 10, 2017) (Cacheris, J.), *appeal filed*, No. 17-6314 (4th Cir. Mar. 10, 2017) (citing *United States v. Fuertes*, 805 F.3d 485, 499 n.5

(4th Cir. 2015)); *see also United States v. Todd*, No. 1:17-CR-24, ECF No. 103 (E.D. Va. Aug. 14, 2017) (O'Grady, J.) (declining to invalidate the residual clause of § 924(c) as unconstitutional until the Supreme Court or the Fourth Circuit holds otherwise).

## 1.  Applicable Legal Principles

Section 924(c) provides for a mandatory minimum consecutive sentence for any person who, "during and in relation to any crime of violence" that is itself a violation of federal law, "uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." 18 U.S.C. § 924(c)(1)(A).  The statute defines "crime of violence" as an offense that is a felony and either:

> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. §§ 924(c)(3)(A), 924(c)(3)(B).  Section 924(c)(3)(A) is commonly referred to as the "elements clause" or the "force clause."  Section 924(c)(3)(B) is commonly referred to as the "residual clause" or the "risk-of-force clause."  In determining whether an offense qualifies as a crime of violence under either clause, courts have used the "categorical approach."  *United States v. Fuertes*, 805 F.3d 485, 498 (4th Cir. 2015), *cert. denied sub nom. Ventura v. United States*, 136 S. Ct. 1220 (2016).  Under that approach, courts look to the statutory definition of the alleged crime of violence and the corresponding elements of the offense – not the underlying facts alleged.  *Id.* at 498.

## 2.  *Johnson* Did Not Invalidate § 924(c)(3)(B)

As this Court has previously observed, "the residual clause at issue in *Johnson* was 'similarly worded'" to the residual clause of § 924(c)(3), but "not identically so."  *United States*

*v. Levy Guillermo Ramirez Mejia*, No. 1:15-CR-361, 2016 WL 743400, at \*3 (E.D. Va. Feb. 23,

2016) (O'Grady, J.), *aff'd sub nom. United States v. Mejia*, No. 16-4227, 2016 WL 7240189

(4th Cir. Dec. 15, 2016) (quoting *United States v. Fuertes*, 805 F.3d 485, 499 n.5 (4th Cir.

2015), *cert. denied sub nom. Ventura v. United States*, 136 S. Ct. 1220 (2016)).

In particular, the ACCA's residual clause defined the phrase "violent felony" as any

crime punishable by imprisonment exceeding one year that:

> *is burglary, arson, or extortion, involves use of explosives*, or *otherwise involves*
> *conduct* that presents a serious potential risk of physical *injury* to another

18 U.S.C. § 924(e)(2)(B)(ii) (emphasis added).  By contrast and as noted above, the residual

clause of § 924(c)(3) defines a "crime of violence" as a felony:

> that *by its nature*, involves a substantial risk that *physical force* against the person or
> property of another may be used *in the course of committing the offense*

18 U.S.C. § 924(c)(3)(B) (emphasis added).  Relying on these textual differences and other

historical features unique to the ACCA's residual clause, nearly all of the appellate courts that

have squarely addressed the question at issue – whether the residual clause of § 924(c)(3) is

unconstitutionally vague in light of *Johnson* – have concluded that it is not.[2]

---

[2] *See United States v. Eshetu*, No. 15-3020, 2017 WL 3138110, at \*5-6 (D.C. Cir. July 25, 2017) (the residual clause of § 924(c)(3) does not violate the Fifth Amendment because it contains no "confusing list" of enumerated crimes; it calls for a different sort of risk assessment from that of the ACCA; and it contains a temporal limitation not included in the ACCA); *Ovalles v. United States*, 861 F.3d 1257, 1266-67 (11th Cir. 2017) (*Johnson* does not apply to or invalidate § 924(c)(3)(B) and recognizing, *inter alia*, that the textual features of § 924(c) "make the analysis substantially more precise, predictable, and judicially administrable" than the residual clause of the ACCA); *United States v. Davis*, No. 16-10330, 2017 WL 436037, at \*2 (5th Cir. Jan. 31, 2017) (*Johnson* does not invalidate § 924(c)(3)(B)); *United States v. Prickett*, 839 F.3d 697, 700 (8th Cir. 2016) (same); *United States v. Hill*, 832 F.3d 135, 145-50 (2d Cir. 2016) (same); *United States v. Taylor*, 814 F.3d 340, 375-79 (6th Cir. 2016) (§ 924(c)(3)(B) is considerably narrower than the ACCA's residual clause).  *But see United States v. Cardena*, 842 F.3d 959, 996 (7th Cir. 2016) (holding that § 924(c)(3)(B) is unconstitutionally vague because it is similar to § 16(b), which the Seventh Circuit had previously held unconstitutionally vague in light of *Johnson*).

*First*, "and most obviously," as the Second Circuit stated, the residual clause of §
924(c)(3) "contains no mystifying list of offenses and no indeterminate 'otherwise' phraseology
– a defining feature of the ACCA's residual clause that, in *Johnson II*,[3] was understood to add an
additional layer of uncertainty as to 'how much risk it takes for a crime to qualify as a violent
felony.'"  *Hill*, 832 F.3d at 147 (quoting *Johnson*, 135 S. Ct. at 2558).  The Supreme Court "cited
this list" when "distinguishing the ACCA's residual clause from other laws that the Government
warned could be vulnerable to vagueness challenge" and "rejected the Government's argument
that its decision in *Johnson II* would draw into question statutes that, like the one here, do not
'link[] a phrase such as "substantial risk" to a confusing list of examples.'"  *Hill*, 832 F.3d at 146
(quoting *Johnson*, 135 S. Ct. at 2561).  Indeed, "an analysis of the Court's pre-*Johnson II*
precedents attempting to construe the residual clause [of ACCA] makes clear that the presence of
these enumerated offenses was, as *Johnson II* suggested, the prime cause of uncertainty in that
provision, and the key obstacle to consistent judicial construction."  *Hill*, 832 F.3d at 146; *see
also see also Eshetu,* 2017 WL 3138110, at *5 (Unlike the ACCA's residual clause, §
924(c)(3)(B) "contains no 'confusing list' of enumerated crimes) (citing *Johnson*, 135 S. Ct. at
2561); *Taylor*, 814 F.3d at 376 ("[T]he ACCA residual clause is linked to a confusing set of
examples that plagued the Supreme Court in coming up with a coherent way to apply the clause,
whereas there is no such weakness in § 924(c)(3)(B)").

*Second*, "even if the list of enumerated offenses is not alone sufficient" to distinguish
the clauses, "ACCA's residual clause defines crimes as violent felonies if they, *inter alia*,

---

[3] The Second Circuit used the term "*Johnson II*" to refer to *Johnson v. United States*, 135 S. Ct.
2551, 2563 (2015), the relevant decision at issue in this section of the government's opposition
to the defendant's motion, and the term "*Johnson I*" to refer to *Johnson v. United States*, 559
U.S. 133 (2010), a separate decision in which the Court examined the definition of "physical
force" under the ACCA, 18 U.S.C. § 924(e)(2)(B)(i).  *See Hill*, 832 F.3d at 141-42.

'present[] a serious potential risk of physical injury to another,'" which is "materially different" from the definition of "crime[s] of violence" in § 924(c)(3)'s residual clause "as those that by their 'nature[] involve[] a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.'" *Hill*, 832 F.3d at 147-48.  The language in the residual clause of § 924(c)(3) "is both narrower *and* easier to construe." *Id.* at 148 (emphasis in original); *see also Eshetu,* 2017 WL 3138110, at *5 ("A court applying section 924(c)(3)(B) need only assess the "substantial risk" of force in a single crime, an easier task."); *Taylor*, 814 F.3d at 376 (noting that the residual clause of § 924(c)(3) "is distinctly narrower" and easier to construe than the ACCA's residual clause "especially in that it deals with physical force rather than physical injury").

*Third*, the residual clause of § 924(c)(3) "has no history of 'repeated attempts and repeated failures' on the part of courts 'to craft a principled and objective standard' out of its terms – the sort of doctrinal history that *Johnson II* recognized was sufficient to 'confirm [the] hopeless indeterminacy' of the residual clause [in ACCA]." *Hill*, 832 F.3d at 148 (quoting *Johnson*, 135 S. Ct. at 2558); *see also Taylor*, 814 F.3d at 376 ("[While] the Supreme Court reached its void-for-vagueness conclusion only after struggling mightily for nine years to come up with a coherent interpretation of the [residual] clause [in ACCA] . . . no such history has occurred with respect to § 924(c)(3)(B).").

*Fourth*, as the D.C. Circuit recently noted, § 924(c)(3)(B) "contains a temporal limitation not included in the ACCA.  Section 924(c)(3)(B) considers the 'risk that physical force . . . may be used *in the course of* committing the offense.'" 18 U.S.C. § 924(c)(3)(B) (emphasis added). *Eshetu,* 2017 WL 3138110, at *6.  The ACCA, however, "more broadly asks if the offense 'otherwise involves conduct that presents a serious potential risk of physical injury to

30

another[.]'"  *Id.* (citing § 924(e)(2)(B)(ii)).  The D.C. Circuit continued, explaining that "in the course of" is particularly meaningful because "[i]t ensures that a court will confine its analysis to the conduct that constitutes the offense."  *Eshetu,* 2017 WL 3138110, at *6 (citation omitted).

*Fifth*, the government notes that § 924(c)(3)(B) has a different function than the ACCA. The ACCA identifies predicate convictions for the purpose of a recidivist enhancement, whereas § 924(c) creates a stand-alone crime when a "crime of violence" is committed with a sufficient nexus to a firearm.  The requirement of a nexus to the use, carrying, or possession of a firearm narrows the type of offenses that might serve as predicates and "makes the crime of violence determination more precise and more predictable."  *Ovalles*, 861 F.3d at 1265–66 (11th Cir. 2017).  This requirement, coupled with § 924(c)(3)(B)'s focus on the use of force (as opposed to any injury that results) and the focus on risk during the commission of the offense, further distinguishes § 924(c)(3)(B) from the ACCA's residual clause.  As the Eleventh Circuit noted, "the ACCA § 924(e) sentence enhancement and the § 924(c) penalty each appear to serve a different statutory purpose" – the former "providing for an enhanced term of imprisonment for . . . a felon in possession of a firearm who had three past convictions for a violent felony or serious drug offense," and the latter "providing for a consecutive term of imprisonment for defendants who use a firearm during a concurrent and simultaneous crime of violence or drug trafficking crime."  *In re Fleur*, 824 F.3d 1337, 1340 n.1 (11th Cir. 2016).

In light of these key differences, the Court should reject the defendant's argument that the residual clause of § 924(c)(3) is unconstitutionally vague in light of *Johnson*.

### 3.  Decisions Interpreting 18 U.S.C. § 16(b) Do Not Support a Finding that § 924(c)(3)(B) Is Unconstitutionally Vague

Contrary to the defendant's claim otherwise (Dkt. No. 220 at 14), the decisions that have invalidated 18 U.S.C. § 16(b) – a provision of the Immigration and Nationality Act that

contains a definition of "crime of violence" that is identical to the residual clause of § 924(c)(3)

– provide no basis upon which to hold that the residual clause of § 924(c)(3) is

unconstitutional.

A number of courts of appeals have held that § 16(b) is unconstitutionally vague

following *Johnson*.  One of these decisions – *Dimaya v. Lynch*, 803 F.3d 1110 (9th Cir. 2015) –

is currently pending before the Supreme Court and will be reargued in the fall.  As an initial

matter, any suggestion that the Supreme Court's resolution of the challenge to § 16(b) may be

determinative of the constitutional validity of the residual clause of § 924(c)(3) – or that the

Court will conclude that *Johnson* necessarily requires invalidating § 16(b) notwithstanding the

unique textual and historical features of the ACCA residual clause – is speculative at best.  As

this Court previously stated, "[w]hether the Fourth Circuit will follow suit" is a question "that

will have to wait for another day."  *United States v. Levy Guillermo Ramirez Mejia*, No. 1:15-

CR-361, 2016 WL 743400, at *4 (E.D. Va. Feb. 23, 2016) (O'Grady, J.), *aff'd sub nom. United

States v. Mejia*, No. 16-4227, 2016 WL 7240189 (4th Cir. Dec. 15, 2016).

Indeed, in *United States v. Fuertes*, the Fourth Circuit declined to rule on the

constitutionality of the residual clause of § 924(c)(3) and observed that in *Johnson* "the

Supreme Court held unconstitutionally vague the version of the residual clause set forth in 18

U.S.C. § 924(e)(2)(B), but the Court had no occasion to review the version of the residual

clause set forth at 18 U.S.C. § 924(c)(3)(B)."  805 F.3d 485, 499 n.5 (4th Cir. 2015).  After

*Fuertes*, the Fourth Circuit sitting *en banc* held by a 12-3 vote that, on direct appeal, a

defendant failed to show that it is "plain" that *Johnson* invalidates § 924(c)(3)(B).  *United

States v. Graham*, 824 F.3d 421, 424 n.1 (4th Cir. 2016).  In fact, no circuit judge dissented on

the *Johnson* issue.

In  addition, as the Second Circuit has explained, the cases  relying on *Johnson II* to invalidate § 16(b) are "unpersuasive for three reasons."  *Hill*, 832 F.3d at 149-50.  *First*, "each greatly underestimates—or misunderstands—the significance of the list of enumerated offenses in the ACCA's residual clause to the decision in *Johnson II*, in part by failing to engage with the precedent that preceded, and informed, that decision."  *Id.  Second*, the cases "either ignore or minimize the other textual distinctions between the residual clause and the language of § 16(b)." *Id.  Third*,  the cases "dismiss[] the significance of the Supreme Court's fraught precedent interpreting the ACCA's residual clause, and in doing so not only disregard[] the significance of that precedent to the *Johnson II* decision, *see* 135 S. Ct. at 2558-61 (discussing these prior cases), but also fail[] to grapple with the fact that the textual aspects unique to the residual clause [in ACCA] were largely to blame for that confusion."  *Id.*  As discussed above, just as § 924(c)(3)(B) is distinguishable from § 924(e)(2)(B)(ii) by virtue of the fact that every offense under § 924(c)(3)(B) necessarily involves the use, carrying, or possession of a firearm, and necessarily involves a violation of another federal criminal law, for purposes of analyzing vagueness doctrine, § 924(c)(3)(B) is similarly distinguishable from § 16(b).  Section 924(c)(3)(B)'s narrower application, which is limited to cases where defendants use, carry, or possess a gun during the commission of another federal offense, means that cases striking down § 16(b) cannot be readily applied to § 924(c)(3)(B), as the numerous courts of appeals discussed above have recognized.

For these reasons, this Court should follow the decisions from the Second, Fifth, Sixth, Eighth, Eleventh, and D.C. Circuits – decisions that squarely address the residual clause of § 924(c)(3) and conclude that it is not unconstitutionally vague – rather than decisions that both interpret a separate provision of law and rely upon a flawed reading of *Johnson*.

### 4.   18 U.S.C. § 2339B is a "Crime of Violence"

The government is unaware of *any* precedent – and the defendant cites none – that 18 U.S.C. § 2339B is not a "crime of violence."  Rather, as set forth below, every court that has considered this issue, including in this district, has concluded that it is.

Beginning with the statutory text, it is clear that Congress intended § 2339B(a)(1) to define an offense that inherently presents a substantial risk that a violator may use physical force. In the same sentence in which it defined the offense, Congress provided for statutory maximum punishment of life imprisonment for those who violate § 2339B(a)(1) "if the death of any person results."  18 U.S.C. § 2339B(a)(1).  The inclusion of enhanced punishment for those who kill while committing the offense reflects a congressional determination that, by its nature, the provision of material support or resources to a foreign terrorist organization carries a substantial risk that physical – indeed lethal – force may be used by the perpetrators of the offense.

In making that determination, Congress identified a close relationship between the act of providing support or resources to a terrorist organization, and the activities of the terrorist organization itself, finding that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct."  Pub. L. No. 104-132 § 301(a)(7), 110 Stat. 1250 (1996), *reprinted in* 18 U.S.C. § 2339B, note; *see Holder v. Humanitarian Law Project*, 561 U.S. 1, 36 (2010) (noting "the considered judgment of Congress and the Executive that providing material support to a designated terrorist organization—even seemingly benign support—bolsters the terrorist activities of the organization").

It is a matter of public record that ISIS has been, and continues to be, a foreign terrorist organization, as designated by the United States Department of State.  It further is a matter of

34

public record that, for an organization to be designated a "foreign terrorist organization" to which Section 2339B is applicable, the Secretary of State must find that the organization engages in violent activities.  As illustrated by Section 2339B's definition of "terrorist organization," a terrorist organization's criminal conduct is inherently violent.  *See* 18 U.S.C. § 2339B(g)(6) (defining "terrorist organization" by incorporating organizations designated under 8 U.S.C. § 1189(a)(1)).  Section 2339B(a)(1) proscribes the provision of material support and resources to organizations that have been identified by the Secretary of State because they engage in "premeditated, politically motivated violence," 22 U.S.C. § 2656f(d)(2) ("terrorism"), or crimes that carry an inherent risk of violence, including "highjacking or sabotage," kidnapping as a means of coercing a third party, and "assassination," 8 U.S.C. § 1182(a)(3)(B)(iii) ("terrorist activity").  *See* 8 U.S.C. § 1189(a)(1)(B).  Thus, conspiracy to provide material support or resources in violation of § 2339B(a)(1) is a crime so closely related to the violent acts which are the purpose of a terrorist organization, that the conspiracy itself poses a substantial risk that force may be used.  *See United States v. Patino*, 962 F.2d 263, 267 (2d Cir. 1992) ("[W]hen a conspiracy exists to commit a crime of violence . . . the conspiracy itself poses a 'substantial risk' of violence.").

Consistent with the plain language of the statute, courts have found that the provision of material support to a terrorist organization constitutes a crime of violence.  For example, in *United States v. Lindh*, 212 F. Supp. 2d 541 (E.D. Va. 2002), Judge Ellis held that the substantive and conspiracy offenses of knowingly providing material support and resources to al-Qaeda, in violation of § 2339B, were "crimes of violence" within the meaning of 18 U.S.C. § 924(c).  In rejecting defendant's motion to dismiss the § 924(c) count, Judge Ellis held that

> Both of these crimes [conspiracy to provide material support and resources to a foreign terrorist organization and the substantive § 2339B offense] are, by their

nature, crimes of violence.  Providing material support or resources to a terrorist organization—which may include "weapons, lethal substances, [or] explosives," **but may be just as deadly if it is "currency or monetary instruments"** —is categorically a crime of violence, as Congress recognized when it enacted Section 2339B.  Furthermore, Congress was clearly mindful of the violent nature of this crime because it imposed greater penalties "if the death of any person results." **Simply put, when one provides material support or resources to a terrorist organization, there is a "substantial risk that physical force against the person or property of another may be used in the course of committing the offense."**

*Id.* at 579 (emphasis added; internal citations omitted).

Furthermore, Judge Ellis specifically rejected the defendant's contention that courts should look only to the actual act of providing material support (*e.g.*, providing money) and once that act is completed "courts must turn a blind eye to the natural consequences – the natural risks – attendant to the aiding and abetting of terrorism proscribed by Section 2339B."  *Id.*  Judge Ellis continued, holding that § 924(c) "requires assessment of the risks that may result from providing material support or resources to terrorists in a manner that Section 2339B forbids."  *Id.* at 579-80 (citing *United States v. Aragon*, 983 F.2d 1306, 1313 (4th Cir.1993)).  "It takes little imagination to conclude that providing material support and resources to a terrorist organization creates a substantial risk that the violent aims of the terrorists will be realized.  Violence, therefore, is intrinsic to the crimes with which Lindh is charged."  *Id.* at 580.

In concluding that providing, and conspiring to provide, material support to a terrorist organization are crimes of violence, the *Lindh* Court analogized to other conspiracies to commit crimes of violence, "which courts have uniformly held to be crimes of violence, even though 'the offense is complete upon reaching an agreement without the use of force.'"  *Lindh*, 212 F. Supp. 2d at 580; *citing United States v. Greer*, 939 F.2d 1076, 1099 (5th Cir. 1991).  *See also United States v. Ward*, 171 F.3d 188, 192-93 (4th Cir. 1999); *United States v. Chimurenga*, 760 F.2d 400, 403-04 (2d Cir. 1985).  The *Lindh* Court reasoned, "[l]ike a conspiracy, a terrorist organization 'provides a focal point for collective criminal action,' and knowingly providing

material support and resources to such an organization 'increases the chances that the planned crime will be committed beyond that of a mere possibility' and is therefore an act involving a 'substantial risk' of violence." *Id.* (citing *Chimurenga*, 760 F.2d at 404). "Just as committing a nonviolent overt act in furtherance of a violent conspiracy may constitute a crime of violence, so too can a nonviolent act in support of violent terrorist activities." *Id.*

Other courts have similarly found that material support to a terrorist organization constitutes a "crime of violence." *See, e.g.*, *United States v. John Doe*, 145 F. Supp. 3d 167, 182 (E.D.N.Y. 2015) ("Accordingly, the Court finds that 'crime of violence' is not unconstitutionally vague as applied to the charge of conspiracy to provide material support to a FTO [foreign terrorist organization]. A judicially imagined conspiracy to provide material support to a FTO will always involve 'a substantial risk of physical force against the person or property of another' given the necessarily violent actions of the FTO receiving support.); *United States v. Ahmed*, No. 10-CR-131, 2012 WL 983545, at *3 (S.D.N.Y. Mar. 22, 2012) ("Therefore, because sections 2339B and 2339D are crimes of violence that can be prosecuted in a Court of the United States, section 924(c) applies to those statutes and the underlying extraterritorial conduct alleged in this case."). The *John Doe* Court specifically noted that "[w]hile a defendant need not carry out the 'assassination,' the 'highjacking or sabotage of [a] conveyance . . . the 'premeditated, politically motivated violence perpetrated against noncombatant targets . . . or any other violent acts that the terrorist organization engages in under § 2339B, it does not follow that providing material support to such an organization is not a crime of violence." 145 F. Supp. 3d at 180-81.

Similarly, in *United States v. Goba*, 240 F. Supp. 2d 242, 251 (W.D.N.Y. 2003), the Court held that providing material support to a terrorist organization constitutes a "crime of violence" under the Bail Reform Act. As in *Lindh*, the *Goba* Court "rejected the defendant's

argument that in evaluating the risk of physical force the court must ignore the risks stemming from providing material support, and found that providing material support is akin to conspiracy to commit a violent crime." *John Doe*, 145 F. Supp. 3d at 180 (citing *Goba*, 240 F. Supp. at 250-51. The bottom line is that any material support to a terrorist organization facilitates the violent criminal conduct endemic in these organizations. *John Doe*, 145 F. Supp. 3d at 181; *Holder*, 561 U.S. at 7. Material support, at its essence, is a valuable resource because such support frees up other resources within the terrorist organization that may be put to violent ends. *Holder*, 561 U.S. at 30.

Here, there is little doubt that the predicate offense set forth in Count Three, conspiracy to provide material support to ISIS, is a crime of violence. Not once did the defendant argue, either before trial or during trial, that Count One does not constitute a crime of violence. In fact, the defendant himself, in his proposed jury instructions, indicated that Counts One and Two of the Superseding Indictment constitute crimes of violence. *See* Dkt. No. 163 at 34 ("For you to find Mr. Khweis guilty of this crime [Count Three], you must be convinced that the government has proven each of the following beyond a reasonable doubt: First: That Mr. Khweis committed one or more of the crimes alleged in Counts One and Two of the Indictment . . . ."). By its nature, the charged conspiracy to provide material support or resources to ISIS, which included, but was not limited to, the defendant's agreement to provide himself (*i.e.*, personnel) as a suicide bomber and/or fighter for ISIS, among other violent acts that the defendant admitted he knew ISIS engages in and has engaged in, involved a substantial risk that physical force would be used in effecting the conspiracy's goal.

### III.    (A) OVERWHELMING EVIDENCE SUPPORTS THE JURY'S GUILTY VERDICT ON COUNTS ONE AND TWO; (B) 18 U.S.C. § 2339B DOES NOT VIOLATE THE FIRST AMENDMENT; (C) 18 U.S.C. § 2339B IS NOT UNCONSTITUTIONALLY VAGUE

### A.  The Evidence Clearly Supports the Jury's Verdict on Counts One and Two

In his motion, the defendant claims that "the evidence was insufficient to sustain convictions on Counts I and II." Dkt. No. 220 at 17.  This argument flies in the face of the overwhelming amount of evidence that the jury received and considered before announcing its guilty verdict on both counts.  For much of the defendant's argument, he recites the elements that the government was required to prove beyond a reasonable doubt for a § 2339B offense (*see id.* at 17-19), and instead reiterates many of the same arguments that were capably made on his behalf during the trial, all of which the jury rejected.  *See, e.g.*, Trial Tr. 1266:23-1267:25.

As established during the trial, the defendant was captured by Peshmerga forces on March 14, 2016 in Northern Iraq near ISIS-controlled territory, after having spent approximately two and a half months as an ISIS member.  Before he left the United States, the defendant quit his job, closed online accounts, concealed and lied to his family about where he was going, and sold his car just days before his departure.  *See* Trial Tr. 680:11-682:16; 934:10-22; 938:8-14; Gov. Exs. 47 and 79.  The defendant departed on December 16, 2015 by using a one-way ticket, in which he listed a non-working phone number on the reservation, with the intent to travel to ISIS-controlled territory in Syria and join an organization that he knew espoused violence and committed horrific terrorist attacks, including the burning alive of a Jordanian pilot.  *See* Trial Tr. 529:4-531:5; 686:12-687:15; Gov. Exs. 49 and 49A.  In fact, the defendant methodically planned his travel and booked four separate one-way tickets before he departed by using a newly established email account to facilitate his travel to ISIS.  *See* Trial Tr. 683:24-684:9; 693:21-694:5.  None of those four tickets involved a return flight to the United States.  *Id.*

Employing a sophisticated scheme of tradecraft, the defendant purposefully traveled to other European countries first before entering Turkey to conceal his final destination and avoid law enforcement scrutiny. *See id.* at 698:15-699:8. He even booked a one-way ticket to Greece before he left the United States, which is indicative of an attempt "to create an alibi or a way out" and mask his "actual intent for travel." *Id.* at 693:8-12. The defendant admitted to the FBI that he arrived in Turkey to contact ISIS recruiters/facilitators who could smuggle him into Syria to join ISIS through social media and encrypted platforms, including the creation of the "iAGreenBirdiA" Facebook and Twitter accounts. *Id.* at 699:14-21. While in Gaziantep, Turkey, the defendant voluntarily agreed to enter a taxi around midnight with other ISIS recruits, avoided land mines and bombs on foot, and subsequently agreed to travel in another vehicle with an armed ISIS member, in order to enter ISIS-controlled territory for the purpose of joining the terrorist organization. *Id.* at 728:23-730:15. That evidence, coupled with the defendant's above-described preparations, all of which transpired before the defendant even arrives at the first ISIS safe house in Syria, provided the jury with sufficient evidence to find him guilty of conspiracy to provide material support, and attempting to provide material support, to ISIS. *Cf. United States v. Elhuzayel, et al.*, Case No. CR-15-0060-DOC-1, ECF No. 194 at 8 (C.D. Cal. Aug. 5, 2016) (Carter, J.) (denying defendant's post-trial motion and stating, *inter alia*, that evidence indicating contact with pro-ISIS individuals who were overseas through an encrypted social media platform, purchasing a plane ticket, and traveling to the airport and passing through TSA security, coupled with additional evidence regarding the defendant's intent to join ISIS, constituted a "substantial step" towards the commission of a § 2339B offense).

But the defendant's journey did not end there, and his illicit agreements with ISIS and provision of material support to the organization continued. During his time with ISIS in Syria

and Iraq, the defendant agreed during his ISIS intake process to be a suicide bomber (Trial Tr. 551:11-16; 731:10-11); resided and/or traveled with ISIS fighters to multiple safe houses, including with another American who had trained with ISIS to conduct an attack in the United States (*Id.* at 1064:8-1065:3); agreed to have his blood drawn by ISIS and was subsequently issued an ISIS identification card with his *kunya*[4] listed (*Id.* at 557:8-23); participated in ISIS-directed religious training (*Id.* at 562:1-5); attended ISIS lectures and constantly watched military videos with his fellow ISIS members for inspiration (*Id.* at 564:1-7); frequently gave money to ISIS members (*Id.* at 563:21-23); and cared for wounded ISIS fighters, including an injured Libyan fighter to whom the defendant provided a Virtual Private Network ("VPN") to help the ISIS fighter conceal his online activity and disguise his location (*Id.* at 565:3-566:9); among other forms of material support and services that the defendant provided to ISIS. The jury heard testimony that the defendant admitted, while he was a member of ISIS in Iraq, "[i]n addition to household salaries, each ISIS member was given a salary for their service." Trial Tr. 563:16-20. An ISIS camp roster that was recovered in Mosul, Iraq indicated that the defendant received an allowance or stipend, and listed his "[c]urrent mission" for ISIS as a "Fighter." *See* Gov. Exs. 30A-B; Trial Tr. 490:25-491:5.

During his travel to join the terrorist organization, the evidence at trial established that the defendant used numerous encrypted applications to conceal his activity and downloaded several applications on his mobile phones that featured secure messaging or anonymous web browsing. *See* Trial Tr. 308:4-311:1; 341:7-342:7. The defendant admitted that he used these programs to

---

[4] The jury heard testimony that the Arabic term "*kunya*" is a nickname for an individual. *Id.* at 264:18-19. The defendant admitted during cross-examination that the *kunya* he gave to ISIS was "Abu Omar al-Amriki," which matches the nickname listed on his ISIS intake form and an ISIS camp roster, both of which were admitted at trial. *See id.* at 1001:20-1002:1; Gov. Exs. 29A-B and 30A-B.

communicate with ISIS to coordinate and secure his passage to the Islamic State (*see id.* at 544:18-545:14), and the jury was presented with evidence from the forensic analysis of the defendant's phones showing that numerous social media platforms, encrypted applications, and VPNs had been installed on the defendant's iPhone 4S and Samsung mobile phone.  *See* Gov. Exs. 4 (slides 12 and 66).  The forensic analysis of those devices also demonstrated that there were images of ISIS fighters wielding firearms; deceased individuals covered in dust and blood; explosives and explosions; Abu Bakr al-Baghdadi; Anwar al-Awlaki; maps of Turkey, Syria, and Iraq; the World Trade Center at the moment of impact on September 11, 2001; and the body of a solider engulfed in flames, among other ISIS and terrorist propaganda, much of which the defendant himself admitted during cross-examination that he viewed on his phones either before he voluntarily traveled to ISIS-controlled territory or while he was with ISIS.  *See generally id.* The jury also heard testimony that the defendant purposefully deleted his contacts and communications with ISIS from his one of his phones, and that he burned a laptop and two other phones before he left ISIS-controlled territory.  *See* Trial Tr. 555:3-4; 743:8-12; 974:24-975:16.

The defendant admitted to the FBI that he "gave himself to ISIS" and voluntarily joined the terrorist organization, which included his agreement to serve as a suicide bomber.  *Id.* at 630:15-18; 551:11-16; 731:10-11.  *Cf. United States v. Farhane*, 634 F.3d 127, 152 (2d Cir. 2011) ("[W]hen a person supplies himself as the bomber or pilot or doctor sought by the terrorist organization, he provides—or certainly attempts to provide—material support in the form of personnel as soon as he pledges to work under the direction of the organization.").  Given the facts above, the notion that the defendant did not provide himself and/or provide services to ISIS, and conspire to do so, is unavailing and should be rejected.

### B. The Jury's Verdict on Counts One and Two do not Violate the Defendant's First Amendment Rights

The defendant also claims that, should this Court enter his convictions on Counts One and Two, the result would violate his First Amendment protections by criminalizing his "mere association with alleged ISIL members." Dkt. No. 220 at 20. The defendant never fully explains how the statute impermissibly restricts that freedom, especially in light of the fact that several components of § 2339B operate to avoid such an infringement, and given that the jury was presented with evidence that his conduct involved, *inter alia*, his agreement to serve as a suicide bomber for ISIS, numerous services that he performed on behalf of the terrorist organization, and given that his mission, at one point, was listed as a "Fighter" for ISIS. Nonetheless, the defendant's First Amendment argument falls flat for the following reasons:

*First*, "[t]he material-support statute is, on its face, a preventive measure – it criminalizes not terrorist attacks themselves, but aid that makes the attacks more likely to occur." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 35 (2010). Section 2339B provides that "[i]ndividuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control." 18 U.S.C. § 2339B(h).

*Second*, the statute states that "[n]othing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States." 18 U.S.C. § 2339B(i).

*Third*, the definition of the term "material support or resources" includes specific examples of the types of service that would constitute material support (*e.g.*, personnel, services currency or monetary instruments, financial services, etc.), some of which the defendant

expressly provided to ISIS in this case, as well as things more closely related to speech (*e.g.*, training, expert advice or assistance).  18 U.S.C. § 2339A(b), 18 U.S.C. § 2339B(g)(4).

It was upon considering a First Amendment challenge that the Supreme Court held in *Holder* that Congress, having narrowly circumscribed the effect of § 2339B, could criminalize speech that provides material support to designated terrorist organizations:

> Congress has not . . . sought to suppress ideas or opinions in the form of "pure political speech."  Rather, Congress has prohibited "material support," which most often does not take the form of speech at all.  And when it does, the statute is carefully drawn to cover only a narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations.

561 U.S. at 26.  Recognizing "the considered judgment of Congress and the Executive that providing material support to a designated foreign terrorist organization – even seemingly benign support – bolsters the terrorist activities of that organization," *id.* at 36, the Court concluded that § 2339B's prohibitions were appropriately tailored to the government's interest in preventing terrorism so as not to abridge the freedom of speech guaranteed by the First Amendment.  *Id.* at 36-39.

Freedom of association encompasses two forms: (1) the right "to maintain certain intimate human relationships;" and (2) "the right to associate for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, petition for the redress of grievances, and the exercise of religion."  *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984).  In *Holder*, the Supreme Court expressly held that § 2339B does not prohibit individuals from becoming members of designated terrorist organization or impose any sanction on them for doing so.  "The statute does not penalize mere association with a foreign terrorist organization[;] … '[it] does not prohibit being a member of one of the designated [FTOs] or vigorously promoting and supporting the political goals of the group . . . . What [§ 2339B] prohibits is the

act of giving material support.'"  561 U.S. at 39-40 (quoting *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1133 (9th Cir. 2000)).

The Fourth Circuit and other federal courts agree.  *See, e.g.*, *United States v. Hammoud*, 381 F.3d 316, 328-29 (4th Cir. 2004) (en banc), *vacated on other grounds*, 543 U.S. 1097 (2005), *reinstated in part*, 405 F.3d 1034 (4th Cir. 2005) ("§ 2339B does not prohibit mere association; it prohibits the conduct of providing material support to a designated FTO"); *People's Mojahedin Organization of Iran v. Department of State*, 327 F.3d 1238, 1244 (D.C. Cir. 2003) (rejecting organization's claims that § 2339B violated its First Amendment rights of freedom of speech and association); *United States v. Warsame*, 537 F.Supp.2d 1005, 1013-15 (D. Minn. 2008) (rejecting defendant's argument that § 2339B violated his right of association because the statute does not require a showing of specific intent to commit the underlying terrorist activity); *United States v. Assi*, 414 F.Supp.2d 707, 712-716 (E.D. Mich. 2006) (same); *Taleb-Jedi*, 566 F.Supp.2d at 173-77 (same).

Contrary to the defendant's assertions, the jury's guilty verdict on Counts One and Two do not offend the defendant's First Amendment freedoms of speech and association, as they clearly involve the defendant's conduct – be it actual, attempted, or as part of the charged conspiracy – to provide, and conspire to provide, material support or resources to ISIS in the form of personnel and/or services.  The evidence at trial demonstrated that the defendant was executing his provision of support to ISIL while taking direction from, and coordinating with, ISIS recruiters in Turkey and Syria, and other ISIS members in safe houses.  Agreeing to be a suicide bomber and serving as a fighter for ISIS, among many other examples elicited at trial demonstrating how the defendant provided himself and services to the terrorist organization, clearly goes well beyond "mere association" with ISIS members.  *See, e.g.*, *United States v.*

*Nagi*, 2017 WL 2240258, at *6 (W.D.N.Y. May 23, 2017) (rejecting as-applied First Amendment challenge to § 2339B and stating that "the Government's proffer shows that the Defendant is not being charged with simply expressing radical beliefs on Twitter, nor is he being charged with attempting to merely become a member of ISIL; he is instead being charged with attempting to act on that radical speech by attempting to volunteer himself as a fighter to ISIL*; Taleb-Jedi*, 566 F.Supp.2d at 176 (E.D.N.Y. 2008) (rejecting as-applied First Amendment challenge and stating that "a defendant does *not* have the right to act as an employee of such an organization and engage in work, no matter how apparently benign.  It is work under the terrorist organization's direction or control . . . that [§ 2339B] seeks to prohibit and that is not constitutionally protected.") (emphasis in original).  At bottom, "[t]he First Amendment's guarantee of associational freedom is no license to supply terrorist organizations with resources or material support in any form, including services as a combatant." *United States v. Lindh*, 212 F. Supp. 2d 541, 570 (E.D. Va. 2002).

## C.  Section 2339B is Not Unconstitutionally Vague As Applied to the Defendant

In order for a conviction to comport with due process, the statute under which it was obtained must "provide a person of ordinary intelligence fair notice of what is prohibited" and must not be "so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).  The Supreme Court has repeatedly held that a determination of vagueness must be considered "as applied to the particular facts at issue, for '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Holder*, 561 U.S. at 18-19 (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)).

The defendant briefly argues that, as applied to him, § 2339B is unconstitutionally vague because "because it would blur the line between 'associating' versus 'serving' or being 'personnel,' such that the law would fail to provide proper notice." Dkt. No. 220 at 20. "Such a general complaint" is foreclosed by *Holder v. Humanitarian Law Project*. *See United States v. Farhane*, 634 F.3d 127, 140 (2nd Cir. 2011). In *Holder*, the Supreme Court observed that the[] term[] "personnel" in § 2339B "did not require the sort of 'untethered, subjective judgments' that had compelled it to strike down statutes tying criminal culpability to vague concepts such as 'annoying' or 'indecent' conduct. The Court identified further protection against vagueness in Congress's addition of 'narrowing definitions' for the[] term[], which 'increased [its] clarity,' as well as in the knowledge element required for a § 2339B conviction." *Id.* (quoting *Holder*, 561 U.S. at 21) (brackets omitted). As to "service," the Court said:

> "[Service] similarly refers to concerted activity, not independent advocacy . . . The statue prohibits providing a service "*to* a foreign terrorist organization." The use of the word "to" indicates a connection between the service and the foreign group. We think a person of ordinary intelligence would understand that independently advocating for a cause is different from providing a service to a group that is advocating for that cause.
>
> Moreover, if independent activity in support of a terrorist group could be characterized as a "service," the statute's specific exclusion of independent activity in the definition of "personnel" would not make sense. Congress would not have prohibited under "service" what is specifically exempted from prohibition under "personnel." The other types of material support listed in the statute, including "lodging," "weapons," "explosives," and "transportation," are not forms of support that could be provided independently of a foreign terrorist organization. We interpret "service" along the same lines . . . . Thus, . . . a person of ordinary intelligence would understand the term "service" to cover advocacy performed in coordination with, or at the direction of, a foreign terrorist organization.

*Holder*, 561 U.S. at 23-24 (emphasis in original).

Moreover, the prohibition on defendant's offense conduct – conspiring and providing himself to ISIS, as a suicide bomber, fighter, and even caring for wounded ISIS fighters as they

returned from the battlefield (just to name a few of many examples) – is notorious.  Such conduct "falls squarely within the core" of what § 2339B prohibits, and thus, defeats any suggestion by the defendant "either that he lacked notice that his conduct was unlawful or that the statute is being enforced arbitrarily with respect to him."  *See Farhane*, 634 F.3d at 140-41 (2011) (holding defendant's vagueness challenge to be without merit where he offered to serve as an on-call doctor for al Qaeda); *see also Parker v. Levy*, 417 U.S. 733, 756 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness."); *United States v Goba*, 220 F.Supp.2d 182, 194 (W.D.N.Y. 2002) (finding that term "personnel" in pre-amendment version of § 2339B was not vague, since "one can be found to have 'provided material support or resources to a foreign terrorist organization' by offering one's services to said organization and allowing one's self to be indoctrinated and trained as a 'resource' in that organization's beliefs and activities").

In fact, the defendant himself admitted, *inter alia*, that before he decided to travel overseas to join ISIS: (1) he knew that ISIS is a terrorist organization; (2) he "watched extensive videos of ISIS military operations and ISIS conducting terrorist attacks"; and (3) he was "pretty sure" that it was illegal for him to join ISIS, but that did not deter him.  *See* Trial Tr. 532:25-533:13; 677:19-25; 678:13-14.  A post-trial suggestion that the defendant did not have the requisite notice that his conduct was unlawful is belied by his own pre-conviction words and actions.

## IV.     THIS COURT PROPERLY ADMITTED BOTH ISIS DOCUMENTS RECOVERED IN MOSUL, IRAQ

In a footnote, the defendant's requests a new trial by claiming that the Court erred in admitting his ISIS intake form and an ISIS camp roster that included the defendant's name and status as a "Fighter" with 19 other ISIS fighters.  *See* Dkt. No. 220 at 20 n.6; Gov. Exs. 29A-B

and 30A-B.  This Court properly admitted both documents because: (1) the government clearly

established the authenticity of the documents through the testimony of Colonel Arkan, Major

Peter Wendell, and Sergeant Timothy Agnew; and (2) the documents are admissible as co-

conspirator statements under Federal Rule of Evidence 801(d)(2)(E).  Additional grounds for

admissibility are Rule 801(d)(2)(A) (statement made by a party in an individual or representative

capacity given that the registration form is signed with the defendant's *kunya*, Abu Omar) and

Rule 801(d)(2)(D) (statement made by the party's agent or employee on a matter within the

scope of that relationship while it existed given that the documents demonstrate that the

defendant was serving as an employee for ISIS).

### A.  Authentication

Under Federal Rule of Evidence 901, the offering party must provide "evidence sufficient

to support a finding that the matter in question is what its proponent claims."  Fed. R. Evid.

901(a).  Rule 901(b)(4) permits proponents to authenticate an item of evidence by identifying its

"appearance, contents, substance, internal patterns, or other distinctive characteristics, taken

together with all of the circumstances."  Fed. R. Evid. 901(b)(4).

"The burden to authenticate under Rule 901 is not high – only a *prima facie* showing is

required."  *United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir 2009) (sufficient circumstantial

proof of authenticity of military records seized in another country "despite the fact that the

Government could not trace the precise history of the documents prior to seizure."); *United

States v. Hassan*, 742 F.3d. 104, 133 (4th Cir 2014) ("[T]he burden to authenticate under Rule

901 is not high—only a prima facie showing is required, and a district court's role is to serve as

gatekeeper in assessing whether the proponent has offered a satisfactory foundation from which

the jury could reasonably find that the evidence is authentic.") (internal citation and quotation

marks omitted); *United States v. Al–Moayad*, 545 F.3d 139, 172 (2d Cir. 2008) (same).

Establishing a formal chain of custody of evidence is not an iron-clad requirement. Rather, it is sufficient for the party offering the evidence simply to satisfy the trial court that the item is what it purports to be and has not been altered. *See United States v. Jones*, 356 F.3d 529, 535-36 (4th Cir. 2004) ("missing link" in chain of custody does not prevent admission of evidence, so long as there is sufficient proof that evidence is what it purports to be and has not been altered; *United States v. Ricco*, 52 F.3d 58, 61-62 (4th Cir. 1995) (same).

## B. Co-Conspirator Statements

Under Federal Rule of Evidence 801(d), an out-of-court statement offered for the truth of its contents is not hearsay if "[t]he statement is offered against an opposing party and" it "was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). The Supreme Court held that the co-conspirator's statement itself can be considered in determining the existence of the conspiracy and in determining the participation of the defendant in the conspiracy. *See Bourjaily v. United States*, 483 U.S. 171, 181 (1987) ("We think that there is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy.").

To admit a statement under Rule 801(d)(2)(E), the district court must find, by a preponderance of the evidence, that "(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." *United States v. Smith*, 441 F.3d 254, 261 (4th Cir. 2006) (citing *United States v. Neal*, 78 F.3d 901, 905 (4th Cir. 1996)). In determining the existence and membership of the alleged conspiracy, the district court

may consider the circumstances surrounding the statement, as well as the contents of the statement itself.  *See* Fed. R. Evid. 801(d)(2); *Bourjaily,* 483 U.S. at 176–81.

"Statements between conspirators which . . . inform each other of the current status of the conspiracy, further the ends of [a] conspiracy."  *United States v. Simmons,* 923 F.2d 934, 945 (2d Cir. 1991) (internal citation and quotation marks omitted).  For example, in *United States v. Russo*, the Second Circuit explained that out-of-court statements of a co-conspirator regarding the membership status of others affiliated with the conspiracy "furthered the maintenance of the [conspiracy] by giving associated persons information about its membership."  302 F.3d 37, 46 (2d Cir. 2002).

### C.  Admissibility of the ISIS Documents

Given the trial testimony provided by Col. Arkan (who recovered the two documents in Mosul, Iraq from a house that ISIS had converted to an office building); Sergeant Major Timothy Agnew (who received the documents from Col. Arkan in eastern Mosul and wrote "American" with a star and line directed at entry 3 on the ISIS camp roster; and Major Peter Wendell (who speaks Arabic and received the batch of documents in Erbil, Iraq from a soldier who worked for Sgt. Maj. Agnew, and who sealed the documents in an evidence bag before delivering them to the FBI), the two ISIS documents were properly authenticated and admissible as co-conspirator statements under Rule 801(d)(2)(E).  *See* Trial Tr. 217:19-218:17; 248:5-249:10; 262:19-263:13; 267:20-25.  All three witnesses testified that the documents were in the same condition as when they recovered or received.  *Id.* at 222:17-24; 251:11-15; 266:24-267:19.  Additionally, prior to this testimony, at a motions hearing on April 12, 2017, the Court heard testimony from Kurdish CTD Official No. 1, who testified that he recognized the format of the two documents, and explained how they were used by ISIS.  *See* Hearing Tr. 148:20-170:18.  He also put into the

record his translation of the documents, which identified the defendant's name and other accurate biographical information.  *Id.*  While Kurdish CTD Official No. 1's testimony was not required to admit both documents at trial given the testimony of the Col. Arkan, the U.S. military officials, and the FBI agents who interviewed the defendant, it serves as an additional basis for the Court to have ruled on their admissibility in the context of Federal Rules of Evidence 104(a) and (c).

The government also heard testimony at trial from Agent Czekala that: (1) upon arriving in ISIS-controlled territory, the defendant "and the other ISIS recruits underwent an intake or processing venture"; (2) an ISIS official had "a paper form in front of him, like a document," and asked the defendant specific questions, such as his name, *kunya*, where he was from, date of birth, marital status, prior occupation, among other questions, the answers to which the ISIS official handwrote on the form (which the government submits is exhibit 29A, the ISIS registration form recovered in Mosul); and (3) while answering questions, the defendant observed "another ISIS member in the room with a laptop computer, and he was entering the responses into the computer" (which the government submits is exhibit 30A, the ISIS camp roster).  Trial Tr. 551:17-18; 552:12-554:13.  Agent Martinez corroborated much of this information, adding that the defendant "acknowledged that he saw the words 'Abu Omar' on that [ISIS registration] form," and "that there was also another ISIS member inputting the information into a laptop."  *Id.* at 730:21-731:5.  As established at trial, there is no dispute about the accuracy of the answers for the majority of responses listed on both documents.[5]

---

[5] The defendant himself admitted during cross-examination that, during the early stages of his time with ISIS, an ISIS member asked him a series of questions, and the defendant provided much of the same information that is accurately reflected on the two documents at issue.  *Id.* at 1000:17-1004:8.  The defendant denied that he was ever asked about a current mission, among a few other items listed on the documents that would tend to incriminate him, but it is well known "[t]hat [the defendant's] statements and behavior are subject to innocent explanations is . . .

These documents are two ISIS records identifying the defendant as a member and/or fighter within the criminal conspiracy.  The documents are clearly authentic, the conspiracy has been established by a preponderance of the evidence, and the underlying information gains its reliability from the existence of the conspiracy and the recovery of the documents themselves. The defendant admitted that he joined ISIS by first reaching out to ISIS facilitators/recruiters on the Internet and through encrypted social media platforms, and subsequently agreed to be smuggled into ISIS-controlled territory by the lethal terrorist organization, at which point he participated in an ISIS intake process with his co-conspirators.  The defendant's argument that an "unknown person writing ascribed the term 'fighter' to him" is unavailing (*see* Dkt. No. 220 at 20), particularly given that the Court allowed the defense to argue "as to what significance it is that somebody else may have put the name Fighter on it," which was, in fact, argued to the jury. Trial Tr. 283:15-19; 1246:9-1247:2.  For all of these reasons, this Court did not err in admitting these documents.

---

immaterial.  A jury is free to choose among reasonable constructions of the evidence."  *United States v. Hernandez*, 433 F.3d 1328, 1334 (11th Cir. 2005) (internal quotation marks and citations omitted)).

## CONCLUSION

For the foregoing reasons, the defendant's arguments are without merit, and his motion for judgment of acquittal or, alternatively, for a new trial, should be denied.

Respectfully submitted,

Dana J. Boente
United States Attorney

By: _____/s/_____          By: _____/s/_____
    Raj Parekh, Trial Attorney              Dennis M. Fitzpatrick
    U.S. Department of Justice              Assistant U.S. Attorney
    Counterterrorism Section              U.S. Attorney's Office
    National Security Division              Eastern District of Virginia
    950 Pennsylvania Ave., N.W.              2100 Jamieson Avenue
    Washington, D.C. 20530              Alexandria, Virginia 22314
    Phone: (202) 616-2428              Phone: (703) 299-3700
    raj.parekh@usdoj.gov              dennis.fitzpatrick@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2017, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will send an electronic copy to all counsel of record in this matter.

By: _____/s/_____
    Raj Parekh
    Special Assistant United States Attorney
    Attorney for the United States
    United States Attorney's Office
    2100 Jamieson Avenue
    Alexandria, VA  22314
    (703) 299-3700 (telephone)
    (703) 837-8242 (fax)
    raj.parekh@usdoj.gov