**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 1:16CR143** |
| | ) | **The Honorable Liam O'Grady** |
| **MOHAMAD JAMAL KHWEIS,** | ) | |
| | ) | **Sentencing Date: 10/27/17** |
| **Defendant.** | ) | |

### DEFENDANT'S POSITION ON SENTENCING

Pursuant to Rule 32 of the Federal Rules of Criminal Procedure, and Section 6A1.3 of the advisory United States Sentencing Guidelines, the Defendant, Mohamad Jamal Khweis ("Mr. Khweis"), by counsel, states that he has received and reviewed the Presentence Investigation Report ("PSR"). Mr. Khweis has one Guidelines objection and maintains the factual corrections outlined in the PSR addendum regarding the timing of the Kurdish investigation, as well as a general factual objection to the Government's characterization of Mr. Khweis' offense (¶¶19-29 of the PSR).

Mr. Khweis submits that a sentence no greater than 60 months incarceration is sufficient, but not greater than necessary, to comply with the purposes enunciated by Congress in 18 U.S.C. § 3553(a)(2). This is based on his background and character, need to avoid unwarranted sentencing disparities, the need to protect the public, and for general deterrence.

## GUIDELINES OBJECTION[1]

Mr. Khweis objects to the USSG § 3A1.4(a) "terrorism enhancement" because knowledge of a foreign terrorist organization's mission when providing material support is insufficient, without more, for its application. *See United States v. Chandia*, 675 F.3d 329, 334 (4th Cir. 2012).  In *Chandia*, the Fourth Circuit held that, when applying the terrorism enhancement, the District Court initially "applied the wrong legal standard by equating intent with knowledge." *Id.* (citing *United States v. Chandia,* 395 F. App'x 53, 60 (4th Cir. 2010) ("*Chandia II*")).  The court explained that the "[defendant's] knowledge that [the Foreign Terrorist Organization] had a terrorist purpose supported his material support convictions but 'that does not automatically yield an inference of the specific intent required for the terrorism enhancement to apply.'" *Id.*  The Fourth Circuit indicated that the District Court must "explain how specific facts indicate that [the defendant's] motive in providing material support constituted the requisite intent for the terrorism enhancement." *Id.* (internal quotations omitted).

In this case, the Government's theory that Mr. Khweis joined ISIS to become a fighter is seriously undermined given the recently recovered document that leaves this remark blank for Mr. Khweis (but states "fighter" for others).  This is significant because the record is void of any other type of specific intent as to Mr. Khweis' motive.[2]  The record is notably missing any evidence of tweets, messages, or other social media in support of ISIS' mission, or any admissions from the defendant that he agreed and sought

---

[1] This objection was not raised with the probation officer or the Government until after the final PSR was filed.  Nevertheless, upon further reflection, and in part based on the newly discovered document, Mr. Khweis raises this Guidelines Objection.

[2] Even if the evidence did not include the newly-discovered document, Mr. Khweis maintains he did not agree to be a fighter, or have knowledge of that entry on the form.

to adhere to ISIS ideology.  In fact the testimony was the opposite.  Mr. Khweis repeatedly denied agreeing with ISIS ideology, both to the agents when interviewed, and at trial.  There was testimony that Mr. Khweis knew ISIS was a violent organization with a violent mission, however, that evidence goes to the material support charge itself.  That evidence does not show that Mr. Khweis' "motivation in providing material support to [ISIS] was to 'to influence or affect government conduct by intimidation or coercion or to retaliate against government conduct.'"  *Id.* at 340 (citing definition given to "a federal crime of terrorism" in 18 U.S.C. § 2332b(g)(5)(A)).  Therefore, Mr. Khweis objects to the application of the terrorism enhancement, and submits the Guidelines calculation should be Offense Level 28, Criminal History Category I, resulting in a range of 78-97 months.

## BACKGROUND

Mr. Khweis is a 27-year-old high school graduate who lived almost his entire life with his mother, father, and brother in Virginia.  Raised by his two parents in Fairfax County, by all accounts, Mr. Khweis' childhood was normal.  He and his brother had the typical sibling squabbles, and, like most teens, at times he found his parents to be too strict, but overall, he had a positive upbringing.  His parents were both Muslim Americans, having immigrated from Palestine and Jordan.  The family was not particularly devout, however, and Mr. Khweis only occasionally attended religious services.

Mr. Khweis was a supportive and helpful son.  Both of his parents worked, and he got his first job at age 14 working at an ice cream shop during the summers.  At age fifteen, he began working as a server in a retirement home.  From this young age up until

3

his travel, Mr. Khweis held numerous jobs including positions in a bank, hotel, and as a bus driver for disabled metro riders.  His employers knew him to be polite and responsible.  Mr. Khweis also engaged in volunteer activities.  He assisted with an event to raise money for Crohn's disease, when he was employed by the bank, he spoke at elementary schools, sponsored "shred it" events, and helped with their involvement in the Fairfax parades.

Mr. Khweis always loved to travel.  Early in life he traveled to Israel, Jordan, and Egypt with his mother.  At age thirteen he again visited Jordan with his mother, and at age fifteen, the Khweis family traveled to Israel, Jordan, and Syria.  Mr. Khweis enjoyed exploring on his own as well, traveling to New York and Colorado a few years later.

In high school, Mr. Khweis found himself slightly wayward.  He began to associate with a tougher crowd of teenagers who smoked pot and drank.  Mr. Khweis' grades faltered, and as he continued through high school he began to fall into the patterns of drinking and smoking with this new crowd. Prior to his travel in this case, Mr. Khweis' day-to-day routine could be described as unremarkable, or even mundane.  He rose early to go to work, he worked his shift, then got off work and drank, smoked cigarettes and marijuana, and socialized with his friends.  During this period, Mr. Khweis made the impulsive and poor decision to travel to ISIS-held territory.  Unfortunately, the adventure quickly few out of control, and Mr. Khweis ultimately found himself before this Court facing his judgment.

## **ARGUMENT**

### I.      **Legal Standard**

In *Kimbrough v. United States*, 128 S. Ct. 558 (2007), and *Gall v. United States*, 128 S. Ct. 586 (2007), the Supreme Court held that the Sentencing Guidelines are simply an advisory tool to be considered alongside other statutory considerations set forth in 18 U.S.C. § 3553(a). In two summary reversals, moreover, the Court stated unequivocally that the Guidelines cannot be used as a substitute for a sentencing court's independent determination of a just sentence based upon consideration of the statutory sentencing factors. *Nelson v. United States*, 129 S. Ct. 890 (2009); *Spears v. United States*, 129 S. Ct. 840 (2009). "Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable," the Court held in *Nelson*. 129 S. Ct. at 892. "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Id*. at *2 (emphasis in original). In other words, sentencing courts commit legal error by using a Sentencing Guidelines range as a default to be imposed.

Congress has required federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in § 3553(a) of Title 18, United States Code. Those factors include (a) the nature and circumstances of the offense and the history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory guideline range; (d) the need to avoid unwarranted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a).

**II.    A sentence of 60 months is sufficient, but not greater than necessary, to accomplish the goals of sentencing under § 3553(a).**

      **i.    Nature and Role in the Offense**

Mr. Khweis' offense is simple and straightforward.  He traveled to ISIS-held territory, and the jury found that he did so to support ISIS.  Mr. Khweis disputes that he went to Syria with any ill intent.  Regardless, there is no dispute, that the evidence never showed Mr. Khweis caused anyone harm, or sought to plan any attacks, and Mr. Khweis deeply regrets having traveled to ISIS territory.

Mr. Khweis' "role," as it were, extends beyond his travel, but should also include the role he had in attempting to thwart ISIS objectives.  After he established a rapport and trust with FBI Agent Michael Connelly, Mr. Khweis spent weeks offering information on ISIS' inner workings.  He provided details of, people, places, and activities from his time among ISIS – details the F.B.I. doesn't often receive first-hand.  This information was valuable to the broader international objective of defeating ISIS.  *See* Suppression Hearing Trans. at 294-95, 299, 311 ("I would say very important intelligence things on the 10th.").  As inane as Mr. Khweis' decision was to travel to that territory, it was also incredibly valuable to have this first-hand information.

      **ii.    Need to Protect the Public and Deterrence**

           *A.    Mr. Khweis' escape and cooperation*

The need to protect the public and provide adequate deterrence is complicated in this type of case.  On one hand, certainly, the Court must send a message to others contemplating travel to ISIS territory.  On the other hand, we, as a society, want

individuals who have made this same type of poor choice and then change their mind, to turn around and provide information to the FBI.  When faced with a choice to leave or stay – we want to incentivize leaving ISIS territory rather than staying.

Unfortunately, Mr. Khweis is not, and won't be, the only youth to engage in this travel.  Regardless of the sentence Mr. Khweis receives in this case, there will be others who will seek to experience life in the caliphate for themselves.  Individuals, especially young men, rarely contemplate the consequences *before* committing an offense, but rather do so once they have completed an act and question it.  "[C]riminals, who are often young men, tend to be impulsive and to discount the future. The possibility of a longer prison sentence is too far away to pose as a deterrent."  Allison Shrager, *In America, mass incarceration has caused more crime than it's prevented*, Quartz Magazine, July 22, 2015.[3] citing David S. Lee, Princeton, and Justin McCrary, UC Berkeley, *The Deterrence Effect of Prison: Dynamic Theory and Evidence*, National Bureau of Economic Research, July 2009.

Because Mr. Khweis will not be the only young man to engage in this travel, it is imperative to ask – when those youth change their minds, do we want them to turn themselves in and provide valuable intelligence information, or do we want them stay under ISIS control, possibly causing harm to themselves or others?  After all, it is likely

---

[3] Available at https://qz.com/458675/in-america-mass-incarceration-has-caused-more-crime-than-its-prevented/ (citing David S. Lee, Princeton, and Justin McCrary, UC Berkeley, *The Deterrence Effect of Prison: Dynamic Theory and Evidence*, National Bureau of Economic Research, July 2009, available at http://eml.berkeley.edu/~jmccrary/lee_and_mccrary2009.pdf; Meier, M. H., Slutske, W. S., Arndt, S., & Cadoret, R. J. (2008). Impulsive and callous traits are more strongly associated with delinquent behavior in higher risk neighborhoods among boys and girls. Journal of Abnormal Psychology, 117(2), 377-385 http://dx.doi.org/10.1037/0021-843X.117.2.377) (last accessed August 14, 2017).

only then, in those perilous moments on the ground, rather than before they left, that these individuals will be contemplating criminal punishment.

We ask that the Court send a message to those youths, that certainly, you will be punished, but you will not spend the majority of your life in a United States' Penitentiary. If the choice becomes staying under ISIS control or living thirty years in a United States' prison, the chances increase that our young men and women choose the former. The Court should punish the initial behavior, but still incentivize a return home to cooperate.

To be fair, Mr. Khweis did not plead guilty, and for that he doesn't receive acceptance of responsibility points. He did, however, flee ISIS territory. Rather than become a fighter or worse, Mr. Khweis escaped. He turned himself in and risked his life to cooperate with the Government. Ultimately, Mr. Khweis provided the Government with valuable intelligence information to thwart ISIS's objectives. These actions merit consideration, both for Mr. Khweis, and for others who may follow.

### B.    Mr. Khweis is not a "radicalized" individual.

Unlike the large majority of §2339A and B offenders, Mr. Khweis' social media and email presence contains no vocal support for ISIS. There are no twitter messages in which Mr. Khweis expresses agreement with ISIS ideology or methods, and there are no messages encouraging travel or praising an attack. Dr. Jess Ghannam, a forensic behavioral psychiatrist, who has extensive experience evaluating individuals with an admitted commitment to Al-Qaida and ISIS, evaluated Mr. Khweis and determined he is not a religiously motivated extremist, or radicalized Jihadist. *See* Def.'s Exhibit C, *Evaluation Report from Jess Ghannam, PhD, MSc, QME.* In formulating his opinion, Dr. Ghannam met with Mr. Khweis for approximately twelve hours over three visits. He

interview the Khweis family, reviewed discovery, and read trial transcripts.  Dr.

Ghannam evaluated these factors using several analytical frameworks and techniques

employed in his field.  He ultimately opined that

> …Mr. Khweis is not a radicalized jihadist nor a religiously motivated
> extremist. Rather, Mr. Khweis is an impulsive and gullible individual
> who holds an unrealistic and naive sense of the world. His conduct
> was driven largely by these factors, combined with years of extensive
> marijuana and alcohol abuse. Rather than being a radical extremist
> with a well-defined political and religious ideology, Mr. Khweis'
> pathway, profile, and history can be understood to be more a function
> of naiveté, gullibility, and substance abuse.

*Id.*

Importantly, Dr. Ghannam also highlighted the need to keep Mr. Khweis

from environments (such a prison) that tend to breed radicalization.  He noted

that, "[i]t is well known in the forensic and law enforcement community, that the

best place for an individual to be radicalized is actually during incarceration.

Should Mr. Khweis be diverted to a federal facility with radical extremists, he is

much more likely to be radicalized there than if he were sent to a facility where

access to treatment for his underlying substance abuse and substance dependence

could be addressed."  *Id.*

A significant period of incarceration coupled with a firearms charge,

would increase the likelihood that the Bureau of Prisons designates Mr. Khweis to

the Communications Management Units in Terre Haute, Indiana.  *See* Carrie

Johnson, *'Guantanamo North': Inside Secretive U.S. Prisons*, NPR, March 3,

2011; Adam Wren, *The Terre Haute Experiment*, Indianapolis Monthly, May

2017 (both referring to FCI Terre Haute as "Guananamo North")[4] A lesser sentence would decrease this possibility, and therefore decrease the possibility of Mr. Khweis being placed in this volatile environment.[5] Additionally, rather than imposing a long prison term, the Court can monitor Mr. Khweis' activities through a period of supervised release.

### iii.    Need to Avoid Unwarranted Sentencing Disparities

In this case, not only did Mr. Khweis flee ISIS territory, turn himself in and cooperate with the Government, his actual offense was less severe when compared with others convicted of similar offenses.  Consider the following cases:

| NAME | CASE NO. | OFFENSE | PLEA | DATE | SENT. | BASIC FACTS |
|---|---|---|---|---|---|---|
| Ardit Ferizi | 1:16CR 42-LMB | 18 U.S.C § 2339B 18 U.S.C § 1030(a)(2)( C) | G | 9/23/16 | 20 years | Hacked a server w/ a US victim company site containing databases w/ PII, culled PII of US military members and other govt personnel (1,300 people), provided info to ISIS leader, discussed publishing PII in hit list |
| Yonathan Melaku | 1:12CR 27-GBL | 18 U.S.C § 1361 18 U.S.C §924( c)(1)(A) 18 U.S.C §1369 | G | 1/11/13 | 25 years | Carried out 5 shootings at military installation in Northern VA. Wanted to send a message that US shouldn't be involved in Iraq and Afghanistan wars.  If message not heard, planned futher crimes. |

---

[4] available at http://www.npr.org/2011/03/03/134168714/guantamo-north-inside-u-s-secretive-prisons and http://www.indianapolismonthly.com/features/the-terre-haute-experiment/ (last accessed Sept. 12, 2017).
[5] Compare Ali Amin and Mohamed Jalloh, versus Ardit Ferizi and John Walker Lindh, described *infra*.  Amin and Jalloh received 11-year sentences and are housed at FCI Allenwood, whereas Ferizi and Lindh, who received 20-year sentences are housed at Terre Haute.

| | | | | | | |
|---|---|---|---|---|---|---|
| Irek Ilgiz Hamidullin | 3:14CR 140-HEH | 18 U.S.C §2339A, 18 U.S.C §2339A, 18 U.S.C §32, 18 U.S.C §32 18 U.S.C §1117, 2 counts 18 U.S.C §1114, 18 U.S.C §2332(b). 2 counts 18 U.S.C §2332(b), 2 counts 18 U.S.C §2332( c), 18 U.S.C §2332a, 18 U.S.C §924( c), 18 U.S.C §924 (o) | NG | 12/3/15 | Life plus 30 years | Orchestrated and conducted violent attack on Afghan and US forces in Afghanistan in 2009, and conspired to kill members of the US military. Months of planning and reconnaissance. Had contact w/ high-level Taliban and Haqqani Network personnel. In 2009, led a group of fighters in attack at Camp Leyza, recieved approval from Taliban and Haqqani Network |
| Ali Shukri Amin | 1:15-CR164-CMH | 18 U.S.C §2339B | G | 8/28/15 | 11.3 years | Used social media to provide advice and encouragement to ISIL and supporters. Provided instructions on using Bitcoin, and facilitated travel of ISIL supporters to Syria to fight. Helped facilitate travel for Reza Niknejad, who went to fight for ISIL in Syria |
| Luis Portorreal | 1:16CR 210-CMH | 18 U.S.C. §1001 | G | 10/20/16 | Probation (5 years) | With Ali Amin, assisted in facilitating Reza Niknejad's travel to Syria to fight for ISIL. Participated in encrypted chats with facilitators, drove Amin and Niknejad to retrieve package with phone and encrypted thumb drive for travel. With Amin, drove Niknejad to airport, and delivered a final letter to Niknejad's family. Deleted encrypted chats, and lied to FBI when question about their involvement. |

| | | | | | | |
|---|---|---|---|---|---|---|
| Heather Coffman | 3:15CR-16-JAG | 18 U.S.C §1001(a) | G | 5/11/15 | 4.5 years | Used Facebook accounts under diff. names showing support for ISIS. Romantic relationship w/ N.A., communicated almost daily months leading up to Sept 2014. She and N.A. explored options for N.A.'s travel to Syria to fight for ISIS and die a martyr.  Formed relationships w/ people she thought were facilitators to help with his travel and training. Admitted she lied in investigation about not knowing if N.A. talked to others who supported ISIS, though she connected him with ISIS fighters to facilitate his travel to fight |
| Haris Qamar | 1:16CR227-LMB | 18 U.S.C §2339B | G | 2/17/17 | 8.5 years | Encouraged lone wolf attacks in DC area. Gave FBI CW ideas for pictures of American landmarks to help ISIS videos. Expressed interst in ISIL violence, loved the bodies, blood, beheadings, and the sound of individuals being killed on video. Described how he would kill someone. Said he believed in suicide bombings. Purchased ticket to go to Turkey, but was prevented from going. |
| Mohamed Bailor Jalloh | 1:16CR163-LO | 18 U.S.C §2339B | G | 2/10/17 | 11 years | Tried to facilitate an attack in VA. Introduced to FBI CS by ISIL member, believed the two would assist in the attack. Thought about attack similar to attack at Ft. Hood, Texas, and praised gunman in attack in Cattanooga. Purchased a weapon to conduct a terrorist attack, and attempted to give money to ISIL. |
| Joseph Hassan Farrokh | 1:16CR20-AJT | 18 U.S.C §2339B | G | 7/15/16 | 8.5 years | Conspired w/ Mahmoud Amin Elhassan to travel to Syria to fight w/ ISIL. Gave Elhassan $600 to aid in travel. Spoke about supporting violent jihad and ISIL. Used apps to avoid detection by law enforcement. Apprehended at airport trying to get to Syria. |

| | | | | | | |
|---|---|---|---|---|---|---|
| Mahmoud Amin Mohamed Elhassan | 1:16CR 64-AJT | 18 U.S.C §2339B 18 U.S.C §1001 (False statements) | G | 2/24/17 | 11 years | Conspired w/ Farrokh to provide material support or resources to ISIL. Drove Farrokh to Richmond to enable Farrokh to fly to overseas to join ISIL. Introduced Farrokh to person believed to be able to facilitate Farrokh's travel to the Islamic State. Made false statements to the FBI about Farrokh's travel to hinder their investigation. |
| Zachary Chesser | 1:10CR 395-LO | 18U.S.C.§875(c) 18 U.S.C. §373 18 U.S.C. §2339B | G | 2/24/11 | 25 years | Helped create a website and posted messages to help those who wished to engage in violent jihad.  Posted requests for others to attack specific individuals connected to a TV episode and related Facebook group considered defamatory to the Prophet Muhammad. Published photos, names, addresses, and other personally identifying information of those individuals, including a teenager, and a photo of a young man from Texas with his brother and parents that included a possible address of his possible church or school. Attempted to board a flight to Uganda, using his child to conceal his ultimate goal of travelling to Somalia to join al-Shabaab. Had previously attempted to join al-Shabaab. |
| Jesse Curtis Morton | 1:12CR 035-LO | 18 U.S.C §371 18 U.S.C §875(c) and 2 18 U.S.C §2261A(2)(B) and 2 | G | 6/22/12 | 11.5 years | Co-conspired with Chesser.  Created "Revolution Muslim," an organization that used websites to solicit murder, threaten others, and encourage violent jihad. Encourage Muslims to support Usama bin Laden, Anwar Al-Awlaki, al-Qaida, the Taliban, and other Muslims engaged in or espousing jihad. Stated that the 9/11 attacks were against legitimate military targets, and justified Nidal Hasan's killing of 13 soldiers at Fort Hood as a "preventative strike" because these soldiers were deploying to Iraq. Moved to Morocco and stated, stated "I want martyrdom ... and will continue to pursue it inshAllah... as |

13

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | long as it is in the limits oft he shariah." Sent messages to an associate encouraging martyrdom, and the associate was later arrested and charged in connection with a plot to attack the Pentagon and the U.S. Capitol building with remote controlled aircraft filled with explosives. |
| Mahmoud Amin Mohamed Elhassan | 1:16CR 64-AJT | 18 U.S.C §2339B 18 U.S.C §1001 (False statements) | G | 2/24/17 | 11 years | Conspired w/ Farrokh to provide material support or resources to ISIL. Drove Farrokh to Richmond to enable Farrokh to fly to overseas to join ISIL. Introduced Farrokh to person believed to be able to facilitate Farrokh's travel to the Islamic State. Made false statements to the FBI about Farrokh's travel to hinder their investigation. |
| Muna Osman Jama | 1:14CR 230-AJT | Count 1, 18 U.S.C §2339B, Counts 2-21, 18 U.S.C §2339B & 2 | NG | 3/31/17 | 12 years | Sent money to financiers of al-Shabaab in Somalia and Kenya. Organized "Group of Fifteen" to track monthly payments that helped finance al-Shabaab military operations in northern Somalia, and was used to fund 2 safehouses. 1 safehouse stored weapons and was used for attack prep, other to treat wounded fighters. Had close relationship w/ leaders and were privy to inside info. Recorded laughing at carnage at Westgate Mall in Nairobi, and Boston Marathon bombing. |
| Hinda Osman Dhirane | 1:14CR 230-AJT | Count 1, 18 U.S.C §2339B, Counts 16-21, 18 U.S.C §2339B & 2 | NG | 3/31/17 | 11 years | Sent money to financiers of al-Shabaab in Somalia and Kenya. Organized "Group of Fifteen" to track monthly payments that helped finance al-Shabaab military operations in northern Somalia, and was used to fund 2 safehouses. 1 safehouse stored weapons and was used for attack prep, other to treat wounded fighters. Had close relationship w/ leaders and were privy to inside info. Recorded laughing at carnage at Westgate Mall in Nairobi, and Boston Marathon bombing. |

| | | | | | | |
|---|---|---|---|---|---|---|
| John Phillip Walker Lindh | 1:02CR 37-TSE | 31 C.F.R §§545.204 & 545.206(a) & 50 U.S.C. §1705(b) & 18 U.S.C § 2, 18 U.S.C §§ 924( c)(1)(A) & 924( c)(1)(B)(ii) & 2) | G | 10/4/02 | 20 years | Traveled to Afghanistan to fight for Afghan Taliban govt forces against Northern Alliance fighters. Captured by Afghan Northern Alliance in Kunduz. "Escaped" bc makeshift prison scene of Taliban uprising (many killed including CIA officer). Lindh allegedly knew of uprising and said nothing and did not cooperate w/ Americans. Recaptured and flown back to US in 2002. |
| Masoud Khan | Crim. No: 03-296-A | 18 U.S.C §371, 18 U.S.C §2384, 50 U.S.C §1705, 18 U.S.C §2339A, 18 U.S.C §924(o), 3 counts, 18 U.S.C §924( c) | NG | 6/4/04 | Life (reduced by 20 years in 2005) | Part of Virginia jihad network that planned attack in US and abroad. Trained in US and in training camps in Pakistan. Some men bought weapons. |
| Seifullah Chapman | Crim. No: 03-296-A | 18 U.S.C §371, 18 U.S.C §2339A, 18 U.S.C §924(o) 2 counts, 18 U.S.C §924( c) | NG | 6/11/04 | 85 years (reduced in 2005 to 65 years) | Part of Virginia jihad network that planned attack in US and abroad. Trained in US and in training camps in Pakistan. Some men bought weapons. |
| Hammad Abdur-Raheem | Crim. No: 03-296-A | 18 U.S.C §371, 18 U.S.C §2339A, 18 U.S.C §924(o) | NG | 6/4/04 | 8 years (reduced in 2005 to 4.3 years) | Part of Virginia jihad network that planned attack in US and abroad. Trained in US and in training camps in Pakistan. Some men bought weapons. |
| Khwaja Mahmood Hasan | Crim. No: 03-296-A | 18 U.S.C §371, 18 U.S.C §924( c) | G | 11/7/03 | 11.25 years | Part of Virginia jihad network that planned attack in US and abroad. Trained in US and in training camps in Pakistan. Some men bought weapons. |
| Yong Ki Kwon | Crim. No: 03-296-A | 18 U.S.C §371, 18 U.S.C §924( c), 18 U.S.C §924(h) | G | 11/7/03 | 11.5 years | Part of Virginia jihad network that planned attack in US and abroad. Trained in US and in training camps in Pakistan. Some men bought weapons. |
| Mohanned Aatique | Crim. No: 03-296-A | 18 U.S.C §960 & 2, 18 U.S.C §924( c) | G | | 10.5 years | Part of Virginia jihad network that planned attack in US and abroad. Trained in US and in training camps in Pakistan. Some men bought weapons. |

| | | | | | | |
|---|---|---|---|---|---|---|
| Donald Thomas Surratt | Crim. No: 03-296-A | 18 U.S.C §371, 18 U.S.C §924(h) | G | 11/7/03 | 3.8 years | Part of Virginia jihad network that planned attack in US and abroad. Trained in US and in training camps in Pakistan. Some men bought weapons. |
| Randall Todd Royer | Crim. No: 03-296-A | 18 U.S.C §924(c) & 2, 18 U.S.C §844(h)(2) & 2 | G | 4/9/04 | 20 years | Part of Virginia jihad network that planned attack in US and abroad. Trained in US and in training camps in Pakistan. Some men bought weapons. |
| Ibrahim Ahmed Al-Hamdi | Crim. No: 03-296-A | 18 U.S.C §924(c) & 2, 18 U.S.C §944(h)(2) (carrying an explosive during the commission of a felony) | G | 4/9/04 | 15 years | Part of Virginia jihad network that planned attack in US and abroad. Trained in US and in training camps in Pakistan. Some men bought weapons. |
| Ahmed Omar Abu Ali | 1:05CR 53-GBL | 18 U.S.C §2339B, 18 U.S.C §2339B, 18 U.S.C §2339A 18 U.S.C §2339A, 50 U.S.C §1705(b); 31 C.F.R §595.204, 50 U.S.C §1705(b); 31 C.F.R §595.204, 18 U.S.C §1751, 49 U.S.C §(a)(2), 18 U.S.C §32(b)(4) | NG | 3/29/06 | Life | Arrested by Saudi authorities. There to join al-Qaeda cell. Received training from cell members in weapons, explosives, document forgery. Plot to assassinate President. Engaged in conspiracy to hijack and destroy civilian airliners. Researched nuclear power facilities in US at behest of senior al-Qaeda operative. |
| Sabri Benkahla | 1:06cr9 -JCC | 18 U.S.C §1623, 18 U.S.C §1503 | NG | 7/24/07 | 10 years | Virginia jihad network member. Traveled to Pakistan via Great Britain to a jihad training camp. |

16

| | | | | | | |
|---|---|---|---|---|---|---|
| Iyman Faris | Crim. No. 03-4965 | 18 U.S.C.A §2339A, 18 U.S.C.A §371 | G (but attempt to w/d plea) | 10/28/03 | 20 years | Before and after September 11, 2001, made trips to Pakistan and Afghanistan, met with Osama Bin Laden and other al Qaeda members who were considering terrorist plots in the United States. Conducted research on ultralight airplanes for members of al Qaeda, provided the results of his research. At the request of members of al Qaeda, investigated the possibility of destroying the Brooklyn Bridge by severing the cables with gas wire cutters. As part of planning a possible attack in the United States, explored the conceivability of obtaining gas cutters and cased the Brooklyn Bridge to determine if such a method of destruction were viable. |
| Amine Mohamed El-Khalifi | 1:12-CR-37-JCC | 18 U.S.C §2332a(a) (attempting to use a weapon of mass destruction) | G | 9/14/12 | 30 years | Plotted to commit a suicide bombing in the U.S. Capitol. Surveyed locations, purchased materials for the attack. Armed himself with what he believed to be a functioning bomb and a MAC-10 automatic weapon. The defendant was arrested as he set off towards the Capitol to carry out his plot. Armed himself with an automatic weapon and a bomb. Arrested as he set off to toward the Capitol to carry out his plot. |
| Zacarias Moussaoui | 01cr455 | 18 U.S.C §§ 2332b(a)(2) & (c), 18 U.S.C §§32(a)(7) & 34, 18 U.S.C § 2332a(a) | G (but attempt to w/d plea) | 5/4/06 | Life | Admitted involvement with al-Qaeda, but claimed not involved in 9/11 attacks. Said he was preparing for another attack. Later claimed he had been intended for 9/11 attack. |

Of these cases, Mr. Khweis' conduct was not more serious than Sabri Benkahla

who traveled to Pakistan via Great Britain to a jihad training camp. Benkahla received

121 months. Mr. Khweis was not more serious than Jama or Dhirane who sent money to

financiers of al-Shabaab that was used to fund two safe houses, one of which was used

for weapons storage and attack preparation. Jama and Dhirane received sentences of 12

and 11 years respectively.  Mr. Khweis' conduct was not more serious that Jalloh who tried to plan an attack in Virginia.  Jalloh received a sentence of 11 years.  Mr. Khweis' offense was not more serious than Qamar, who encouraged, and provided information for lone wolf attacks in the Washington, D.C., and who purchased ticket to go to Turkey, but was prevented from going.  Qamar received 102 months.  Mr. Khweis' offense was not more serious that Ferizi who hacked a computer database to assist an ISIL leader in creating a hit list of 1,300 service members, permanently endangering their lives.  Ferizi received a sentence of 20 years.

Mr. Khweis' offense was certainly not more serious than Daniela Greene's offense out of United States District Court in Washington, D.C.  *See* 1:14-cr-00230-RC, ECF No. 56 (D.D.C May 7, 2015).  Greene was an interpreter for the FBI and held a top-secret security clearance.  She was responsible for investigating a leader of ISIS in Syria. During her participation in the investigation, she lied and told the FBI she sought to travel to Germany to see her family.  Instead, she traveled to Turkey, crossed the Syrian boarder, met with the ISIS leader she was investigating, and married him.  They spent over a month together during which time, Greene informed the ISIS leader she was employed by the FBI, and the FBI had an open investigation into his activities.  Ms. Greene had a change of heart, and after sending several inculpatory emails, returned to the United States forty days later.  *See id.*  Although providing information to an ISIS leader regarding the FBI's investigation of him would clearly be "material support," Greene was charged, and pled guilty to, making false statements.  She received a sentence of twenty-four months imprisonment. *See id.* at ECF No. 66-2.

In this case, just like Greene, Mr. Khweis traveled to ISIS territory. He stayed slightly longer than Greene at approximately 2.5 months. However, unlike Greene, Mr. Khweis did not work for the FBI, have a top-secret security clearance, and tip off an ISIS leader to an FBI investigation. Of all the cases mentioned, Mr. Khweis' offense is most similar to Greene's, though hers is more severe. Mr. Khweis elected to exercise his constitutional right to a trial, and Ms. Greene pled guilty, and that fact should be taken into consideration. However, simply exercising a constitutional right should not result in a sentence decades longer that Ms. Greene's 24 months.

The Government's request equates Mr. Khweis' offense with, not with the more appropriate cases like Greene's, but instead with people like Melaku, who carried out five shootings at military bases in Northern Virginia; or Ardit Ferizi who gained personal information of 1300 service members to assist a ISIL for a hit list; or El-Khalifi who plotted a suicide bombing at the United States Capitol, who armed himself with an automatic weapon and a bomb, and was arrested as he set off to toward the Capitol to carry out his plot. These offenses are all far more serious that Mr. Khweis' conduct. Mr. Khweis has also attached a list of other cases around the country for sentencing disparity consideration. *See* Def. Ex. D.

### iv.    Mr. Khweis' Personal Characteristics

Mr. Khweis made a poor decision to travel to ISIS territory, however, that act is only one moment of his 28 years. Others have highlighted his caring, helpful and respectful nature. *See* Def.'s Ex. E. Mr. Khweis' mother wrote, "I believe that he is aware of the pain that he has caused for everyone in the community, family and friends. Still to this day everyone is still shocked of what happened. Mohamed always helped

around in the neighborhood whether it was shoveling snow, cutting the grass, or even raking leaves. My son Mohamed always liked to give a helping hand when he sees someone needs help." *Id.* His brother explained to the Court, "Mohamed was a kindhearted person. Just like my mother, the normal thing for him was to put other people in his life first….That is who I remember my brother Mohamed to be, and let me tell you who he is today. Mohamed is a tremendously bright person and I still believe his potential is still there but buried inside that jail cell." *Id.*

Mr. Khweis' family friend wrote of the particular kindness he showed her, "They say blessings come in disguise and that is what Mohamed was and is to my family and me. I am a single mother and there was a point where I could not even buy clothes or diapers for my children or find anyone to watch them when I would want to look for work. Mohamed was the only one who would offer to watch them for me free of charge and my children absolutely loved being around him. I have known Mohamed for 9 years. Until this day they still ask me about him and when they can see him again. I will always see Mohamed as that wonderful and helpful person he is." *Id.* Other letters describe Mr. Khweis' kindness, generosity, and remorse, showing that Mr. Khweis is not the individual the Government paints him to be through this single act.

Importantly, Mr. Khweis has not sat idle while incarcerated.  He has participated extensively in classes, attempting to further his education and engagement.  He has participated in Bible Classes, Alpha Group Study, Discipleship Classes, Church Morning/Evening Services, Catholic Mass, Narcotics Anonymous, Health Education, Motivational Program, Path for Peace, Mindfulness Program, Life Learning Program, NOVA Open Road college courses, Re-Entry Life Skills Coaching, Motivational

Program, Resource & Community Services Workshop, and Art Class/Contest.  *See* Def.'s Ex. F.  Even just recently, Mr. Khweis completed a community college course and received the highest marks.  This is evidence of Mr. Khweis' commitment to being in engaged and productive in his community.  He seeks an opportunity to show he still has much to offer in this regard.  He has remained in general population almost the entire time he has been incarcerated and has not had one incident or infraction.  *See id.*

Finally, Mr. Khweis has had an opportunity to reflect on his actions and circumstances.  He wrote to the Court that he is disappointed in himself, and says to himself every day that "I wish I never traveled to a place I never should have gone.  I ruined my life and my family's life.  I disappointed my family and feel terribly sorry for doing so."  *See* Def.'s Ex. A.  Mr. Khweis reflected on his upbringing, and stated, "instead of making my family proud of me I brought my family shame and humiliation." *Id.*  He explained, "everyday I live in regret wishing I could turn back time and made [sic] better decision." *Id.*  We ask that the Court grant Mr. Khweis an opportunity to make those better decisions.

>    **v.      Mr. Khweis' criminal history is overstated.**

A criminal history category six grossly overstates Mr. Khweis' one misdemeanor conviction for a traffic offense, which, under normal circumstances, would place him in Category I.  "If reliable information indicates that a defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes," the Court may depart downward. *See* U.S.S.G. § 4A1.3(b); *United States v. Moreland*, 437 F.3d, 424, 432 (4th Cir. 2006); *see also United States v. Nelson,* 166 F. Supp. 2d 1091 (E.D. Va. 2001).

This departure is available in the context of the terrorism enhancement in addition to others crimes. *See United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003), ("A judge determining that § 3A1.4(b) over-represents the seriousness of defendant's past criminal conduct or the likelihood that defendant will commit other crimes always has the discretion under § 4A1.3 to depart downward at sentencing."). Thus, regardless of the type of crime, departures are "encouraged" when a defendant's criminal history category fails to accurately reflect his true criminal history or the likelihood he will commit other crimes. *See United States v. Dixon*, 318 F.3d 585, 588 (4th Cir. 2003).

This point was illustrated in this Court in *United States v. Benkahla*, 501 F.Supp.2d 748 (E.D. Va. 2007). Benkahla was convicted by a jury of two counts of making false declarations to a grand jury, obstruction of justice, and making false statements to an FBI agent, after repeatedly denying that he traveled to Pakistan to engage in weapons training to prepare for violent jihad. *Id*. at 750-51. Benkahla received the terrorism enhancement with a total guidelines range of 210-262 months. *Id*. at 757.

The Court sentenced Benkahla below Guidelines, explaining that, "For an individual with no criminal record and no evidence of ever having committed an illegal act in his life outside the conduct for which he is convicted, this clearly over-represents the seriousness of his criminal history." 501 F.Supp.2d at 759. The Court also noted that criminal history category VI over-represented the likelihood Benkahla would commit other crimes, remarking that he did not exhibit common characteristics of being a terrorist, and therefore, lacked "the same likelihood of recidivism, the difficulty of recedivism, or the need for incapacitation." *Id*.

22

In this case, the seriousness of the crime is already accounted for in the increased offense level mandated by the terrorism enhancement. The criminal history category, on the other hand, is meant to reflect the history and characteristics of the defendant, particularly with respect to recidivism.  Not only is Mr. Khweis' actual criminal history minimal, his risk of recidivism is also incredibly low because he is not a radicalized individual, and has continued self-improvement activities while incarcerated, including reflecting on the seriousness of his actions.  *See* Def.'s Exhibit C, *Evaluation Report from Jess Ghannam, PhD, MSc, QME*.  He did not plead guilty, but has nevertheless expressed remorse and regret regarding his decision to travel.  Mr. Khweis' history as a generally law-abiding citizen should be accounted for in his sentence, but instead, Mr. Khweis' Guidelines calculation (and particularly his criminal history score) is the same as an individual who led a life of terrorism and terrorist-related activity prior to his offense. For example, Ardit Ferizi engaged in years of criminal activity prior to assisting in preparing a hit list with personal information of service members for ISIL.  *See* 1:16CR42, ECF No. 72-1 at 15-16.  Yet, the two individuals have identical criminal history scores.  In order to provide meaningful distinction between these two types of individuals, the Court should vary downward and sentence Mr. Khweis below the Guidelines range.

## CONCLUSION

WHEREFORE, for the above reasons, Mr. Khweis respectfully requests a sentence of 60 months.  Mr. Khweis further asks for credit for the time he served in Kurdish prison,  *See United States v. Ali Saleh Kahlah al-Marri*, 1:09-cr-10030-MMM-JAG, ECF No. 54 (C.D. Ill, Nov. 2, 2009) (applying credit for time defendant was held as

an enemy combatant because the detention "involved the same conduct with which he was charged in this indictment."), and that the Court recommend the RDAP program and placement at FCI Cumberland.

Respectfully submitted,
MOHAMAD KHWEIS
By Counsel

_____/s/_____
Jessica N. Carmichael, Esq.
Virginia Bar No. 78339
HARRIS CARMICHAEL & ELLIS, PLLC
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
(703) 684-7908
jcarmichael@harriscarmichael.com

_____/s/_____
John K. Zwerling, Esq.
Virginia Bar No. 8201
ZWERLING/CITRONBERG, PLLC
114 N. Alfred Street
Alexandria, VA 22314
703-684-8000
jz@zwerling.com

## <u>CERTIFICATE OF SERVICE</u>

      I, hereby certify, that on the 20th day of October, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following and all parties to this action:

Dennis Fitzpatrick, Esq.
United States Attorney's Office
2100 Jamieson Ave
Alexandria, VA 22314
(703) 299-3954
Email: dennis.fitzpatrick@usdoj.gov

Raj Parekh, Esq.
US Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
703-299-3700
Email: raj.parekh@usdoj.gov


                                          _____/s/_____
                                          Jessica N. Carmichael, Esq.