IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Action No. 1:16-cr-143 |
| | ) | Hon. Liam O'Grady |
| MOHAMAD JAMAL KHWEIS, | ) | |
| | ) | |
| *Defendant*. | ) | Sentencing: October 27, 2017 |

## UNITED STATES' MEMORANDUM IN AID OF SENTENCING

*ISIS is the most lethal terrorist organization in the world, and has been since 2014, killing over 9,000 individuals annually since then.* (Trial Tr. 799:12-14; 800:14-18)

*A senior Syria ISIS official approached [Mohamad Khweis] and asked if he would be a suicide bomber, or if he wanted to be a suicide bomber. The defendant said yes*. (Trial Tr. 551:12-16)

*The defendant added that ISIS and other terrorist organizations frequently use this term [Greenbird] to show their support for violent jihad, and particularly suicide operations and to become a martyr. It is with that context that the defendant said he used that term "GreenBird." When we asked him what was the iAGreenBirdiA, the iA portion, he explained that it's Arabic for inshallah, which means God willing. So essentially he was trying to advertise online that God willing I'll die fighting for ISIS or die as a suicide bomber.* (Trial Tr. 540:5-15)

*Well, I thought of GreenBird because Twitter, the Twitter icon is a Bluebird.* Trial Testimony from Mohamad Khweis. (Trial Tr. 860:21-22).

## I.    INTRODUCTION

Mohamad Khweis turned his back on his own country by joining the most lethal terrorist organization in the world, renowned for its brutality and murderous agenda, and offered himself as a suicide bomber. The defendant is the only individual to have successfully joined the Islamic State of Iraq and al-Sham ("ISIS") in ISIS-controlled territory and face a jury of his peers. The jury swiftly, decisively and unequivocally convicted this defendant of all counts lodged against

him.  The defendant has earned a serious accounting of his serious criminal conduct.  A sentence of **420 months (35 years)** imprisonment not only appropriately measures the severity of the defendant's criminal conduct, but it also reaffirms the existence of the moral system thoroughly disregarded by the defendant.  The defendant has engaged in abhorrent conduct that society rightfully condemns. The defendant has earned a substantial sentence.

The defendant engaged not only in exceedingly dangerous and abhorrent conduct, but he demonstrated an utter disregard for the law with his obstructionist conduct.  His trial testimony from June 5-6, 2017 was infected with lies and excuses to minimize the numerous ways in which he provided and conspired to provide material support to ISIS.  Recall that when the defendant was apprehended on March 14, 2016, he thwarted and impeded the FBI's efforts to get timely, actionable information in an effort to learn more about the terrorist organization's recruitment efforts and its otherwise violent conduct.  The defendant lied for several days to the FBI, fabricating stories and recounting names of fictitious individuals in order to falsely exculpate himself.  In the intervening 15 months, while he was incarcerated in Northern Iraq and in the Alexandria Detention Center, this defendant learned nothing.  Fifteen months after his capture, the defendant reverted to what he knows: lying.

Following a jury trial in this Court, the defendant was found guilty on June 7, 2017 of all three counts charged in the Superseding Indictment, to include, conspiring to provide material support or resources to ISIS in violation of 18 U.S.C. § 2339B (Count One); providing and attempting to provide material support or resources to ISIS, also in violation of 18 U.S.C. § 2339B (Count Two); and possessing, using and carrying firearms in violation of 18 U.S.C. § 924(c)(1)(A) (Count Three).

2

As further explained below, the government submits that the Sentencing Guidelines in this matter are properly calculated at level 42 with a criminal history category VI.  This calculation recommends a sentence within a range of 360 months to life imprisonment.  The justice system expresses society's rejection of aggravated criminal conduct through substantial punishments.  A lengthy sentence is necessary to deter the defendant, and others like him, from committing future crimes.  After a conscientious consideration of the statutory sentencing factors set forth in 18 U.S.C. § 3553(a), the United States submits that a sentence of **420 months (35 years)** of imprisonment is sufficient and not greater than necessary to satisfy the statutory purposes of sentencing.

The court is fully acquainted with the facts of this case.  The factual record in this case consists of two full days of pre-trial hearings and depositions along, with a week of trial testimony.  In addition, the pre-trial and post-trial briefing in this case by both parties has been extensive.  Further, the Presentence Investigation Report ("PSR") has a comprehensive summary of the defendant's conduct.  The government therefore submits the following abbreviated summary of the defendant's conduct.

The defendant's desire to join ISIS involved considerable planning and a deliberate execution of his plan.  The defendant succeeded.  The defendant understood, before he departed the United States, that "one of the main goals of ISIS is to destroy America" and that he knew ISIS wanted to take over America "when their caliphate expanded or their country and their influence expanded."  The defendant also knew that ISIS expanded its caliphate by violence, and he nonetheless wanted to see it and "be part of it."  Trial Tr. at 531:1-10; 954:13-16

During his time with ISIS in Syria and Iraq, the defendant agreed during his ISIS intake process to be a suicide bomber (Trial Tr. 551:11-16; 731:10-11); resided and/or traveled with

ISIS fighters to multiple safe houses, including with another American who had trained with ISIS to conduct an attack in the United States (*Id.* at 1064:8-1065:3); agreed to have his blood drawn by ISIS and was subsequently issued an ISIS identification card with his *kunya*[1] listed (*Id.* at 557:8-23); participated in ISIS-directed religious training (*Id.* at 562:1-5); attended ISIS lectures and constantly watched military videos with his fellow ISIS members for inspiration (*Id.* at 564:1-7); frequently gave money to ISIS members (*Id.* at 563:21-23); and cared for wounded ISIS fighters, including an injured Libyan fighter to whom the defendant provided a Virtual Private Network ("VPN") to help the ISIS fighter conceal his online activity and disguise his location (*Id.* at 565:3-566:9); among other forms of material support and services that the defendant provided to ISIS.

As demonstrated by the violent and graphic images on his phones, the defendant was fully aware of the brutal conduct and goals of ISIS. The evidence proves that the defendant was radicalized towards violent jihad. The defendant agreed to be a suicide bomber for ISIS. The defendant knowingly traded his life in Fairfax County, Virginia for the violent, hate-filled life created by the Islamic State. The defendant is a dangerous and unpredictable individual. Sentencing him to 35 years' imprisonment reasonably and appropriately addresses his inexcusable criminal conduct.

## II.     THE DEFENDANT'S SENTENCING EXPERT IS NOT CREDIBLE

Dr. Jess Ghannam is not credible, and his meandering 19 page report concluding that the defendant is not radicalized should be disregarded by the court. There are numerous problems

---

[1] The jury heard testimony that the Arabic term "*kunya*" is a nickname for an individual. *Id.* at 264:18-19. The defendant admitted during cross-examination that the *kunya* he gave to ISIS was "Abu Omar al-Amriki," which matches the nickname listed on his ISIS intake form and an ISIS camp roster, both of which were admitted at trial. *See id.* at 1001:20-1002:1; Gov. Exs. 29A-B and 30A-B.

with Dr. Ghannam's narrative and conclusions.  However, the dispositive factor in favor of rejecting Dr. Ghannam's conclusions is that he has been found not credible by two courts in the last two years.  To be clear, these courts have not simply disagreed with or rejected Dr. Ghannam's conclusions, these courts have explicitly criticized Dr. Ghannam's objectivity, reliability and credibility.

Dr. Ghannam was enlisted by the defendant to address a competency issue in *United States v. Adnan Ibrahim Harun A Hausa*, Case No. 1:12-cr-00134-MDG (E.D.N.Y.).  In rejecting the defendant's claim of incompetency to stand trial, the Honorable Brian M. Cogan of the Eastern District of New York, in a docketed memorandum Order published February 24, 2017, made the following credibility findings concerning Dr. Ghannam *after Dr. Ghannam testified under oath*:

> Finally, Dr. Ghannam's opinion is fundamentally unreliable because Dr. Ghannam is not credible.  During his cross examination, Dr. Ghannam was repeatedly impeached with evidence demonstrating his bias against the United States such that the value of his opinion was discredited almost entirely.  People are free to espouse whatever political and ideological beliefs they want; that is their right and it is Dr. Ghannam's right as well, but his beliefs, which he has publicly stated on radio shows, in documentaries, at rallies, at protests, and in writings, bespeak an individual whose bias is so significant that, in cases like this, his credibility is irrevocably compromised.  Of course, when asked on redirect whether, in effect, he could put aside his bias, he answered affirmatively, but I could not credit that conclusion any more than his opinions in this case.

Order, J. Cogan, February 24, 2017, 1:12-cr-00134 (ECF No. 228) (Attached at Ex. A).

Judge Cogan not only found Dr. Ghannam's credibility "irrevocably compromised," he eviscerated his methodology and assumptions as well.  For instance, Judge Cogan stated, "I do not credit Dr. Ghannam's testimony regarding the cultural sensitivities to the effect that a devout Muslim would never keep himself unclean in the way Harun does." *Id.*  Dr. Ghannam submitted that his "cultural affinity" with defendant Harun and his ability to speak with him in Arabic was

important. Judge Cogan rejected and criticized these assumptions. *Id.* This is critical because the report submitted by Dr. Ghannam in this case is replete with unsupported narratives and commentary.

Indeed, Dr. Ghannam is a colorful figure. In a publicly available video for the entire world to see (11:18 in length), Dr. Ghannam takes the podium at a Ralph Nader presidential rally where, among other things, he refers to the Israeli "Destruction" Forces (at 6:20), he calls the United States the "Empire" and recounts apologizing to a five-year old child for being from the "Empire" (at 6:55) (he said the five-year old child "understood" him), and he encourages the audience to "challenge the imperial wet dreams that George Bush and John Kerry have" (at 10:17). *See* https://archive.org/details/JessGhannam_10-11-04 (last visited Oct. 20, 2017).

Dr. Ghannam has made repeated public statements compromising his objectivity. In another video clip from *circa* 2013, also publicly available, Dr. Ghannam states, "I was born into politics." *See* https://vimeo.com/79157049 (last visited Oct. 20, 2017). He further states to the interviewer, "when the lights go down I'm a community activist." *Id.* Critically, Dr. Ghannam misstates the title of a book in which he is a significant contributor. On page seven of his *curriculum vitae* attached as Exhibit B to the defendant's position on sentencing, Dr. Ghannam refers to his contribution to "Psycho-Political Aspects of Suicide <u>Bombers</u>, Terrorism and Martyrdom." However, that is not the correct title to the book. The correct title is "Psycho-Political Aspects of Suicide <u>Warriors</u>, Terrorism and Martyrdom." *See* https://www.amazon.com/ Psycho-Political-Aspects-Warriors-Terrorism-Martyrdom/dp/0398078025/ (last visited Oct. 20, 2017). Curiously, Dr. Ghannam knowingly ignores the term "Warriors" from a book in which he is a significant contributor.

Dr. Ghannam was also found not credible in a terrorism prosecution in Toronto, Canada. On September 23, 2015—after reviewing an expert report from Dr. Ghannam and presiding over a hearing in which Dr. Ghannam testified under oath—Justice Michael Code of the Ontario Superior Court of Justice made the following findings in a written opinion: (1) that portions of Dr. Ghannam's sworn testimony were "not credible"; (2) that Dr. Ghannam's analysis of evidence "was biased and selective and did not live up to the standards of objectivity expected of expert witnesses"; and (3) that during cross-examination, Dr. Ghannam "resorted to evasion and argument with the [prosecutor], until I had to stop him." *R. v. Esseghaier, et al.*, 2015 ONSC 5855, ¶ 52 (Sept. 23, 2015) (opinion attached as Exhibit B). For these reasons, and others, the court ultimately concluded that "I cannot accept Dr. Ghannam's testimony or his report. It is completely inadmissible in certain respects and it lacks credibility and reliability in other respects. It is entitled to little or no weight." *Id.* ¶ 53.

With respect to the "substance" of Dr. Ghannam's report in this case, the report is too flawed for the undersigned prosecutors to adequately address all of its inadequacies in this sentencing memorandum. The government raises the following six issues for the Court's consideration:

First, Dr. Ghannam states on page 2 of his report that he bases his conclusion on a "reasonable degree of medical certainty." Dr. Ghannam is not a medical doctor. Furthermore, there is hardly any medical diagnosis in the entire report. He makes one half-hearted reference to the Diagnostic Statistical Manual of Mental Disorders. At best, the report is a psychological assessment of the defendant, and a questionable one at that. That is not a medical diagnosis. Therefore, the report is flawed from its inception.

Second, in the introduction to the assessment section on page 11 of his report, Dr. Ghannam states, "there are no empirically derived, agreed upon questionnaires or tools that have consistently shown to be reliable and valid that can predict who will become radicalized. Therefore, the use of specific questionnaires are considered questionable, especially if used in isolation."  Questionable by whom?  In addition to being pure gibberish ("questionnaires are considered questionable"), Dr. Ghannam's assessment is pure *Alice in Wonderland*-esque: I am assessing for radicalization, but there are no empirical tests for radicalization; therefore, radicalization is what I say it is, and is not.

Third, Dr. Ghannam claims on page 13 of his report that, "based on all of the available evidence made available to me . . . . I could find little to no evidence that Mr. Khweis had any attachment to a violent ideology."  This statement cannot be taken seriously.  This conclusion alone demonstrates that Dr. Ghannam does not possess a single iota of objectivity.  Dr. Ghannam should consider the following facts proven at trial: (1) using a sophisticated travel scheme and multiple layers of tradecraft, the defendant surreptitiously migrated to the Islamic State ("the most lethal terrorist organization in the world") and managed to contact ISIS recruiters/facilitators while avoiding law enforcement scrutiny; (2) the defendant joined the terrorist organization agreeing to be a suicide bomber; (3) the defendant possessed numerous jihadist and violent images on his phone; and (4) the defendant admitted to watching horrifically violent ISIS videos, including the burning to death of a Jordanian pilot in a cage.  At a *minimum*, it must be concluded that defendant had *some* attachment to violent ideology.

Fourth, Dr. Ghannam states, again at page 13, "there was no sense of rejection of society . . . he at no point rejected society and its values."  This defendant abandoned a country that cherishes individual liberty and autonomy, in exchange for a repressive religious state that

desires to live according to societal values as they existed in 700 A.D.  The government submits that the evidence at trial proved that the defendant "rejected society and its values."

Fifth, Dr. Ghannam states, again at page 13, "[The defendant] appeared moved by injustices of any kind."  Dr. Ghannam ignores the fact that the defendant appeared unmoved by the burning of a Jordanian pilot in a cage and the massacre of innocent civilians in Paris, France on November 13, 2015, both of which were committed by the same vicious terrorist organization that the defendant voluntarily joined with complete knowledge of those odious attacks.  By any reasonable measure, those events are quintessential injustices.

Sixth, Dr. Ghannam concludes on page 18 that the defendant's "plan was more impulsive and naïve."  The evidence at trial absolutely disproves that the defendant acted impulsively.  As far as naiveté, it is hard to claim that this world traveler is not worldly or that he joined ISIS out of ignorance or mistake.  The evidence demonstrated that his decision to join ISIS was well-informed, calculated, and deliberate.  The defendant knew exactly what he was doing.

For all of these reasons, and more, we ask the court to reject Dr. Ghannam's "expert" report.

## III.    SENTENCING LAW

The standards governing sentencing are well-established.  In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court rendered the United States Sentencing Commission, Guidelines Manual ("U.S.S.G." or the "Guidelines") purely advisory, and emphasized that a sentencing court must consider both the Guidelines and the 18 U.S.C. § 3553(a) factors when making a sentencing decision.  *Id.* at 264; *see also United States v. Kimbrough*, 552 U.S. 85 (2007) (stating that "the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence").

However, that the Guidelines are non-binding does not render them irrelevant to the imposition of an appropriate sentence.  In *Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586 (2007), the Supreme Court instructed that the sentencing court should calculate the sentencing Guidelines range, permit the government and the defendant "an opportunity to argue for whatever sentence they deem appropriate," consider all of the § 3553(a) factors, and finally pronounce a sentence taking into account all of the relevant factors.  *Id.* at 596-97.  The *Gall* Court further instructed that, in the event that the sentencing court decides to impose a variance sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."  *Id.* (noting that a "major departure should be supported by a more significant justification than a minor one.").

When "rendering a sentence, the district court must make and place on the record an individualized assessment based on the particular facts of the case."  *United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009)).  Ultimately, the court "must state in open court the particular reasons supporting its chosen sentence."  *Carter*, 564 F.3d at 328 (quoting 18 U.S.C. § 3553(c)).

IV.    **SENTENCING GUIDELINES**

The Probation Office has determined that the defendant's total offense level is 40, his criminal history category is VI, and the advisory Guidelines range is 360 months to life imprisonment for Counts One and Two (separate violations of 18 U.S.C. § 2339B), and 60 months to life imprisonment for Count Three (one violation of 18 U.S.C. § 924(c)(1)(A)).  PSR at ¶ 16.  The government concurs with this calculation as it pertains to the criminal history category and advisory Guidelines range (360 Months to life), but we submit that the defendant's total offense level is properly calculated at 42, rather than 40, following the application of a two-

10

level "specific offense characteristic" enhancement pursuant to Section 2M5.3(b)(1)(E) that is discussed below.

The defendant's base offense level is 26 pursuant to U.S.S.G § 2M5.3(a).  PSR at ¶ 48. In addition, the government submits that the following adjustments and enhancement apply:

i.    The Two-Level Specific Offense Characteristic Set Forth in U.S.S.G. § 2M5.3(b)(1)(E) Applies.

Pursuant to U.S.S.G. § 2M5.3(b)(1)(E), an additional two-level increase applies here because the defendant's § 2339B convictions, conspiring to provide and providing and attempting to provide material support or resources to ISIS, a designated foreign terrorist organization, "involved the provision of . . . material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act."  The government respectfully disagrees with the Probation Office with respect to the applicability of this adjustment.  The standard is not whether the adjustment is "more appropriate," but rather whether, based on the plain language of the Guidelines, the adjustment applies.  As the plain language of the guideline provision makes clear, the two-level upward adjustment applies even when a defendant did not himself engage in an act of violence so long as he acted in support of such violence.  *See United States v. Ali*, 799 F.3d 1008, 1032 (8th Cir. 2015) (upholding application of 2-level upward adjustment in U.S.S.G. § 2M5.3(b)(1)(E) where defendants provided money to terrorism organization al-Shabaab, knowing that al-Shabaab engaged in violent acts); *United States v. Elhuzayel and Badawi*, 8:15-cr-00060-DOC (C.D.CA.). The evidence in the *Elhuzayel* and *Badawi* cases included multiple communications in which the defendants discussed how great it would be to fight with ISIS on the front lines and attain martyrdom, but there was no evidence of a "specific plot" to carry out a violent attack.

The record in this case fully supports the application of this two-level upward adjustment. It strains credulity to suggest that the defendant would not be aware that the many ways in which he provided material support in the form of himself and services was going to a group that committed violent acts. But even if, for the sake of argument, he was not aware of that fact, he need only have *reason to believe* they were to be used in a violent act. For example, during his time with ISIS in Syria and Iraq, the defendant in this case agreed during his ISIS intake process to be a suicide bomber. *See* Trial Tr. 551:11-16; 731:10-11. An ISIS camp roster dated January 7, 2016 that was recovered in Mosul, Iraq listed the defendant's "Current mission" for ISIS as a "Fighter." *Id.* at 490:25-491:5; Gov. Exs. 30A-B. The defendant's interest in serving as a fighter and/or suicide bomber for ISIS were also corroborated by his Facebook and Twitter records that showed the creation of the username "iAGreenBirdiA" while the defendant was in Turkey, which the defendant acknowledged is used by ISIS and other violent terrorist groups to reference martyrdom, violent jihad, and suicide operations. *Id.* at 540:5-9; Gov. Exs. 61-62.

Furthermore, the defendant told the FBI that he knew, even before he departed the United States, that "ISIS members would undergo military training"; that by joining ISIS, "weapons training was a possibility"; that if he was asked, he would be willing to undergo weapons training; that he understood that ISIS recruits "who were unskilled were likely destined for military training and to fight," which involved weapons training; and that, approximately one month before he traveled overseas to join ISIS, he knew that ISIS claimed responsibility for the November 13, 2015 attacks in Paris, France, during which ISIS operatives used firearms and explosives to kill upwards of 100 civilians. *See* Trial Tr. 532:5-24; 577:13-14; 631:16-23; 742:3-13. Indeed, during his ISIS intake process, the defendant told a senior ISIS official that he was unskilled. Id. at 552:12-16. The numerous images of ISIS fighters using, carrying, or possessing

12

firearms that the defendant viewed on his phone shortly before he voluntarily joined the terrorist organization provides strong corroboration of those statements. The jury also heard testimony that, before the defendant decided to leave the United States and join ISIS, he knew that ISIS is a terrorist organization (*Id.* at 529:4-19); that ISIS was expanding its so-called caliphate by violence, and he nonetheless wanted to see it and "be part of it" (*Id.* at 531:1-10; 954:13-16); that ISIS conducts military and terrorist operations in Syria and Iraq (*Id.* at 526:16-18); and that ISIS plans and launches attacks against its enemies, which includes the United States and other countries (*Id.* at 531:17-24).

ii.    The Terrorism Adjustment Set Forth in U.S.S.G. § 3A1.4(a) Applies.

The government concurs with the Probation Office that the terrorism adjustment set forth in U.S.S.G. § 3A1.4(a) applies because the defendant's offenses of conviction are felonies that involved, or were intended to promote, a federal crime of terrorism. See U.S.S.G. § 3A1.4.[2] For purposes of this guideline, "federal crime of terrorism" has the meaning given that term in 18 U.S.C. § 2332b(g)(5). U.S.S.G. § 3A1.4, comment.(n.1). Section 2332b(g)(5) defines the term "federal crime of terrorism" to mean an offense that is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and is a violation of any one of enumerated statutes that include 18 U.S.C. § 2339B.

To satisfy the first prong of the "federal crime of terrorism" definition, the government need only prove that the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. Application of U.S.S.G. § 3A1.4(a) does not require a finding that the defendant was personally motivated by a desire to

---

[2] The applicable sentencing guideline provision states, in relevant part: If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

13

influence or affect the conduct of government, or to retaliate against government conduct. *See United States v. Awan*, 607 F.3d 306, 316-318 (2d Cir. 2010) (holding that government need not show defendant was personally motivated to influence government if it shows that he intended to promote a crime calculated to have such an effect); *United States v. Jayyousi*, 657 F.3d 1085, 1114-15 (11th Cir. 2011) (holding that the first prong of USSG § 3A1.4(a) focuses on the "the intended outcome of the defendant['s] unlawful acts--i.e., what the activity was calculated to accomplish, not what the defendant['s] claimed motivation behind it was . . . . [d]efendant's motive 'is simply not relevant.'"); *accord United States v. El-Mezain*, 664 F.3d 467, 571 (5th Cir. 2011) (citing with approval *Awan* and *Jayyousi* opinions).

The defendant's convictions for conspiring to provide, and providing and attempting to provide material support or resources to ISIS, "involved" violations of § 2339B, and the record in this case establishes by a preponderance of evidence, and any standard for that matter, that these offenses were "calculated to influence or affect the conduct of government by intimidation or coercion," and "to retaliate against government conduct." *See* 18 U.S.C. § 2332b(g)(5)(A); *United States v. Hammoud*, 381 F.3d 316, 355 (4th Cir. 2004) (no plain error when district court applied preponderance of the evidence standard at a sentencing hearing for terrorism enhancement). The evidence established that ISIS holds destructive intentions towards the United States and other governments, that ISIS thinks that violent acts against military personnel and civilians will influence government conduct, and that ISIS believes such attacks are justified retaliation against governments whose fundamental values are antithetical to the subjugation of all people to Sharia law as practiced by ISIS.

Moreover, the evidence at trial demonstrated beyond peradventure that the defendant endorsed these intentions and intended to further ISIS's goals. The following are a few

examples: (1) before he departed the United States, he knew that ISIS expanded its caliphate by violence, and he nonetheless wanted to see it and "be part of it."; (2) he understood that individuals traveling to ISIS-controlled territory would undergo a vetting process and receive military training as part of their process within the organization; (3) he embarked on a circuitous route to Turkey in order to avoid detection; (4) he communicated with ISIS sympathizers and recruiters by way of multiple social media programs and platforms to surreptitiously facilitate his entry into the ranks of ISIS; (5) he traveled from north to south Turkey to meet with ISIS couriers who secreted him into Syria using an armed vehicle with other ISIS recruits; (6) he went through an intake and screening process with ISIS, which included expressing the suicide bombing role he would like to serve with ISIS, providing biographical information, and having his blood type tested; and, (7) he completed ISIS-directed religious training that lasted nearly a month with each sermon ending with "may God destroy America."

Further, the Guidelines – including both prongs of § 3A1.4 – are to be determined on the basis of all acts committed by the defendant, and all acts of others that were within the scope of the jointly undertaken criminal activity, in furtherance of the criminal activity, and reasonably foreseeable in connection with that criminal activity. *See* U.S.S.G. Section 1B1.3(a) and (b). This section imputes to the defendant here, by way of example, the evidence that ISIS has repeatedly called for violent attacks against Western countries, to include the United States. Accordingly, the terrorism adjustment, set forth in U.S.S.G. § 3A1.4, applies to the defendant's § 2339B convictions.

The government anticipates that the defendant will argue that the U.S.S.G. § 3A1.4 terrorism adjustment overstates his criminal history. This argument is frequently made during terrorism-related sentencing hearings, and is completely devoid of any merit. Every court of

15

appeals to have considered the rationality of the terrorism adjustment has upheld it.  In *United States v. Meskini*, the Second Circuit explained:

> Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time.  Thus, the terrorism guideline legitimately considers a single act of terrorism for both the offense level and the criminal history category.

319 F.3d 88, 92 (2d Cir. 2003); *see, e.g., United States v. Ali*, 799 F.3d 1008, 1031 (8th Cir. 2015) (adopting "Second Circuit's well-reasoned conclusion in Meskini").  The Second Circuit explained further why the creation of a uniform criminal history category pursuant to U.S.S.G. § 3A1.4 was rational:

> Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.

*Meskini*, 319 F.3d at 92; *see also Ressam*, 679 F.3d at 1091 ("Terrorists, even those with no prior criminal behavior, are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.").

Noting that district courts had the discretion to depart downward in a specific case, the Second Circuit continued in *Meskini* to explain why the sentencing guidelines for terrorism cases were rational:

> Considering the serious dangers posed by all forms of terrorism, the Guidelines are in no way irrational in setting the default for criminal history at a very high level, with downward departures permitted in exceptional cases.

319 F.3d at 92.  Therefore, every court of appeals to have addressed this issue has found a rational basis for the creation of sentencing guidelines that impose higher sentences on defendants convicted of terrorism crimes, and this Court should reject any argument to the

contrary. *See United States v. Benkhala*, 530 F.3d 300, (4th Cir. 2008) (holding that enhancement was proper because defendant "attended a jihadist training camp abroad, was acquainted with a network of people involved in violent jihad and terrorism, and lied about both.").

If the defendant attempts to argue that the U.S.S.G. § 3A1.4 terrorism adjustment should not apply to him because he did not engage in any violence or any pattern of criminality, such as argument is equally without merit and flies in the face of the evidence established at trial.  "The material-support statute is, on its face, a preventive measure -- it criminalizes not terrorist attacks themselves, but aid that makes the attacks more likely to occur."  *Holder v. Humanitarian Law Project, et al.*, 561 U.S. 1, 35 (2010).  Aid that makes terrorism attacks more likely to occur -- defendant Khweis's conduct -- is extremely dangerous and must be deterred.  Any argument that he did not engage in any pattern of criminality is soundly rebutted by the evidence.  He joined the most lethal terrorist organization on the planet, agreed to be a suicide bomber for them, and performed a plethora of services for the organization, to include frequently providing money to ISIS members and caring for wounded ISIS fighters, which certainly makes terrorism attacks more likely to occur.  Thus, the defendant's and characteristics fall squarely within the behavior that the terrorism sentencing guidelines are designed to address – behavior that presents a "grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal."  *Meskini*, 319 F.3d at 92.  Imposition of a within-guideline sentence here is therefore necessary and just.

    iii.   <u>Obstruction Enhancement Pursuant to U.S.S.G. § 3C1.1.</u>

The government agrees with the Probation Office that the obstruction of justice adjustment set forth in U.S.S.G. § 3C1.1 applies to the defendant's conduct.  The government

submits that the Court can apply this enhancement based on one or all of the following arguments: (1) the defendant's perjurious testimony at trial, which was replete with materially false statements, intending to deceive the jury, in order to falsely exculpate himself; (2) the defendant's repeated lies to the government, including during voluntary interviews with FBI Special Agent Michael Connelly, about his involvement with ISIS and the conduct of his fellow ISIS members; and (3) the defendant's intentional destruction of his laptop and two of his phones shortly before his capture, both of which he brought into ISIS-controlled territory, and his intentional deletion of his contacts/communications with ISIS from one of his other phones.

First, committing perjury during trial qualifies as obstruction of justice for sentencing purposes. *See* U.S.S.G. § 3C1.1 cmt. n.4(B). As stated by the Fourth Circuit, "[t[here are three elements necessary to impose a two-level enhancement for obstruction of justice based on the defendant's perjurious testimony: the sentencing court must find that the defendant (1) gave false testimony; (2) concerning a material matter; (3) with willful intent to deceive." *United States v. Perez*, 661 F.3d 189, 192 (4th Cir.2011) (internal quotation marks omitted). "[I]t is preferable for a district court to address each element of the alleged perjury in a separate and clear finding. It is enough, however, if the court makes a finding of an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury." *Id.* at 193 (internal quotation marks and citation omitted).

As this Court is well aware, the defendant's testimony at trial was infected with lies and excuses to minimize the numerous ways in which he provided and conspired to provide material support to ISIS. Over the course of two days on the witness stand, he demonstrated an utter disregard for the law and the truth-seeking role of this Court and the jury with his obstructionist

18

conduct.  The following examples are a subset of the many materially false lies proffered by the

defendant at trial, all of which were clearly intended to deceive the jury:

- After being asked by his own counsel when he decided to travel to the Islamic State, the defendant testified, "*Well, I wasn't 100 percent like sure that -- like when I -- **like when I made my trip, when I started traveling, I wasn't 100 percent sure that I wanted to go there** . . . . So when I arrived to Turkey, I started going to those bars.  And after drinking and stuff like that I was like, you know, I want to go, **I want to go real quick and come right -- like just go real quick and come back out.**" Trial Tr. 856:17-857:8.*  Before he left the United States, the defendant quit his job, closed online accounts, concealed and lied to his family about where he was going, sold his car just days before his departure, and traveled on a series of one-way tickets.  Any suggestion that he wanted to join ISIS "real quick and come back out" is preposterous.  As this Court stated, "[h]is conduct strongly suggests that he did not expect to return home to see his family." *United States v. Khweis*, No. 1:16-CR-143, 2017 WL 2385355, at *12 (E.D. Va. June 1, 2017).

- When asked about the creation of his iAGreenBirdiA Twitter account, the defendant testified, "***Well, I thought of GreenBird because Twitter, the Twitter icon is a Bluebird.***" *Id.* at 860:21-22.  This absurd statement needs no further explanation.

- When asked why he brought 5 phones with him to ISIS-controlled territory, the defendant testified, "*Ever since I was little, I would have more than one phone.  Like, for example, when I was in high school, I would have – I had Nextel, and I had -- Nextel you could change the phones -- there is a SIM card, you could remove your SIM card and use it on another phone.*" *Id.* at 871:1-6.  He didn't bring 5 phones with him because of his childhood.  He brought 5 phones with him to minimize the risk that he would be caught by law enforcement while he was desperately trying to connect with ISIS members to take him across the Turkish-Syrian border and into their safe houses.

- After being a member of ISIS for over 2.5 months and having his laptop computer and five phones with him the entire time, the defendant claimed that he destroyed and burned two of his phones before he left ISIS-controlled territory because he only wanted to take "*the phones that were unlocked that I would be able to use, you know, outside, you know, outside the U.S.*" *Id.* at 896:11-13.  During his earlier direct examination, the defendant testified that "*with WiFi, with WiFi **all of them worked** . . . .*" *Id.* 871:11.

- The defendant further testified that he destroyed and burned his laptop shortly before his capture because he "*had like a lot of personal information, I would access my credit cards, **my credit score**, like a lot of personal information.*" *Id.* at 896:13-16.  The notion that the defendant burned his laptop as a member of ISIS (who had already provided personal information by voluntarily handing over his passport) because he was worried about his credit score was beyond laughable, and insulting to the jury's intelligence.

19

- When asked on cross-examination whether he mentioned to the State Department, following his capture, that he met an American recruit who joined ISIS, the defendant attempted to falsely explain his material omission by stating that Mark Jasonides, who was the first U.S. government official to interview the defendant, met with him for "*no more than five minutes.*"  The evidence at the suppression hearing clearly demonstrated that the meeting lasted "*45 minutes to an hour.*"  Hearing Tr. at 242:13-15.

- On cross-examination, the defendant was posed with the following question: "*You testified yesterday [during direct examination] that you knew that violence was occurring in the Islamic State before you decided to travel overseas, correct?*"  Rather than provide a very simple affirmative answer to this question, which goes to the crux of the knowledge and intent elements underlying his criminal conduct, the defendant answered: "*I was aware of violence occurring outside the Islamic State.*"  Trial Tr. 942:2-6.

- The defendant testified that he created a second Facebook account when he arrived in Turkey "*by mistake.*"  *Id.* at 969:12-13.  He entered Turkey for the singular purpose of joining ISIS, created a Facebook account 22 minutes prior to creating the second account that he falsely claimed was created "by mistake" (*see* Gov Exs. 62-63), and the testimony at trial clearly showed that the second Facebook account (unlike the first account) was created using a fictitious email address, with the name "Jay Kh" (which the defendant tried to explain by testifying that his middle name starts with "J"), from the same IP address.  This wasn't a mistake.  The defendant used tradecraft to successfully evade law enforcement detection while he sought safe passage to the Islamic State.

- Rather than truthfully admit that he booked a return flight to Turkey, while he was in Turkey (even booking a one-way ticket to Greece before he left the United States, which is indicative of an attempt "to create an alibi or a way out" and mask his "actual intent for travel."  *Id.* at 693:8-12), the defendant falsely testified that he did not know that he was booking a return flight to Turkey because he was "*new at booking flights.*"  When challenged on cross-examination and presented with evidence of his prior experience booking a series of one-way flights just a few weeks prior, the defendant changed his story yet again and claimed that he "*was drinking at the time.*"  *Id.* at 1014:10-1017:9.

- The defendant denied on cross-examination that he knew Tor Browser, which he voluntarily downloaded on his phone, allows for anonymous Internet browsing, and inexplicably stated that *he didn't really know what Tor Browser is*.  *Id.* at 1042:7-17.  The defendant and the jury were then shown the defendant's download history from Apple, which clearly indicated that the defendant downloaded "Tor-powered, free VPN for anonymous internet Web browsing" on December 24, 2015 (*see* Gov. Ex. 64), the same date that he created the iAGreenBirdiA Twitter account and viewed numerous ISIS-related propaganda on his phone, among many other steps that he took on that day to advance his terrorism-related goals.

- When asked on cross-examination whether he gave money to ISIS while in Tal Afar, Iraq, the defendant made an absolute mockery of his oath by testifying, "*I kept on saying*

20

*no, but at the end I said yes, and it's not true.  I did give -- I did give -- I did buy an ice cream bar for a little kid.  But the little kid told me, don't tell my father.  I think he was having cavities, he is not supposed to have sweets.  **So I did -- there was a time where I did buy an ice cream bar for a little kid.***"  *Id.* at 1097:13-21.  The evidence at trial established that the defendant frequently gave money to ISIS members.  *Id.* at 563:21-23.

Second, Application Note 1 in U.S.S.G. § 3C1.1 states, in relevant part, that "[o]bstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction."  The jury heard testimony that the defendant purposefully deleted his contacts and communications with ISIS from his one of his phones, and that he burned a laptop and two other phones before he left ISIS-controlled territory.  *See* Trial Tr. 555:3-4; 743:8-12; 974:24-975:16.  Additionally, Special Agent Ryan Lamb testified that the defendant's iPhone and Samsung mobile phones, both of which contained a significant amount of ISIS-related propaganda that was recovered using forensic extraction tools, contained evidence of wiping and deletion.  *Id.* at 353:14-23.  Any argument that the defendant did not know that purposefully destroying evidence of his communications with ISIS, as well as evidence regarding his research and knowledge about the terrorist organization, would somehow not "thwart the investigation or prosecution" of his conduct is baseless and should be swiftly rejected.  In fact, the defendant himself admitted, *inter alia*, that before he decided to travel overseas to join ISIS, he knew that it was illegal for him to join ISIS.  *See id.* at 678:13-14.

Third, Application Note 4(G) in U.S.S.G. § 3C1.1 states that "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense" warrants the enhancement.  During the suppression hearing held in this case, Special Agent Michael Connelly testified that the

21

defendant repeatedly told him that he wasn't truthful in his responses to questions, including during voluntary interviews on March 19, 26, and April 7, 2017.  The defendant's "multiple resets" as Agent Connelly put it, significantly obstructed and impeded the intelligence-gathering process because at that point, the FBI is "reporting this information which [they] don't know to be truthful or not.  Dedicating all this effort to collecting intelligence.  And he basically resets the entire timeline.  He says, we've got to go back to zero so I can tell you what actually happened." Hearing Tr. 293:6-14.

During cross-examination, the defendant admitted that he lied to the FBI about his involvement with ISIS numerous times following his capture, to include statements that he was not with ISIS, but rather in Mosul with a fictitious female named Zubayda Hussein, and that he knew the FBI was looking everywhere for this woman to verify his story, but he nonetheless continued to tell them in multiple interviews that she exists.  *See id.* 1066:7-1067:5.  In response to questions about ISIS during the first few interviews with the FBI, the defendant did not recount his knowledge of Jaysh Kalifa, the external operations ISIS group that delivered a presentation to the defendant and his fellow ISIS recruits while he was in Syria, nor did the defendant initially inform the FBI that he met an American ISIS recruit who had trained, at least for some period of time, on how to conduct an attack in the United States, electing instead continue to mention his knowledge of a woman who does not exist.  *Id.* at 1069:19-21; 1071:7-1072:2.

## V.    TITLE 18 UNITED STATES CODE SECTION 3553(a) FACTORS

After calculating the appropriate Guidelines range, the court must "determine whether a sentence within that range . . . serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors." *United States v. Green*, 436

22

F.3d 449, 456 (4th Cir. 2006). Title 18, United States Code, Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant. Title 18, United States Code, Section 3553(a)(2) asks the court to address the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant. Title 18, United States Code, Section 3553(a)(4) asks the sentencing court to address the applicable guidelines range. Finally, 18 U.S.C. § 3553(a)(6) asks the court to avoid unwarranted disparities in sentencing. We address each of these sentencing factors in turn below.

In the final analysis, a term of imprisonment of 35 years appropriately reflects the seriousness of the offense, the critical need to deter this type of conduct, and the defendant's clear knowledge of and intent to commit all three crimes with which he was charged. The recommended Guidelines range of 360 months to life in this case appropriately captures the severity of the defendant's conduct and the danger to the community. Lastly, in an effort to avoid unwarranted disparities in sentencing, we ask the court to impose a 35 year sentence.

### A.     18 U.S.C. § 3553(a)(1)-(2)

Defendants convicted of terrorism offenses pursuant to § 2339B, and related statutes, are engaging in a unique and violent brand of criminality. It is impossible to understand the severity of the defendant's conduct outside of the context of the terrorist group he seeks to support. For this reason, the government sets forth in stark terms in its memorandum the graphic description of ISIS. The ease with which the defendant gravitated towards this brutal terrorist organization is alarming. ISIS has long been, and remains, an enemy of the United States – an

23

enemy that has murdered United States citizens overseas and that has promoted, and taken credit for, lethal attacks on U.S. soil. Knowing this, Mohamad Khweis provided a resource essential to ISIS' survival – personnel for its army. In addition, the defendant aspired to become a suicide bomber and/or fighter.

The defendant's repeated lies to the FBI (and during his testimony at trial) after he was captured, including withholding critical intelligence information such as the fact that one of his fellow ISIS members had trained with Jaysh Kalifa to commit an attack in the United States, demonstrates his lack of remorse. The defendant could have acknowledged to the FBI the seriousness and extent of his conduct when the intelligence would have been most valuable – immediately upon his capture. He made a different choice and sent the FBI chasing ghosts and looking in rabbit holes for individuals who he knew were completely fictitious. He chose allegiance to the Islamic State cause over allegiance to the truth. Thus, the nature and circumstances of the defendant's crimes require the sentence the government seeks.

The importance of the rule of law cannot be overstated. A substantial sentence in this case would send an appropriate and much needed message to all persons harboring any notion that serving, joining or aiding ISIS in any manner is meaningful and worth the risk. It is repulsive conduct. Strong punishments for this conduct send the appropriate message to others, *i.e.*, that providing, and conspiring to provide, material support to terrorist organizations will be pursued aggressively, and those who violate the law in this manner will be tried, convicted, and punished accordingly.

The deterrence factor is particularly acute in terrorism cases. The sentence advocated by the government is necessary to deter the defendant and others from committing similar crimes. As multiple courts of appeals have recognized, in the terrorism arena, the difficulty of deterrence

24

necessitates the imposition of lengthy sentences. *See Meskini*, 319 F.3d at 92; *United States v. Ali*, 799 F.3d 1008 (8th Cir. 2015) (same). Although courts have recognized that recidivism ordinarily decreases with age, courts have rejected this reasoning in terrorism cases. Echoing multiple courts of appeals, the Ninth Circuit instructed in *United States v. Ressam*, "Terrorists, even those with no prior criminal behavior, are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *Ressam*, 679 F.3d at 1091 (quoting *Jayyousi*, 657 F.3d at 1117). There is no particularized information here that overcomes the reasoning expressed by these courts of appeals.

In a free, open, and vibrant democracy, tough sentences for violent crimes achieve justice by allowing the people to live freely without fear, violence and intolerance. Fidelity to the rule of law, and respect for the law, is a hallmark of American democracy. As applied to this defendant's conduct in joining the most lethal organization on the planet, and then showing little regard for this Court and the oath that he took given his absurd testimony at trial, he has demonstrated no respect for the law.

### B.    18 U.S.C. § 3553(a)(4)

In this case, the recommended Guidelines sentencing range appropriately captures the defendant's conduct and the continuing danger terrorism presents to the community. The government respectfully submits that a term of imprisonment within the applicable Guidelines range would be sufficient, but not greater than necessary, to carry out the goals of sentencing set forth in 18 U.S.C. § 3553(a). Untethering terrorism crimes from the Guidelines does not further the interests of justice, nor does it properly follow the Supreme Court's guidance, nor does it properly account for the statutory balancing framework set forth in § 3553(a). A Guidelines

25

sentence reflects the seriousness of this offense and society's expressed contempt for the defendant's conduct.

The Sentencing Commission thoughtfully recognizes that terrorism crimes are viewed as one of the most serious classes of crimes in the criminal justice system.  Recent events have demonstrated the enormous toll in loss of life that terrorism crimes create in communities across the country.  Further, with the spread of the poisonous ideology into the internet and social media, the jihadist philosophy shows no sign of abating.  The sentencing Guidelines captures this understanding and sends the appropriate message to the public that we are guided by the rule of law.

### C.      18 U.S.C. § 3553(a)(6)

Mohamad Khweis is the only individual to date to have successfully traveled to ISIS-controlled territory, join the terrorist organization, and face a jury of his peers.  Thus, there are no other cases that offer comparable records.  The defendant will likely point to sentences imposed in cases in which defendants pled guilty to conspiring and/or attempting to provide material support to ISIS or other terrorist organizations.  While it is true that very few defendants in terrorism cases have proceeded to trial, this is hardly the only distinction between defendant Khweis and other defendants.

Defendants who pled guilty to crimes of terrorism accepted responsibility for their criminal conduct in open court, recognizing that their conduct did, in fact, violate American law.  In a terrorism case, particularly in a case involving a terrorism organization such as ISIS that adamantly rejects the validity of American law, the act of accepting responsibility for one's criminal conduct demonstrates a willingness to rehabilitate.  Thus, courts of appeals have soundly rejected, in terrorism cases, a downward departure/variance based on comparing the

26

sentences imposed on defendants who went to trial with defendants who pled guilty.  *See Ressam*, 679 F.3d at 1094-95 ("We . . . reject the comparison of Ressam's sentence to defendants who pleaded guilty.").

Another difference is that most defendants in other terrorism cases were not sentenced for conspiracy -- a crime that increases the threat to the public and decreases the likelihood of deterrence.  As the Supreme Court explained over fifty years ago:

> [C]ollective criminal agreement – partnership in crime – presents a greater potential threat to the public than individual delicts.  Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality.  Group association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish.

*Callanan v. United States*, 364 U.S. 587, 593-94 (1961).

Still another difference is that other terrorism organizations are not like ISIS – "the most lethal terrorist organization in the world," which routinely inflicts particularly brutal and heinous violence on civilians.  Here, the defendant not only knew well ISIS' brutality, he did everything that he could to travel overseas and successfully join the terrorist organization and avoid getting caught.  This further differentiates defendant Khweis from defendants who pled guilty in other terrorism cases.

In addition, courts of appeals, including the Fourth Circuit, have cautioned against giving excessive weight to the sentencing disparity factor.  *See, e.g.*, *United States v. Khan*, 461 F.3d 477, 500-01 (4th Cir. 2006) (holding that the district court erred when it placed "excessive weight" on § 3553(a)(6) and imposed a below-guidelines sentence).  Several courts of appeals have vacated sentences that were reduced based on comparisons to sentences in terrorism cases

27

where defendants were not similarly situated. *See Ressam*, 679 F.3d at 1095; *United States v. Abu Ali*, 528 F.3d 210, 265 (4th Cir. 2008); *Jayyousi*, 657 F.3d at 1117-18.

Nonetheless, two terrorism prosecutions of three defendants who proceeded to trial offer fair and comparable sentences for guidance in this case: (1) Tairod Nathan Webster Pugh was sentenced to 35 years in prison by the Honorable Nicholas G. Garaufis in the Eastern District of New York on June 6, 2017; and, (2) co-defendants Nader Salem Elhuzayel and Muhanad Elfatih M.A. Badawi were each sentenced to 30 years imprisonment by The Honorable David O. Carter on October 16, 2016, in the Central District of California.

1.      *United States v. Tairod Nathan Webster Pugh*, 1:15-cr-00116-NGG (E.D.N.Y.).

Pugh was convicted by a jury of an attempt to provide material support to a foreign terrorist organization (Count One) and obstruction and attempted obstruction of an official proceeding (Count Two). The defendant was sentenced to consecutive sentences of 180 months (the statutory maximum penalty under Count One given that Pugh's conduct predated Congress' decision to increase the statutory maximum penalty for 18 U.S.C. § 2339B offenses) and 240 months (Count Two), for a total sentence of 35 years.

The defendant's convictions arose for his attempt to travel to Syria to join ISIS and his subsequent destruction of various electronic devices he possessed after he was stopped by Turkish authorities at the airport in Istanbul. When the defendant committed his crimes he was in his late 40s and he had served in the United States military. At sentencing the court considered, and ultimately rejected, the argument that the defendant had a "host of psychological impairments, which led to … poor decision making."

Similar to defendant Khweis, Pugh relied upon the mitigation argument of poor decision-making. That argument was unpersuasive in Pugh's case, and it is unpersuasive here.

28

Defendants Pugh and Khweis also engaged in similar obstructive conduct. Unlike Pugh, however, the defendant Khweis successfully made it to ISIS-controlled territory and worked within the terrorist organization for over 2.5 months. In light of the sentence imposed on Pugh, a sentence of 35 years imposed on Khweis is reasonable and appropriate, and avoids an unwarranted disparity with a comparable case.

      2.      *United States v. Elhuzayel and Badawi*, 8:15-cr-00060-DOC (C.D.CA.).

Elhuzayel and Badawi were each convicted of multiple terrorism counts, as well as a host of bank fraud counts. Both were convicted by a jury and sentenced to 30 years' imprisonment on September 30, 2016 by the Honorable David O. Carter in the Central District of California. Unlike Khweis, Elhuzael and Badawi never actually joined ISIS in Syria and Iraq.

The material support scheme in the case centered on Badawi's efforts to get Elhuzael into the Islamic State in order to fight for ISIS. Badawi was the radicalizer, recruiter and facilitator, and Elhuzayel was the prospective fighter. Both defendants desired to ultimately die as martyrs fighting for ISIS.

In the trial of Mohamad Khweis, this Court heard testimony concerning the role of martyrdom in the world of radical violent jihad. Indeed, the defendant established a social media moniker (iAGreenbirdiA) which glorifies martyrdom and suicide bombings, and reflects the defendant's solidarity with the cause. Accordingly, the Elhuzayel and Badawi case serves as a useful comparison with the one notable exception – Khweis made it into the Islamic State, while Elhuzayel and Badawi's efforts were thwarted.

Once again, in light of the sentences imposed on Elhuzayal and Badawi, a 35 year sentence for defendant Khweis is reasonable and appropriate and avoids an unwarranted disparity with a comparable case.

29

## **CONCLUSION**

For the foregoing reasons, the government believes that a sentence of **420 months (35 years)** of imprisonment would be sufficient, and not greater than necessary, to satisfy the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

Dana J. Boente
United States Attorney

By: _____/s/_____          By: _____/s/_____
Raj Parekh, Trial Attorney          Dennis M. Fitzpatrick
U.S. Department of Justice          Assistant U.S. Attorney
Counterterrorism Section          U.S. Attorney's Office
National Security Division          Eastern District of Virginia
950 Pennsylvania Ave., N.W.          2100 Jamieson Avenue
Washington, D.C. 20530          Alexandria, Virginia 22314
Phone: (202) 616-2428          Phone: (703) 299-3700
raj.parekh@usdoj.gov          dennis.fitzpatrick@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 20, 2017, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will send an electronic copy to all counsel of record in this matter.

By: _____/s/_____
Dennis M. Fitzpatrick
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA  22314
(703) 299-3700 (telephone)
dennis.fitzpatrick@usdoj.gov

30