**R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550**

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

2015 ONSC 5855
Ontario Superior Court of Justice

R. v. Esseghaier

2015 CarswellOnt 14550, 2015 ONSC 5855, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

# Her Majesty the Queen and Chiheb Esseghaier and Raed Jaser

M.A. Code J.

Heard: July 13, 2015; July 14, 2015; July 15, 2015; July 16, 2015; July 17, 2015; July 22, 2015; September 2, 2015; September 3, 2015; September 4, 2015
Judgment: September 23, 2015
Docket: CR-13-10000655-0000

Counsel: Croft Michaelson, Marcy Henschel, Sarah Shaikh, for Crown
John Norris, Breese Davies, for Jaser
Russell Silverstein, Ingrid Grant — Amicus Curiae
Chiheb Esseghaier, for himself

Subject: Criminal; Evidence; Public

**Related Abridgment Classifications**
For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

Criminal law

VI Offences
   VI.143 Terrorism
      VI.143.d Sentencing

Criminal law

VII Pre-trial procedure
   VII.22 Determination of fitness to stand trial

Criminal law

IX Sentencing
   IX.3 Evidence

Evidence

XVI Opinion
   XVI.4 Experts
      XVI.4.b Purpose

**WestlawNext** CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550**

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

**Headnote**

Criminal law --- Offences — Terrorism — Sentencing

Two accused were charged with terrorism-related offences — E was convicted of 5 counts while J was convicted of 3 counts — Court asked amicus to deal with issue of assessment for E, who was self-represented and appeared to be mentally ill — Assessment was made and doctor testified as to E's mental health and culpability in actions — Crown sought two concurrent life sentences for E, in addition to 30 years concurrent imprisonment — Crown sought life sentence for J and 20 years concurrent imprisonment — Amicus claimed that sentencing of E should be delayed and that in alternative, E should be sentenced to 13-15 year sentence — Counsel for J submitted that 5.5 year sentence less 3.5 years for pre-trial custody was appropriate — Sentencing submissions made by all parties — E sentenced to two life sentences and 18 years concurrent imprisonment — J sentenced to life sentence and 13 years concurrent imprisonment — Expert testimony on behalf of J violated necessity requirements and controverted jury's verdict, by portraying J as drug addict who was not committed to terrorism — J was poor candidate for rehabilitation, given that he had not taken responsibility for his role in terrorist plot or renounced his jihadist beliefs — J also continued to insist that he never held violent or jihadist ideology — Although there was no mitigating factor of remorse, Crown could not prove that J was committed to further violent or terrorist acts — J abandoned terrorist plot at late stage, although his motive was unclear — E was considered fit to stand for sentencing, as he had understanding of proceedings and jeopardy that was necessary — E had fully held to jihadist beliefs, and had not recognized legitimacy of trial process — E had religious beliefs that could have been indicators of mental illness, but evidence showed that E was not delusional or psychotic at time of offences — Causal link was not present to show that mental illness caused E to commit offences — Amicus could not have E treated against his own wishes, as this could not be done by counsel if E had been represented — Accused's offences were at most serious level, and they did not have mitigating factors of youth or remorse in their favour — Life imprisonment was appropriate for most grave offences of conspiracy to endanger safety and conspiracy to commit murder — Determinate sentences for related offences had to be consecutive to each other, but concurrent to life sentences — Each accused received 5 and 8 years respectively on counts of participating in terrorist activities — E received additional 5 years on count that he alone faced — Both accused were given 1.5-1 credit for time already served, reducing determinate sentences by 44 months.

Evidence --- Opinion — Experts — Purpose

Two accused were charged with terrorism-related offences — E was convicted of 5 counts while J was convicted of 3 counts — Court asked amicus to deal with issue of assessment for E, who was self-represented and appeared to be mentally ill — Assessment was made and doctor testified as to E's mental health and culpability in actions — Crown sought two concurrent life sentences for E, in addition to 30 years concurrent imprisonment — Crown sought life sentence for J and 20 years concurrent imprisonment — Amicus claimed that sentencing of E should be delayed and that in alternative, E should be sentenced to 13-15 year sentence — Counsel for J submitted that 5.5 year sentence less 3.5 years for pre-trial custody was appropriate — Sentencing submissions made by all parties — E sentenced to two life sentences and 18 years concurrent imprisonment — J sentenced to life sentence and 13 years concurrent imprisonment — Expert testimony on behalf of J violated necessity requirements and controverted jury's verdict, by portraying J as drug addict who was not committed to terrorism — Jury was capable of determining matters that were subject of expert's testimony.

Criminal law --- Sentencing — Evidence

Two accused were charged with terrorism-related offences — E was convicted of 5 counts while J was convicted of 3 counts — Court asked amicus to deal with issue of assessment for E, who was self-represented and appeared to be mentally ill — Assessment was made and doctor testified as to E's mental health and culpability in actions — Crown sought two concurrent life sentences for E, in addition to 30 years concurrent imprisonment — Crown sought life sentence for J and 20 years concurrent imprisonment — Amicus claimed that sentencing of E should be delayed and that in alternative, E should be sentenced to 13-15 year sentence — Counsel for J submitted that 5.5 year sentence less 3.5 years for pre-trial custody was appropriate — Sentencing submissions made by all parties — E sentenced to two life sentences and 18 years concurrent imprisonment — J sentenced to life sentence and 13 years concurrent imprisonment — Expert testimony on behalf of J violated necessity requirements and controverted jury's verdict, by portraying J as drug addict who was not committed to terrorism — J was poor candidate for rehabilitation, given that he had not taken responsibility for his role in terrorist plot or renounced his jihadist beliefs — J also continued to insist that he never held violent or jihadist ideology — Although there was no mitigating factor of remorse, Crown could not prove that J was committed to further violent or terrorist acts — J

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    2

R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

abandoned terrorist plot at late stage, although his motive was unclear — E was considered fit to stand for sentencing, as he had understanding of proceedings and jeopardy that was necessary — E had fully held to jihadist beliefs, and had not recognized legitimacy of trial process — E had religious beliefs that could have been indicators of mental illness, but evidence showed that E was not delusional or psychotic at time of offences — Causal link was not present to show that mental illness caused E to commit offences.

Criminal law --- Pre-trial procedure — Determination of fitness to stand trial

Two accused were charged with terrorism-related offences — E was convicted of 5 counts while J was convicted of 3 counts — Court asked amicus to deal with issue of assessment for E, who was self-represented and appeared to be mentally ill — Assessment was made and doctor testified as to E's mental health and culpability in actions — Crown sought two concurrent life sentences for E, in addition to 30 years concurrent imprisonment — Crown sought life sentence for J and 20 years concurrent imprisonment — Amicus claimed that sentencing of E should be delayed and that in alternative, E should be sentenced to 13-15 year sentence — Counsel for J submitted that 5.5 year sentence less 3.5 years for pre-trial custody was appropriate — Sentencing submissions made by all parties — E sentenced to two life sentences and 18 years concurrent imprisonment — J sentenced to life sentence and 13 years concurrent imprisonment — E was considered fit to stand for sentencing, as he had understanding of proceedings and jeopardy that was necessary — E had fully held to jihadist beliefs, and had not recognized legitimacy of trial process — E had religious beliefs that could have been indicators of mental illness, but evidence showed that E was not delusional or psychotic at time of offences — Causal link was not present to show that mental illness caused E to commit offences — Amicus could not have E treated against his own wishes, as this could not be done by counsel if E had been represented.

**Table of Authorities**

**Cases considered by *M.A. Code J.*:**

*Hill v. R. (No. 2)* (1975), 25 C.C.C. (2d) 6, 7 N.R. 373, 62 D.L.R. (3d) 193, [1977] 1 S.C.R. 827 at 841, 1975 CarswellOnt 863, 1975 CarswellOnt 864 (S.C.C.) — referred to

*R. c. Brisson* (1989), 19 Q.A.C. 231, 47 C.C.C. (3d) 474, 1989 CarswellQue 131 (C.A. Que.) — referred to

*R. c. Cardin* (1990), 58 C.C.C. (3d) 221, 1990 CarswellQue 1071, 1990 CarswellQue 1906 (C.A. Que.) — referred to

*R. v. Abbey* (1982), [1982] 2 S.C.R. 24, 138 D.L.R. (3d) 202, 43 N.R. 30, 39 B.C.L.R. 201, 29 C.R. (3d) 193, 68 C.C.C. (2d) 394, [1983] 1 W.W.R. 251, 1982 CarswellBC 230, 1982 CarswellBC 740 (S.C.C.) — followed

*R. v. Abdelhaleem* (2011), 2011 ONSC 1428 (Ont. S.C.J.) — referred to

*R. v. Ahmad* (2010), 2010 ONSC 5874 (Ont. S.C.J.) — considered

*R. v. Ahmed* (2014), 2014 ONSC 6153, 2014 CarswellOnt 14865, 122 O.R. (3d) 675 (Ont. S.C.J.) — followed

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

*R. v. Ahmed* (2014), 2014 ONSC 6153, 2014 CarswellOnt 14865, 122 O.R. (3d) 675 (Ont. S.C.J.) — referred to

*R. v. Albright* (1987), 4 M.V.R. (2d) 311, [1987] 2 S.C.R. 383, 45 D.L.R. (4th) 11, 79 N.R. 129, [1987] 6 W.W.R. 577, 18 B.C.L.R. (2d) 145, 37 C.C.C. (3d) 105, 60 C.R. (3d) 97, 1987 CarswellBC 292, 1987 CarswellBC 706 (S.C.C.) — referred to

*R. v. Amara* (2010), 2010 ONCA 858, 2010 CarswellOnt 9669, 266 C.C.C. (3d) 422, 275 O.A.C. 155 (Ont. C.A.) — considered

*R. v. Batisse* (2009), 2009 ONCA 114, 2009 CarswellOnt 580, 93 O.R. (3d) 643, 64 C.R. (6th) 112, 241 C.C.C. (3d) 491, *(sub nom. R. v. B. (B.))* 247 O.A.C. 37 (Ont. C.A.) — referred to

*R. v. Birtles* (1969), 53 Cr. App. R. 469, [1969] 2 All E.R. 1131, [1969] 1 W.L.R. 1047 (Eng. C.A.) — followed

*R. v. Bogiatzis* (2010), 2010 ONCA 902, 2010 CarswellOnt 9789, 271 O.A.C. 348, 285 C.C.C. (3d) 437 (Ont. C.A.) — referred to

*R. v. Braun* (1995), [1995] 3 W.W.R. 402, 97 Man. R. (2d) 172, 79 W.A.C. 172, 95 C.C.C. (3d) 443, 1995 CarswellMan 22 (Man. C.A.) — referred to

*R. v. Brookes* (1970), [1970] 3 O.R. 159, 10 C.R.N.S. 126, [1970] 4 C.C.C. 377, 1970 CarswellOnt 2 (Ont. C.A.) — referred to

*R. v. Brown* (1985), 31 Man. R. (2d) 268, *(sub nom. R. v. Urbanovich)* 19 C.C.C. (3d) 43, 1985 CarswellMan 241 (Man. C.A.) — referred to

*R. v. Chen* (2015), 2015 CarswellOnt 8981, 2015 ONSC 3759 (Ont. S.C.J.) — referred to

*R. v. Corpus* (2000), 2000 CarswellOnt 497, 130 O.A.C. 84 (Ont. C.A.) — referred to

*R. v. Cotroni* (1979), [1979] 2 S.C.R. 256, *(sub nom. R. v. Swartz)* 7 C.R. (3d) 185, 11 C.R. (3d) 150, *(sub nom. R. v. Papalia)* 26 N.R. 133, 45 C.C.C. (2d) 1, 93 D.L.R. (3d) 161, 1979 CarswellOnt 78, 1979 CarswellOnt 48 (S.C.C.) — considered

*R. v. Detlor* (1981), 23 C.R. (3d) 59, 1981 CarswellOnt 67 (Ont. C.A.) — referred to

*R. v. Edwards* (2001), 2001 CarswellOnt 2284, 155 C.C.C. (3d) 473, 54 O.R. (3d) 737, 147 O.A.C. 363, 45 C.R. (5th) 177 (Ont. C.A.) — referred to

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

*R. v. Ellis* (2013), 2013 ONCA 739, 2013 CarswellOnt 17091, 303 C.C.C. (3d) 228, 21 Imm. L.R. (4th) 120, 312 O.A.C. 328 (Ont. C.A.) — referred to

*R. v. Ferguson* (2008), 2008 SCC 6, 2008 CarswellAlta 228, 2008 CarswellAlta 229, 228 C.C.C. (3d) 385, 54 C.R. (6th) 197, 371 N.R. 231, 87 Alta. L.R. (4th) 203, [2008] 5 W.W.R. 387, 290 D.L.R. (4th) 17, 425 A.R. 79, 418 W.A.C. 79, [2008] 1 S.C.R. 96, 168 C.R.R. (2d) 34 (S.C.C.) — followed

*R. v. Fuller* (1968), 5 C.R.N.S. 148, 67 W.W.R. 78, [1969] 3 C.C.C. 348, 2 D.L.R. (3d) 27, 1968 CarswellMan 67 (Man. C.A.) — referred to

*R. v. Gardiner* (1982), [1982] 2 S.C.R. 368, 68 C.C.C. (2d) 477, 30 C.R. (3d) 289, 140 D.L.R. (3d) 612, 43 N.R. 361, 1982 CarswellOnt 90, 1982 CarswellOnt 739 (S.C.C.) — referred to

*R. v. Gauthier* (1996), 108 C.C.C. (3d) 231, 78 B.C.A.C. 85, 128 W.A.C. 85, 1996 CarswellBC 1587 (B.C. C.A.) — followed

*R. v. Gaya* (2010), 2010 ONCA 860, 2010 CarswellOnt 9670, 272 O.A.C. 242, 266 C.C.C. (3d) 428 (Ont. C.A.) — considered

*R. v. Hersi* (2014), 2014 ONSC 4414, 2014 CarswellOnt 10362 (Ont. S.C.J.) — referred to

*R. v. Hill* (1974), 15 C.C.C. (2d) 145, 16 Crim. L.Q. 247, 1974 CarswellOnt 1009 (Ont. C.A.) — referred to

*R. v. Holt* (1983), 4 C.C.C. (3d) 32, 1983 CarswellOnt 1226 (Ont. C.A.) — followed

*R. v. Imona-Russell* (2013), 2013 SCC 43, 2013 CarswellOnt 10507, 2013 CarswellOnt 10508, *(sub nom. R. v. Russel (W.I.))* 447 N.R. 111, *(sub nom. Ontario v. Criminal Lawyers' Association of Ontario)* 4 C.R. (7th) 1, 300 C.C.C. (3d) 137, *(sub nom. R. v. Russel)* 308 O.A.C. 347, 363 D.L.R. (4th) 17, *(sub nom. Ontario v. Criminal Lawyers' Association of Ontario)* 291 C.R.R. (2d) 265, *(sub nom. Ontario v. Criminal Lawyers' Association of Ontario)* [2013] 3 S.C.R. 3 (S.C.C.) — referred to

*R. v. Jaser* (2014), 2014 ONSC 6052, 2014 CarswellOnt 18937 (Ont. S.C.J.) — referred to

*R. v. Jaser* (2015), 2015 ONSC 4729, 2015 CarswellOnt 11226 (Ont. S.C.J.) — considered

*R. v. Jaser* (2015), 2015 ONSC 4729, 2015 CarswellOnt 11226 (Ont. S.C.J.) — referred to

*R. v. Khalid* (2010), 2010 ONCA 861, 2010 CarswellOnt 9671, 183 O.R. (3d) 600, 272 O.A.C. 228, 266 C.C.C. (3d) 405 (Ont. C.A.) — considered

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550**

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

*R. v. Khawaja* (2010), 2010 ONCA 862, 2010 CarswellOnt 9672, 103 O.R. (3d) 321, 271 O.A.C. 238, 82 C.R. (6th) 122, 273 C.C.C. (3d) 415 (Ont. C.A.) — considered

*R. v. Khawaja* (2012), 2012 SCC 69, 2012 CarswellOnt 15515, 2012 CarswellOnt 15516, 97 C.R. (6th) 223, 290 C.C.C. (3d) 361, 437 N.R. 42, 356 D.L.R. (4th) 1, 301 O.A.C. 200, [2012] 3 S.C.R. 555, 118 O.R. (3d) 797 (note) (S.C.C.) — referred to

*R. v. Kirzner* (1976), 14 O.R. (2d) 665, 74 D.L.R. (3d) 351, 32 C.C.C. (2d) 76, 1976 CarswellOnt 566 (Ont. C.A.) — referred to

*R. v. Kirzner* (1977), [1978] 2 S.C.R. 487, 1 C.R. (3d) 138, 38 C.C.C. (2d) 131, 81 D.L.R. (3d) 229, 18 N.R. 400, 1977 CarswellOnt 1, 1977 CarswellOnt 470 (S.C.C.) — referred to

*R. v. Mack* (1988), [1989] 1 W.W.R. 577, [1988] 2 S.C.R. 903, 90 N.R. 173, 67 C.R. (3d) 1, 37 C.R.R. 277, 44 C.C.C. (3d) 513, 1988 CarswellBC 701, 1988 CarswellBC 767 (S.C.C.) — considered

*R. v. Marshall* (2015), 2015 ONSC 4593, 2015 CarswellOnt 11043 (Ont. S.C.J.) — referred to

*R. v. Mohan* (1994), 29 C.R. (4th) 243, 71 O.A.C. 241, 166 N.R. 245, 89 C.C.C. (3d) 402, 114 D.L.R. (4th) 419, [1994] 2 S.C.R. 9, 18 O.R. (3d) 160 (note), 1994 CarswellOnt 66, 1994 CarswellOnt 1155 (S.C.C.) — followed

*R. v. Nunner* (1976), 30 C.C.C. (2d) 199, 1976 CarswellOnt 932 (Ont. C.A.) — referred to

*R. v. Prioriello* (2012), 2012 ONCA 63, 2012 CarswellOnt 1508, 288 O.A.C. 198, 29 M.V.R. (6th) 50 (Ont. C.A.) — referred to

*R. v. Puddicombe* (2013), 2013 ONCA 506, 2013 CarswellOnt 10743, 299 C.C.C. (3d) 534, 308 O.A.C. 70, 5 C.R. (7th) 31 (Ont. C.A.) — referred to

*R. v. Robinson* (1974), 19 C.C.C. (2d) 193, 1974 CarswellOnt 1073 (Ont. C.A.) — referred to

*R. v. Rudyk* (1975), 1 C.R. (3d) S-26, 11 N.S.R. (2d) 541, 1975 CarswellNS 1 (N.S. C.A.) — referred to

*R. v. Sang* (1979), [1979] 2 All E.R. 1222, [1980] A.C. 402, [1979] Crim. L.R. 655, 69 Cr. App. R. 282 (U.K. H.L.) — referred to

*R. v. Shahnawaz* (2000), 2000 CarswellOnt 4094, 149 C.C.C. (3d) 97, 51 O.R. (3d) 29, 137 O.A.C. 363, 40 C.R. (5th) 195 (Ont. C.A.) — considered

**R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550**

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

*R. v. Shea* (1980), 42 N.S.R. (2d) 218, 77 A.P.R. 218, 55 C.C.C. (2d) 475, 1980 CarswellNS 163 (N.S. C.A.) — referred to

*R. v. Smickle* (2013), 2013 ONCA 678, 2013 CarswellOnt 15936, 5 C.R. (7th) 359, 311 O.A.C. 288, 304 C.C.C. (3d) 371, 297 C.R.R. (2d) 49 (Ont. C.A.) — followed

*R. v. Summers* (2014), 2014 SCC 26, 2014 CSC 26, 2014 CarswellOnt 4479, 2014 CarswellOnt 4480, 9 C.R. (7th) 223, 456 N.R. 1, 308 C.C.C. (3d) 471, 316 O.A.C. 349, 371 D.L.R. (4th) 581, [2014] 1 S.C.R. 575, 307 C.R.R. (2d) 96 (S.C.C.) — referred to

*R. v. Szostak* (2012), 2012 ONCA 503, 2012 CarswellOnt 9100, 94 C.R. (6th) 48, 111 O.R. (3d) 241, 294 O.A.C. 147, 289 C.C.C. (3d) 247 (Ont. C.A.) — followed

*R. v. Taylor* (1992), 17 C.R. (4th) 371, 77 C.C.C. (3d) 551, 13 C.R.R. (2d) 346, 59 O.A.C. 43, 11 O.R. (3d) 323, 1992 CarswellOnt 120 (Ont. C.A.) — considered

*R. v. Taylor* (1995), [1996] 3 W.W.R. 88, 137 Sask. R. 233, 107 W.A.C. 233, 104 C.C.C. (3d) 346, 132 D.L.R. (4th) 323, [1996] 2 C.N.L.R. 208, 1995 CarswellSask 413 (Sask. C.A.) — referred to

*R. v. To* (2015), 2015 ONSC 1169, 2015 CarswellOnt 2640 (Ont. S.C.J.) — referred to

*R. v. Turner* (1974), [1975] Q.B. 834, [1975] 1 All E.R. 70, Crim. L.R. 98, 60 Cr. App. R. 80, [1975] 2 W.L.R. 56 (Eng. C.A.) — followed

*R. v. Whittle* (1994), 32 C.R. (4th) 1, 170 N.R. 16, 73 O.A.C. 201, 92 C.C.C. (3d) 11, [1994] 2 S.C.R. 914, 23 C.R.R. (2d) 6, 116 D.L.R. (4th) 416, 1994 CarswellOnt 91, 1994 CarswellOnt 1163 (S.C.C.) — considered

*R. v. Wolfe* (1982), 38 O.R. (2d) 367, *(sub nom. R. v. Longworth)* 67 C.C.C. (2d) 554, 1982 CarswellOnt 1318 (Ont. C.A.) — considered

*Simpson v. R.* (1981), 20 C.R. (3d) 263, *(sub nom. R. v. Simpson (No. 3))* 58 C.C.C. (2d) 308, 1981 CarswellOnt 47 (Ont. C.A.) — referred to

**Statutes considered:**

*Anti-terrorism Act*, S.C. 2001, c. 41
    Generally — referred to

*Canadian Charter of Rights and Freedoms*, Part I of the Constitution Act, 1982, being Schedule B to the Canada Act 1982

WestlawNext. CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

(U.K.), 1982, c. 11
s. 7 — considered

s. 8 — considered

*Corrections and Conditional Release Act*, S.C. 1992, c. 20
Generally — referred to

s. 85 — considered

s. 86 — considered

s. 87 — considered

s. 120 — referred to

*Criminal Code*, R.S.C. 1985, c. C-46
Generally — referred to

Pt. II.1 [en. 2001, c. 41, s. 4] — referred to

s. 83.2 [en. 2001, c. 41, s. 4] — considered

s. 83.18 [en. 2001, c. 41, s. 4] — considered

s. 83.18(1) [en. 2001, c. 41, s. 4] — considered

s. 83.26 [en. 2001, c. 41, s. 4] — considered

s. 109 — considered

s. 248 — considered

s. 465(1)(a) — considered

s. 465(1)(c) — considered

s. 487.051 [en. 1998, c. 37, s. 17] — considered

s. 718 — considered

s. 718.1 [en. R.S.C. 1985, c. 27 (1st Supp.), s. 156] — considered

s. 718.2 [en. 1995, c. 22, s. 6] — considered

s. 719(3.1) [en. 2009, c. 29, s. 3] — considered

s. 720 — referred to

s. 723(5) — considered

s. 724(2) — considered

s. 743.6(1.2) [en. 2001, c. 32, s. 45] — considered

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550**

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

s. 745(d) — referred to

s. 746(a) — referred to

*Mental Health Act*, R.S.O. 1990, c. M.7
Generally — referred to

s. 21 — considered

s. 22 — considered

SENTENCING of two accused for terrorism-related offences.

*M.A. Code J.*:

A. Overview

1    Chiheb Esseghaier and Raed Jaser (hereinafter, Esseghaier and Jaser) were tried on an Indictment alleging various offences, all found in Part II.1 of the *Criminal Code* which is the Terrorism section. The trial began on January 23, 2015 with jury selection and concluded on March 20, 2015 when the jury returned verdicts convicting both accused on all counts with one exception. The one exception was Count One, in relation to Jaser only, where the jury could not reach a unanimous verdict. Accordingly, a mistrial was declared on Count One in relation to Jaser.

2    The verdicts on which the two accused must now be sentenced are, therefore, as follows:

• Count One in relation to Esseghaier only, charging conspiracy to damage transportation infrastructure with intent to endanger safety (derailing a VIA passenger train) for the benefit of a terrorist group, contrary to ss. 83.2, 248, and 465(1)(c). This offence carries a maximum sentence of life imprisonment;

• Count Two in relation to both Esseghaier and Jaser, charging conspiracy to commit murder for the benefit of a terrorist group, contrary to ss. 83.2 and 465(1)(a). This offence carries a maximum sentence of life imprisonment;

• Counts Three and Four in relation to both Esseghaier and Jaser, charging two counts of participating in or contributing to the activity of a terrorist group, contrary to s. 83.18(1). This offence carries a maximum sentence of ten years imprisonment;

• Count Five in relation to Esseghaier only, charging a further count of participating in or contributing to the activity of a terrorist group, contrary to s. 83.18(1). This offence carries a maximum sentence of ten years imprisonment. Jaser was never charged in this last count.

3    In the result, Esseghaier must be sentenced on all five counts. Jaser must be sentenced on three counts. The sentences on the s. 83.18 counts must be consecutive, except in relation to a sentence of life imprisonment, because of the effect of s. 83.26. In addition, an order extending parole ineligibility must be made unless the statutory presumption in s. 743.6(1.2) is rebutted.

4    The sentencing hearing in this case was delayed for a number of reasons. Jaser needed time to arrange a private assessment by a psychologist and his counsel needed time to consider a number of legal issues that relate to sentencing. In

R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

addition, I asked *amicus* to take on a more active role in relation to sentencing and to raise any issues that might assist Esseghaier, who remained self-represented throughout the trial and the sentencing hearing. *Amicus* sought a psychiatric assessment of Esseghaier, pursuant to s. 21 of the Ontario *Mental Health Act*, in order to determine whether there was any evidence of mental illness that might assist the court on sentencing. Esseghaier consented to the assessment and I made the Order. This initial assessment, carried out by Dr. Ramshaw, led into a collateral inquiry as to whether Esseghaier was presently fit to participate at his sentencing hearing. I made a preliminary ruling on that issue on July 22, 2015 and then ordered a second assessment by Dr. Klassen, at the request of the Crown. See: *R. v. Jaser*, 2015 ONSC 4729 (Ont. S.C.J.). Dr. Ramshaw and Dr. Klassen disagree on the issue of fitness but they agree that Esseghaier is presently mentally ill.

5    After Dr. Klassen completed his testimony on September 2, 2015, the parties were ready to make their submissions in relation to sentence. The Crown submitted that both accused should receive the maximum sentences allowed by law. In the case of Esssegghaier, that meant two concurrent sentences of life imprisonment on Counts One and Two, and three consecutive ten year sentences on Counts Three, Four and Five, to be served concurrently to the life sentences. In other words, the Crown submitted that Esseghaier should receive two concurrent sentences of life imprisonment and a concurrent determinate sentence of thirty years imprisonment. In relation to Jaser, the Crown submitted that he should receive a sentence of life imprisonment on Count Two and two consecutive ten year sentences on Counts Three and Four, to be served concurrently to the life sentence. In other words, the Crown submitted that Jaser should receive a sentence of life imprisonment and a concurrent determinate sentence of twenty years imprisonment.

6    The Crown arrived at these suggested sentences by relying on recent terrorism sentencing cases where the Ontario Court of Appeal imposed life imprisonment, or sentences in the twenty year range, which have been upheld by the Supreme Court of Canada. See: *R. v. Khawaja* (2010), 273 C.C.C. (3d) 415 (Ont. C.A.), aff'd (2012), 290 C.C.C. (3d) 361 (S.C.C.); *R. v. Khalid* (2010), 266 C.C.C. (3d) 405 (Ont. C.A.); *R. v. Amara* (2010), 266 C.C.C. (3d) 422 (Ont. C.A.); *R. v. Gaya* (2010), 266 C.C.C. (3d) 428 (Ont. C.A.). The principle emerging from the Ontario Court of Appeal cases, concerning the range of sentence, is as follows (*Khalid*, *supra* at para. 34):

> ... where the terrorist activity, to the knowledge of the offender, is designed to or is likely to result in the indiscriminate killing of innocent human beings, sentencing judges should give serious consideration to life sentences, and where a life sentence is not called for, to sentences exceeding twenty years.

The Supreme Court of Canada added the following (*Khawaja*, *supra* at para. 126):

> The fact that sentences of over twenty years may be imposed more often in terrorism cases is not inconsistent with the totality principle. It merely attests to the particular gravity of terrorist offences and the moral culpability of those who commit them.

7    On behalf of Jaser, Mr. Norris submitted that the appropriate total sentence was five and one-half years, less three and one-half years credit for pre-trial custody, leaving a remnant of two years imprisonment to be served from today's date. He would allocate the sentences as follows, in order to give effect to the requirement of consecutive sentences in s. 83.26: four months on Count Two; eight months consecutive on Count Three; and twelve months consecutive on Count Four.

8    Mr. Norris conceded that these suggested sentences may appear unduly lenient, especially on Count Two. He arrived at a proposed range that is well below the Crown's suggested range by relying heavily on McKinnon J.'s recent decision in *R. v. Ahmed* (2014), 122 O.R. (3d) 675 (Ont. S.C.J.) where twelve years imprisonment was imposed. Mr. Norris then deducted a number of sentencing discounts from this twelve year range, in order to reflect various mitigating circumstances on which Jaser relied such as entrapment, time spent in segregation during pre-trial custody, drug addiction, the minimal steps taken in furtherance of the Count Two conspiracy before it was eventually abandoned by Jaser, and the absence of any evidence that Jaser held ongoing violent Jihadist beliefs.

9    *Amicus*, Mr. Silverstein, submitted that I should not sentence Esseghaier until after a period of involuntary treatment of mental illness in a psychiatric hospital. *Amicus* sought a hospitalization order, pursuant to s. 22 of the *Mental Health Act*, in order to determine whether involuntary treatment of Esseghaier was feasible and whether it would reduce certain symptoms

**WestlawNext** CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

that Esseghaier presently exhibits. This, in turn, would help to determine whether Esseghaier's militant commitment to violent Jihad is influenced by mental illness. In the meantime, the sentencing hearing would be adjourned to await these attempts at involuntary treatment. Both Esseghaier and the Crown strongly opposed this suggested manner of proceeding.

10    In the alternative, if sentencing was to proceed, Mr. Silverstein submitted that a determinate sentence of thirteen to fifteen years was appropriate. *Amicus* arrived at this suggested range of sentence by relying on *R. v. Ahmad*, 2010 ONSC 5874 (Ont. S.C.J.), where Dawson J. imposed a sixteen year sentence in a terrorism case, and by relying in mitigation of sentence on evidence of Esseghaier's mental illness and his naivete.

11    It can be seen that the parties are far apart. It can also be seen that there are a number of preliminary issues that need to be addressed before an appropriate sentence can be determined.

## B. Facts Relating to the Offences

### (i) Introduction

12    Fact finding in jury trials, at the sentencing stage, involves two distinct processes. They are set out in s. 724(2): first, all facts that are "essential to the jury's verdict" must be taken as proven and facts "consistent only with a verdict rejected by the jury" must be rejected; second, any additional facts that are relevant and necessary to sentencing may be found by the trial judge on the basis of evidence heard at trial and any additional evidence heard at sentencing. Aggravating facts must be proved beyond reasonable doubt and mitigating facts must be proved on a balance of probabilities. The Crown's failure to prove an aggravating fact does not infer the existence of an opposing mitigating fact. It may be that neither the aggravating or mitigating version of facts can be proven in relation to any given issue and that the trier is "simply left not knowing one way or the other". See: *R. v. Ferguson* (2008), 228 C.C.C. (3d) 385 (S.C.C.) at paras. 15-22; *R. v. Gauthier* (1996), 108 C.C.C. (3d) 231 (B.C. C.A.) at paras. 20-24; *R. v. Smickle* (2013), 304 C.C.C. (3d) 371 (Ont. C.A.) at paras. 17-25; *R. v. Holt* (1983), 4 C.C.C. (3d) 32 (Ont. C.A.), at 51-2.

13    I do not intend to summarize all of the voluminous evidence relating to the offences that was heard at trial. A detailed summary of that evidence can be found in the written Charge to the Jury, at pp. 135-280, which was made an Exhibit at trial and which is a public document. I will summarize the essential aspects of the evidence.

### (ii) The Count One and Count Two Conspiracies

14    Most of the evidence heard at trial related to the so-called "train plot". This was a plan whose immediate object was to derail a VIA passenger train traveling between Toronto and New York. The ultimate object of the plan was to kill the passengers on the train. The precise location and means by which this plan would be carried out was still the subject of ongoing investigation and discussion between Esseghaier and Jaser but it generally revolved around the idea of damaging a railway bridge such that a train would derail and fall from the bridge and the passengers would be killed. The two accused visited the St. Catharine's Railway Station on August 26, 2012, the railway bridge at Jordan Harbour on September 17, 2012, the railway tracks at East Point Park on September 18, 2012, and the railway bridge at Highland Creek on September 24, 2012. I am satisfied that all four of these trips were in the nature of reconnaissance missions, as Esseghaier and Jaser were trying to determine where, when, and how the "train plot" could be carried out successfully, should they agree to that plot.

15    The jury must have been satisfied on the basis of *all the evidence* that the Count One conspiracy, which related solely to the "train plot", had been proved (the so-called "step one" in the *Carter* instruction), given that they convicted Esseghaier on Count One. However, one or more members of the jury must also have found that Jaser's agreement to carry out the "train plot" had not been proved to a standard of probability, based on Jaser's *own acts and declarations* (the so-called "step two" in the *Carter* instruction), given that they could not reach a unanimous verdict on Count One in relation to Jaser. See: *R. v. Bogiatzis* (2010), 285 C.C.C. (3d) 437 (Ont. C.A.) at paras. 24-30; *R. v. Puddicombe* (2013), 299 C.C.C. (3d) 534 (Ont. C.A.).

16    I am satisfied that all twelve jurors must have rejected Jaser's defence of lack intent, to the effect that he was not a genuine or sincere Jihadist and was merely trying to defraud his two accomplices (Esseghaier and Agent El Noury). This was

R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

the defence that was put to the jury and its rejection necessarily flows from the jury's conviction of Jaser on the Count Two murder conspiracy, from the fact that Jaser's defence of lack of any genuine intent was common to both Counts One and Two, and from the convictions of Jaser on Counts Three and Four which required proof of a specific intent to enhance the abilities of Esseghaier's terrorist group.

17      The fact that one or more jurors was not persuaded of Jaser's probable membership or agreement to the Count One conspiracy, based on his own acts and declarations, does not mean that the "train plot" should be discarded or ignored at sentencing in relation to Jaser. The "train plot" was central to Count One but it was also relevant to the Count Two murder conspiracy on which Jaser was convicted. As I explained in the Charge to the Jury, when addressing the Count Two murder conspiracy (at pp. 94 and 101-103):

> Whereas Count One was focused factually on what has been called the "train derailment plot", Count Two has a broader factual focus. At the same time as the narrower train derailment conspiracy, the Crown alleges that there was also a broader murder conspiracy to kill persons unknown. This common object of killing people was allegedly "for the benefit of, at the direction of or in association with a terrorist group". The broader general murder conspiracy allegedly included, but was not limited to, the "train plot" and the "sniper plot". The Crown alleges that there was an agreement between Mr. Esseghaier and Mr. Jaser to seek to cause death to persons unknown on multiple occasions.
>
> . . .
>
> I will review the evidence of the two accused's various statements and their various acts in the next section of this Charge. As you will recall, there were a number of occasions on which the accused talked about either the "train plot", the "cook plot", and/or the "sniper plot". There were also a number of occasions on which they talked about the importance of having multiple projects in order to carry them out continuously, one after another, and make a bigger impact. There is no serious issue, in my view, that when the accused talked about these various ideas or schemes they were talking about deliberately trying to kill people, which would be murder if it was actually carried out. However, the real issue in my view, is not whether they were talking about murder. It is not a crime to talk about murder. It becomes a crime when both an agreement and an intention to commit murder are formed, that is, when the first two required elements on Count Two exist. In my view, you should focus on these two elements of conspiracy, as explained in my instructions above, when deliberating on the "lesser included offence" charged in Count Two.
>
> I think it is fair to say that it is only in relation to the "train plot" that the accused actually took some active steps, to begin to investigate it or to begin to prepare for it. Accordingly, there is circumstantial evidence relating to the "train plot", as I explained above. The other plots were discussed but there do not appear to be any steps taken beyond the discussions. The fact that the accused discussed the "cook plot" and the "sniper plot" may provide evidence of an intent to kill, which is an essential element of murder, depending on how you assess it in the context of all the other evidence bearing on the issue of the accused's intention, including evidence relied on by the defence. However, in deciding whether to infer a positive agreement and whether to infer a genuine intention to carry out an agreement to murder, you may want to focus on the statements made and the steps taken in furtherance of the "train plot". Ask whether they do or do not prove beyond reasonable doubt, together with the discussions about the "cook plot" and the "sniper plot" and all the other relevant evidence bearing on the element of intention, that there was a general conspiracy to commit murder as alleged by the Crown. Of course, these are all factual issues that are entirely for you to decide.
>
> [Emphasis added.]

18      Mr. Norris conceded at the sentencing hearing that the "train plot" was under discussion between Esseghaier and Jaser, as one possible means of carrying out the Count Two murder conspiracy. Indeed, it was the one means that was most actively investigated and considered. The alternative means, which Jaser tended to prefer, was the so-called "sniper plot" which involved using a rifle to assassinate prominent persons, in particular, wealthy Jews. Mr. Norris submitted that the Count One train derailment conspiracy was a more serious offence than the Count Two murder conspiracy because many acts in furtherance of the Count One conspiracy were carried out whereas the Count Two conspiracy never advanced beyond a "blue sky" idea. He submitted that the lack of proof of Jaser's agreement to the Count One conspiracy reduced his moral culpability. In my view, the Count Two conspiracy was just as serious, if not more serious, than the Count One conspiracy. It

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

is only the Count Two conspiracy that required proof of the mental element for murder. Furthermore, the numerous acts in furtherance of the Count One conspiracy (such as the four railway bridge reconnaissance trips) were also relevant acts in furtherance of the Count Two conspiracy, as I explained in the above excerpts from the Charge to the Jury.

19    It must be remembered that the object of an agreement in the law of conspiracy is simply the commission of a criminal offence. Dickson J., as he then was, described the requisite scope of the agreement in *R. v. Cotroni* (1979), 45 C.C.C. (2d) 1 (S.C.C.) [hereinafter Papalia], at 17-18:

> The essence of criminal conspiracy is proof of agreement. On a charge of conspiracy the agreement itself is the gist of the offence ... The *actus reus* is the fact of agreement ... The agreement reached by the co-conspirators may contemplate a number of acts or offences. Any number of persons may be privy to it. Additional persons may join the ongoing scheme while others may drop out. So long as there is a continuing overall, dominant plan there may be changes in methods of operation, personnel, or victims, without bringing the conspiracy to an end. The important inquiry is not as to the acts done in pursuance of the agreement, but whether there was, in fact, a common agreement to which the acts are referable and to which all of the alleged offenders were privy.

> [Emphasis added.]

Martin J.A. made much the same point in *R. v. Wolfe* (1982), 67 C.C.C. (2d) 554 (Ont. C.A.) [hereinafter Longworth], at 565-6 when he stated:

> I agree that it is not necessary to show that parties to a conspiracy were in direct communication with each other, or even that they were aware of the identity of the alleged co-conspirators. Moreover, it is not necessary to show that each conspirator was aware of all the details of the common scheme, but it must be shown that each of the conspirators were aware of the general nature of the common design and intended to adhere to it.

> [Emphasis added.]

20    The basic proposition in *Papalia* and *Longworth* is that the element of agreement requires adherence to an "overall dominant plan" to commit a criminal offence, and not to "all the details of the common scheme" or all the possible means or "methods of operation" by which that offence could be committed. In the present case, the "overall dominant plan" alleged in Count Two was committing murder for a terrorist purpose. The "train plot" and the "sniper plot" were simply the means of committing murder that were under discussion and that were being investigated. Also see: *R. v. Marshall*, 2015 ONSC 4593 (Ont. S.C.J.) at paras. 42-8.

21    I am satisfied that Jaser was actively exploring the viability of the "train plot", as a means to commit murder, but that he generally tended to favour the "sniper plot" as his preferred means. In Esseghaier's case the opposite was true as he generally tended to favour the "train plot", as his preferred means to commit murder, but he was also willing to explore and consider the "sniper plot". Esseghaier's agreement to narrowly and separately carry out the "train plot" was proved in the manner required by the *Carter* rules and by the law of conspiracy, whereas Jaser was only proved to have considered and explored the "train plot" as one possible means of carrying out his broader agreement with Esseghaier to commit murder.

22    The alternative or multiple means of committing murder that Esseghaier and Jaser were exploring, and the terrorist motives behind their scheme, were made clear in various wiretap intercepts played at trial. I will set out and summarize some of the more important ones. The first interception of a discussion that Esseghaier and Jaser had with Agent El Noury concerning this matter was on September 9, 2012. It was as follows (as summarized and quoted in the Charge to the Jury):

> • Esseghaier stated, "It's a very good mission. So we would like to tell you what we are planning, me and Raed. Because me and Raed we are, we have some plan as we are... strong. But, of course, we need someone to protect our back. And this person who protect our back should be someone who has a very good position... you know, the ability to manage the situation by distance... The ability to deviate the attention of security services... As you know, in Canada or in America, those countries they have many the armies in our land and this army is taking control of land and is spreading corruption

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550
_____
2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

on the earth... they are spreading evil... they are spreading adultery, they are spreading alcohol in those lands, you understand? They are spreading Christianity. Now they send people in Afghanistan, in Somali, in many area, in Pakistan, they send people to spread the Christianity... So it's our mission to fight those countries that have harmed them... So it's our duty to... make trouble in their homes";

• Having set out the objectives of the "mission", Esseghaier then told El Noury, "This is your time and your opportunity to not only support our brothers by money but also by action... to go to the higher level which is the level of action... So we are, just me and our brother Raed, to do something very simple that don't needs weapons, don't need a lot of security issues... Very clean operation. The operation is the following. We have train, to make a hole in the bridge of the train. You know the train when is going in the bridge... It's on the bridge. And when we make a hole by a driller machine, two persons in each side he has his driller machine... So when the train is coming, so he will go through that hole... and of course the train is full of people, at least two hundred or three hundred people";

• Jaser went on to discuss their ultimate objective and stated, "But you see, it's not just one thing... Because we want to make sure that they understand that as long as they're over there, their people will not feel safe on this side. They should not feel safe and we are here for a reason". Esseghaier added, "but not only this, but they are fighting us in our country, in our lands. So it's our now obligation";

• They discussed their need for a third person. Esseghaier stated to El Noury, "you will come to Toronto and you put the stuff in the apartment and you give the key to him and you teach him, so you return back to U.S.A. and you wait our call for downloading the video". Jaser then said, "Nobody can know about this". Esseghaier said, "Nobody know. We are just three here". Jaser replied, "Certainly, certainly... we were kind of debating if we need a third person or not... And we do need a third person";

• They discussed timing for the train project and whether there would be other projects. Esseghaier said, "this operation, we cannot do before when the period of the shortest day of time". Jaser said, "Yeah". Esseghaier continued, "Because in that period the night is getting earlier". Jaser said, "We need that". Esseghaier continued, "We need that time because the train is around 5 pm or five and half pm". Jaser said, "I tell you something, we could easily say you know, let's just do it one time you know, teach these people a lesson, and be a bit aggressive about it, maybe a little bit careless... I would rather be careful just so I can live, have another opportunity and another opportunity. It's not about being afraid of being caught or whatever, that's not the point". Esseghaier said, "continuously". Jaser said, "continuously be". Esseghaier said, "yeah, he's right, he's right". Jaser said, "It's not about fear". Esseghaier said, "The plan is not one or two. The plan is always we keep". Jaser replied, "Praise God";

• This led into a discussion about the "sniper plot". Jaser said, "Another thing is, I would like to begin with, what's it called, sniper rifle. Because there are certain people who play a big part, at least they can control, and that is important... sniper... From a distance... God almighty says, fight their leaders. So fight the leaders of this people". Esseghaier asked, "How we can reach them?" Jaser replied, "Easily in Canada". Esseghaier said, "they are not in the street, those people generally they are in castles". Jaser stated, "here in Canada, it's different... They do public speech. You know, they are very aggressive here in the public". Esseghaier said, "Oh they do public, public conference". Jaser said, "you find that they come to the gay parade... the Mayor of Toronto... he takes the subway in Toronto... Canada is different. Canada is not the U.S... But they feel safe. We're gonna change all that". Esseghaier said, "we have to study, this is what he is planning very good, I like this plan". Jaser stated, "This is long term, I just need to practise, need to practise this... I gonna get my hunting rifle, hunting rifle, that's easy. And I'm gonna get the license... gun carrying license. So we'll get all that... Very easy, very easy... That's a beautiful plan";

• They discussed the video to be released relating to the "train plot". Esseghaier said, "When the video is uploaded". Jaser said, "first thing they're gonna do is, who's on the video?... We have actually do our homework... there's signatures on the recording... They will know that this is being recorded on site of Canada. That will drive them even more nuts... You can even hold up a Canadian newspaper or something... We are in the neighbourhood... Get out, get out before we kill you all. Because we want this whole city, the whole country to burn. I could care less who dies. Everyone is a target. They pay taxes, they vote. They're enemies". Esseghaier stated, "All of those details, we have to try, when we prepare the video, together, we have to change the voice background. We have to take care about this, all those details, the camera also". Jaser said, "like a background noise audio to it... something like, we can record for half an hour of subway station... and then use that as a background noise. That would drive them nuts... The location is actually

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

really important because they can figure out where you are from the background image... We don't have to go too far, few hours up north, you're in the middle of nowhere". Esseghaier said, "The subject of the video, is it the help of Tamer is important, is it necessary? What do you think?" Jaser told El Noury, "The only thing is when you, you just come pick it up... The production should be okay". Esseghaier stated, "The production should be okay... me and Raed, we take care about this... he has technical background". Jaser replied, "Some, some, I have people that help".

23    Two weeks later, in the September 23rd, 2012 discussion at the "safe house", Esseghaier and Jaser pointed out some of the challenges concerning the "train plot" that they had discovered during their reconnaissance trips to various railway bridge locations. Jaser also expressed his preference for the "sniper plot". The conversation was as follows:

• They proceeded to discuss exactly how to go about cutting steel support beams. Jaser said "we don't need it any more", in reference to the jackhammer. Jaser continued, "we're standing on a bridge and we're cutting, where are we gonna end up? Yeah, it's a problem... the torch doesn't make noise, it's the saw that makes noise... we're cutting some of it, I mean not the whole thing". They discussed how to cut part on "one side" and then part on "the other side". Jaser said, "Yeah, that's fine, that sort of makes sense". Esseghaier said, "me in one extremity here and Raed in the other extremity, we start at the same time, he cut everything here, Raed, and me I cut everything here". Jaser thought that this would be a problem because "the way it's designed, it looks like a very intricate puzzle... the wood is interlocked, everything has steel bolts... So, it's a lot of work. So you have to cut across, and you have to cut diagonally... there's under layers as well". Esseghaier said, "we cut everything". Jaser said, "it's a lot of work brother... Actually, there is one more way we can do it. We can work on the foundation, okay... do the drill part. So get rid of everything at the bottom first...";

• They discussed going to the new location the next day. Jaser said, "what I'm thinking is, tomorrow at 9:30, me and you, we'll go and have a look". Esseghaier said, "the bridge". Jaser said, "yeah". Esseghaier said to El Noury, "all three of us, we go, and you will see with us". Jaser suggested they all meet at 9:30 am at his house. Esseghaier said, "we do the planning... we check the bridge... we will discuss the details, which kind of torch we need, is it big torch, how much intensity, we discuss the details... how we can manage the cutting, each one from one extremity, or we go like this gradually, or we need a third person, we try to figure out all of those details... we check all the technical details in the bridge". Jaser said, "if he [El Noury] comes with us, it's nice because he can give us some of his input as well... That would help because I am like disturbed about the design of this bridge. But maybe we can...". Esseghaier said, "so you can help us". El Noury replied, "absolutely";

• As they left the "safe house" apartment at the end of the meeting, Esseghaier agreed to stay there for the night. Jaser and El Noury then had a conversation outside in the parking lot, in Esseghaier's absence. Jaser said, "it seems to be too much work for a very small job... It's too small. It's a big operation, we're setting up for a big operation, we end up doing something very tiny. The set up is nice but the operation doesn't make sense. You know, when you wanna move something, instead of moving a bag, you can move a ton. So what's the difference. It's the same thing, what's the difference. I gotta be honest with you, I told you yesterday, you know. My whole goal was just to get out of this place. But you're right, so die here. That's it". El Noury said, "But not before we make our statement". Jaser said, "of course, of course". Later in the conversation Jaser said, "like the whole set up is too much man... very small... twenty thirty people, forty people. And who are they? Slaves. Really, just like you and me, workers. You know? Sheep. We don't want sheep. We want the wolf. We can get the wolf, brother we can get the wolf. The G eight summits are here... I want you to think about the benefit... you know, you guys do this or we gonna keep doing this to you... the benefits of taking down some of their heads has, a greater impact, it's like when the head is cut off, the body gets confused, even temporarily, until it grows another head. But, for awhile, it's going in every direction. That's what we want". El Noury said, "cause a greater impact than an accident on a train, you know a couple people". Jaser said, "couple of sheep... you know, sheep are harmless. They're actually cute". They laughed and left each other.

24    During the final reconnaissance trip on September 24, 2012, to the Highland Creek bridge, Jaser became concerned about Esseghaier's lack of operational security. A number of civilians had seen Esseghaier, Jaser, and El Noury walking on the railway bridge and Esseghaier had been speaking loudly and excitedly. This part of the conversation was as follows:

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

• Agent El Noury testified that Jaser had a scowl on his face and appeared upset as they walked back. El Noury asked him, "what wrong Raed?" Esseghaier said, "there are many things on his mind". Jaser replied, "when I tell you there is someone looking at you, okay, you don't say to me it doesn't matter, what is he doing here, why do you care about him? The devil sent him to spy on us... So why don't you take these things seriously?... If you make a mistake with something that you don't take seriously... it's a sin. And if the operation fails just because of a guy, me for example, or you, or any person, took things lightly, that's a sin. I don't need this kind of sins man... so take today's act as a lesson".

25    Shortly after the above conversation, uniform Toronto police officers attended at the parking lot at East Point Park. They cautioned Esseghaier, Jaser and El Noury about walking along the railway tracks and took down their names and addresses. Jaser and Esseghaier proceeded to argue about whether their plans had been compromised and about whether the "sniper plot" was preferable to the "train plot". The conversation was as follows:

• Jaser began by stating, "You guys are stupid... I'm very upset with you. I told you to be serious about this. I told you the devil sends people to locate you, you don't listen... This is okay, but we just compromised the location. So you have to think of it that way, that's how I think. So no worries, we just have to find another place. It's not a big deal, there's a lot of good places";

• Esseghaier disagreed and asked, "how they [the police] can make the connection?" Jaser replied, "you're foolish... And you should be happy... that you have a brother like me who is telling you about your faults". Jaser explained to Esseghaier that if they make a video and release it after "the train derails", that the police will connect it to the fact that it happened "500 metres away from where three Arab guys, one from the States, one from Quebec, and one from Ontario, were found hanging around and checking things out";

• Jaser stated again, "the fact that this happened, it compromises the location. I think we need to re-discuss this whole issue, okay? Because your job, your mission is to follow orders from the brothers... But you see, when you come to fulfill your orders here, okay. You do things according to the reality that's on the ground. You don't do it according to what they, how they do it back there. Do you see my point? There is a completely different set of scenarios and situations, even the building material that they use is different. So, if you wanna take down this, if you wanna do this, fine, we can do it, but we're gonna do it our way, not their way. You see, because we're in Canada, we're not in Kandahar. It's a completely different situation here. Now this is one. Secondly, number two, taking down a passenger train that might take out 20, 30, 40, 50, 100, whatever. I don't think many people will die by the way, just so you know. Train is not going very quickly, okay. It's not gonna drop very far, okay. And when it does, it's gonna stop itself because of the sheer weight. Just so you know". Esseghaier replied, "Raed, we are not talking about the technical issue... we are talking about what's happen now";

• Jaser then stated, "what happened now compromises the location only, not the operation. Operation can continue, we're still good to go. Okay? But we have to go, you know, different place... We're very good, nothing happened. Just like when we talked to the guy on the other site. You know, I gave him da'wa, we gave him copy of Qur'an, no problem, everything is okay. Yeah, this no big deal";

• Jaser then discussed both the "train plot" and the "sniper plot". He began by asking, "who knows how to hurt these people the most? You or me?" Esseghaier replied, "You". Jaser continued, "this is an operation because they asked you to do something... But we can have our own operation... And their operation we could do, if it makes sense. If it's safe to do. Okay? But we can do our own operation. Okay? Now, if you wanna talk about how to hurt these people the most... We're gonna try to fulfill the command as we see fit. Not as they see fit, because they're not here... So we're trying to work things out according to what we know, what we see and the reality on the ground... The train, we can continue to do, no problem, find another location, God willing, you never know. What did I tell you about the last time? Before we left the last time, what did I say to you? I said, may the outcome be good. Right? Isn't this better and easier? Alright. Third one will be even much easy. You see? Much more secluded, nobody will see us, no trails, nobody walking... So we'll continue. Now, we move on with God's blessing. Number two, this is very important. That the war overseas is being funded from here. There people, they only understand the language of two things. Death and money. That's it. You hit them where it really hurts. You take their lives, you take their wealth... You think they care about the life of 50 people on a train?... But the expensive Jew, the rich Jew, the Jew that is Zionist... when you take 50 of them out, what

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

happens? You will drive them crazy". Esseghaier asked, "But how?" Jaser replied, "is it harder to shoot someone in the head or to derail a train?... we'll take a sniper, we need a sniper. We can kill many of them before something happens... You're sniping somebody from far, far away, maybe 200, 300, 400 yards away, at least... The message by derailing a train and killing a few sheep is not the same as when you, when you take out the vice... The almighty God says fight the leaders of non belief";

• Esseghaier and Jaser proceeded to debate the merits of the "sniper plot" and the "train plot". Esseghaier said, "We do both. I agree with him... I agree to kill the elders... I never say no, but my question, how?... you can come back with plan?" Jaser replied, "Brother, I can come up with a better plan than anybody else in this city. I know this city inside out". Esseghaier said, "you bring to us a plan, so I don't have problem". Jaser replied, "Habibi, I'm with you, I'm not disagreeing with the mission. I'm talking about a fact, you cannot make a decision from over there about something that happens in Toronto". Esseghaier said, "It will show that they are powerful, they are strong". Jaser replied, "I'm not saying no, I agree with you... Like right now location compromised, no problem, find a new location, not the end of the world, no problem. We're gonna continue... The mission is about continuously fighting... this is nothing, taking down the train... It's not a big deal. They will even downplay it by the way and say, oh it was a train derailment, oh no big deal, a few hundred people were harmed... And your video... it's gonna do well for a few hours and then they're gonna start to shut it... But when I tell you, I know how to harm them, I know what I'm talking about... To kill the heads of the financing arm of Israel, okay, I know what I'm talking about". Esseghaier replied, "Okay, I never say that I am not agree on what you said... Raed, your plan, give us your plan... you are talking now about the elders, killing the elders of non belief, okay? So, this is also, what is the frame of time?" After some further debate, Jaser stated that he would provide his plan in "two weeks";

• They returned to discussing the subject of a new location for the "train plot". Esseghaier said, "Raed, we are upset because of the police. I know that you are upset, and no problem. The police, he change for us the location. Maybe is better for us. Maybe we find another, something easier. You know? So no problem". El Noury asked, "Do you know Google earth?" Jaser replied, "Yeah... That's what I've been doing... I'm not worried about this". Jaser went on to say, "I'm worried about you [Esseghaier]. You have a very weird mind... very simplistic";

• At this point in the discussion, Jaser said, "I'll let you know brother. I have to get back to you... we can't just do things like this. It doesn't work. I have to check with someone... I have to see if we can carry on right now or what's going on. Because I have to check, I have to check some things... when they have three people at this location, we're already seen on the tracks... They have something called an incident report... The incident report goes in the database. That's it. When some other incident happens, they check this incident against the other incidents they have in the database... they're going to check when another train, when a train goes down anywhere, okay? They're gonna come to us... This is a problem, do you see? Now I need to check... Because you see, it doesn't make a difference what happens anywhere in Canada... we're all coming from different places and we all met here and we're seen on the tracks, that's the problem... I really don't like it... Now anything that happens on the CNR rail... on a track, anything, any incident, they will check the database. And if they see anything that resembles Arabs, like Arab work... they will definitely at least put us on the spot light. They may not come after us immediately but they will watch us";

• Esseghaier continued to insist that "the operation it will be done after 3 months" but that "we have to change the place". Jaser replied, "Trains man, the problem is... I have to think about it. Me, I don't work like you". Esseghaier repeatedly stated, "we want this operation be safe. So, God Almighty he warn us to save our operation... So we change the location but we should not stop the operation";

• Esseghaier appeared to assign some blame to Jaser for the encounter with the police stating, "he [Jaser] neglect one thing, which is the most important thing, is the get out from the place... answer me Raed this question. Why you care about all of this stuff and the only thing that is the most important thing, you didn't care about it?" Jaser replied, "Because Allah doesn't want us to do the operation". Esseghaier stated, "Okay Raed, I don't know if God want us to do the operation or no... but what I know is that we have to fight those disbelievers". Jaser replied, "Yes, yes, we will do that, God willing".

26    There was a further argument on the evening of September 24, 2012, as Agent El Noury, Jaser and Esseghaier drove downtown to drop Esseghaier off at the Toronto bus depot. At this point, it is clear that Jaser abandoned the Count Two

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

conspiracy and did not participate any further in any of Esseghaier's terrorist activities.

*(iii) The Count Three, Four and Five Offences*

27    The facts relating to the three counts of participating in or contributing to the activity of a terrorist group (Counts Three, Four, and Five) are not seriously in dispute, given the jury's guilty verdicts on all three counts. They cover different time frames and different activities that occurred in those time frames. Count Three covers the time period from September 7 to 10, 2012 and it is mainly referable to recruiting Agent El Noury into the terrorist group and discussing the logistics of the planned terrorist activity. Count Four covers the time period between September 13 and 24, 2012 and it is mainly referable to the reconnaissance trips, to efforts to obtain a "safe house" in Toronto, and to further discussions about the logistics of the planned terrorist activity. Finally, Count Five covers the time period between September 25, 2012 and February 14, 2013 and it is mainly referable to Esseghaier's efforts to recruit a replacement for Jaser in the existing terrorist group and his efforts to contact the "brothers" overseas and to obtain instructions.

*(iv) Entrapment*

28    One final factual issue raised by Jaser, that relates to the offences, is the suggestion that entrapment played a role in facilitating the Count Two conspiracy and that this mitigates sentence. There are both legal and factual impediments to this submission.

29    Mr. Norris conceded at the sentencing hearing that the traditional "defence" or common law doctrine of entrapment, as developed under Canadian law, could not be made out in this case. It has two alternative branches, neither of which exist in this case: first, the police provide an accused with an opportunity to commit a crime when they lack reasonable suspicion (the practice known as "random virtue testing"); or second, the police have reasonable suspicion but they go beyond merely providing an opportunity to commit a crime and induce the crime by way of improper tactics such as threats, persistent importuning, or exploitation of human frailties and vulnerabilities, such that even an average member of the community would have been induced to commit the crime. None of this happened in the present case. The RCMP had reasonable grounds to suspect Esseghaier and Jaser were engaged in some kind of terrorist activity, as a result of early cooperation and information sharing between CSIS and the RCMP, prior to the point in time when Agent El Noury came to Canada and began to infiltrate Esseghaier and Jaser's group. Furthermore, Agent El Noury never engaged in the kind of tactics that could have improperly induced the commission of the offences. See: *R. v. Mack* (1988), 44 C.C.C. (3d) 513 (S.C.C.), at 554-560.

30    Mr. Norris' submission is that police conduct that falls short of the two prohibited *Mack* forms of entrapment can, nevertheless, mitigate sentence. In essence, he submits that the severe common law remedy of a stay of proceedings was developed in *Mack* as a response to severe forms of state misconduct and it does not preclude a lesser remedy of reducing the sentence in cases involving lesser forms of entrapment. He points to a body of English and Australian case law, and early Canadian cases prior to *Mack*, where the remedy for entrapment still is (or was) a reduction in sentence, rather than the modern Canadian remedy of a stay. See, e.g.: *R. v. Kirzner* (1976), 32 C.C.C. (2d) 76 (Ont. C.A.), aff'd (1977), 38 C.C.C. (2d) 131 (S.C.C.); *R. v. Sang*, [1979] 2 All E.R. 1222 (U.K. H.L.), at 1226; *R. v. Birtles*, [1969] 1 W.L.R. 1047 (Eng. C.A.), at 1049-50; *R. v. Mandica* (1980), 24 SASR 394. The test for entrapment developed in these cases tends to focus on the accused's predisposition to commit the offences, that is, the court inquires into whether there is "a real likelihood that he [the accused] was encouraged to commit an offence *which otherwise he would not have committed*" [emphasis added]. Mr. Norris relies on this test for entrapment in the case at bar.

31    There are significant doctrinal, conceptual and public policy difficulties in recognizing Mr. Norris' proposed lesser form of entrapment with its lesser remedy. The courts in England have rejected the modern Canadian approach to entrapment, where it takes a more serious form and where it results in a stay of proceedings. Conversely, the courts in Canada rejected an approach to entrapment that results only in a reduction of sentence and that focuses only on the subjective predisposition of the accused. Instead, the Canadian approach to entrapment focuses on serious state misconduct. Lamer J, as he then was, gave the unanimous judgment of the Court in *R. v. Mack*, *supra* at pp. 540 and 551, and stated the following:

It is the belief that the administration of justice must be kept free from disrepute that compels recognition of the doctrine

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

of entrapment. In the context of the *Charter*, this court has stated that disrepute may arise from "judicial condonation of unacceptable conduct by the investigatory and prosecutional agencies": *Collins v. The Queen* (1987), 33 C.C.C. (3d) 1 at pp. 16-7 (S.C.C.). The same principle applies with respect to the common law doctrine of abuse of process. Conduct which is unacceptable is, in essence, that which violates our notions of "fair play" and "decency" and which shows blatant disregard for the qualities of humanness which all of us share.

. . .

It could ... be argued that the use of the term "entrapment" itself dictates an inquiry into the predisposition of the individual accused. The argument is really one of causation. As I understand it, the idea is that even if the police conduct, viewed objectively, has gone further than the provision of an opportunity, in the case of an accused who is predisposed, it cannot be said that the reason or cause for his or her commission of the offence is the actions of the police; rather, it is because of the accused's predisposition to crime. In my opinion, the test for entrapment cannot be safely based on the assumption that a predisposed person can never be responding to police conduct in the same way a non-predisposed person could be. It is always possible that, notwithstanding a person's predisposition, in the particular case it is the conduct of the police which has led the accused into the commission of a crime.

Those who argue for an inquiry into predisposition, and thereby deny the availability of an allegation of police misconduct, ignore this possibility. I am unwilling to do so. <u>Obviously it is difficult to determine exactly what caused the accused's actions, but given that the focus is not the accused's state of mind but rather the conduct of the police, I think it is sufficient for the accused to demonstrate that viewed objectively, the police conduct is improper</u>.

[Emphasis added.]

32    Mr. Norris does not allege any kind of police misconduct in his entrapment argument. Rather he submits that there is "no evidence" that Jaser and Esseghaier were already predisposed to commit the murder conspiracy offence charged in Count Two, prior to Agent El Noury's introduction to the group, and that it was due to Agent El Noury's acts of encouragement and facilitation that this Count Two offence came about.

33    It is unnecessary to decide the interesting doctrinal issue of whether a lesser form of entrapment, based on the accused's predisposition, can exist under Canadian law in light of the decision in *Mack*. I am satisfied, on the facts of this case, that there is abundant evidence inferring that Esseghaier and Jaser were already predisposed to engage in a murder conspiracy for the benefit of a terrorist group, prior to Agent El Noury's introduction to the group.

34    The flaw in Mr. Norris' argument, with respect, is that he conceded that Jaser and Esseghaier were already discussing the "train plot", prior to the introduction of Agent El Noury. His submission was that "there is no evidence they had discussed *any other plans for killing people*", such as the "sniper plot", prior to the introduction of Agent El Noury. As already explained above, the "train plot" was a means to commit murder and it is relevant evidence relating to the Count Two murder conspiracy, as the underlined submission from Mr. Norris' factum, set out above, seems to concede.

35    Furthermore, it can be inferred that the "sniper plot" had already been discussed by Esseghaier and Jaser prior to the introduction of Agent El Noury into the terrorist group. I have summarized the lengthy September 9, 2012 discussion, where the terrorist scheme was first presented to Agent El Noury by Essseghaier and Jaser (at para. 22 above). In that discussion, Esseghaier began by introducing the topic of the "train plot". Jaser participated in this discussion but then went on to state that "it's not just one thing" and that their overall objective was to create circumstances where "people will not feel safe on this side". Jaser continued, "we could easily say, you know, let's just do it one time ... I would rather be careful just so I can live, have another opportunity and another opportunity". Esseghaier then stated, "The plan is not one or two. The plan is always we keep". Jaser replied "Praise God". At this point, Jaser introduced the topic of the "sniper plot".

36    It can be inferred from the above discussion that the plan which already existed on September 9, 2012 involved multiple or sequential terrorist acts, all of which had the object of killing innocent civilians in order to instill fear in the public and cause a change in Canadian foreign policy. Agent El Noury encountered this pre-existing scheme and proceeded to encourage it and to assist the accused in planning and preparing for it, which is exactly what the police have always done and are entitled to do when they introduce an undercover officer into a pre-existing plan to murder someone (by having the

**WestlawNext** CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550
_____
2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

undercover officer pose as a "hit man") or into a pre-existing drug trafficking operation (by having the undercover officer pose as a drug dealer who needs to buy from a supplier). Even under the English approach to entrapment, with its focus on pre-disposition, there is nothing wrong with this kind of police participation in and encouragement of a pre-existing plot. Parker L.C.J. gave the judgment of the Court of Appeal in the root case that sets out the English doctrine of entrapment, *R. v. Birtles*, *supra*. He stated the following:

> ... it is vitally important to ensure so far as possible that the informer does not create an offence, that is to say, incite others to commit an offence which those others would not otherwise have committed. <u>It is one thing for the police to make use of information concerning an offence that is already laid on. In such a case the police are clearly entitled, indeed it is there duty, to mitigate the consequences of the proposed offence, for example, to protect the proposed victim, and to that end it may be perfectly proper for them to encourage the informer to take part in the offence or indeed for a police officer himself to do so</u>. But it is quite another thing, and something of which this Court thoroughly disapproves, to use an informer to encourage another to commit an offence or indeed an offence of a more serious character, <u>which he would not otherwise commit</u>, still more so if the police themselves take part in carrying it out.

> [Emphasis added.]

37    I am satisfied, on the facts of the present case, that entrapment does not exist in any form, including the English and Australian form, and it is not a mitigating factor on sentence.

### C. Facts Relating to the Offenders

38    There are a number of important factual issues relating to the offenders. In Jaser's case, he called Dr. Ghannam and it was suggested through this expert witness that Jaser was a drug addict, that his commitment to violent Jihad was insincere, and that his involvement in the offences was motivated by fraud, that is, by a need to obtain money from his accomplices. In Esseghaier's case, Dr. Ramshaw and Dr. Klassen testified that he was presently mentally ill, while disagreeing as to whether he was fit to participate at a sentence hearing. I will first address the evidence relating to Jaser and then turn to the evidence relating to Esseghaier.

### (i) The evidence relating to Jaser

39    Jaser did not request a Pre-Sentence Report. Instead, Mr. Norris advised that he was having a psychological assessment prepared and that it would provide the court with the necessary information relating to Jaser's past antecedents and future rehabilitative prospects. A report from Dr. Ghannam was filed and he testified at the sentencing hearing.

40    Dr. Ghannam is a clinical psychologist who practises mainly in California. He has not testified previously in Canada and he has rarely testified in criminal matters in the United States. Most of his forensic work in the courts has been in civil cases where he has testified frequently about the psychological effects of injuries. His only experience in terrorism cases has been with Guantanamo Bay prisoners, as he has been consulted concerning the long term effects of "enhanced interrogation" and lengthy imprisonment and about the rehabilitative potential of these prisoners, should they be released to a foreign country. He has not yet testified on these matters in the U.S. courts.

41    Dr. Ghannam came to Toronto, met with Jaser and with members of Jaser's family, and interviewed them. He also reviewed documents relating to the trial evidence provided to him by counsel. Finally, he had Jaser complete various psychological tests.

42    Dr. Ghannam's report states that he was asked "to provide an opinion regarding Mr. Jaser's intention, his motivation, and his state of mind in relation to the convictions that he sustained, specifically the charges and the allegations of being a radical Muslim extremist engaging in terrorism". Dr. Ghannam's main conclusions, both in his report and in his testimony, were that Jaser was a drug addict and a "con man" at the time of the offences, that his motivation was to obtain money from his two accomplices, that he was never a sincere Jihadist, and that he never had any genuine intention to harm anyone. Dr.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

Ghannam expressed these conclusions in the following terms in his report, which he adopted in his testimony:

Mr. Jaser had (and has) a severe, significant and, at times, debilitating addiction to a wide variety of drugs that include marijuana, hashish (black tar) and alcohol, and there was never a time since the age of 14 up until the day he was arrested that he was not only using these substances, but was chronically high and intoxicated. From the age of 14 to the time of his arrest, Mr. Jaser's state of mind and primary motivation for existence was based on one major fundamental direction - to obtain sources of funding, financial support and monies to support his drug and alcohol addiction.

. . .

The other major theme that was consistently revealed in my evaluation of Mr. Jaser, and corroborated by family members, is that <u>at no time in his life was there any evidence of any genuine intent or specific action to harm people, animals or even insects</u>.

Notwithstanding the serious offences of which he was found guilty, from all the sources upon which I drew in my evaluation <u>Mr. Jaser is an individual who had no intention that I could gather to induce or to create harm for any living entity, whether it is animals, insects or humans</u>.

With regards to his faith and the presumption of a pious, radicalized Islamic or Muslim terrorist, <u>there is no evidence in the record historically, either in the family, the family history and its development, or in Mr. Jaser's life to support the notion that he was sincerely adopted any radicalized interpretations of Islam, let alone any significant commitment to Islam in any form</u>.

. . .

I can say with reasonable psychiatric certainty that it is my opinion that Mr. <u>Jaser's primary motivation and state of mind and intention in all of the activities related to the offences for which he has been found guilty were founded on his desire for money in order to fund his addiction</u>.

... all of the information presented to me, represents a picture and a pattern to be consistent with someone who in fact has a serious, significant and debilitating drug addiction diagnosis and does not represent the typical pattern and motivation of someone representing and being involved with radical Islam.

. . .

In his profile, <u>there is no evidence to suggest any commitment to any religion, let alone Islam</u>. He would be equally able to front himself as a Christian, a Muslim, or a Jew, anybody in order to get what he needed in terms of funding his drug habit. His development of a Muslim profile and a Muslim identity did not appear until late in his life <u>nor was there any evidence to suggest that it was genuine</u>. The people that were closest to him never believed it was genuine. Even the undercover agent did not trust Mr. Jaser.

When he started to get more involved in the mosque, and as he was exposed to the organized Muslim community for the first time in 2009, he was stunned by the amount of money that could be collected in such a short period of time during Ramadan. From that time forward up until the termination of his relationship with undercover agent, Tamer Al Noury, and Chiheb, <u>he pretended to be a pious Muslim, growing his beard and wearing traditional Muslim clothing in an attempt to secure relationships with people who were wealthy, and it was clear, based on reviewing all of the evidence presented to me, that once he realized that he was unable to receive any significant funding from the undercover agent, Tamer El Noury or Chiheb, he cut off relationships with them</u>.

. . .

A reasonable and consistent conclusion based upon all of the evidence presented to me, based on my experience interviewing terrorism suspects and convicted terrorists, is that the profile and behaviour of Mr. Jaser is of someone with a severe drug addiction problem rather than of someone with a committed interest in committing terrorist acts based on a religious belief, specifically Islamic beliefs.

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

... he was and continues to be apprehensive to hurt anybody or anything, to kill anything.

. . .

Mr. Jaser did exhibit a wide range of emotions and behaviours consistent with an emerging and underlying remorse and at no point in my review of his history and my interviews with his family, could I find any significant basis for the allegation of Mr. Jaser being a Muslim or Islamic extremist or terrorist. Mr. Jaser was actually quite antagonistic toward religion, all organized religion, and he saw religion and religious identity only as a way to scam and con people to give him money.

[Emphasis added.]

43      In order to give the above opinions about Jaser's intentions, beliefs, and motivations at the time of the offences, Dr. Ghannam had to do some analysis of the evidence in the case, in particular, the wiretaps. Dr. Ghannam's analysis of the wiretaps is interwoven with his interviews of Jaser in which Jaser provided his own interpretation of the trial evidence. Jaser, of course, did not testify at trial or at the sentencing hearing and so the interpretation of the evidence that he provided to Dr. Ghannam was not heard by the jury or by me and it was never tested by cross-examination. The part of Dr. Ghannam's report where he analyzed the evidence at trial, and added in Jaser's own analysis, is as follows:

He [Jaser] begins to develop an elaborate long-term scam of the Muslim community in the Toronto area. He develops ideas for more elaborate stories, more elaborate organizations for raising money from wealthy Muslims so that he can pocket it. It is also during this time, later in 2012, that he is introduced to Tamer Al Noury, the FBI undercover agent. Mr. Jaser is very clear in describing that four out of the five times that he met with Tamer Al Noury, that he was high on hashish and marijuana. The hashish he used was black tar, which creates a significant high and at times make it more difficult to cognitively process information. The fifth time he was with Tamer, he was exceedingly high and very agitated. (He got so agitated with Esseghaier that he asked to be taken away).

Although Mr. Jaser was keen on keeping the connection with any individual in the Muslim community where he had the idea that he might be able to take money from them, in the period before Chiheb's first trip to Iran, Mr. Jaser paid very little attention to him. He would mostly ignore his phone calls. He felt sorry for Chiheb. Around February 2011, Chiheb takes his first trip to Iran and he comes back and wants to speak with Raed and tells him stories about a man with a taxi service in Iran who is giving away lots of money. Once Jaser hears the story of someone giving away lots of money, his interest in Chiheb is increased significantly and he begins to develop a scheme, a scam and a con for using Chiheb to get this money.

What is notable in reviewing the undercover wire-taps and transcripts of interactions between Chiheb and Mr. Jaser, as well as the undercover agent, Tamer Al Noury, it is clear that Chiheb does not trust Raed with money. In fact, there are numerous references to Chiheb warning the undercover agent about Raed's intentions and distrust of Raed around money. Mr. Jaser himself does not trust Chiheb because Chiheb at that time was asking Mr. Jaser for money. This was very distressing to Mr. Jaser as his intent was to obtain money from Chiheb.

. . .

It is after the second trip to Iran that Chiheb comes back and starts to talk about the train plot. According to Mr. Jaser, his primary motivation for appearing to cooperate with Chiheb on the plot was to create the conditions for getting money from Chiheb as well as from Tamer Al Noury, who represented himself as being a wealthy Egyptian businessman. Mr. Jaser was always calculating on how to best extract money from Tamer and if it entailed befriending Chiheb and indulging him, he would do it.

In the summer of 2012, because of his inability to obtain any significant money from either Chiheb or Tamer, the undercover agent, it is clear that Mr. Jaser is becoming increasingly frustrated by Chiheb and Mr. El Noury. Although he engages in activities and drives Chiheb and Tamer around, including to the train tracks, Mr. Jaser is becoming increasingly agitated and frustrated with them, because it is not producing any results - no money is coming his way.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

> The primary reason for the agitation is his inability to secure any significant amount of money or to convince Mr. Tamer El Noury of his numerous business opportunities. The wire taps and notes are replete with Mr. Jaser wanting to isolate Chiheb from the relationship with Tamer Al Noury and that Mr. Jaser's primary intent was to secure business opportunities and money from Mr. Tamer El Noury and to create these grand schemes for funneling money into projects that would ultimately financially benefit Mr. Jaser.

44      Crown counsel, Mr. Michaelson, conducted a lengthy and effective cross-examination of Dr. Ghannam. In his closing argument on sentencing, Mr. Michaelson submitted that much of Dr. Ghannam's evidence was inadmissible and that, in any event, it was entitled to little or no weight due to a number of serious deficiencies in his testimony.

45      I agree with Mr. Michaelson. Much of Dr. Ghannam's opinion evidence was inadmissible because it controverted the jury's verdict and because it offered opinions concerning Jaser's beliefs, intentions, and motives at the time of the offences, based on Dr. Ghannam's and Jaser's analysis of the trial evidence. These are not topics on which the trier of fact, either at trial or on sentencing, needs the assistance of an expert. See: *R. v. Mohan* (1994), 89 C.C.C. (3d) 402 (S.C.C.) at paras. 21-31; *R. v. Abbey* (1982), 68 C.C.C. (2d) 394 (S.C.C.), at 409-412. In both *Mohan* and *Abbey*, in unanimous judgments of the full Court, the formulation of the necessity requirement for expert opinion evidence set out in *R. v. Turner* (1974), [1975] Q.B. 834 (Eng. C.A.), at 841 was adopted. In that case, Lawton L.J. stated:

> An expert's opinion is admissible to furnish the court with scientific information which is likely to be outside the experience and knowledge of a judge or jury. If on the proven facts a judge or jury can form their own conclusions without help, then the opinion of an expert is unnecessary. In such a case if it is given dressed up in scientific jargon it may make judgment more difficult. The fact that an expert witness has impressive scientific qualifications does not by that fact alone make his opinion on matters of human nature and behaviour within the limits of normality any more helpful than that of the jurors themselves; but there is a danger that they may think it does.

> [Emphasis added.]

46      In my view, Dr. Ghannam's proferred opinion evidence repeatedly violated the necessity requirement, as set out in *Abbey*, *Mohan*, and *Turner*, because Jaser's motives, intentions, and beliefs are "matters of human nature and behaviour within the limits of normality" on which a "judge or jury can form their own conclusions". Judges and juries routinely draw inferences about these matters at criminal trials, as they did in this case, based on the evidence called at trial and without the assistance of experts. Furthermore, Dr. Ghannam's opinions controverted the jury's verdicts. Jaser's main defence at trial was that he lacked the intent to carry out the two conspiracies and that he lacked any sincere commitment to the terrorist goals of Esseghaier's violent Jihadist plots. The basis for this defence was that Jaser feigned agreement and intent in order to further his real objective which was to obtain money from Agent El Noury and from Esseghaier. As Mr. Norris put it at the end of his jury address: "Jaser is a con man and not a terrorist". The jury rejected this defence by convicting Jaser on three counts.

47      In the Charge to the Jury (at pp. 60, 71-2, 83-6, 98-9, 101-103, 109, 120, and 127-130) the jury was repeatedly instructed on these central issues of motive and intent, as follows: "Jaser's position is that there never was a true agreement or a true intention because his conduct was feigned"; the offence of conspiracy requires "a genuine intention that the parties to the agreement will put it into effect"; "Jaser's defence is to the effect that his statements were insincere"; "terrorist activity" is an element in all five counts and it requires proof of a "political, religious or ideological purpose"; Count Two requires proof of "an intention to kill" or "an intention to cause bodily harm that an accused knew was likely to kill", that is, "a genuine intention to carry out an agreement to murder"; counts Three and Four require proof of an "ulterior purpose", namely, "to improve or to enhance the ability of a terrorist group to facilitate or carry out a terrorist activity"; and "Jaser's position" in relation to this element was that "he was feigning his agreement with Mr. Esseghaier (and Tamer El Noury) for his own purposes, and as a result, was not acting with the specific intent to enhance Mr. Esseghaier's ability to carry out, terrorist activity".

48      Finally, Jaser's counsel's position was put to the jury in the penultimate section of the Charge — "The Positions of the Crown and the Defence" — in the following terms which explicitly referred to his defence that he was a fraudsman and not a terrorist (at pp. 291-3):

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

Mr. Jaser's position is that at no time was there the necessary meeting of the minds between himself and Chiheb Esseghaier to commit the offences set out in Counts One and Two in the indictment — the conspiracy counts. Further, at no time did he have the necessary intent or purpose to commit the offences set out in Counts Three and Four — the participation counts. <u>However things might have appeared, Mr. Jaser's engagement with Mr. Esseghaier in relation to terrorist activities was entirely feigned. It was a legend Mr. Jaser adopted because he thought he could use it to obtain money from Mr. Esseghaier and Tamer El Noury.</u>

<u>There is little if any dispute about what Mr. Jaser said or did. What is very much in dispute is why he said and did the things he did. It is Mr. Jaser's position that, on the whole of the evidence, the Crown has failed to demonstrate that he said what he said and did what he did with the necessary states of mind to amount to the criminal offences alleged.</u>

Mr. Esseghaier had sincere terrorist aspirations. He was actively involved in planning terrorist attacks and recruiting people to join him. Mr. Esseghaier was willing to give money to Mr. Jaser provided that he believed it was going towards Mr. Esseghaier's own intended attacks. More generally, the evidence demonstrates Mr. Esseghaier's willingness to contribute his own money towards what he believed to be the cause of the Mujahideen.

Similarly, Tamer El Noury presented himself as a very wealthy and successful business man who was interested in and willing to fund extremist Jihadist projects. Tamer El Noury said repeatedly he was prepared to give any amount of money required to assist with Mr. Esseghaier's terrorist plans. There appeared to be no limit to the amount of money Tamer El Noury was willing to contribute in relation to Mr. Esseghaier's terrorist plans or other similarly-motivated ideas.

<u>Mr. Jaser's position is that he said the things he said and did the things he did because he was playing to his audience. He said the things that Mr. Esseghaier and Tamer El Noury would want to hear if they were going to give him the money he was trying to obtain from them. Mr. Jaser explicitly sought money from Mr. Esseghaier and Tamer El Noury on several occasions.</u>

. . .

<u>The evidence of his financial motive should leave a reasonable doubt that Mr. Jaser's true intent was to engage in acts of terrorism as opposed to pursuing an ulterior motive.</u> This is true of the things he said that might appear to indicate agreement with the terrorist plots, the things he did that might appear to indicate engagement with those plots, his extremist talk, and his alleged operational security. All of this was nothing more than playing the role he had taken on; it was his legend.

[Emphasis added.]

49     The Crown's rebuttal of Jaser's defence, to the effect that he was a "con man" and not a sincere terrorist, was also put to the jury in this penultimate section of the Charge to the Jury (at pp. 285-288):

The position of the Crown is that there's simply no evidentiary foundation to support the defence argument that Mr Jaser was trying to defraud either Mr. Esseghaier or Agent El Noury. Mr. Jaser was involved in the conspiracies with Mr. Esseghaier by August 26, 2012, well before Agent El Noury had even arranged to meet with Mr. Esseghaier or had heard of the train plot. Mr. Esseghaier was hardly a viable target for fraud in the summer of 2012. He was a Ph.D. student. He had few belongings, and no car.

There is no evidence that Esseghaier gave a cent to any of the brothers on either of his visits to Iran. There is no evidence that the small sums of $200 and $300 that were withdrawn on August 26 and September 16, 2012 from Esseghaier's bank account were given to Jaser. There is simply no evidence that Esseghaier was defrauded by anyone. And there is no evidence that Jaser had any knowledge of Esseghaier's financial affairs. Any suggestion to the contrary is pure speculation.

<u>It defies common sense to suggest that Jaser associated with Esseghaier, and involved himself in a serious crime, because he hoped to get money from Esseghaier. And it is also contradicted by the evidence — when Esseghaier offered</u>

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

to pay for Jaser's car repairs, Jaser declined the offer.

There is also no evidentiary foundation for the suggestion that Mr. Jaser feigned agreement with Esseghaier because he hoped to defraud Agent El Noury. Again, the conspiracies were in existence well before Agent El Noury was even on the scene. Mr. Jaser's request for money to help a Muslim sister is wholly consistent with his religious views. His request for assistance to buy equipment, and his proposal that Agent El Noury become involved in a business that would finance future terrorist operations, are wholly consistent with the evidence that Jaser is a devout Muslim, of modest means, who was bent on Jihad.

Mr. Jaser's involvement in the conspiracies was not motivated by a desire to obtain money. It was about obtaining one of the two great rewards: either the victory of Islam over the disbelievers; or death and paradise.

It is notable that, after the conspiracies between Esseghaier and Jaser ran aground, Agent El Noury asked Mr. Jaser to send him the business proposal, but Mr. Jaser never did so. Agent El Noury also told Mr. Jaser that if he wanted money to just say so, but Mr. Jaser took offence at that suggestion. If Mr. Jaser had been trying to defraud Agent El Noury, he would have taken advantage of these opportunities to try to get money. But instead, Mr. Jaser returned the $1000 Agent El Noury had given him. It is implausible to suggest that he would have done so, if he had been trying to defraud Agent El Noury.

Mr. Jaser ended his involvement with Mr. Esseghaier and Tamer El Noury for one reason and one alone. He was afraid of getting caught as a result of the police stop on September 24, 2012 and because of the rash behaviour of Mr. Esseghaier.

It is a reasonable inference that persons intend the logical consequences of their actions and say what they mean. The suggestion that Mr. Jaser was feigning or pretending agreement is completely incompatible with the compelling evidence of his own actions and statements, which repeatedly reflect his deep commitment to radical and extremist beliefs and his deep desire to commit Jihad. Neither logic, nor the evidence, (and that is what you must decide this case on), support the assertion that he was only pretending.

[Emphasis added.]

50      It can be seen from the above passages in the Charge to the Jury that Jaser's defences of lack of motive and intent or feigned agreement, on the basis that his real intention was to obtain money from Esseghaier and Agent El Noury, was squarely put to the jury. Jaser chose not to testify at trial but his present position, concerning his motive and his intent, was nevertheless before the trier of fact. The jury's guilty verdicts on Counts Two, Three, and Four necessarily mean that the defence was rejected. It was not open to Jaser to continue to press his rejected view of the trial evidence through the vehicle of an expert report on sentencing. As noted previously (at para. 12 above), s. 724(2) of the *Criminal Code* and the case law prohibit findings of fact at the time of sentencing that are "consistent only with a verdict rejected by the jury".

51      Mr. Norris submitted that hearsay is admissible at a sentencing hearing, pursuant to s. 723(5), and that an accused's hearsay accounts relating to sentencing issues are routinely included in Pre-Sentence Reports. This is true but the hearsay must be "credible and trustworthy", at least to some degree, before it can be given any weight. Furthermore, unsworn hearsay from an accused in a Pre-Sentence Report that controverts a prior verdict is inadmissible. See: *R. v. Gardiner* (1982), 68 C.C.C. (2d) 477 (S.C.C.), at 514; *R. v. Albright* (1987), 37 C.C.C. (3d) 105 (S.C.C.), at 111; *R. v. Rudyk* (1975), 1 C.R. (3d) S-26 (N.S. C.A.); *R. v. Brown* (1985), 19 C.C.C. (3d) 43 (Man. C.A.); *R. v. Braun* (1995), 95 C.C.C. (3d) 443 (Man. C.A.); *R. v. Gauthier*, *supra* at paras. 26-31. Indeed, the latter two cases (*Braun* and *Gauthier*) are to the effect that Jaser would not have been allowed to give sworn testimony at the sentencing hearing in a manner that controverted the jury's verdict. He surely cannot be allowed to give unsworn hearsay that controverts the jury's verdicts.

52      Aside from the above two fundamental flaws in Dr. Ghannam's testimony — violation of the necessity requirement for expert opinion evidence and controverting the jury's verdicts — there were a number of other serious concerns that emerged from the cross-examination of Dr. Ghannam. In brief summary, I note the following four points:

• First, Dr. Ghannam's opinion that Jaser was profoundly addicted to drugs and/or alcohol at the time of the present

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

offences was contradicted by a convincing body of contrary evidence filed by the Crown at the sentencing hearing. Furthermore, Jaser's statements to Dr. Ghannam that "he was high" and that "he was exceedingly high" at the time of his various meetings with Agent El Noury, are controverted by listening to the wiretaps which contain no suggestion of impairment due to drugs or alcohol;

• Second, Dr. Ghannam's opinion that Jaser was not sincerely committed to an extremist Jihadist interpretation of Islam is also controverted by listening to the wiretaps. They are replete with lengthy passionate speeches on this subject. In my view, these speeches could not reasonably be interpreted as insincere. For example, in one of their early meetings, on September 10, 2012, Jaser discussed his religious views at length. He told Esseghaier and Agent El Noury that:

Islam is not a religion of choice. The Islam forces itself to the world. Forces itself. Islam is here to conquer, not as an option... How many people on this earth right now want the law of Allah? Minority, very small minority. But you see, on this minority the caliphate will be established. In the caliphate, is a gift for the whole world but it will have to be carried on the shoulders of true believers.

Similarly, on the trip to conduct reconnaissance at the Highland Creek bridge on September 24, 2012, Jaser told Agent El Noury (in Esseghaier's absence) about his prayers on the previous night:

I prayed before I went to sleep, asked God to just guide us and whatever, and if this is something good, that is good for me and, remember what I said? I said, God if this is, if this thing with these brothers is good for me in this life and the next, then let it happen... What I mean by good in this place, I don't limit it to success. Even failure is good. What is wrong with failure?... Failure gives you one of the two rewards... We are waiting for the two good rewards... For God to give us one of the two great rewards. Either victory of Islam over the disbeliever okay? Ask God to make us, make us victorious. The other victory is... you die. Okay and you go to paradise now. So, how can you lose?... they can never win against Islam. They are stupid, they're fighting God.

Later, in this same conversation, Jaser explained to Agent El Noury why he had previously argued with Esseghaier about whether they should go and fight in Syria:

The reason why I opened the subject up with brother Chiheb is because this is something that is bothering me. You know? I don't see how can I, I just don't. I can't wait. I wanna be there... I wanna go and just, how can you do this? You know, they're being raped... Like, it's bad, you know... Like, baby in a bed, and they would come and stab him... Take out his eyes... Can you think why?... let's assume this guy disbeliever, let's make an assumption, right? And now we're in a battlefield, right, I wanna kill him... Dispatch him... I'm just doing my job. But why would you do all those things? This is the thing, like okay, they say Islam is so evil. They don't see themselves how they are dealing with the Muslims. They say you guys are doing this and that. Yeah okay... So, if we come and you know, we do something and a few quote un-quote innocent bystanders die. What's the problem? What is the problem? I don't understand you, you have indiscrimination when it comes to carpet bombing, okay? You rape, you molest. You rape babies, okay? How can you rape a baby?... And then you come here and talk to me about human rights... brother, brother, fear Allah, our fight is not about results. We're here only for a short time and we will die. I'm gonna die and you're gonna die. Whether, where and how is unknown. The fact is we will die.

In my view, no reasonably objective expert could listen to the tone and content of these intercepts, and many others, and conclude that Jaser's religious and political beliefs were insincere;

• Third, Dr. Ghannam's analysis of the wiretap evidence adduced at trial was biased and selective and did not live up to the standards of objectivity expected of expert witnesses. He appeared to simply adopt his client Jaser's analysis, rather than doing an independent, objective, and principled analysis of his own;

• Fourth, Mr. Michaelson brought out a series of troubling inconsistencies between the contents of Dr. Ghannam's notes

R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

of his interviews and the contents of his report. One could perhaps overlook a few of these inconsistencies, as simply reflecting cryptic note-taking, but the number and gravity of the inconsistencies and their repeated bias towards supporting Jaser's story suggested lack of objectivity. Most importantly, Dr. Ghannam's explanations for the inconsistencies were not credible and he eventually resorted to evasion and argument with the Crown, until I had to stop him.

53    For all of the above reasons, I cannot accept Dr. Ghannam's testimony or his report. It is completely inadmissible in certain respects and it lacks credibility and reliability in other respects. It is entitled to little or no weight.

54    I should add that after Dr. Ghannam's evidence had been so thoroughly damaged by Mr. Michaelson's cross-examination, Mr. Norris made the wise decision to call Jaser's younger brother, Nabil Jaser. He was a credible witness and he gave a reliable account of the family's history. The family is Palestinian and Jaser was born in 1977 in the United Arab Emirates where his father had a business. Jaser is now thirty-eight years old. The family moved to Jordan, where Nabil was born in 1981. The family members were refugees and they moved to Europe for a period of time. They eventually settled in Toronto in 1993. Both brothers attended high school in Toronto. There are two other brothers in the family and they are both disabled.

55    Nabil Jaser finished high school, completed a course in policing at Seneca College, and he now works for a major security firm in Toronto. He married in 2008 and moved out of the family home. He now owns his own home and has children. He impressed me as a responsible and reliable individual.

56    Jaser moved out of the family home around 2003, according to Nabil, and began living with a girlfriend. He moved back into the family home around 2006 and broke up with his girlfriend. Jaser then met his current wife, Marwa, around 2008. They got married soon after they met and they moved into their own rented premises sometime in 2008. Jaser worked for a school bus and taxi company and also for a moving company.

57    In terms of Jaser's behaviour and his alleged drug addiction and lack of sincere religious beliefs, Nabil Jaser testified as follows:

• when Jaser was in high school in Toronto, he was rebellious and badly behaved and Nabil once saw him smoking a marijuana joint with friends;

• Nabil did not believe that Jaser ever finished high school. Jaser went on to become involved in criminal frauds (Jaser's criminal record confirms that in late 1997, when he would have been twenty years old, he was convicted of a number of fraud and breach of recognizance offences and received an eighteen month conditional sentence and then in 2001, when he would have been twenty-three or twenty-four, he was convicted of uttering threats and received a fine and probation);

• Nabil described Jaser as spending money frivolously, arguing with his parents, going out to clubs and coming home drunk, and always being in need of money during this early period in his life;

• Nabil assumed that Jaser and his girlfriend smoked marijuana but he never saw it, although he saw them consume alcohol;

• after Jaser broke up with his girlfriend, around 2006 when he would have been about twenty-eight or twenty-nine, he became depressed. Nabil saw him smoking marijuana during this period;

• after Jaser met his wife, Marwa, around 2008 when he would have been about thirty-one, they continued to live a rebellious and promiscuous life style involving drinking, going out to clubs, and arguing with Jaser's parents;

• the family were always practicing Muslims, although they were not strict fundamentalists;

• Jaser and Marwa were not initially religious but, at some point around 2009 or 2010, this changed and they became increasingly religious;

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

• around the same time that this change occurred, Nabil learned that Marwa had an abortion;

• Nabil described Jaser as absorbing the Muslim religion quickly, praying five times a day, going to the mosque, always reading the Qu'ran and religious texts, growing a beard, wearing traditional Muslim clothes, and lecturing the family about the need to be strict in religious matters;

• Nabil testified that all Jaser talked about was religion during this phase. He thought that it lasted for about a year and it seemed to be genuine but then it seemed to fade somewhat;

• Jaser's father was concerned about Jaser's increasing religiosity and spoke to a community elder about it;

• although the family was religious, they were opposed to Jihad (in the sense of religiously motivated violence);

• Nabil never heard Jaser advocating violent Jihad and was shocked when he learned of Jaser's arrest;

• Nabil and the family remain supportive of Jaser, in spite of hearing what is on the wiretaps and being angry and disappointed;

• during Jaser's religious phase, Nabil never saw him using drugs or alcohol. During this period, Jaser appeared to have money earned from his work at the taxi company and he was not spending extravagantly, as he had been when he was younger and was committing frauds.

58      In addition to calling Nabil Jaser as a witness at the sentencing hearing, the defence filed a number of wiretap intercepts from late 2012 and early 2013 in which Jaser referred to the fact that "he used to smoke a lot of hash" and that "he did it long time ago". On these wiretaps, Jaser is disparaging of a person named Taher who is "smoking too much weed" and Jaser "questions how he (Taher) pays for it".

59      I am satisfied of the following facts, based on Nabil Jaser's testimony, the wiretaps tendered in evidence by the Crown at trial, the additional evidence filed on sentencing by the Crown, and the further wiretaps filed by the defence at the time of sentencing:

• Jaser was irresponsible and rebellious when he was young, he smoked hashish or marijuana and drank alcohol, he was not religious, and he engaged in criminal frauds;

• at some point around 2009 or 2010, when Jaser would have been thirty-two or thirty-three years old, he changed and became deeply religious. This change may or may not have been due to his wife's abortion, which was a roughly contemporaneous event. In my view, the exact cause of this significant change in Jaser's life is not important;

• at this point, after the change in Jaser's life, his behaviour was no longer characterized by taking drugs, drinking alcohol, going out to clubs, and committing frauds. He was lawfully employed at a taxi company and he was not living an extravagant life style;

• the theory that Jaser was trying to defraud his accomplices and was not genuinely committed to the Count Two conspiracy and to the Count Three and Four terrorist activities was rejected by the jury; and

• Jaser's enthusiasm for religion appeared to decline somewhat at some point, which may have coincided with the point in time when he abandoned the present terrorist offences on September 24, 2012.

60      The fact that Jaser tried, and succeeded, in convincing Dr. Ghannam that he was an insincere drug addict and fraudsman at the time of the offences, does not reflect well on his current prospects for rehabilitation. He has not accepted the jury's verdicts, he has not provided a truthful account of the offences, and most importantly, he has not renounced the violent Jihadist ideology that he exhibited at the time of the offences. He continues to insist, falsely, that he never genuinely held any violent Jihadist beliefs. I assume that Jaser wants to preserve his right to appeal his convictions, and so the position he has

**WestlawNext** CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

taken at the sentencing hearing cannot be used against him to the extent that it is necessary to the conduct of an effective appeal. However, as will be explained below, his failure to renounce the violent Jihadist beliefs that are pervasive on the wiretaps has consequences in the sentencing of terrorist cases.

61      In these circumstances, the defence has failed to prove certain mitigating facts such as remorse and renunciation on a balance of probabilities. However, the Crown has also failed to prove the aggravating fact of an ongoing present commitment to violent Jihadist ideology on a standard of proof beyond reasonable doubt. I am left in the position described in *R. v. Holt*, *supra* and *R. v. Smickle*, *supra* of not knowing where the truth lies in relation to Jaser's present beliefs and present rehabilitative prospects. The legal effect of this factual outcome on sentencing, in terrorist cases, will be discussed later in these reasons.

62      The potentially mitigating facts that the defence did succeed in proving are that Jaser enjoys the ongoing support of his family, and they appear to be a responsible pro-social family, and that Jaser did abandon the terrorist scheme on September 24, 2012. In addition, there is no evidence of any ongoing terrorist activity by Jaser in the subsequent seven months leading up to his arrest on April 22, 2013. Jaser may well have been motivated by a desire for self-preservation, when he abandoned Esseghaier and Agent El Noury on September 24, 2012, given that it was now known to the police that the three of them had been on the railway tracks at Highland Creek bridge and given that Jaser was becoming increasingly concerned about Esseghaier's lack of operational security. These appear to have been the two main concerns that motivated Jaser's decision to leave the conspiracy. A pragmatic desire for self-preservation may mean that Jaser is more amenable to deterrence and rehabilitation than a rigid ideologue. However, Jaser's current prospects must be evaluated in the context of all the evidence. I will return to this issue later in these reasons.

*(ii) The evidence relating to Esseghaier*

63      The evidence relating to Esseghaier's past antecedents and current prospects comes from a number of sources. He cooperated with the preparation of a Pre-Sentence Report and with Dr. Ramshaw's psychiatric assessment. These two documents provided a great deal of information relevant to sentencing, including interviews with Esseghaier's parents in Tunisia. Esseghaier did not cooperate with the further assessment by Dr. Klassen but it, nevertheless, addressed the issues of mental illness and fitness that were raised by Dr. Ramshaw. Finally, the RCMP interviewed a number of Esseghaier's colleagues and associates about his behaviour during the time period leading up to the present offences, when Esseghaier was a PhD. student in Quebec.

64      Before summarizing the above information relevant to sentencing, I want to address the issue of whether Esseghaier is presently fit to participate, or to choose not to participate, at his sentencing hearing. No one had ever raised the issue of fitness or been concerned about it until Dr. Ramshaw concluded in her July 3, 2015 report that Esseghaier was "more likely than not unfit" at that time. Dr. Ramshaw testified on July 14 and 15, 2015. After her testimony had concluded, the Crown sought a further psychiatric assessment of Esseghaier during its submissions on July 16 and 17, 2015. I released written reasons in relation to the request for a further psychiatric assessment pending sentencing on July 22, 2015. I concluded that Dr. Ramshaw's opinions concerning fitness "contain a number of serious flaws", that "the record that presently exists is unsatisfactory", that "I can presently attach little or no weight" to Dr. Ramshaw's opinions concerning fitness, and that "this is a proper case to allow the Crown to seek a further assessment by a different psychiatrist". See: *R. v. Jaser*, 2015 ONSC 4729 (Ont. S.C.J.).

65      Dr. Klassen prepared a report dated August 27, 2015 and he testified on September 2, 2015. His conclusion was that Esseghaier was mentally ill but that he was fit. The legal test that Dr. Klassen applied to the fitness issue was explained in his report as follows:

> I do think that the presence of an active psychotic illness informs this gentleman's response to his court proceedings, and likely constrains his options somewhat. This gentleman's significant rigidity is likely at least in part the product of mental disorder, as opposed to personality features alone.
>
> That being said, available information suggests that this gentleman has clearly been aware of the nature and object of the proceedings that he's been a part of; he's aware that he's being tried pursuant to the *Criminal Code*, and seems to have

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

an awareness of the elements of the court process. He's certainly aware that the court process could lead to his imprisonment.

It's been suggested that this gentleman may be unfit to stand trial because he's unable to communicate with counsel or participate meaningfully in the court proceedings. That being said, it's my understanding that simply declining to accept the assistance of counsel is not, in and of itself, *prima facie* evidence of unfitness; accused persons are permitted to represent themselves. Further, while I note that *Amicus* has suggested that a mental health assessment might be of value, it's also indicated that *Amicus* has not had concerns about fitness, and from the transcripts it appears that this gentleman has demonstrated engagement in the court process when he's felt it necessary, albeit engagement seemingly predicated on his delusional beliefs.

While this gentleman's participation has been shaped by his mental disorder, the test to be applied, as I understand it, in determining an accused's ability to communicate with counsel is one of limited cognitive capacity. The issue of interest is whether the accused could relate the facts to counsel in such a fashion that counsel could present a defence. My understanding is that it is *not* necessary that an accused be able to act [in] his or her own best interests; it's my understanding that the court is not to adopt the higher threshold "analytic capacity" test for determining fitness. Specifically, it's my understanding that a test requiring that an accused be capable of making rational decisions, beneficial to the accused, is not consistent with the finding in *Taylor*. Rather, it's my understanding that the accused is entitled to choose his or her own defence, and to present it as he or she chooses, assuming the risks involved.

It's certainly been my experience that actively mentally disordered individuals make decisions that, to others, may seem unwise, or self-defeating, but it's my understanding that provided that the three elements regarding fitness articulated above are met, they may be found fit to stand trial.

It's further my understanding that it's not relevant, in a determination of fitness, to consider whether the accused, and counsel, have an amicable or trusting relationship, or whether the accused is fully cooperative with counsel, rather the test is whether, in somewhat of a mechanical way, the accused is aware of the proceedings and can communicate the facts as he/she understands them.

Accordingly, given this gentleman's understanding of the nature and object of the proceedings, and his understanding of the possible consequences of those proceedings, and further given this gentleman's engagement with Your Honour, it's my opinion that this gentleman is likely fit to stand trial/be sentenced, in accordance with the principles articulated in *R. v. Taylor* and affirmed in *Whittle*.

[Italics of Dr. Klassen in the original, underlining added for emphasis.]

66    I do not intend to repeat my critique of Dr. Ramshaw's approach to fitness nor do I intend to repeat my understanding of the legal test for fitness. I simply adopt what I said in my reasons dated July 22, 2015.

67    In my view, Dr. Ramshaw applied an erroneous legal test to the facts relating to Esseghaier's fitness. Dr. Klassen applied the correct legal test, as set out above, and arrived at the correct legal conclusion. The evidence that emerges from both psychiatric reports, and from my interactions with and my observations of Esseghaier in the court room, is that Esseghaier has the requisite "limited cognitive capacity to understand the process and to communicate with counsel", as explained in *R. v. Taylor* (1992), 77 C.C.C. (3d) 551 (Ont. C.A.) and *R. v. Whittle* (1994), 92 C.C.C. (3d) 11 (S.C.C.), at 25-6. He has provided a coherent and consistent account of his involvement in the offences and of his present attitudes and beliefs concerning the offences, both to Dr. Ramshaw and to the probation officer who prepared the Pre-Sentence Report. He understands that he has been convicted of serious criminal offences under the *Criminal Code* and that he is presently facing the prospect of lengthy imprisonment at a sentencing hearing. Finally, he has made a consistent and coherent decision throughout the trial and sentencing proceedings as to how he will and how he will not participate, based on his strongly held religious beliefs. He has a s. 7 *Charter* right to autonomy in the conduct of his defence which protects these decisions, even if they are contrary to his best legal interests.

68    For all these reasons, Esseghaier is presently fit. I did not understand *amicus* to be pressing the fitness issue, in light of Dr. Klassen's report and my July 22, 2015 reasons. *Amicus'* main focus was on the more difficult issue of whether Esseghaier

**WestlawNext**®CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

is mentally ill and, if so, what impact mental illness has on his sentencing. I will address that issue in due course.

69    The picture of Esseghaier's antecedents that emerges from the materials filed on sentencing can be summarized as follows:

• he was born on September 19, 1982 in Tunisia. He was about thirty years old at the time of the present offences in 2012. He has three younger siblings and parents who still live in Tunisia;

• he described his relationship with his parents as "good and very close when I was a child". His upbringing by his parents was "normal". They were a "moderate" Muslim family;

• his mother stated that he "excelled in school", although he had few friends. Esseghaier agreed that he was "the first in terms of good marks". There were no behavioural or mental health problems during his upbringing in Tunisia;

• he obtained two university degrees in Tunisia, an engineering diploma in industrial biology and a Masters degree in industrial biotechnology;

• he came to Canada in 2008, at about age twenty-six, and began a PhD. program at Sherbrooke University in Quebec. He had difficulties with his supervisor at Sherbrooke and transferred to a university in Montreal (the I.N.R.S.). He completed his PhD. course work and began his thesis. He has published three or four academic articles in the field of biosensors that are available on the internet;

• in the summer of 2009, while still at Sherbrooke, he went through what he called "a radical change" and became very religious. He had always been Muslim but he now embraced the religion in a different way. He grew a beard, attended the mosque more frequently, and studied and prayed continuously;

• in 2010, he described his religious beliefs as taking on a more political dimension as a result of the war in Afghanistan. He twice traveled to Iran, in 2011 and 2012, and met with Mujahedeen at a location close to the border with Afghanistan. He stated that by 2012, "he felt strongly about Jihad and realized he was at war in order to create one Islamic state";

• Esseghaier's colleagues and associates in Quebec noticed these changes that occurred while he was a PhD. student. They described him as always having been naïve, stubborn, spontaneous, and isolated. When he changed, initially at Sherbrooke and later in Montreal, he grew a beard, he became more withdrawn, and he spent all his time praying and researching Islam on the internet. He began seeing a Muslim cleric in Montreal and he was seen meeting with certain bearded men who his associates had not seen before. He also began trying to persuade his colleagues or associates that "the only way to help Muslims ... is by Jihad". His personal hygiene deteriorated, he lived in poor circumstances in Montreal ("like a homeless person"), he was aggressive and argumentative, and he would sometimes yell and make strange movements during prayers;

• Esseghaier's thesis supervisor in Montreal confirmed that Esseghaier disappeared twice from his PhD. program, when he traveled to Iran, and he was given an ultimatum about his attendance.

70    The evidence concerning Esseghaier's present beliefs, his attitude towards the offences, and any future rehabilitative prospects, is not encouraging. He told the author of the Pre-Sentence Report, in effect, that his belief system had not changed since his convictions. The report concluded that "he appears determined to follow through on these beliefs regardless of the personal consequences to him ... he attempts to rationalize the consequences of any behaviour through his religious beliefs and viewpoints and is unwilling to accept the harm this could have to any victims or society ... it is difficult not to conclude that Mr. Esseghaier continues to present an ongoing risk of serious harm to the community".

71    Esseghaier's religious and political rationalizations for terrorist activity were made clear in the wiretap intercepts. In a conversation with Agent El Noury on September 10, 2012, while driving back to Montreal, he explained why it was justifiable to kill civilian women and children in Canada. The conversation was summarized as follows in the Charge to the Jury (at p. 178):

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

Esseghaier explained his three point rationale to El Noury for "killing women and children". El Noury testified that Esseghaier became emphatic at this point in the conversation, waving his arms and repeating his arguments to make sure that El Noury understood them. Esseghaier's three point justification for killing civilian women and children was as follows: first, "the necessity of saving religion"; second, that they pay taxes and "they are killing our women and our children in our country"; and third, the "practical justification" that "we lack technology... we lack believers, we lack money... So we are not able to kick out the army by fighting army between army. So, in that case, we are in the obligation to use other ways... This is the only way that we can... They still in Afghanistan, no? So why we don't use other ways to help our brothers... we want to give a push to our brothers, to help them".

72    In June 2015, almost three years after Esseghaier made the above arguments to Agent El Noury, he was interviewed by Dr. Ramshaw. It is apparent that Esseghaier's beliefs have not changed as he told Dr. Ramshaw the following (as summarized and quoted in my July 22, 2015 reasons):

• Esseghaier discussed the offences that had been the subject of the trial. Dr. Ramshaw stated that, "Mr. Esseghaier acknowledged the behaviour leading to his charges. He was open to talking about his plans, his motivation, and all aspects of his life". Dr. Ramshaw questioned Esseghaier directly about the offences which led to his convictions. He replied in terms that closely resemble his numerous recorded statements on the wiretaps tendered in evidence at trial. Dr. Ramshaw stated that Esseghaier told her that, "he was at war and it was his duty to fight to apply the laws of God in earth ... the jihad is the means to apply the word of God ... When asked about the plans to derail a train to kill, he stated, 'the train is not relevant matter because when God he destroy hundreds of states and made them level zero — what is worse, blowing up one train or destroying city?' When asked why they were plotting to kill, he responded, 'What the state is doing is worse than killing'... When asked about the expected impact of what he was planning, he said, 'The media makes report', and he shows the people what they should do. ... He was there to fight for the Islamic state, not to fight the people, but 'if the people are soldiers then you fight the soldiers'. The people of Canada were working for the state in civilian clothes, and therefore were all soldiers — 'people are not aware of what they are doing; they don't apply the rule of God — and should be one state under rule of God' ... He acknowledged that he felt he was on a mission ... 'me I don't think it's terrorism — it is applying the laws of God — we are obliged to apply war and do killing'".

• Dr. Ramshaw described Esseghaier's current views about terrorist activities, stating that "Mr. Esseghaier believed that being a Muslim, he had a mission of jihad where making chaos in the form of terrorist activities will bring the ruling state to its knees and therefore they would be able to start having an Islamic state even if were a small area within the country. This would eventually engulf the whole country and its surroundings. Although he did not identify with any group, he believed that after carrying out his terrorist activity, many Muslims, "soldiers" of Islam as he described them, would eventually join him in creating State of Islam."

73    I am satisfied that Esseghaier continues to hold the same dangerous extremist beliefs that led to the present offences. He is completely remorseless and has not been changed by his arrest or by the court process. He has no rehabilitative prospects because of the rigidity of his political and religious beliefs.

74    This leads to the final factual issue concerning Esseghaier and that is the evidence of mental illness. Both Dr. Ramshaw and Dr. Klassen concluded that at present he is mentally ill. They believe that the illness is likely schizophrenia. They relied heavily on what they described as "delusions" which have appeared in the last six months. In this regard, both psychiatrists noted that Esseghaier was not psychotic at the time of his arrest (when he gave a lengthy statement to the RCMP) and that his utterances on the wiretaps appeared to be driven by extremist beliefs and not by delusions. In addition, he was seen by two well-known forensic psychiatrists, Dr. Ben Aron and Dr. Glancy, on October 27, 2014 and on April 26, 2015, that is, just prior to his trial and just after the conclusion of his trial. They found "no evidence of psychopathology" and "no evident major mental illness".

75    However, by the time Dr. Ramshaw saw Esseghaier on four occasions in June 2015 she concluded that he had become delusional. Dr. Ramshaw agreed that Esseghaier's most significant delusions developed after his convictions by the jury on March 20, 2015 and while he was in jail awaiting sentencing. Dr. Klassen testified that it was Esseghaier's "huge disclosure" to Dr. Ramshaw in June 2015 that provided the first clear evidence of psychotic delusions.

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

76    The particular "delusions" disclosed to Dr. Ramshaw in June 2015 were also disclosed to me in court in June and July 2015. They have been added to, over time, while Esseghaier continued to await sentencing. They all revolve around Esseghaier's belief that he will be released from jail on December 25, 2014 when God will take his soul to heaven, his body will be flown back to Tunisia, his mother will die, and the Prophet Jesus will be sent back to earth by God in order to lead a Muslim army and establish the Caliphate. The date of December 25, 2014 is important to Esseghaier because he would be age thirty-three at that time, according to the lunar calendar, and because of similarities that he sees between himself and the Prophet Jesus and the Prophet Joseph. In particular, he notes that the Prophet Jesus' soul rose to heaven at the age of thirty-three on December 25. Esseghaier does not believe that he is a prophet but he does believe that he shares some similarities with the prophets. Since he is still alive today and his soul has not yet been taken to heaven by God, he believes that it must still be 2014, and that the jail authorities have been manipulating lights in order to compress time and make him think that it is now 2015. These beliefs, which the psychiatrists call delusions, are referred to as "realizations" by Esseghaier. He is adamant that they are based on his reading of the Holy Qu'ran. He explained to me that he first mentioned these "realizations" to the court and to Dr. Ramshaw in June 2015, almost three months after his convictions by the jury, because he had been thinking about it for some time, he did not want to rush, and he wanted to be sure of his analysis.

77    Dr. Ramshaw acknowledged that there is considerable difficulty in disentangling genuine religious beliefs from psychotic delusions. She described this issue in the following terms in her report:

> Mr. Esseghaier had a number of beliefs shared with the average Muslim. From his praying, it seems that he followed the Sunni sect. However, he also has extremist ideologies in keeping with Muslim extremists' beliefs about the obligatory rule of jihad and the idea that Muslims are at war with other non-followers. Despite these beliefs and how religious he appeared, he did not refer to any of the famous Muslim scholars. For him to rely solely on his ability to interpret the Quran and the Sunnah is clearly grandiose, as Muslims rely on scholars (even the very religious and extremist Sunni rely on scholars such as Ibn Taymiyyah and Hasan Al-Banna). Further, many of his beliefs are delusionally based (e.g. that it is not currently Ramadan and there are fake days created by the officers and prisoners, that he knows his age of death, that an Islamic Khilafa is linked directly to his soul rising to heaven, etc.). These beliefs are grandiose, paranoid, and bizarre, and are beliefs that are not shared with other Muslims. Further, even he has emphasized that he knows of no one who follows the laws of the Holy Quran and interprets them like him.

> . . .

> According to Mr. Esseghaier, based upon his interpretations of the Holy Quran, he has developed numerous realizations since his arrest. This had included that he is on a special mission for Allah to fight evil and warn of hellfire, that he is "unique", and that no one else in the world he knows of adheres to the laws of the Holy Quran as he does. He believes he has many commonalities with the Prophet Joseph and the Prophet Jesus. Like the Prophet Jesus, he spoke to the people as an infant, he changed at age 27 by the lunar calendar, and his soul will rise to heaven at the age of 33; and like the Prophet Joseph, he left his homeland, he had troubles with a woman, he went to jail, he spoke with two prisoners, and he will be released — the latter is the intersecting commonality with Jesus.

> . . .

> Most religious beliefs are not associated with any mental disorder. However, it is not rare for those who become psychotic to develop increasing religious beliefs — primarily dictated by their sociocultural background (e.g. someone who is Muslim might become more adherent to the Islamic faith). The distinction between psychotic and non-psychotic religious beliefs are usually clear, such as when someone believes they are God or Jesus or when they hear the voice of God speaking to them as a "chosen" person. However, there are times when it is not evident, and it can be difficult to determine whether it is purely a culturally bound belief or whether it is arising from or developing into psychosis, or whether it is both. Absent Mr. Esseghaier's expressed beliefs since his arrest, one might opine that Mr. Esseghaier had extremist religious beliefs and not a psychotic disorder.

> The development of extreme religious beliefs over time, as occurred with Mr. Esseghaier, could be just that — culturally shared beliefs and not delusions (i.e. fixed false beliefs that are not accepted by others). Mr. Esseghaier's decline in function (social and self care), the reported low mood, his increasingly rigid thinking and idiosyncratic style, and his odd

**WestlawNext** CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

behaviour are, however, indicators of concern. Further, his ideas of reference, grandiose beliefs (uniqueness, the meaning of his birth and knowledge of his death, the associations with Jesus and Joseph, being a visitor in court not a convicted individual), and the conspiracies (film makers posing as prisoners, officers and prisoners creating false shorted days and fake dates), as well as his joyous affect, his implausible rationale for his beliefs, and his poor hygiene, are symptoms of a psychotic illness, and not just extreme religious beliefs.

When asked to clarify the above passage, Dr. Ramshaw testified that, in her view, hearing the voice of God is "psychotic" or a "psychotic belief".

78    Given that Dr. Klassen was not able to see Esseghaier and conduct his own assessment, he relied heavily on Dr. Ramshaw's findings concerning Esseghaier's delusions. He described them in his report in the following terms:

Given Dr. Ramshaw's findings, some of this gentleman's utterances in court, and more generally speaking his approach to the trial process, was likely informed by extant, and/or evolving, symptoms of mental illness, including comments about a Caliphate, the last prophet, a united Muslim state, the final judgment, and the need to advise, or perhaps more specifically save, others.

Again given Dr. Ramshaw's findings, I would submit that at this point this gentleman suffers from a psychotic illness, marked most notably by delusions. This gentleman presents with grandiose and paranoid delusions, and also delusions of reference. I won't recount these in detail here; they've been well articulated in Dr. Ramshaw's report. He presents himself, without saying so directly, as a prophet, if not frankly somewhat messianic (I note that he states that his soul will rise on December 25th). There are further grandiose delusions, I would submit, regarding the events that are to follow his death. There've been expressed referential and paranoid delusions regarding being filmed, regarding daylight, tricked with a fake website, and as regards blankets and a cake; again these are well described in Dr. Ramshaw's report.

[Emphasis added.]

79    It is unnecessary to arrive at any firm conclusions concerning Esseghaier's alleged mental illness, for reasons that I will explain below. However, in my view, both Dr. Ramshaw and Dr. Klassen could have been more cautious before describing at least some of Esseghasier's religious beliefs as delusions and as psychotic symptoms of mental illness. Both Dr. Ramshaw and Dr. Klassen described Esseghaier's central belief — that God will take his soul to heaven and release him from jail and that this event will signal or lead to the return of the Prophet Jesus and the beginning of the Caliphate — as a grandiose and psychotic delusion. From Esseghair's perspective, it is a "realization" based on his reading of the Holy Qu'ran. Some devout Christians believe that the Book of Genesis and the Book of Revelations, as set out in in the Bible, describe real events and literal truth. I am quite sure that no forensic psychiatrist would describe these religious beliefs, about past and future events that are perceived to be real, as psychotic delusions.

80    The *D.S.M.*, which is still the authoritative source for diagnosing mental illness, expressly addresses the need for caution in this area. In its chapter on schizophrenia, the following is stated (at p. 103):

Cultural and socioeconomic factors must be considered, particularly when the individual and the clinician do not share the same cultural and socioeconomic background. Ideas that appear to be delusional in one culture (e.g., witchcraft) may be commonly held in another. In some cultures, visual or auditory hallucinations with a religious content (e.g., hearing God's voice) are a normal part of religious experience.

[Emphasis added.]

81    I also note that Ms. Henschel conducted effective cross-examinations of both psychiatrists concerning whether Esseghaier actually met the required diagnostic criteria for schizophrenia, as set out in the *D.S.M.* at p. 99 (Ms. Henschel was technically examining Dr. Klassen in-chief but she was allowed considerable lee-way to challenge him, without objection). By the end of these cross-examinations, it appeared to me to be open to some doubt as to whether Esseghaier actually met the requisite diagnostic criteria for schizophrenia. In addition, Dr. Klassen significantly revised certain parts of his opinion as a

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

result of facts that were drawn to his attention during Ms. Henschel's examination.

82     Finally, I note that both Dr. Ramshaw and Dr. Klassen appeared to pay little attention to *the timing* of Esseghaier's recent disclosures of what he calls "realizations" and what they call "delusions". He had been isolated for almost two years in a prison cell, by the time he was convicted on March 20, 2015. He had been required to attend at a trial that he fundamentally objected to and he had been convicted on all counts by the jury. He then had to begin reflecting on his imminent fate, awaiting a sentencing hearing under the *Criminal Code* where he faced the prospect of a lengthy jail sentence, perhaps life in prison. He is a deeply religious man and it hardly seems surprising to me, in these circumstances, that he might start to have hopes or "realizations" about God taking his soul to heaven and finally releasing him from jail and from this life. He also holds strong religious and political beliefs about the Caliphate (or a single Muslim state on earth) and it does not surprise me that his "realizations" or hopes might include the coming of the Caliphate at the time of his soul rising to heaven. In short, *the timing* of these "realizations" strikes me as being consistent with an intensely religious and political man, who is extremely isolated, and who is trying to come to grips with his fate here on earth in the time since his convictions and while facing the prospect of spending the rest of this life in prison.

83     For all these reasons, I have some skepticism about the opinion that Esseghaier is presently schizophrenic. Having said that, I accept that some of Esseghaier's beliefs may well be delusional and may be less firmly tied to any religious beliefs. For example, his belief that the present year is still 2014 and that the jail authorities have been compressing time by manipulating the light, may well be delusional and may not be religious, although I note that even these beliefs serve to support and explain Esseghaier's central religious belief - that God will take his soul to heaven on December 25, 2014, at the age of thirty-three, like the Prophet Jesus.

84     Assuming, without deciding, that Dr. Ramshaw and Dr. Klassern are right and that Esseghaier is presently delusional and suffering from some mental illness (probably schizophrenia), the evidence is overwhelming that *he was not delusional and psychotic at the time of the present offences in September 2012*. The wiretap intercepts contain no evidence of any psychotic delusions, whether the ones recently disclosed by Esseghaier in June 2015 or any other prior delusional thoughts. Both Dr. Klassen and Dr. Ramshaw were clear on this point in their testimony. At most, the psychiatrists expressed the view that Esseghaier might have been in the "prodromal phase", which they described as the period prior to the onset of schizophrenia, before any of the symptoms of the illness have appeared such as delusions and psychosis. Both psychiatrists agreed that the "prodromal phase" can coincide with a typical Jihadist radicalization. They could not say whether Esseghaier was more probably in the "prodromal phase" or was more probably undergoing a typical radicalization process during the 2009 to 2012 period when he changed, became intensely religious and political, traveled twice to meet with Mujahedeen in Iran, and began plotting the present offences in a non-delusional manner.

85     In these circumstances, the causal link between the commission of the offences in 2012 and present mental illness in 2015 (assuming, without deciding, that present mental illness has been proved on a balance of probabilities) has simply not been established to anything close to the requisite degree. Indeed, the evidence from the wiretap intercepts and the statements made by Esseghaier in his lengthy post-arrest police interview, refute any such suggestion. See: *R. v. Prioriello* (2012), 288 O.A.C. 198 (Ont. C.A.) at paras. 11-13; *R. v. Shahnawaz* (2000), 149 C.C.C. (3d) 97 (Ont. C.A.) at paras. 29-33; *R. v. Batisse* (2009), 241 C.C.C. (3d) 491 (Ont. C.A.) at paras. 38-40; *R. v. Ellis* (2013), 303 C.C.C. (3d) 228 (Ont. C.A.) at paras. 107-128; *R. v. To* (2015), 119 W.C.B. (2d) 331 (Ont. S.C.J.) [2015 CarswellOnt 2640 (Ont. S.C.J.)] at paras. 24-5 and 38 per. Durno J.

86     Even if a causal link between present mental illness in 2015 and Esseghaier's offending behaviour in 2012 had been established, it is unlikely that it would have a mitigating effect on sentence. That is because Esseghaier is adamantly opposed to treatment and firmly denies the existence of any mental illness. He is presently dangerous, for the reasons set out above, and an untreated mental illness that is causally linked to the offending behaviour cannot mitigate the sentencing of a dangerous individual. If anything, it means that the protection of the public becomes the predominant sentencing principle, requiring the imposition of a fit and appropriately lengthy sentence so that the Parole Board can release Esseghaier only if and when he is successfully treated. See: *R. v. Robinson* (1974), 19 C.C.C. (2d) 193 (Ont. C.A.); *R. v. Detlor* (1981), 23 C.R. (3d) 59 (Ont. C.A.); *R. v. Hill* (1974), 15 C.C.C. (2d) 145 (Ont. C.A.), aff'd [*Hill v. R. (No. 2)*] (1975), 25 C.C.C. (2d) 6 (S.C.C.); *Simpson v. R.* (1981), 58 C.C.C. (2d) 308 (Ont. C.A.); *R. v. Edwards* (2001), 155 C.C.C. (3d) 473 (Ont. C.A.) at para. 69; *R. v. Khawaja* (2012), 290 C.C.C. (3d) 361 (S.C.C.) at para. 122; *R. v. Corpus* (2000), 45 W.C.B. (2d) 385 (Ont. C.A.) [2000 CarswellOnt 497 (Ont. C.A.)] at paras. 7-8; *R. v. Chen*, 2015 ONSC 3759 (Ont. S.C.J.) at para. 26, per.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550**

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

MacDonnell J.

87    Given the absence of a causal link between mental illness and the offences in this case, I cannot accept *amicus'* submission that Esseghaier's present mental illness (assuming it exists) has a mitigating effect on sentence.

88    I should also address *amicus'* primary submission, concerning a hospitalization order under s. 22 of the provincial *Mental Health Act*. As noted previously (at para. 9 above), *amicus* submitted that a hospitalization order would allow involuntary treatment to be attempted at a psychiatric hospital and that the sentencing hearing should be adjourned to await the results. In light of the fact that Esseghaier is adamantly opposed to any such process, and will fight it to his last breath as he told the court, Dr. Klassen testified that involuntary treatment would require a number of steps. First, Esseghaier would have to be certified under the *Mental Health Act*, then a substitute decision maker would have to be put in place by the Consent and Capacity Board, and then Esseghaier would have a right of appeal to the courts. It could take up to two years for this process to conclude, according to Dr. Klassen. If the above process went according to plan, treatment with anti-psychotic drugs would then be attempted, the results would generally be known within about two months, and a further report would be made to the court.

89    In my view, none of this is appropriate. It is unprecedented to adjourn a sentencing hearing indefinitely to await treatment, especially where the underlying illness is not causally connected to the offending behaviour. *Amicus* knew of no precedent where this has been done. Charron J.A., as she then was, addressed this issue in *R. v. Shahnawaz*, *supra* at paras 30 and 34:

>    In my view, the trial judge erred in considering the treatment of Mr. Shahnawaz's psychological condition as the crucial factor in his rehabilitation in the absence of any evidence that his psychological disabilities played any role in the commission of the offences. <u>Rehabilitation as a goal of sentencing is not the restoration of an offender's physical and mental health</u> but his reinstatement as a functioning and law abiding member of the community. It is in this sense that rehabilitation of the offender serves to protect society.

>    . . .

>    <u>The court must not lose sight of the fact, however, that it is difficult to predict Mr. Shahnawaz's future condition and that the state of any prisoner's health while in custody is largely a matter for the correctional authorities</u>.

>    [Emphasis added.]

90    In the present case, there is no treatment plan in place or under way, the prospects of successful treatment are unknown, and significant delays can be anticipated. In addition, I have real doubts as to whether it is legally permissible to force this process on Esseghaier, against his will, through the vehicle of a criminal trial. As a self-represented accused who is presently fit, he is entitled to choose his defences and to choose his manner of participating or not participating at his trial and sentencing. This autonomy is important to what little dignity he still has left. *Amicus* has made it clear that one of the goals of hospitalization and involuntary treatment is to explore issues relating to s. 16 criminal responsibility. The law is clear that even Esseghaier's own counsel could do no such thing without his client's consent and without instructions. Rosenberg J.A. summarized the law on this point, speaking for the Court in *R. v. Szostak* (2012), 289 C.C.C. (3d) 247 (Ont. C.A.) at paras. 76-8:

>    In my view, this requires a determination whether counsel required instructions to apply for an assessment order and whether the appellant has shown that his trial counsel acted without instructions in seeking the assessment.

>    I should begin by saying that I am satisfied that where, as here, the accused is fit, counsel is not entitled to advance the NCRMD defence against the wishes of the accused. I would go further and hold that counsel must have instruction before advancing the NCRMD defence. This control over the defence is a necessary consequence of the values of dignity and autonomy that underlie our adversarial system. As Lamer C.J. said in *Swain*, at p. 972:

>    Given that the principles of fundamental justice contemplate an accusatorial and adversarial system of criminal justice

**WestlawNext** CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    36

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

which is founded on respect for the autonomy and dignity of human beings, it seems clear to me that the principles of fundamental justice must also require that an accused person have the right to control his or her own defence. The appellant has properly pointed out that an accused will not be in the position of choosing whether to raise the defence of insanity at his or her trial unless he or she is fit to stand trial. If at any time before verdict there is a question as to the accused's ability to conduct his or her defence, the trial judge may direct that the issue of fitness to stand trial be tried before matters proceed further (see *Criminal Code*, s. 543, now s. 615). *Thus, an accused who has not been found unfit to stand trial must be considered capable of conducting his or her own defence.*

An accused person has control over the decision of whether to have counsel, whether to testify on his or her own behalf, and what witnesses to call. This is a reflection of our society's traditional respect for individual autonomy within an adversarial system. In *R. v. Chaulk*, *supra*, I indicated that the insanity defence is best characterized as an exemption to criminal liability which is based on an incapacity for criminal intent. *In my view, the decision whether or not to raise this exemption as a means of negating criminal culpability is part and parcel of the conduct of an accused's overall defence.*

[Emphasis of Rosenberg J.A.]

Proulx and Layton reach a similar conclusion in their discussion at p. 158. As they say, "Simply put, defence counsel should not impose his or her views on the client in this regard." For the purposes of an inquiry into effective assistance I see no distinction between counsel acting against the client's wishes and counsel acting without instructions. The constitutional right to control the conduct of the defence prevents defence counsel from raising the NCRMD defence against the instructions of the client. Minimal standards of effectiveness of performance require counsel to inform the client of the options available, including possible pleas, possible defences and possible excuses, such as NCRMD. For counsel to proceed with a NCRMD defence without instructions is simply a demonstration of a failure to provide adequate advice and hence an adequate defence. <u>Provided the accused is fit to stand trial, counsel must obtain instructions about decisions fundamental to the defence of the case. In my view, that includes obtaining instructions as to whether or not to pursue a NCRMD defence. Accused persons provided with all the necessary information may act irresponsibly and against their own best interests, but that is their right.</u>

[Emphasis added.]

91    If defence counsel could not pursue the issue of Esseghaier's mental illness and criminal responsibility, without proper instructions, then *amicus* certainly cannot pursue it. See: *R. v. Imona-Russell* (2013), 300 C.C.C. (3d) 137 (S.C.C.) at paras. 54 and 114-115.

92    For all these reasons, I decline to make a hospitalization order under s. 22 of the *Mental Health Act*. In my view, the interests of justice require that this sentencing should proceed and should not be further delayed. As a matter of longstanding criminal law policy, it has repeatedly been held that sentencing should not be adjourned for lengthy or indeterminate periods and that short adjournments should only be granted where the court needs information that is important to sentencing. Both of these principles would be violated by the proposed adjournment in this case, given that it is indeterminate in length and its purpose is to see whether or not involuntary treatment of an illness will be successful. See: *R. v. Fuller* (1968), [1969] 3 C.C.C. 348 (Man. C.A.), at 352; *R. v. Brookes*, [1970] 4 C.C.C. 377 (Ont. C.A.); *R. v. Nunner* (1976), 30 C.C.C. (2d) 199 (Ont. C.A.), at 207; *R. v. Shea* (1980), 55 C.C.C. (2d) 475 (N.S. C.A.); *R. c. Brisson* (1989), 47 C.C.C. (3d) 474 (C.A. Que.); *R. c. Cardin* (1990), 58 C.C.C. (3d) 221 (C.A. Que.); *R. v. Taylor* (1995), 104 C.C.C. (3d) 346 (Sask. C.A.). Also see: s. 720 of the *Criminal Code*.

93    I hasten to add that Dr. Ramshaw's and Dr. Klassen's psychiatric reports will be forwarded by the Court to the correctional authorities, at the conclusion of sentencing. I also note that ss. 85, 86 and 87 of the *Corrections and Conditional Release Act*, SC 1992, c. 20, place statutory duties on Correctional Services Canada to provide "essential health care" to federal inmates, which includes "mental health care", and to take the inmate's health care needs into account "in all decisions affecting the offender".

**D. Sentencing in Terrorism Cases**

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

94     The principles of sentencing are set out in ss. 718, 718.1, and 718.2 of the *Criminal Code* and I am bound by those principles. The most fundamental principle is "proportionality", as set out in s. 718.1. It requires that the sentence "must be proportionate to the gravity of the offence and the degree of responsibility of the offender".

95     I have already summarized the positions of the parties concerning the appropriate range of sentence in this case and noted that they are far apart (at paras. 5-11 above). I will not repeat those positions.

96     The *Anti-Terrorism Act*, S.C. 2001, c. 41 was passed in late 2001, enacting Part II.1 of the *Criminal Code*, which includes the offences charged in this case. These offences have been in existence for almost fourteen years and a body of case law now exists, most of it binding on this court, which sets out the proper approach to sentencing in terrorism cases. Four decisions of the Ontario Court of Appeal were released in December 2010 (*Khawaja*, *Amara*, *Khalid*, and *Gaya*) and they were generally upheld by the Supreme Court of Canada, in December 2012 when the accused's appeal in *Khawaja* was dismissed and then in February 2013 when the three applications for leave to appeal in *Amara*, *Khalid*, and *Gaya* were dismissed. Since these appellate decisions were released, judges of this Court have interpreted and applied the relevant sentencing principles in terrorism trials on a number of occasions. See: *R. v. Abdelhaleem*, 2011 ONSC 1428 (Ont. S.C.J.), per. Dawson J.; *R. v. Ahmed* (2014), 122 O.R. (3d) 675 (Ont. S.C.J.), per. McKinnon J.; *R. v. Hersi*, 2014 ONSC 4414 (Ont. S.C.J.), per. Baltman J.

97     In my view, the most important points to emerge from this body of case law are the following:

• First, the unusual gravity of terrorism offences means that denunciation and deterrence (both specific and general) are the predominant sentencing principles to be applied. See: *Khawaja*, *supra* at paras. 126 and 130 (S.C.C.). As the Court of Appeal put it in that case, "When terrorists acting on Canadian soil are apprehended and brought to justice, the responsibility lies with the courts to send a clear and unmistakeable message that terrorism is reprehensible and those who choose to engage in it here will pay a very heavy price". See: *Khawaja*, *supra* at para. 246 (Ont. C.A.). Baltman J. vividly illustrated this point in *R. v. Hersi*, *supra* at para. 63, when she stated:

> ... terrorists are the worst kinds of cowards because they deliberately target innocent members of the public who are not prepared for combat. When it is no longer safe to partake in ordinary activities like watching a soccer match or attending a graduation ceremony, deterrence takes on a different dimension. The message needs to be sent out that anyone who aspires to become part of such evil must pay a heavy price.

• Second, all the general principles of sentencing apply in terrorism cases, including the significance of rehabilitation as a mitigating factor. See: *Khawaja*, *supra* at paras. 115 and 124 (S.C.C.). However, the rigid ideological belief systems that often motivate terrorist offences can give rise to an inference of ongoing dangerousness. This, in turn, can place an evidentiary or tactical burden on the defence to lead evidence at sentencing showing that the accused is "no longer committed to violent Jihad and terrorism ... The lack of information on a person's probability of re-offending, in the face of compelling evidence of dangerousness, is sufficient to justify a stiffer sentence". The Court of Appeal held that this tactical or evidentiary burden can be taken up at the time of sentencing, without compromising a conviction appeal, stressing the importance of "convincing evidence that [the accused] no longer subscribed to violent Jihad at the time of sentencing". See: *R. v. Khawaja*, *supra* at paras. 123-4 (S.C.C.); *R. v. Khawaja*, *supra* at paras. 197-203 (Ont. C.A.);

• Third, in applying the above principles to the most serious kind of terrorism offences — those where "the terrorist activity, to the knowledge of the offender, is designed to or is likely to result in the indiscriminate killing of innocent human beings" — the Court of Appeal has repeatedly held that "sentences exceeding twenty years, and up to and including life imprisonment, should not be viewed as exceptional," that "sentencing judges should give serious consideration to life sentences, and where a life sentence is not called for, to sentences exceeding twenty years", and that "life sentences or sentences exceeding twenty years will generally be appropriate". See: *R. v. Khawaja*, *supra* at paras. 219, 221, and 238 (Ont. C.A.); *R. v. Khalid*, *supra* at para. 34; *R. v. Amara*, *supra* at para. 18;

• Fourth, the suggested range of twenty years to life imprisonment in cases involving "plots that, to their knowledge, are designed to or are likely to result in the indiscriminate killing of innocent human beings", has led to life sentences in two cases at the Court of Appeal level. In one of these cases, the accused was "the mastermind" of the plot and his prospects

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

of rehabilitation were "guarded at this stage" (*R. v. Amara*, *supra* at para. 19). In the other case, the accused was not the leader or mastermind but he was a significant aider and abettor and "willing participant" in a group of terrorists. The other members of the group "were further along in terms of realizing their violent plans" but in this accused's case there was "a complete absence of contrition or remorse" (*R. v. Khawaja*, *supra* at paras. 196, 230, and 239). At the trial level, Dawson J. imposed a life sentence in *R. v. Abdelhaleem*, *supra* at paras. 23-4, 32, 49, 57 and 78-9, in a case involving a bomb plot where "great destruction and loss of life" was contemplated, where the adult accused was the "right hand man and primary assistant" to the leader Amara, and where the accused attempted to advance an exculpatory or minimizing account of the offences at the sentencing hearing through his psychiatrist, did not "accept responsibility for his actions", and "expressed no genuine remorse";

• Fifth, the bottom end of the twenty years to life imprisonment range in terrorist cases involving plots that are "likely to result in the indiscriminate killing of innocent human beings", has been imposed in cases with strong mitigating features. In both *Khalid*, *supra* and *Gaya*, *supra*, the accused were nineteen and eighteen years old at the time of the offences. They both pleaded guilty, they were "genuinely remorseful" and "truly remorseful", and they had strong family and community support. They played significant roles in the bomb plot but they were not in the same senior leadership positions as Amara and Abdelhaleem. The Court of Appeal held that twenty to twenty-five years was the appropriate range in cases like this with strong mitigating circumstances. The Court stated:

> The fact that the authorities foiled the respondent's and his co-conspirators' plot does not lessen the gravity of the respondent's crime, nor does it diminish his level of moral blameworthiness. The sentencing judge took the position that "[a]bsent the mitigating factors", the range of 18 to 20 years sought by the Crown "might have been appropriate". With respect, we disagree. In the circumstances, were it not for the mitigating features that serve to reduce the length of sentence, the respondent would most certainly have been a candidate for a life sentence.
>
> . . .
>
> Taking into account the mitigating factors that the sentencing judge considered and giving them the weight they deserve, we think that the respondent should have received a sentence in the range of 20 to 25 years. Stern sentences in that range are meant to send a clear message — those who chose to pursue deadly terrorist activities from or in Canada will pay a very heavy price.

Sentences of twenty years and eighteen years were imposed, in light of certain positions that had been taken at trial. See: *R. v. Khalid*, *supra* at paras. 21-2, 36 and 56; *R. v. Gaya*, *supra* at paras. 12-16 and 20.

98    Applying the above principles to the case at bar, I am satisfied that Counts One and Two fall within that most serious category of terrorist offences, described by the Court of Appeal as cases where "the terrorist activity, to the knowledge of the offender, is designed to or is likely to result in the indiscriminate killing of innocent human beings". When Esseghaier first described the "train plot" to Agent El Noury, in a September 8, 2012 intercept, he explicitly stated "*many people will die*". One of the reasons for Jaser's occasional lack of enthusiasm for the "train plot" was that too few people would die and they would not be sufficiently important people. As he explained to Agent El Noury in a September 23, 2012 intercept: "it seems to be too much work for a very small job ... It's too small. It's a big operation ... we end up doing something very tiny ... very small ... twenty thirty people, forty people. And who are they? Slaves. Really, just like you and me, workers. You know? Sheep. We don't want sheep. We want the wolf. We can get the wolf, brother we can get the wolf. The G8 summits are here ..."

99    The next day, September 24, 2012, Jaser continued with this theme shortly after uniform Toronto police officers had cautioned them about walking on the Highland Creek railway bridge. Jaser stated, "*taking down a passenger train that might take out 20, 30, 40, 50, 100, whatever. I don't think many people will die by the way,* just so you know". Jaser's preferred means was the "sniper plot" which was explicitly a plan to kill people. As he put it in this same September 24, 2012 conversation: "the war overseas is being funded from here. There people, they only understand the language of two things. Death and money. That's it. You hit them where it really hurts. You take their lives, you take their wealth ... You think they care about the life of fifty people on a train? ... But the expensive Jew, the rich Jew, the Jew that is Zionist ... when you take fifty of them out, what happens? You will drive them crazy ... *We can kill many of them before something happens... The*

WestlawNext. CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

*message by derailing a train and killing a few sheep is not the same as when you, when you take out the vice*. ...The almighty God says fight the leaders of non belief". Esseghair replied, "We do both. I agree with him ... *I agree to kill the elders*".

100    Given that the present case falls within the most serious class of terrorist offences, where "indiscriminate killing of innocent human beings" is being planned for political and religious motives, the appropriate range of sentence is twenty years to life imprisonment. Neither Esseghaier nor Jaser is a well-situated young first offender who has pleaded guilty, expressed remorse, and renounced his violent Jihadist ideology. They have none of these strong mitigating factors seen in cases like *Khalid* and *Gaya*. Rather, they were the two leaders of the plot, they were mature adults, they were equals, they both went to trial, Jaser has a prior criminal record, and they have not renounced their terrorist beliefs. Accordingly, like *Amara*, *Abdelhaleem*, and *Khawaja*, they are presumptively facing life sentences.

101    Mr. Norris submitted that *R. v. Ahmed*, *supra* was a comparable case and that the twelve year sentence imposed by McKinnon J. in that case should be the starting point, when determining a fit sentence for Jaser. Mr. Silverstein submitted that *R. v. Ahmad*, *supra* was a comparable case and that the sixteen year sentence imposed by Dawson J. in that case should be the starting point, when determining a fit sentence for Esseghaier.

102    In my view, neither of these cases is a useful comparator. Most significantly, neither *Ahmed* nor *Ahmad* was a case where the accused was being sentenced for a conspiracy to indiscriminately kill. Indeed, in *Ahmed* the accused had been acquitted of the only charge that arguably may have involved such consequences and that carried a maximum sentence of life imprisonment. He was convicted and sentenced for providing money to the Mujahedeen abroad, for forming a terrorist group in Ottawa, for various recruiting efforts, and for trying to obtain terrorist training abroad. These offences carried ten year and fourteen year maximum sentences. Furthermore, Ahmed was not "the true leader", he expressed "heartfelt and sincere" remorse at his sentencing hearing, and McKinnon J. found that "he has renounced his terrorist sympathies and he could be a force for good in de-radicalizing other would-be terrorists". None of this bears any resemblance to Jaser, neither in terms of the gravity of the offences or the circumstances of the offender. See: *Ahmed*, *supra* at paras. 3-12, 39, 46-7, 51, 92, 106 and 115.

103    Similarly, *Ahmad* involved an accused who was sentenced primarily for his involvement in what was known as "the camp plot" (a terrorist training exercise) and not for involvement in the "bomb plot" that Amara and Abdelhaleem went on to lead. Ahmad had no specific plans or targets, beyond obtaining weapons and forming his own terrorist group. Furthermore, he was twenty-one years old at the time of the offences, he pleaded guilty, he expressed remorse, and Dawson J. found that he had "prospects for rehabilitation". Finally, Dawson J. did not have the benefit of the Court of Appeal's terrorism sentencing case law at the time he sentenced Ahmad on October 25, 2010. Accordingly, *Ahmad* is not a useful comparator, either to Esseghaier's circumstances or to the offences in this case. See: *R. v. Ahmad*, *supra* at paras. 12-14, 21-2, 25, 61, and 70-71.

104    It can be seen that both Mr. Norris and Mr. Silverstein began their analysis at the wrong starting point. I am bound, by a consistent body of Ontario Court of Appeal case law, to begin my analysis at the range of twenty years to life imprisonment because of the gravity of terrorist crimes that have "indiscriminate killing" as their object. Counsel's suggested range of twelve to sixteen years is inappropriate in this most serious kind of terrorism offence. Furthermore, there are little or no mitigating circumstances that could reduce the sentence below the range or that could situate the case at the bottom end of the range.

105    In Esseghaier's case, like *Khawaja*, he is remorseless and dangerous and continues to hold the same views that led to the present offences. I have found as a fact that any present mental illness is not causally connected to the 2012 offences. Finally, Esseghaier bears no resemblance to *Khalid* or *Gaya*, as noted previously. In these circumstances, life imprisonment is the presumptively appropriate sentence.

106    In Jaser's case, I have already rejected the suggestion that entrapment played a mitigating role in his case. I have also rejected Dr. Ghannam's evidence concerning Jaser's alleged drug addiction and the alleged insincerity in his expressions of violent religious extremism. Finally, I have rejected the suggestion that there were no acts in furtherance of the Count Two conspiracy, that it was just a "blue sky" idea, and that it was less serious than the Count One conspiracy. Jaser took numerous steps with Esseghaier, over a period of time, to plan for, prepare and assess the various means of carrying out their agreement to kill innocent civilians for religious and political purposes. I am satisfied that he was determined and serious.

**WestlawNext** CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

107     The only mitigating facts I have found in Jaser's favour are that he has strong family support and his family members appear to be responsible pro-social individuals. These two mitigating circumstances do not come close to the circumstances that resulted in *Khalid* and *Gaya* being situated at the bottom end of the twenty year to life imprisonment range.

108     There is one potentially mitigating factor in Jaser's case that is somewhat more difficult to assess and that is the effect of his abandonment of the Count Two conspiracy on September 24, 2012 and the absence of evidence that he carried on with any terrorist activities or terrorist beliefs in the ensuing seven months, prior to his arrest on April 22, 2013.

109     The evidence before me on the s. 8 *Charter* Motion, which it was conceded could be considered on sentencing, revealed that Jaser and Esseghaier had been discussing a "fishing" venture (a code word for terrorist plans) as early as May 2012. In a May 2012 CSIS intercept, Jaser discussed a covert plan "to go fishing" which he believed "will happen with God's help" and which was "progressing well". Jaser told Esseghaier to "keep the subject that they shared together secret". There was a second relevant CSIS intercept, in August 2012, where Jaser and Esseghaier again discussed a trip to "do some fishing". Jaser referred to some unspecified difficulties and to the fact that they did not yet have "all that was needed". Jaser stated that he "would prefer that the brothers understood that it was imperative that they should help without asking questions". Esseghaier suggested that they should "go just on a reconnaissance trip by car". Shortly after this intercept, on August 26, 2012, the evidence at trial revealed that Esseghaier and Jaser went to the St. Catharine's Railway Station on a reconnaissance mission. See: *R. v. Jaser*, 2014 ONSC 6052 (Ont. S.C.J.) at paras. 51 and 86-9.

110     It therefore appears that Jaser and Esseghaier were engaged in terrorist plotting of some kind for about five months, from May to September 2012. At the end of September 2012 Jaser terminated his connection to Esseghaier and abandoned their terrorist activity. His motivation for abandoning the plot was the fact that the police now knew their names and knew that they had been walking on the railway tracks at Highland Creek Bridge on September 24, 2012. In addition, Esseghaier appeared to be much less concerned than Jaser about the security of the operation. In other words, Jaser feared apprehension if he and Esseghaier were to continue with their plot.

111     I agree with Mr. Norris that fear of apprehension can be a positive feature on sentencing, as it may indicate that Jaser is more susceptible to deterrence and rehabilitation, unlike a rigid and fearless ideologue. However, there is other relevant evidence that bears on the issue of whether Jaser has been deterred and whether he is capable of rehabilitation. In particular, Jaser's persistence in telling a false, exculpatory, minimizing story to Dr. Ghannam (and indirectly to the court), that was rejected by the jury, indicates that he has not yet accepted responsibility for the offences, he has not yet expressed genuine remorse, he has little insight, and he has not renounced the violent and racist Jihadist beliefs that he expressed in the wiretap intercepts. This is all because he continues to deny that the beliefs expressed in the intercepts were ever sincere. My overall impression of Jaser is that he is intelligent, devious, and untrustworthy. I am very guarded about his present prospects for rehabilitation.

112     In my view, Jaser is left in much the same position as the accused in *Amara*, *supra* at para. 19, where Durno J. and the Court of Appeal found that he was the leader of a deadly plot, where his "reformation is far from certain and his prospects for rehabilitation are guarded at this stage", and where a life sentence was imposed. Jaser is also in a similar position to the accused in *Abdelhaleem*, *supra* at paras. 78-81, where Dawson J. stated:

> In addition, the accused has expressed no genuine remorse for his involvement in these very serious offences. While he did tell the presentence reporter that he now realizes his participation was a mistake, there is nothing beyond that. In his much more extensive interaction with Dr. Bloom he continued to take the untenable position that he was trying to prevent Mr. Amara from carrying out his plan, and that he was entrapped by Mr. Elsohemy and the police. He refuses to acknowledge that he has done anything wrong and professes to be unable to understand why he has been held criminally responsible for his involvement. He fails to recognize the seriousness of the fact that by helping Mr. Amara he put many innocent lives at risk.

> While the evidence does not demonstrate that Mr. Abdelhaleem represents a serious ongoing danger *because* he is ideologically committed to terrorism, he has committed serious terrorist offences and the combination of some uncertain degree of ideological motivation, together with his lack of insight and remorse <u>leaves me unable to conclude that he does not continue to pose a substantial risk to the public.</u>

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550
_____
2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

In these circumstances I have come to the conclusion that I must impose a sentence of life imprisonment on count two, which relates to the bomb plot. The chief factor in my decision is the gravity of the crime. In terms of the fundamental principle of sentencing, this is the sentence that is proportionate to the gravity of the offence and to the degree of responsibility of the offender. Mr. Abdelhaleem was centrally involved in a plan to kill indiscriminately. He operated as Mr. Amara's executive assistant. Had the plan been carried out he would be liable to conviction for multiple counts of first degree murder.

Furthermore, Mr. Abdelhaleem exhibits no genuine remorse or insight into his behaviour and so far has not accepted responsibility for his dangerous actions. While I do not believe his actions were motivated solely by political, religious or ideological beliefs, as Mr. Amara's seem to have been, he nonetheless made a deliberate decision to participate in Mr. Amara's plot and did so over a number of months. The aspects of his personality and psychological make-up that led to that decision remain intact. Until Mr. Abdelhaleem accepts responsibility for his actions, exhibits a willingness to work on his problems and develops insight into what led him here today he will continue to pose an unacceptable risk to the community [italics of Dawson J. in the original, underlining added for emphasis].

113    For all the above reasons, I am satisfied that life imprisonment is the appropriate sentence on both Counts One and Two, in Esseghaier's case, and on Count Two in Jaser's case.

114    The determinate sentences on Counts Three, Four, and Five must be consecutive to each other but concurrent to the life sentences on Counts One and Two. However, the accused's pre-trial custody should be credited against the determinate sentences. Both accused have been in custody since their arrests on April 22, 2013, that is, for some two years and five months. I am sure that their time at remand jails has been difficult, based on what I heard at various points during the pre-trial motions and during the trial and based on the evidence filed on sentencing. In particular, Jaser spent some seven and a half months in segregation, immediately after his arrest, not because of any misconduct but mainly because of the high profile of the offences charged and the resulting need to protect him from other inmates. I have no specific information about Esseghaier but I am sure that he was similarly placed in segregation for a period of time because of the publicity surrounding the arrests in this case.

115    Mr. Norris submitted that I should give Jaser enhanced credit for this seven and a half month period, at a ratio of about 3:1, due to the harsh conditions. The Crown submitted that I am bound by s. 719(3.1) to give credit at a maximum ratio of 1.5:1 for this period of particularly harsh pre-trial custody and that I should only give credit at a ratio of 1:1 for the rest of the time when Jaser was in general population, given that he has little prospect of remission and early parole. Indeed, s. 743.6(1.2) presumptively increases the normal parole eligibility periods in the case of terrorism offences.

116    This issue is somewhat academic, given the life sentences imposed on Counts One and Two, and given that the life sentences begin to run from the April 22, 2013 date when Esseghaier and Jaser first went into custody. Parole eligibility and remission will also run from this date. See: *Corrections and Conditional Release Act*, S.C. 1992, c. 20, s. 120; *Criminal Code*, ss. 745(d) and 746(a).

117    In my view, the fairest way to deal with the issue of pre-trial custody is to give both accused credit on a ratio of 1.5:1 for the entire two year and five month period since their arrest. In other words, they are entitled to forty-four months credit against the determinate sentences to be imposed on Counts Three, Four, and Five. See: *R. v. Summers* (2014), 308 C.C.C. (3d) 471 (S.C.C.).

118    It is very difficult to fix the length of an appropriate determinate sentence on Counts Three and Four, given that the conduct alleged in these two counts mostly involves acts in furtherance of the conduct already captured by Counts One and Two. The maximum sentence under s. 83.18 is ten years imprisonment and the Crown seeks the maximum. In *R. v. Khawaja*, *supra* at para. 255, the Court of Appeal imposed sentences of four years and eight years for the two s. 83.18 offences that the accused was convicted of in that case. The sentence of four years related to receiving training for the benefit of a terrorist group. The sentence of eight years related to participating in discussions with the terrorist group for the purpose of developing remote detonator devices. In *R. v. Abdelhaleem*, *supra* at paras. 82-3, Dawson J. imposed a sentence of five years for the one s. 83.18 offence that the accused was convicted of in that case. This sentence of five years related to various activities of the accused such as recruiting, assisting, and advising Amara's terrorist group.

WestlawNext. CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550**

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

119     In my view, the recruiting activity and the logistics discussions that are the focus of Counts Three and Five are relatively preliminary steps relating to terrorist activities and they are generally analogous to the activities that resulted in the five year sentence in *Abdelhaleem*. The reconnaissance, "safe house", and logistics activities that are the focus of Count Four are much more proximate to the terrorist plots themselves and are, therefore, generally analogous to the activities that resulted in the eight year sentence in *Khawaja*.

120     For the above reasons, the appropriate sentence on Count Three is five years for both accused, the appropriate sentence on Count Four is eight years for both accused, and the appropriate sentence on Count Five is five years for Esseghaier alone. These sentences must run consecutively to each other because of s. 83.26. The total determinate sentence for Esseghaier is, therefore, eighteen years. The total determinate sentence for Jaser is thirteen years. I am satisfied that these sentences conform to the totality principle. The determinate sentences run concurrent to the life sentences.

121     Forty-four months credit for pre-trial custody should be deducted from the five year sentences on Count Two, effectively reducing these sentences to sixteen months. In the result, Esseghaier's total determinate sentence to be served from today's date is fourteen years and four months. Jaser's total determinate sentence to be served from today's date is nine years and four months.

122     The three ancillary orders sought by the Crown are as follows: a DNA Order pursuant to s. 487.051; a lifetime firearms prohibition Order pursuant to s. 109; and a parole ineligibility Order pursuant to s. 743.6(1.2). The first two Orders are easily justified in this case, they are not opposed, and they should both be granted.

123     A parole ineligibility Order is more unusual. Nevertheless, it must be granted under s. 743.6(1.2) in terrorism cases unless an accused demonstrates, in the particular circumstances of this offence and this offender, "that the expression of society's denunciation of the offence and the objectives of specific and general deterrence would be adequately served by" the usual parole eligibility rules under the *Corrections and Conditional Release Act*. The length of the presumptive parole ineligibility Order under s. 743.6(1.2) is "one half of the sentence or ten years, whichever is less".

124     In the life imprisonment cases that are comparable to the present case, *R. v. Khawaja*, *supra* at para. 254, *R. v. Amara*, *supra* at para. 4, and *R. v. Abdelhaleem*, *supra*, at paras. 84-87, the presumptive order was made in all three cases. For the reasons given in those cases, and given the absence of any persuasive mitigating circumstances in this case and the very serious offences that are at issue, an Order is made in relation to both Esseghaier and Jaser that they serve ten years before becoming eligible for parole. The ten year period runs from the date of their arrest.

**E. Conclusion**

125     In the result, Esseghaier is sentenced to life imprisonment on Count One and life imprisonment on Count Two, both sentences to run concurrently. He is also sentenced to five years on Count Three less credit for forty-four months pre-trial custody (in effect, a sentence of sixteen months), to eight years on Count Four, and to five years on Count Five. These three determinate sentences must run consecutively to each other, resulting in a total determinate sentence from today's date of fourteen years and four months, which runs concurrently to the two life sentences.

126     Jaser is sentenced to life imprisonment on Count Two. He is also sentenced to five years on Count Three less credit for forty-four months pre-trial custody (in effect, a sentence of sixteen months) and to eight years on Count Four. These two determinate sentences must run consecutively to each other, resulting in a total determinate sentence from today's date of nine years and four months, which runs concurrently to the life sentence.

127     Both Esseghaier and Jaser must serve ten years of their sentence, from the date of their arrest, before they are eligible for parole.

128     I wish to conclude by thanking all counsel for their excellent work in this long and difficult case.

*Accused E sentenced to two life sentences and 18-year determinate sentence; accused J sentenced to life sentence and 13-year determinate sentence.*

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**R. v. Esseghaier, 2015 ONSC 5855, 2015 CarswellOnt 14550**

2015 ONSC 5855, 2015 CarswellOnt 14550, [2015] O.J. No. 4922, 125 W.C.B. (2d) 232

---

**End of Document**     Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

WestlawNext. CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.   44