1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
UNITED STATES OF AMERICA        :
                                :
                                :
     -vs-                       :    Case No. 1:16-cr-143
                                :
                                :
MOHAMAD JAMAL KHWEIS,           :
           Defendant.           :
                                :
--------------------------------:
```

FORFEITURE HEARING

July 28, 2017

Before:   Liam O'Grady, USDC Judge

APPEARANCES:

Dennis M. Fitzpatrick and Raj Parekh,
Counsel for the United States

Jessica N. Carmichael and Phoenix S. Harris,
Counsel for the Defendant

The Defendant, Mohamad J. Khweis, in Person

2

1      THE CLERK: The Court calls case 1:16-cr-143, the
2  United States of America versus Mohamad Jamal Khweis for a
3  motion hearing.
4      May I have the appearances, please, first for the
5  Government.
6      MR. FITZPATRICK: Good morning, Your Honor. Dennis
7  Fitzpatrick and Raj Parekh on behalf of the United States.
8      THE COURT: Good morning.
9      MR. PAREKH: Good morning, Your Honor.
10     MS. CARMICHAEL: Good morning, Your Honor. Jessica
11 Carmichael and Phoenix Harris on behalf of Mr. Khweis.
12     THE COURT: All right, good morning.
13     MS. HARRIS: Good morning, Your Honor.
14     THE COURT: All right. This comes on for the notice
15 of forfeiture, preliminary notice of forfeiture, but also there
16 has been filed now a motion to replace counsel, withdrawal of
17 counsel.
18     Where are we, Ms. Carmichael?
19     MS. CARMICHAEL: Your Honor, Mr. Khweis would like me
20 to ask the Court for appointment of new counsel for him.
21     THE COURT: And is he going to provide any reasons?
22     MS. CARMICHAEL: If Your Honor would like to inquire,
23 we would ask that he be allowed to do that ex parte.
24     THE COURT: Well, I don't want to embarrass anybody,
25 and I certainly don't want to unnecessarily air anything that

1  doesn't need to be aired.  And if there is a matter that he
2  believes the Government shouldn't be allowed to hear, then I
3  need him to write that in a pleading, or you to write it for
4  him.
5          Mr. Khweis, you're not entitled to new counsel just
6  because you don't agree with some of the decisions that your
7  counsel made to date or personality differences.  You have very
8  competent counsel who did a terrific job on your behalf in
9  trial.  And frustration over the result, none of those are
10 reasons to replace counsel.  They have invested a significant
11 amount of time.  And unless I hear something that requires me
12 to replace counsel, I have no intention of doing so.
13         So if you want to put something in writing, you go
14 ahead and do it, and I will consider it.  You can file that ex
15 parte.  And I will determine whether it should remain ex parte.
16         All right?
17         MS. CARMICHAEL:  Thank you.
18         THE COURT:  So let's move to the civil forfeiture
19 motion.  And it's your motion?
20         MR. PAREKH:  Yes.
21         MS. CARMICHAEL:  Your Honor, before we begin
22 argument, I would ask that the Court engage in a colloquy with
23 Mr. Khweis as to whether he would like to testify in this
24 matter.
25         THE COURT:  In this matter?

1          MS. CARMICHAEL:  Yes, Your Honor.  Based on my
2    research, I believe he has a constitutional right to testify in
3    this matter.
4          THE COURT:  Okay.  Mr. Khweis, do you want to testify
5    in the civil forfeiture matter?
6          THE DEFENDANT:  Your Honor, I was told that my
7    property, they won't argue for my property except the money.
8    So if they don't argue about all of my property, then I would
9    like to testify, but I don't want to --
10         THE COURT:  They have filed an amended opposition
11   where they have argued that none of your property should be
12   forfeited.  So I am not sure you had the opportunity to see
13   that.  But they have filed last week an amended opposition
14   where they oppose the phones and the SIM cards, everything that
15   was seized from you should not be forfeited.  Okay.
16         THE DEFENDANT:  Okay.  Yeah, if they argue about --
17   if they argue for all of the items, then I don't wish to
18   testify.
19         THE COURT:  Okay.  They have done so.
20         THE DEFENDANT:  Okay.
21         THE COURT:  All right, thank you.  Have a seat.
22         All right, Mr. Parekh.
23         MR. PAREKH:  Thank you, Your Honor.
24         As the Court knows, we filed a motion for a
25   preliminary order of forfeiture following the jury's June 7,

1   2017 return of a guilty verdict on all three charged counts
2   that were set forth in the January 5, 2017 superseding
3   indictment.
4           In that indictment, Your Honor, we provided the
5   defendant with notice that upon his conviction of either
6   Counts 1 or 2 of that indictment, that the Government would
7   seek forfeiture.  So we do believe that we have complied with
8   Federal Rule of Criminal Procedure 32.2.
9           The defendant had notice of that forfeiture for
10  several months before trial began.  And now that the jury has
11  returned a guilty verdict on all three counts, we do believe
12  that the Government is entitled to seek forfeiture of the items
13  that we have outlined in our motion.
14          Those items, Your Honor, include his cell phones, his
15  SIM cards, and the currency that he was found with.  And they
16  were marked and introduced and admitted into evidence as
17  Government's Exhibits 9, 10, 11, 11A, 12 through 14, and 18
18  through 20.
19          As Your Honor knows, we've moved in accordance with
20  18 U.S.C. 981(a)(1)(C) and (G) and 28 U.S.C. 2461(c).  As Your
21  Honor noted, 981 is titled Civil Forfeiture, but it is made
22  applicable to criminal forfeiture through section 2461(c).
23          Your Honor, we think clearly in this case we've
24  demonstrated the statutory required nexus.  As Your Honor
25  knows, under 981(a)(1)(G)(ii), the Government is entitled to

1   seek forfeiture of all assets, foreign or domestic, acquired or
2   maintained by any person with the intent and for the purpose of
3   supporting, planning, conducting, or concealing any federal
4   crime of terrorism.  Of course, conspiracy to provide material
5   support to ISIS and providing or attempting to provide material
6   sport to ISIS qualifies as defined in section 2332b(g)(5).
7           Your Honor, we've also satisfied the nexus required
8   between the property and 981(a)(1)(G)(iii) which allows for all
9   assets, foreign or domestic, to be seized from an individual
10  that were derived from, involved in, or used, or intended to be
11  used to commit any federal crime of terrorism.
12          This is not a case, Your Honor, where we're seeking
13  all of the defendant's assets.  So contrary to the defendant's
14  opposition, we're not -- even though we could arguably under
15  the statute, we're not seeking to seize, hypothetically, if he
16  had a home in Europe, or bank accounts in the United States, or
17  his home in Alexandria to the extent he owned it.
18          We are simply seeking to forfeit certain property
19  that was found on his person when he was captured on March 14
20  of 2016 by the Kurdish Peshmerga near ISIS-controlled
21  territory.
22          I will try to be brief, Your Honor, but to the extent
23  the defense is going to argue that we haven't satisfied the
24  statutory nexus, we think that argument is meritless in light
25  of the testimony that Your Honor heard both during the

1   suppression hearing and the jury trial held in this matter.

2           I understand that since our reply the defendant, as
3   Your Honor stated, has amended his opposition to include all
4   the items.  So just starting with the cell phones and the SIM
5   cards, which I will refer to as the electronic media.  Your
6   Honor, those items the defendant needed in this case to make it
7   to ISIS territory.  Your Honor and the jury heard testimony
8   that he had encrypted messaging apps on those phones.  He had
9   ISIS propaganda.  Violent images.  Abu Bakr al-Baghdadi.  Anwar
10  al-Awlaki.  Maps of Turkey, Syria, and Iraq.  The body of a
11  soldier engulfed in flames.

12          Your Honor heard testimony that he admitted to the
13  FBI that he used these programs to communicate with ISIS
14  facilitators.  Your Honor saw that he even booked a flight back
15  to the United States while he was in Turkey.  And he said that
16  he could have gotten on that flight, but he chose not to, he
17  decided to continue forward.

18          So we think clearly the electronic media was involved
19  in planning his conduct to join ISIS.

20          Now, as it relates to the currency, Your Honor, there
21  were three denominations of currency found on the defendant
22  when he was captured.  4,151 U.S. dollars.  20,000 Iraqi Dinar.
23  And I believe 285 Turkish Lira.

24          Your Honor, as it relates to the U.S. dollars,
25  clearly that currency was involved in planning this defendant's

1 conduct. He admitted that he sold his car approximately one
2 week before he left the United States. He left the United
3 States -- before he left, his quit his job. He closed online
4 accounts. He concealed and lied to his family about where he
5 was going.
6 And he even admitted, as Your Honor heard through the
7 trial testimony, that he took the proceeds of the sale of that
8 car with him overseas. He went overseas on a one-way ticket.
9 And at the time that he left, Your Honor, he had no ticket back
10 to the United States. So there is no evidence that he intended
11 to return. And he took that money with him.
12 The jury also saw bank withdrawal slips, cash
13 withdrawal slips that were presented. One was a few days
14 before his departure in December of 2015. The other one was
15 the day before his departure. Those cash withdrawal slips
16 amounted to $3,800. That was done shortly before he left.
17 When he arrived in Turkey, Your Honor heard testimony
18 from numerous witnesses that he admitted that he was there for
19 the purpose of contacting ISIS. And at one point, Your Honor,
20 during the cross-examination the defendant was sort of -- he
21 was trying to minimize his conduct, and he was saying, well, I
22 was asking individuals whether I would have to pay.
23 And then about two or three pages into the transcript
24 I asked him: But if they told you you would have to pay them
25 to travel into Syria, you would have paid, correct? And he

1  said:  Yes.
2         I would like to note, Your Honor, when our reply was
3  filed, Mr. Linnell did an outstanding job with the transcripts,
4  when our reply was filed it was based on the transcripts that
5  were available at the time.  They haven't really changed too
6  much since our reply was filed, but I note that because to the
7  extent the Court looks at some of the line citations, they
8  might be off by a couple of lines in certain places because the
9  transcripts have been revised.
10         But we have provided cites to trial testimony,
11  including the defendant's own testimony, where he admits that
12  he was in Turkey as of December 20.  According to his own
13  statement, he was there until the end of December of 2015.
14  Perfectly logical inference that he had Turkish Lira on him
15  because he was in Turkey for a week to ten days.
16         And so the reason that he was there, because he was
17  trying to join ISIS, directly connects that currency to the
18  federal crime of terrorism that he has now been convicted of by
19  a jury.
20         As it relates to the Iraqi Dinar, Your Honor, Your
21  Honor heard testimony from Agent Czekala that each household in
22  Iraq was given a stipend or salary so that they could purchase
23  food and other items.  In addition to household salaries, each
24  ISIS member was given a salary for their service.
25         The defendant's ISIS intake form, which listed his

1   mission as a fighter, that was introduced into evidence, and on
2   that form it had an allowance of $50.
3               Furthermore, when asked whether the defendant stated
4   that he gave anything to ISIS members, the jury heard testimony
5   that "he frequently gave money to other ISIS members."
6               So again, we think there is a logical inference
7   there.  He was with ISIS in Iraq.  He joined the organization.
8   He was there for several weeks at a minimum.  And so, it's
9   perfectly reasonable that that money also was involved in the
10  commission of this offense, of his terrorism-related conduct.
11              Your Honor, the Government clearly believes that (ii)
12  and (iii) of 981(a)(1)(G) have been satisfied.  So we don't
13  think that Your Honor even needs to consider any constitutional
14  arguments.
15              THE COURT:  You can rest on your papers on 1 and 4.
16              MR. PAREKH:  Thank you, Your Honor.
17              THE COURT:  I don't need to hear any further argument
18  on that.  Thank you, Mr. Parekh.
19              MR. PAREKH:  Thank you, Your Honor.
20              THE COURT:  Ms. Carmichael.
21              MS. CARMICHAEL:  Good morning, Your Honor.
22              I think it's important at the outset to just
23  establish what exactly we're talking about here.  We're talking
24  about approximately $17 in Iraq Dinar, approximately $80 in
25  Turkish Lira, and approximately 4,000 U.S. dollars, and some

1  phones, and some SIM cards.
2          Mr. Khweis wishes to argue that not all of the phones
3  and SIM cards were used in the offense.
4          As to the money, Your Honor, these were not proceeds
5  or instrumentalities of the offense.  And I believe the
6  Government is asking this Court to speculate that this money
7  was used in the offense in any way.  It was lawfully earned
8  money.  He had a job.  You heard testimony that he sold his
9  car.  And the Government has the withdrawal slips from the bank
10 accounts that Mr. Khweis used to withdraw the money.
11         Mr. Khweis unquestionably did buy plane tickets and
12 such, but certainly that money was not found on him, it had
13 already been spent.
14         And if Mr. Khweis intended this money to go to ISIS,
15 Mr. Khweis would have left it in ISIS territory.  Instead, he
16 took it with him.
17         So, Your Honor, our argument is that this was
18 lawfully earned currency that was simply taken in and then out
19 of ISIS territory.  That does not constitute a proceed or an
20 instrumentality of the offense.
21         To the extent the Government relies on substitute
22 assets, Your Honor, the defense doesn't believe -- the defense
23 agrees that substitute assets can be forfeited, but doesn't
24 believe that that's really an issue in this case because there
25 haven't been any funds that have been alleged need to be

1   substituted, I guess would be an inartful way to put that.

2              With respect to the in personam versus in rem
3   distinction, Your Honor, there have been numerous cases that
4   have discussed that in rem and in personam jurisdiction are
5   relatively insignificant when it comes to this type of
6   forfeiture request because it is in fact putting a penalty on
7   an individual through seizing the assets.

8              I would like hand the Court two additional cases that
9   I was not able to -- well, that I had not found at the time I
10  filed my response.  And I've provided those to the Government
11  as well.  One is a Fourth Circuit Court case, United States
12  versus Grand, and one is a Second Circuit case, United States
13  versus Huber.

14             Your Honor, these go to the constitutionality
15  argument and --

16             THE COURT:  Of 1 and 4?

17             MR. ZWERLING:  Of 1 and 4, Your Honor.  We assert
18  that this -- the Constitution was founded on a principle of
19  being against forfeiture of estate.  And those cases lay out
20  the forfeiture of estate prohibition and its history.  I don't
21  need to go into that, Your Honor, except to say that we believe
22  that there has been an incremental progression that trends
23  against the forfeiture of estate, and that this now is falling
24  squarely in asking a Court to allow that an individual -- or
25  that the Government can seize someone's entire estate simply

1  because they have been convicted of a particular felony, not
2  because that money has actually been used to commit that
3  felony.  But that it is entirely untainted money that the
4  Government is asking to be seized.
5          We believe that the Saade case that the Government
6  cited is not binding on this Court, and it's extremely
7  distinguishable in the sense that that case -- in that case the
8  defendant conspired to acquire $25 million worth of weapons to
9  provide to the Taliban.  Certainly that's not the case here.
10         Again, the defendant in that case did not make the
11 constitutionality argument that we are making, not the broad
12 constitutionality argument.  I believe they made an Eighth
13 Amendment argument in that case.
14         THE COURT:  It was punitive, right.
15         MR. ZWERLING:  Correct, correct.  So it was a
16 different argument, Your Honor.  Therefore, we believe that it
17 was distinguishable.
18         Essentially, Your Honor, simply because this
19 defendant was convicted of a terrorism offense does not mean
20 that he should have to forfeit his entire estate.  And that's
21 why we believe the statute is unconstitutional.  We believe
22 it's untainted funds.
23         THE COURT:  All right.  Thank you, Ms. Carmichael.
24         Well, I think that all these seized items, both the
25 money and the telephones and the SIM cards, all of it is

14

1    forfeitable under sections 2 and 3.

2             By Mr. Khweis' own testimony, he went into Iraq
3    looking for a new caliphate.  He joined ISIS.  He spent
4    two-and-a-half months in ISIS.  He worked diligently, as Mr.
5    Parekh has indicated and gone over in the pleadings and here in
6    court, to cleverly get into ISIS territory through a pretty
7    sophisticated scheme.  He was successful.  He sold his assets,
8    and I think the evidence is absolutely clear he intended to use
9    all this money to support his planning the act of getting into
10   Syria, and he did so.  And he took all this money and clearly
11   sold his assets that he had that were available in furthering
12   that intent to get to ISIS and to join ISIS and to stay there.

13            And also, clearly this money and the other assets
14   were being used or intended to be used to commit the crime of
15   terrorism.

16            The fact that he left and he still had some of the
17   money remaining is irrelevant to whether under prongs 2 or 3
18   the money is forfeitable.  I think it was clear he acquired and
19   maintained it with the intent of supporting and planning the
20   act of terrorism, and it was used or intended to be used to
21   commit that crime.

22            So I am going to grant the Government's motion for
23   the order of forfeiture.  And I will put a written order
24   together to that effect.

25            All right.  Anything else this morning on the case?

```
1         MR. PAREKH:  Not from the Government, Your Honor.
2         THE COURT:  All right.  Thank you.
3         MS. CARMICHAEL:  Nothing from the defense, Your
4  Honor.
5         THE COURT:  All right.  Thank you.
6  ---------------------------------------------------
                        HEARING CONCLUDED
7
```

```
19         I certify that the foregoing is a true and
20  accurate transcription of my stenographic notes.



                    /s/  Norman B. Linnell
24                  Norman B. Linnell, RPR, CM, VCE, FCRR
```