1

```
               UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF VIRGINIA
                   Alexandria Division


-------------------------------:
                               :
UNITED STATES OF AMERICA        :
                               :
                               :
     -vs-                       :   Case No. 1:16-cr-143
                               :
                               :
MOHAMAD JAMAL KHWEIS,           :
               Defendant.       :
                               :
-------------------------------:
```

SENTENCING HEARING

October 27, 2017

Before:   Liam O'Grady, USDC Judge

APPEARANCES:

Dennis M. Fitzpatrick and Raj Parekh,
Counsel for the United States

John K. Zwerling and Jessica N. Carmichael,
Counsel for the Defendant

The Defendant, Mohamad J. Khweis, in Person

2

```
 1              THE CLERK:  The Court calls case 1:16-cr-143, the
 2   United States of America versus Mohamad Jamal Khweis for
 3   sentencing.
 4              May I have the appearances, please, first for the
 5   Government.
 6              MR. FITZPATRICK:  Thank you.  Good morning, Your
 7   Honor.  Dennis Fitzpatrick and Raj Parekh on behalf of the
 8   United States.
 9              THE COURT:  Good morning.
10              MR. PAREKH:  Good morning, Your Honor.
11              MR. ZWERLING:  Good morning, Your Honor.  John
12   Zwerling and Jessica Carmichael for Mr. Khweis, who is present
13   in court.
14              THE COURT:  All right, good morning to you.
15              Good morning, Mr. Khweis.
16              THE DEFENDANT:  Good morning.
17              THE COURT:  All right.  This comes on for post-trial
18   motions and also sentencing.  Are the parties ready to proceed?
19              MR. FITZPATRICK:  Yes, Your Honor.
20              THE COURT:  All right.  Do you want to do the
21   post-trial motions first?  I think maybe that makes sense.
22              Ms. Carmichael.
23              MS. CARMICHAEL:  Yes, Your Honor.
24              THE COURT:  Well, it's your motion, absolutely, go
25   ahead.
```

3

1          MS. CARMICHAEL:  Your Honor, would Your Honor prefer
2    to hear the Rule 33 motion for a new trial first or the Rule 29
3    judgment of acquittal?

4          THE COURT:  33.

5          MS. CARMICHAEL:  Thank you, Your Honor.

6          As Your Honor is well aware, during trial in this
7    case the Government presented a document, to which the defense
8    objected, which was purportedly an ISIS document and labeled
9    Mr. Khweis as a fighter.

10          Throughout the trial the Government repeated this
11   theme over and over and over again.  The defense, of course,
12   challenged the authenticity and the basis for that entry.  And
13   the Government in its closing argument even suggested that the
14   defense might attack the document, but that everything else is
15   correct in that document and, therefore, the fighter entry was
16   correct as well.

17          Since that time, Your Honor, a new document was
18   recovered.  And this new document has two entries for Mr.
19   Khweis.  And in the Remarks and in the Notes column, the entry
20   is blank.  For other individuals it lists them as fighter, but
21   for Mr. Khweis there is no such designation.

22          This is exculpatory, Your Honor, and it undermines
23   the confidence in the jury's verdict.  Because the Government
24   repeated this so often throughout the case and as it maintains
25   that Mr. Khweis was in fact a fighter, it significantly

4

1    undermines that notion and makes it more likely that the jury

2    would have believed that that was not in fact Mr. Khweis'

3    intent when he went over there.

4             Additionally, Your Honor, the entries, the new

5    entries that are blank are subsequent to the initial entry,

6    which makes it even more likely that that initial entry was in

7    fact incorrect, Your Honor.

8             The Government indicates that this document is

9    inculpatory, but we simply disagree with that.  The fact that

10   other individuals are listed as fighters but Mr. Khweis is not

11   listed as a fighter on that document, is clearly exculpatory.

12            Your Honor, this is consistent with innocence,

13   inconsistent with guilt.  And I think that it's particularly

14   worth noting that with respect to Count 3, this document has a

15   significant value because the Government relied heavily on

16   Pinkerton, in Pinkerton liability, discussing that Mr. Khweis

17   conspired with other fighters and resided at a safe house with

18   other fighters.  And, therefore, it undermines that argument

19   significantly and undercuts the Pinkerton theory, which was the

20   Government's case.

21            THE COURT:  Well, how do you respond to the

22   Government's argument that he was really charged with the

23   material support being as personnel and services, not as a

24   fighter?

25            And also that, you know, their theory that under the

5

1    <u>Pinkerton</u>, as you said in Count 3, that he clearly knew that

2    ISIL was a terrorist organization and engaged in battles

3    throughout the Middle East, and that it's not necessary that he

4    actually have been designated as a fighter, it's really not

5    relevant to the elements of the offense.

6           MS. CARMICHAEL:  I think that that argument would

7    hold more weight had the Government not relied so heavily on

8    this document and this designation as a fighter during trial.

9    That was clearly what the Government was after in the jury

10   verdict.

11          THE COURT:  One of the documents said fighter, the

12   other did not, right?  So you had it both ways.  And you made

13   contrary arguments, right?

14          MS. CARMICHAEL:  That's correct, Your Honor.  And

15   this adds significantly more weight to these defense arguments.

16          THE COURT:  Okay.  All right, thank you.

17          Mr. Parekh.

18          MR. PAREKH:  Thank you, Your Honor.

19          Your Honor, based on the quantum of evidence that was

20   presented to the jury in this case, the defendant is simply not

21   entitled to a new trial given this newly discovered document.

22          The evidence demonstrated that Mohamad Khweis heeded

23   the call to jihad, incessantly engaged in epic proportions of

24   self-deception, and became the consummate utility player for

25   ISIS.  I use the phrase "utility player" because the evidence

6

1    showed that he really was the Jack of all trades for the

2    organization, not simply someone who was in the pipeline to be

3    a fighter.

4              As Your Honor just alluded to, the Government was

5    required to prove that the defendant either provided material

6    support or resources in the form of personnel or services.

7    Going back to the theme of Mohamad Khweis being the Jack of all

8    trades, he wanted to be a suicide bomber for ISIS.

9              When ISIS needed him to travel with ISIS fighters to

10   multiple safe houses across war zones in Syria and Iraq, he was

11   hired for the position.

12             When ISIS members and fighters needed money, he gave

13   them money.  When ISIS needed his blood, he allowed them to

14   draw it.  When ISIS needed someone to cook and care for wounded

15   fighters, Mohamad Khweis multitasked and filled that role as

16   well.

17             When an injured fighter needed to conceal his online

18   activity and disguise his location, the defendant provided him

19   the means to do so.

20             When ISIS needed him to attend ISIS lectures,

21   including sermons that always ended with "may God destroy

22   America," Mohamad Khweis complied.

23             When ISIS needed someone to constantly watch military

24   videos with fellow ISIS members for inspiration, Mohamad Khweis

25   said, put me in coach, whatever the team needs.

7

1          What these examples demonstrate is that over the

2     course of two-and-a-half months this defendant gave himself as

3     personnel to ISIS and served the most lethal terrorist

4     organization on the planet in different positions and different

5     roles.

6          There is nothing about this newly discovered document

7     that undermines the confidence in the jury's swift and decisive

8     guilty verdict on all three counts.  At the end of the day, the

9     document is more inculpatory than anything else because it puts

10    Mohamad Khweis firmly within the operations and machinery of

11    the terrorist organization.  It further reinforces that he was

12    a paid member of ISIS.

13         The defendant argues that there is no designation for

14    him, but there is designation for other individuals on the

15    document.  Your Honor, what that shows is that Mohamad Khweis

16    was in fact conspiring with other fighters.  He's listed on a

17    document with other fighters.

18         He's also listed on this document, as he was on one

19    of the documents admitted at trial, as receiving a stipend or

20    allowance from ISIS.  The notion that he was a paid member of a

21    terrorist organization, who since 2014 has killed 9,000

22    individuals annually, just to sit around and check things out,

23    is preposterous.

24         Furthermore, Your Honor, the defense just now in

25    their argument stated that this was the primary piece of

8

1    evidence that the Government used to convict him.  That simply

2    is not the case and ignores the vast body of evidence developed

3    in this case.

4          The jury saw everything from the defendant's airline

5    records, his wireless network connection data points, Google

6    Internet search history, DMV records, car rental records, bank

7    records, e-mail records, social media records.

8          The fact that he stated that he wanted to be a

9    suicide bomber was corroborated by the independent piece of

10   evidence, his creation of the iAGreenBirdiA Twitter account

11   while he was in Turkey even before he entered the terrorist

12   organization.  He was advertising to them, inshallah, I will

13   become a martyr, inshallah.  That is precisely the first thing

14   that he did when he entered Syria.

15         Your Honor, we even introduced a private Twitter

16   message to what was described to be an ISIS recruiter or

17   facilitator that Mohamad Khweis sent while he was in Turkey

18   seeking to enter the terrorist organization.

19         We had countless statements that were corroborated by

20   numerous witnesses in the case regarding the role of guns,

21   firearms within the terrorist conspiracy.  You had a Kurdish

22   Peshmerga official who came in from the battlefield, testified

23   live in this courtroom and said, the area in which the

24   defendant was coming from was all ISIS-controlled territory and

25   it was filled with ISIS snipers.

9

1              So we don't think that there is anything in this
2    document that would undermine the confidence of the jury's
3    verdict.
4              Moreover, as Your Honor stated, the defense did try
5    to impeach the document.  They did it on cross-examination,
6    they did it during closing argument, and they argued, which is
7    what they would argue with this document, that we don't know
8    who ascribed any of these entries, particularly the fighter
9    notation.
10             But again, as the defendant concedes, this newly-
11   discovered document was subsequent to the document that was
12   introduced at trial.  The document introduced at trial we
13   presented as his intake forms.  That was corroborated through
14   the testimony of the agents who said he went through this
15   process when he arrived.  He was asked questions.  The answers
16   to those questions were listed on that document, as well as in
17   the testimony of the defendant's statements.
18             And in addition to that, the document had a date of
19   January of 2016.  It's simply incorrect to suggest, as the
20   defendant did in his filing, that the Government presented Mr.
21   Khweis as its primary argument that he was a fighter.
22             I went through the transcript, Your Honor, and just a
23   few examples.  Page 561, Agent Czekala testified that Mosul,
24   Iraq, it was at this safe house where he was instructed that
25   the next step for him would be military training and that he

10

1      eventually would be a fighter for ISIS.

2              The next page, after he is instructed that he

3      eventually would receive military training and become a fighter

4      for ISIS, he was told that he should have been assigned to an

5      ISIS household that had -- that was full of English speakers.

6              Page 566, at one point he was approached and Mohamad

7      Khweis asked an ISIS official, why am I waiting?  Why am I not

8      undergoing military training?  And the ISIS official reassured

9      him and tried to comfort him and said that this happens.  He

10     gave an example of another ISIS fighter that had waited a long

11     time before undergoing military training.  And that the ISIS

12     official reiterated that he would be a fighter after he

13     received that training.

14             There was also testimony which indicated that the

15     defendant was frustrated that he hadn't yet received the

16     military training.

17             And so, the fact that this document and these entries

18     were subsequent to the intake documents actually corroborates

19     the testimony at trial.  And, therefore, in the Chavis test, it

20     also doesn't satisfy the merely impeaching or cumulative prong

21     in favor of the defense.

22             The defense impeached the documents that were

23     introduced at trial, and this document would have merely

24     corroborated the testimony that the agents gave.

25             And so for those reasons, Your Honor, we don't

11

 1  believe that the defense is entitled a new trial, and we ask

 2  that you rule such.

 3          Thank you.

 4          THE COURT:  All right, thank you.

 5          Mr. Zwerling.

 6          MR. ZWERLING:  May I respond just briefly, Your

 7  Honor?

 8          THE COURT:  Yes, sir.

 9          MR. ZWERLING:  Judge, this case is an unusual case in

10  many respects.  One of them is that the vast majority of the

11  Government's case against Mr. Khweis comes from the mouth of

12  Mr. Khweis.  The agents testify, he told us this, he told us

13  that, he told us the other.  Virtually everything that the

14  Government has just recited to you was an agent testifying what

15  Mr. Khweis told them.

16          And what I find troubling is that when Mr. Khweis

17  says, I was asked upon intake whether I would be willing to be

18  a suicide bomber, I said, yes.  He told them that.  He said,

19  but I didn't mean it.  I was afraid to say no.

20          Now, you remember that he came over to Syria and ISIS

21  in a somewhat unusual fashion because he didn't have a sponsor.

22  They didn't know him from a hole in the wall.  He was not

23  trusted.  And if they thought he was a spy, he told the

24  Government, and the Government has confirmed, the way they

25  treat spies is not very nice, they kill them, and in not nice

12

1      ways.  So he didn't want to run into that.

2             Not one time since this case started, except on

3      cross-examination, has the Government, whenever they talk about

4      the statement by Mr. Khweis that he was asked to be a suicide

5      bomber and said yes, ever puts in the qualifying part of the

6      statement that he made.  And I just don't think -- that just

7      strikes me the wrong way.

8             And I recall him wanting to go to meet up with the

9      English speakers, not necessarily the fighters.  There were

10     fighters everywhere.  I never once heard him say, I wanted to

11     get training.  He said he was told by other people that he

12     would get training, that that's what would eventually happen.

13            Now, as far as the significance of this document, Mr.

14     Khweis testified in this case.  Now, he told the Government,

15     and it came out to the jury, that when he was brought to the

16     first house in Raqqah, they took everybody, they took blood,

17     and they took information, they took their documents.  And

18     there was one guy on a computer and one guy filling out a form

19     by hand.  And he told them what he was asked and what his

20     answers were.

21            They had never heard of this before.  Was he telling

22     the truth?  Well, it turns out months later after his

23     statements, part of Mosul is liberated and lo and behold they

24     find the computer entries in this document that was introduced,

25     and it had everything that he told them.

1          The one thing on that document that he didn't tell

2     them about was that he was designated a fighter.  And he

3     testified to the jury, I never said that.  And of course, there

4     is the document.  If nothing else, that showed he was a liar to

5     the jury.  His credibility was severely impacted.  Our ability

6     to argue that his story was credible was severely impacted by

7     that document with that entry.

8          Then lo and behold, the next two months the similar

9     document does not have him listed as a fighter.  Which is an

10    indication, certainly a good argument that the first one was a

11    mistake.  Okay.  We didn't have that available to us to argue

12    to the jury.  And had we, maybe the jury would have found the

13    important parts of his testimony credible, not the

14    Bluebird/GreenBird part.

15         But even with the GreenBird, which he admitted to at

16    one point in the trial before, I will get into in sentencing,

17    before the next time he said no, it was at the Twitter bird

18    that was blue that made me think of the GreenBird.

19         He explained, and the Government has not ever told

20    you, although you have heard it, how he changed his handle to

21    GreenBird, iAGreenBirdiA.  His initial one was fearislove.

22         So he is there in Turkey.  He is trying -- and he

23    admits, he is trying to get someone to take him into ISIS.  And

24    he is posting on his Twitter account fearislove, you know, that

25    he wants to go.  And he gets no response.

14

1        He says, well, why am I not getting a response?

2   Well, let me try this.  You know, iAGreenBirdiA, you know, God

3   willing, let the GreenBird take my soul to heaven.  And he gets

4   responses.

5        Does that indicate that he wanted to be a suicide

6   bomber by itself?  I don't think so.

7        So the point I am trying to make for the significance

8   of this new document is not only does it diminish the power of

9   the Government's argument about the existence of the term

10  "fighter" there, but these new documents would strengthen our

11  argument that the important parts of his testimony were

12  credible.  That he didn't go there to be a fighter.  He went

13  there for naive reasons.

14        And whether it is to be like an ambulance ET in

15  helping people who need to get to the hospital or helping to

16  feed people, that could easily go towards whether he should be

17  held accountable under Pinkerton for possession of the

18  firearms.

19        Judge, I have not seen any other cases, maybe there

20  are some, of people who have traveled or wanted to travel who

21  have ever been convicted under Pinkerton.  This is a unique

22  thing for me.  And I think it is a stretch, but I think if in

23  fact he went there to be a fighter, it would be less of a

24  stretch than if he had not.

25        And for those reasons, we ask you to grant the Rule

1   33, especially on the gun count.

2            THE COURT:  All right.  Well, I am going to deny the

3   Rule 33 motion.  You know, he is not charged with providing

4   material support by being a fighter.  It was by providing

5   support as personnel or services.

6            I think that the power of the initial documents was

7   corroboration that he in fact joined ISIS, which he was

8   ambivalent about certainly at trial.  But with the FBI, even

9   when he was being interviewed, and that the import of those

10  documents was that they had him in their system as having

11  registered and become a member.

12           And the real power of the testimony was in the

13  actions that he was responsible for and how he deliberated on

14  which terrorist organization to join.  How he very cleverly got

15  to Syria.  How he wanted almost desperately to get to Syria.

16  How he modified his plans based on, as you said, whether he got

17  responses from ISIL to some of these social media messages or

18  not, how he traveled there, and then was in the process of

19  being trained to be a fighter.

20           And I think that was the testimony loud and clear, is

21  that he hadn't been out in the field and wasn't going out into

22  the field until he had had the training, which had not included

23  military training to date.  And the jury heard that loud and

24  clear.

25           So these new documents just, one, corroborate once

1  again that he actually was being paid in February and March, or

2  January and February by ISIL.  That he still was a member of

3  ISIL.  And the fact that it does not designate him as a fighter

4  in those documents, I don't think is significant to the proof

5  in the charge or the elements of the offenses.

6  And as pointed out in the United States versus Chavis

7  test, at least the fifth prong is that where new evidence is

8  presented, that it has to rise to a level that it would

9  probably result in an acquittal in a new trial.  And I don't

10  think that this additional evidence comes close to that for the

11  reasons I have stated and those that Mr. Parekh has identified.

12  Whether it's the fact that he agreed initially to be a suicide

13  bomber, albeit not sincerely, and the rest of the information

14  that I have given.

15  And I have looked closely again at Count 3 and the

16  Pinkerton theory and the Government's evidence on the Pinkerton

17  theory.  And it was consistent not with him being a fighter,

18  because there is no evidence that he had become a fighter at

19  the time he left, but instead that he had joined a terrorist

20  organization where fighting was the first and foremost goal of

21  the organization to, one, create a caliphate; and, two, resist

22  and commit jihad against the United States and other countries.

23  So I don't think it changes the evidence in Count 3

24  to the extent that you believe.

25  So your exception is noted, of course.  And I will

17

1    deny the motion for a new trial based on the newly discovered

2    evidence.

3          All right, let's go on to the Rule 29.  Ms.

4    Carmichael.

5          MS. CARMICHAEL:  Thank you, Your Honor.

6          I would like to start with Count 3 on the Rule 29.

7    In the brief I have discussed four reasons why the evidence was

8    insufficient as a matter of fact and law.  Today I would like

9    to discuss two of those reasons.

10          The first, that the firearm must be used to further

11    the specific predicate offense.  And second, being that it must

12    be a real firearm by statute.

13          As Your Honor just discussed, the Government

14    proceeded on Count 3 on a <u>Pinkerton</u> theory of liability.  Your

15    Honor noted at the time that it was pure speculation as to a

16    substantive offense and, therefore, the Government was only

17    permitted to proceed through co-conspirator arguments.

18          The Government essentially at trial argued that ISIS

19    uses firearms to commit violent acts.  Mr. Khweis knew that

20    ISIS uses firearms to commit violent acts.  Mr. Khweis

21    conspired to provide material support for ISIS.  And,

22    therefore, he is responsible for his co-conspirators caring

23    firearms in furtherance of a crime of violence.

24          Your Honor, the problem with this theory and the

25    problem with the evidence that was presented at trial with

18

1  respect to Count 3 is that Pinkerton liability depends on a

2  specific predicate offense, not simply that ISIS is generally a

3  violent organization that generally commits acts of violence.

4        And in this case, the Government did specify a

5  predicate offense in the indictment.  Interestingly, the

6  Government specified that predicate offense as the conspiracy

7  charge, the conspiracy to provide material support.

8        As Your Honor knows, the conspiracy offense is the

9  agreement to violate the law.  The subsequent acts taken after

10 that point are not relevant with respect to the conspiracy

11 charge.  And as the Government often argues at trial, the crime

12 is complete once the agreement is made.

13       Therefore, for Mr. Khweis, the Government needed to

14 show that a firearm furthered the formation of this agreement

15 to provide material support.

16       And, Your Honor, the Government gave examples of the

17 formation of this agreement in its closing argument.  The

18 Government discussed the agreement to get in the taxicab, the

19 agreement to have blood drawn.  And in each of these examples

20 and through the testimony elicited at trial, the Government was

21 very adamant and sure to point out that a firearm did not

22 further the formation of that agreement.

23       I think one of the questions was, well, no one put a

24 gun to your head and said, get in the taxicab.  Therefore, Your

25 Honor, we submit that a firearm simply did not further this

1    specific predicate offense.

2            One of the reasons I think that this is so troubling,

3    that this type of liability with this specific predicate

4    offense is so troubling is that it makes it so that every

5    material support case, for example, someone buying a gift card

6    for ISIS sitting in their parents' basement at their home in

7    the U.S., could be liable under this theory of a 924(c) charge.

8    And, Your Honor, that simply cannot be what the statute was

9    contemplating at the time that it was written.

10           I think had the Government charged the actual

11   substantive offense of providing material support -- and of

12   course, we would still argue that it did not satisfy that, but

13   I think the Government may be a bit closer if it had pled the

14   substantive material support as a predicate offense rather than

15   the formation of an agreement.

16           And, therefore, Your Honor, we believe that the

17   evidence is insufficient on the Pinkerton theory.

18           With respect to the 924(c) charge and the fact that

19   the firearm in this case does not meet a statutory definition

20   of a firearm.  Your Honor, it's the Government's burden to

21   prove that the firearm meets the statutory definition of a

22   firearm.

23           And I would like to first point out that we don't

24   even know which firearm we're talking about here.  It makes the

25   entire analysis elusive.  We don't know if it's from the time

1    he got there or if it's from the time he left.  I mean, we have

2    no idea what firearm we're even talking is an issue here.

3           And while an expert is not required to show that the

4    firearm is operable or readily convertible to operable, the

5    evidence and the burden still requires something more than an

6    individual just saying the word "gun" or the word "firearm,"

7    which is almost all that we have in this case.

8           The other cases in which expert testimony was not

9    elicited at trial, those witnesses still testified to a

10   description of the firearm which would have led a trier of fact

11   to find that it was in fact a firearm.

12          Now, Your Honor, just to be clear, we are not

13   alleging that ISIS uses toy guns or fake guns, Your Honor.  But

14   we are saying that in this case, one, we don't know which gun

15   we're talking about; and, two, that it wouldn't be -- it

16   wouldn't be far-fetched to think that whatever gun we are

17   talking about could have been some relic left over from the

18   Soviet era that somebody carries around to make it look like a

19   gun but has actually no hope of functioning at all.

20          So for those reasons, we submit that Count 3 cannot

21   stand because the evidence was insufficient as a matter of law

22   and fact, as well as the other reasons that I submitted in my

23   brief.

24          With respect to Count 1 and 2, Your Honor, I think at

25   the outset -- well, first of all, we submit that the evidence

1   was insufficient on the material support charge and the

2   conspiracy to provide material support.

3         I think that one of the glaring voids in this case is

4   the absolute absence of any type of social media postings, text

5   messages, e-mails, anything where Mr. Khweis espouses ISIS

6   idealogy, says that he agrees with ISIS idealogy, encourages

7   anyone to join ISIS, any of that.  There is none of that

8   leading up to his travel, and there is none of that while he is

9   in ISIS territory.

10        And as a result, Your Honor, we submit that the

11  Government failed to show that Mr. Khweis provided material

12  support to a foreign terrorist organization rather than an

13  individual who happens to be a member of a foreign terrorist

14  organization.

15        The courts have been clear that the defendant must

16  act with knowledge that his support would be used to further

17  the terrorist organization's activities and not just the

18  personal interests of its members.

19        There were examples in this case of Mr. Khweis buying

20  food, or bringing food, or perhaps cleaning, and all of those

21  acts could have been taken simply to help a person who happens

22  to be a member of a terrorist organization rather than showing

23  an intent to actually support a terrorist organization's goals.

24        In addition, providing medicine would be exempt under

25  the statute.

22

1          With respect to the personnel, Your Honor, we submit

2    that the evidence was insufficient on this as well because the

3    case law is clear that Mr. Khweis must have acted as personnel

4    under the direction and control and at the will of the foreign

5    terrorist organization, and that the record does not establish

6    that beyond a reasonable doubt.

7          We did not hear testimony that Mr. Khweis purchased

8    any food or cleaned anything at the direction or command of

9    another member of the foreign terrorist organization.  And

10   there was no testimony of an employee or employer-like

11   relationship.

12          And finally, Your Honor, I would just like to

13   conclude on the Rule 29 that Mr. Khweis when he was interviewed

14   by the agents, he made a statement that he wanted to be able to

15   tell his kids and his grandkids about his travel.  That

16   indicates that Mr. Khweis did not wish to be a martyr.  He did

17   not wish to be a suicide bomber.  And for some reason, that

18   particular statement is not credited nearly as much or even

19   ever mentioned even though it is a statement that he made to

20   the agents.

21          We see that -- if Mr. Khweis' statements are going to

22   be -- to the agents are going to be credited to the degree that

23   the Government wants them to be credited, particularly the

24   suicide bomber, which we continue to maintain they are taking

25   out of context, we think that the statement about his kids and

23

1    his grandkids should be given equal weight.

2              THE COURT:  All right, thank you.

3              Does the Government want to respond?

4              MR. PAREKH:  Thank you, Your Honor.

5              As the evidence in this trial demonstrated, firearms

6    were abundant and essential for the operation of the ISIS

7    criminal conspiracy that the defendant deliberately joined.

8              The defense's argument is that Mohamad Khweis

9    conspired at one moment in time and that the conspiracy didn't

10   continue.  But that flies in the face of the indictment.  The

11   indictment reads:  Beginning in at least December 2015 and

12   continuing thereafter up to and including March 14, 2016,

13   Mohamad Khweis did knowingly conspire with others to provide

14   material support or resources in the form of personnel or

15   services.

16             The conspiracy, Your Honor, that we allege was broad,

17   it was sweeping.  This is a case that the defendant actually

18   made it to ISIS.  This is not a situation where he conspired to

19   join the organization and was just in the United States or in

20   Turkey.  He actually made it.

21             And so, to state that somehow Pinkerton liability

22   would not extend to the acts of his co-conspirators, goes

23   against the black letter law.  Pinkerton liability states that

24   so long as a partnership in crime continues, the partners act

25   for each other in carrying it forward.  That's been reaffirmed

1     many times by our circuit.

2           And the case here, Your Honor, is that in order to

3     even join the conspiracy, the defendant needed a firearm to get

4     him into ISIS.  So even using the defense's cramped and

5     incorrect interpretation of the law, the firearm actually did

6     further advance or promote Mr. Khweis' conspiracy.

7           On cross-examination I asked him whether he knew that

8     the border to Syria was closed?  And he said he did.  He said

9     that he needed someone to help him get across the border.  And

10    he was actually transported to the first safe house in Syria in

11    an armed ISIS vehicle.

12          So in order to even agree to provide himself to the

13    organization and to get into the organization, a firearm

14    assisted him, and in fact was the means by which he was able to

15    get into the organization.

16          Also, Your Honor, the defendant knew that firearms

17    were present even before he traveled to Syria.  The jury saw

18    countless images on his phone of ISIS members with firearms,

19    ISIS fighters, individuals shooting guns.  Those were all

20    images, many of which had dates on December 24, 2015, and many

21    of which were images that the defendant stored, downloaded on

22    his phone even before he joined ISIS.

23          And so, he didn't go in with this eyes closed, Your

24    Honor.  He knew that ISIS uses firearms.  He knew what the

25    organization uses in furtherance of its criminal conspiracy.

1          And what the defense also leaves out, Your Honor, is

2     that the jury was able to find a guilty verdict on Count 3

3     using two different theories.  It wasn't just possession in

4     furtherance of.  We also charged in the indictment, and as Your

5     Honor instructed, that his co-conspirators could have also been

6     using or carrying firearms during and in relation to a crime of

7     violence.

8          And in relation to, the jury is instructed that a

9     firearm is carried in relation to a crime of violence if it has

10    some purpose or effect with respect to the crime, and if its

11    presence was not the result of accident or coincidence.  The

12    firearm must facilitate or potentially facilitate the crime.

13         Your Honor, what is unique about this case is that

14    the defendant actually wanted to go and did go to a war zone to

15    join ISIS.  He could have stayed behind in the United States

16    and provided support to ISIS from the United States.

17         Clearly we know from the evidence that he was adept

18    at using electronic devices.  He was adept at using encrypted

19    messaging applications.  He could have told the ISIS

20    recruiters, what do you need me to do from here?  I live in the

21    Alexandria, Virginia area.  I support ISIS.  I'm willing to do

22    what it takes.

23         But he wanted to go to a war zone where firearms are

24    essential to the existence of the organization.  The

25    organization would not exist in Syria and Iraq if it wasn't for

26

1    firearms.

2            And in fact, the testimony in this trial was filled

3    with evidence that firearms were being used.  The Peshmerga

4    soldier said that ISIS snipers were in the area where the

5    defendant was captured.

6            Kurdish CTD Official No. 1 said that they were living

7    in a state of war, and that Mosul is being guarded by armed

8    ISIS members.

9            The defendant himself said that ISIS members were

10   guarding checkpoints in cities that ISIS was controlling.

11           He said before he left, contrary to what the defense

12   said -- and I would be happy to provide the transcript cite.

13   On cross-examination I said:  You knew that ISIS wanted to

14   attack and destroy America before you decided to travel to

15   ISIS-controlled territory?  And he said:  Yes.

16           It's in the transcript.  He said it under oath.  And

17   so, the notion that he didn't support violent idealogy is just

18   belied by the facts.

19           And the caliphate, not only did he say that he wanted

20   to see the caliphate, but he said that he wanted to be a part

21   of it.  He admitted to the FBI that he wanted to see the

22   caliphate expand, and that he knew that the caliphate expands

23   by violence.

24           The notion that somehow firearms didn't play a role

25   in doing so is just not consistent with the testimony at trial,

1    including from the defendant himself.

2           And so, for those reasons, Your Honor -- and I should

3    note that during and in relation to -- you know, one of the

4    cases the defense cites is the Khan case, Judge Brinkema's

5    opinion.  And Her Honor writes in that opinion that the during

6    and in relation to standard is actually lower.  In the opinion

7    she says that the in furtherance of standard was a higher

8    standard than during and in relation to.  And she cites to the

9    actual House Congressional Report from October 24, 1997.

10          And so, there are multiple theories of liability

11   here, Your Honor.

12          Now, to go to the point where the defense claims that

13   the firearms didn't further or advance the conspiracy.  Just to

14   name a few examples of that, Your Honor.  I have already talked

15   about how the defendant was transported to an ISIS safe house

16   in a vehicle that was armed with an ISIS member.

17          While the defendant was residing in ISIS safe houses,

18   he was being guarded and protected by armed ISIS members.

19   Number one, a safe house isn't going to be very safe if it's

20   not being guarded.

21          Number two, in order for him to receive his training,

22   his religious indoctrination, to provide services to the

23   organization, he needed to be kept alive.

24          In fact, this is an organization, Your Honor, as the

25   testimony at trial showed, the defendant himself said that, you

1    know, they told me to put my phone in airplane mode and to take

2    out the batteries because they were worried about air strikes.

3           And so, the notion that this is an organization that

4    is carrying around replica firearms when they're worried about

5    air strikes, is just absurd, Your Honor.  And we ask that the

6    Court not credit that argument.

7           Additionally, the evidence was that some of the ISIS

8    recruits that underwent ISIS-directed religious training with

9    the defendant were tasked with armed guard duty at checkpoints

10   to control those checkpoints.

11          The defendant received an inner workings view of this

12   organization.  He wasn't just kept in one safe house.  He was

13   shuttled across multiple safe houses in two different countries

14   whereby the organization opened it up its entire criminal

15   enterprise and exposed this defendant to the inner workings of

16   the organization.

17          And what that included, Your Honor, was the defendant

18   himself stated there were weapons everywhere.  There were

19   weapons at every safe house.  In fact, he said that when he

20   entered the first safe house, he specifically indicated that

21   there was a rifle there.  He didn't just say firearm.  He

22   identified it as a rifle.

23          He also said that there were so many weapons laying

24   around, that I had to move them out of the way.  I had to

25   organize them.  That's also in the transcript.

29

1          And so, again, this argument that his co-conspirators

2    weren't using firearms or somehow that the firearms were

3    replicas or not real firearms, is just belied by the evidence.

4    And the jury is allowed to reasonably infer based on the

5    testimony, based on the images on his phone, that these were in

6    fact real firearms.

7          In fact, Your Honor, there may not be another

8    defendant in this country who knows firearms and what types of

9    firearms ISIS uses better than Mohamad Khweis.  He was there

10   for two-and-a-half months.  He is the only defendant, the only

11   individual to date to face a jury of his peers after

12   successfully joining ISIS in ISIS-controlled territory.

13         He didn't just see one firearm on one occasion, he

14   constantly saw firearms over the course of two-and-a-half

15   months.  And he said not just to the agents during interviews

16   in Iraq, but also on the stand he testified that there were

17   firearms, that there were firearms everywhere.

18         And so, his extrajudicial admissions were

19   corroborated by under oath testimony, as well as the testimony

20   of the Peshmerga soldier, CTD Official No. 1, and the agents.

21         Additionally, what the defense leaves out is that he

22   had a video on his phone.  The video that was played at trial,

23   it was a portion of the video.  And Special Agents Lamb and

24   Czekala specifically identified that this was an ISIS video,

25   there are ISIS members in the video, ISIS flags in the

1   background, and they are holding up AK-47s and some variant of

2   a rifle.  These are specific types of firearms that are being

3   identified.

4           And what also came out at trial is that the defendant

5   stated to the agents that that video was sent to me by one of

6   my fellow ISIS associates who claimed to be in the footage of

7   the video.

8           The defendant is residing with ISIS fighters

9   throughout his entire time there.  In fact, he says that

10  another fellow American recruit was receiving firearms

11  training.  This person was training or had been trained to

12  conduct an attack back into the United States, and part of that

13  training included shooting.

14          So, Your Honor, again, the argument that these

15  weren't real firearms or that firearms weren't integral to the

16  conspiracy, is just not shown by the evidence.

17          Now, to go to the defendant's last argument on

18  sufficiency.  Your Honor, I think the best way to describe this

19  is that the crimes to which the defendant were convicted,

20  particularly Counts 1 and 2, are simply not a 24-hour window of

21  catastrophically poor judgment or crimes of impulse.  These are

22  crimes emblematic of lawlessness and arrogance.

23          And the evidence showed not just through his own

24  statements, but through documentary and electronic evidence,

25  that Mohamad Khweis acted deliberately, consciously, and in a

31

1  calculated manner to provide -- conspire to provide material

2  support to ISIS.

3          Again, the defense claimed just now in their argument

4  that there is nothing to indicate that he supported violent

5  jihad.  Again, that is not in the statute.  The elements are

6  very clear.

7          But even assuming, arguendo, that argument is valid,

8  there is testimony at trial, page 540 of the transcript, Agent

9  Czekala testified that the defendant added that ISIS and other

10 terrorist organizations frequently use this term, referring to

11 the GreenBird account that he created, to show their support

12 for violent jihad, and particularly suicide operations and to

13 become a martyr.

14         He created that account before he joined the

15 organization.  It evidences his intent.  He clearly was

16 desperate to get into the organization.  He wanted to show his

17 bona fides.  And he knew exactly what creating that account

18 would do.

19         And so, we do think that that is corroboration for

20 his statement that, yes, he wants to be a suicide bomber.

21         The arguments that the defense made were capably made

22 to the jury, and the jury was allowed to believe one version of

23 the evidence over the other.  They received the full story.

24 And what they saw is not just the defendant's statements, they

25 saw the defendant making his way to ISIS territory by leaving

32

1    his family behind, by quitting his job, by selling his car, and

2    disposing of his assets.

3              In fact, Your Honor will recall that he admitted on

4    cross-examination that he booked another flight while he was in

5    Turkey.  And so, the jury saw evidence of that plane ticket.

6    He had a way to go home.  On December 22 he booked a flight,

7    and the next day he could have gotten on that flight and flown

8    back from Turkey to the United States.

9              Now, we may not be here if he had made that decision,

10   but that's not what he wanted to do.  He wanted to engage in

11   operational trade craft.  He booked a ticket that six days

12   later got him back to Turkey if he so wanted to or if he had to

13   fly back.  He said, yes, I could have gone home, but I decided

14   to go to ISIS.

15             All of that was independent of his confession or his

16   admissions.

17             The jury saw evidence also that he had closed his

18   online accounts.  They saw e-mail records.  They saw that he

19   had deleted specific portions of his Internet history.  Again,

20   this is evidence from his phone separate and apart from his

21   statements to the FBI.  There were some Google searches or

22   Internet searches that he kept, others that he deleted,

23   including deletions where he looked up individuals associated

24   with jihad as Agent Lamb testified at the trial.

25             So, Your Honor, for all those reasons, we would ask

33

1   that you deny the defense's Rule 29 and 33 motions.

2          Thank you.

3          THE COURT:  All right, thank you.

4          MS. CARMICHAEL:  Your Honor, may I respond briefly?

5          THE COURT:  Yes.

6          MS. CARMICHAEL:  Your Honor, the Government says that

7   the firearms were essential to the existence of ISIS, and talks

8   about guns being everywhere, guns on the couch, guns in the

9   safe houses.  Your Honor, that is not a 924(c) charge.  A

10  924(c) charge is a specific gun used in furtherance of a

11  specific -- or during and in relation to a specific predicate

12  offense.

13         Guns in videos, or guns in Internet history, or any

14  other groups of firearms that we're talking about is not enough

15  to have sufficient evidence on a 924(c) charge.  We need to

16  know what gun was used in furtherance of what specific

17  predicate offense, first.

18         Secondly, Your Honor, the examples that the

19  Government provided of the predicate offense, the gun being

20  used in furtherance of the predicate offense, the examples were

21  a gun in a taxi and Mr. Khweis residing in a safe house.  Your

22  Honor, these are examples -- residing in a safe house and going

23  in a taxi are examples of the allegations of the substantive

24  material support offense.

25         They are not examples of the formation of the

34

1    agreement, which is the conspiracy offense.  And I think it's

2    clear that a gun was not used to further or during and in

3    relation to the formation of that agreement.

4            If the Government wanted to argue those examples, the

5    Government should have charged the substantive material support

6    offense as the predicate.

7            And finally, Your Honor, I would just like the Court

8    to note that mere membership or association with ISIS is not

9    enough to overcome -- well, first of all, that is a First

10   Amendment right.  And it's not enough to overcome the high

11   burden that the Government has when proving material support.

12           THE COURT:  Okay, thank you.

13           Well, we visited these issues at the end of the

14   Government's case, and I found then and I find now that it's

15   proper for the Government to tie the Count 3 firearm count to

16   the conspiracy charge.  That you are narrowly identifying the

17   elements necessary to prove the conspiracy charge.  But I also

18   believe the case law supports, and certainly something the

19   Fourth Circuit will look at, is that the overt acts in

20   furtherance of that conspiracy, and specifically to the

21   firearms, are also proper for the jury to consider in Count 3

22   under the Pinkerton theory.

23           And that for those reasons and the ones cited

24   previously, and I stand by them today, I find that Count 3 is

25   supported by the evidence.  The jury considered the arguments.

35

1    And where there were credibility issues, they came down and

2    found that the Government had proven its case beyond a

3    reasonable doubt.  And I think the instructions that they had

4    represent the case law as it stands today.

5            And as to Counts 1 and 2, I think the evidence was

6    overwhelming that Mr. Khweis very carefully and deliberately

7    chose to join ISIL.  That he made his arrangements.  That he

8    was sophisticated in doing so.  And the fact that he didn't

9    advocate for ISIL prior to leaving was I think a decision he

10   made that he realized it would draw red flags and he never

11   would get there, and he wanted to.

12           So the jury certainly could have found that from the

13   evidence and otherwise his intent, those were issues that the

14   jury considered.

15           I think the elements of the offenses in 1 and 2 were

16   properly relayed to the jury, and that they found Mr. Khweis

17   guilty beyond a reasonable doubt.  And I think that there is

18   support, evidentiary support for each of the elements of the

19   offenses and each of the offenses.

20           So I am going to deny the Rule 29 motion.  And again,

21   your exception is noted to my rulings.

22           All right.  Let's go -- there is a forfeiture motion

23   as well.  Do you want to address that now or not?

24           MR. PAREKH:  Your Honor, I believe Your Honor held

25   the forfeiture hearing on July 28 and issued a preliminary

36

1   hearing order of forfeiture on August 1, 2017.

2           THE COURT:  Right.

3           MR. PAREKH:  So we would just ask in connection with

4   any sentence, that forfeiture be pronounced as part of the

5   defendant's sentence.

6           THE COURT:  Okay.  I didn't know whether separate

7   argument was necessary at this time.

8           All right, let's go on to the sentencing then and the

9   presentence report.  I have read the parties' submissions, the

10  report of Dr. Ghannam, certainly the letters in support of Mr.

11  Khweis, and the arguments that have been made regarding whether

12  the Sentencing Guideline calculation is correct or not.

13          Why don't I hear from Mr. Zwerling or Ms. Carmichael

14  on the -- I think you object to a couple of the offense levels.

15          Go ahead.

16          MS. CARMICHAEL:  Thank you, Your Honor.  In addition

17  to the factual objections that Mr. Khweis maintains with

18  respect to the Government's characterization of the offense,

19  Mr. Khweis also objects to the terrorism enhancement under

20  3A1.4(a).

21          The Fourth Circuit has been clear in the Chandia case

22  that it is the wrong legal standard to equate intent with

23  knowledge on this terrorism enhancement.  And that the

24  knowledge of a foreign terrorist organization's purpose

25  supports a material support conviction, but in order for the

1    enhancement to apply, there must be something more.  There must

2    be a specific intent regarding motive required for the

3    enhancement.

4             If there wasn't an additional requirement, Your

5    Honor, then this would be simply the base Offense Level and not

6    an additional enhancement that needed to be applied.

7             As I discussed in the Rule 29 and Rule 33, the record

8    is void of any specific intent in the form of Tweets or social

9    media or comments agreeing with ISIS idealogy.  There are no

10   texts, e-mails to this effect.

11            And, therefore, even if the Court -- well, as the

12   Court found, that the material support conviction is supported,

13   the lack of the specific intent and motive would preclude

14   application of any 3A1.4 enhancement.

15            Your Honor, the Government also seeks the

16   2M5.3(b)(1)(E) enhancement which Probation did not calculate.

17   And we agree with the Probation officer on this point.

18            The Government argues that it should apply because

19   Mr. Khweis would be aware of the many ways he provided material

20   support to a group that committed violent acts.

21            Your Honor, we submit that that would apply to every

22   single material support case.  Every material support case

23   involves providing support to a violent terrorist organization

24   that commits violent acts because that's the definition of a

25   foreign terrorist organization.

38

1          We again submit that something additional must be
2    present in order for this enhancement to apply.  Something more
3    like the Ferizi case where there is a specific plot or a
4    specific attack in mind when the defendant takes action.
5          Without that, Your Honor, there is double counting,
6    triple conducting the same conduct over and over and over
7    again.  And I believe that the meaning would be lost if it were
8    applied in this case.
9          And finally, Your Honor, with respect to the
10   obstruction enhancement, I would only like to mention that,
11   simply because the Probation officer did not indicate the fact
12   of the destruction of computers and cell phones as a reason to
13   support the obstruction enhancement.  And we agree with that.
14   We don't believe that that should support an obstruction
15   enhancement because he was not under investigation at that time
16   and had no reason to believe that that would be the case.
17          I only mention that because the Government includes
18   it in its sentencing brief.
19          Thank you.
20          THE COURT:  All right.  Thank you, Ms. Carmichael.
21          MR. FITZPATRICK:  Your Honor, with respect to --
22   well, let's go in order.
23          With respect to the 2M5.3, Your Honor, with all due
24   respect to Ms. Blanchard and Ms. Marden, who prepared this
25   report -- they are two of the best in the business.  So this

1    isn't directed at them.  We just respectfully disagree with

2    them.

3            The enhancement says, at the barest level the

4    enhancement says, if the defendant had a reason to believe that

5    the material support is to be used to commit or assist in the

6    commission of a violent act.

7            Here, Your Honor, we had testimony in this case, as

8    Mr. Parekh laid out in detail, of the defendant's efforts to go

9    in, join the organization, provide personnel and services to

10   the organization.

11           You heard testimony at trial that the organization

12   commits, the criminal conspiracy commits 9,000 killings a year.

13   That is 750 a month.  That is 25 per day.  Certainly the

14   defendant had a reason to believe that his services and his

15   personnel would be used to further violent acts.

16           So, Your Honor, this is not an effort -- the

17   Government is not trying to be gratuitous here.  And we

18   understand the argument of enough is enough.  It doesn't

19   materially change the range, it is going to be 360 months to

20   life regardless, but we do have an obligation to address the

21   plain language of the enhancement and apply the facts.  And

22   when you do that, it's very hard to get away from the fact that

23   this enhancement applies.

24           And again, respectfully, we don't believe that it is

25   a more appropriate standard, sort of gauging, well, we've

1    reached a threshold level here, and we just don't like the way

2    this feels.  More appropriate is the standard.  It is simply do

3    the facts line up with the elements.  And here we would suggest

4    that we do that overwhelmingly.

5              With respect to the terrorism enhancement, Your

6    Honor.  On the intent issue, was his conduct intended to

7    promote the federal crime of terrorism.  On the intimidate or

8    coerce a foreign government or to retaliate against a foreign

9    government, this defendant stated that he knew, when he

10   departed for Syria he was aware of the November 2015 Paris

11   attacks, which was an ISIS-claimed attack, which killed dozens

12   and dozens of people in a nightclub in Paris, France.  In fact,

13   Your Honor, the defendant took a substantial step the day after

14   that event to go and join ISIS.

15             With respect to once he finally gets into the

16   machinery of the organization, you will recall the testimony in

17   the case that when he gets to Mosul and he is undergoing his

18   Sharia training, every sermon was concluded with "may God

19   destroy America."

20             The clear inference from there, Your Honor, is that

21   he certainly knew about it.  And in addition, his actions

22   demonstrate that he intended to provide his material support to

23   that organization with those goals in mind.

24             So, Your Honor, we would ask the Court to properly

25   find the Guidelines here at a level 42, a Criminal History

1    Category VI based on the terrorism enhancement, and the 2M5.3

2    violent crime, violent act enhancement.

3           With respect to the obstruction, Ms. Carmichael is

4    correct, we set forth three reasons.  I am happy just to rely

5    on two, just to move the process along.

6           The testimony from the defendant in this trial was

7    very, very bad, it was awful.  And he lied to a jury of his

8    peers, and he lied to this Court.  And that is sort of four-

9    square obstruction of justice.

10           In addition, Your Honor, in many ways -- well, that

11    is actually the most aggravated obstruction of justice in this

12    case.  But also, Your Honor, when he misleads Special Agent

13    Connelly for five days and they are out there looking for this

14    other woman and this other guy who he said he was with, that is

15    awful conduct as well.

16           So on those two bases, Your Honor, we would ask that

17    you impose the obstruction as well.

18           And once again, we find -- we respectfully submit the

19    Guidelines here are a level 42 at a Criminal History Category

20    VI.

21           Thank you.

22           THE COURT:  Well, I think that the intent and motive

23    necessary for the 3A4.1 is clearly met by the facts of the

24    case, and the 12-point enhancement is appropriate.

25           You know, I understand the argument about the double

42

1    counting with 2M5.3, but the Guideline is clear that if the

2    offense involved dangerous weapons, firearms, explosives,

3    funds, or e-funds, or other material support or resources with

4    the intent, knowledge, or reason to believe they are to be used

5    to commit or assist in the commission of a violent act,

6    increase by two levels.

7         Clearly the facts of this case fully support the

8    two-level enhancement.  Even though it may be really subsumed

9    within 3A4.1 and also may be double counting, it's not the only

10   instance where our Guidelines double count similar behavior.

11   But I think it -- and that is something that I certainly look

12   at in the 3553 factors in determining the appropriate sentence.

13        So when you're looking at the Guideline calculations

14   themselves, and the requirements of the Guideline manual from

15   the Sentencing Commission, it's appropriate.

16        The obstruction, there is significant evidence of the

17   obstruction, whether it's lying to the FBI, and Mr. Khweis

18   repeatedly coming in and saying, we need to reset, I have

19   thought about it, and I want to tell you version B, and then

20   version C, clearly he has obstructed the agents from day 1.

21        And as Mr. Fitzpatrick said, of course, it resulted

22   in the FBI running around on goose chases.  And his testimony

23   in trial was absolutely incredible.  And in cross-examination

24   he made admissions, and also was clearly found to have lied on

25   the stand by the jury in reaching the verdict that they

43

1    reached.

2              So I think that the level 42 is the proper Guideline

3    calculation.  It does not make a difference in the recommended

4    sentence, which is still the same 360 months to life.

5              Are there other amendments, corrections that the

6    Government seeks in the report?

7              MR. FITZPATRICK:  No, sir.  No, Your Honor.

8              THE COURT:  Mr. Zwerling or Ms. Carmichael, any other

9    corrections, additions that you want to make to the report?

10             MS. CARMICHAEL:  No, Your Honor.

11             THE COURT:  Mr. Khweis, have you gone over the

12   presentence report, sir?

13             THE DEFENDANT:  Yes.

14             THE COURT:  Other than the amendments that your

15   counsel have asked that we have just been talking about, any

16   other corrections or amendments that you want made to the

17   report at this time, sir?

18             THE DEFENDANT:  No.

19             THE COURT:  All right, thank you.  Have a seat.

20             I will order that the report be filed without -- with

21   the adjustment of the Guideline calculation, and otherwise

22   filed as is.

23             All right.  I have read the parties' submissions on

24   sentencing, and I will hear anything the Government would like

25   to say at this time.

44

1          MR. FITZPATRICK:  Thank you very much, Your Honor.

2          Your Honor, this is a serious case.  Your Honor heard

3     a lot of evidence in this case.  The jury heard a lot of

4     evidence in this case.

5          As you know, the Government is seeking a sentence of

6     420 months imprisonment, which equates to 35 years.  We submit

7     to Your Honor that that sentence is sufficient but not greater

8     than necessary to address all of the statutory factors in 18

9     U.S.C. 3553(a).

10         In addition, Your Honor, we respectfully submit that

11    given the aggregated nature of this case, the planned and

12    deliberate crimes committed by the defendant, that it's also a

13    reasonable and appropriate sentence in this case.

14         Before I support that argument, Your Honor, with more

15    detail, I would like to address at the outset there was a

16    report submitted with the defendant's submission by Dr. Jeff

17    Ghannam.  We would ask the Court to disregard that report.

18         Frankly, the Government has thrown that report in the

19    proverbial trash bin.  It is not worth the paper that it is

20    written on.  Respectfully, it should not have been filed in

21    this case.

22         In February of 2017 a Federal District Court Judge in

23    the Eastern District of New York said that Dr. Jeff Ghannam was

24    fundamentally unreliable.  I am hard pressed to find -- I

25    cannot recall another time that I have read a Federal District

45

1    Court Judge's opinion where he has said an expert witness is

2    fundamentally unreliable.  They may be out there, but this was

3    a first for me.

4           I don't want to dignify that report with much of an

5    argument because it is an undignified report.  It is not worthy

6    of being in this courtroom.

7           With respect to the substance of the sentencing, Your

8    Honor.  We start with -- a good place to start is the Holder v.

9    Humanitarian Law Project, which said that any provision of

10   material support to a terrorist organization makes it more

11   likely that a terrorist event will happen.  Right?  That is the

12   basic take-away of Holder.

13          In this case you have crimes committed by this

14   defendant in which he planned out his activities.  He got

15   smart, he got educated on how to do it, how to go beneath the

16   radar screen and make contacts with foreign terrorists so that

17   he could get squired into Syria and Iraq.

18          There was at a bare minimum, Your Honor, he began his

19   planning in October of 2015.  That's at a bare minimum.  That's

20   when he quit his job and started disposing of his assets.

21          So, Your Honor, when you look at the planning, the

22   strategy that the defendant had, plus his state of mind, the

23   images on his phone -- he clearly, Your Honor, was a

24   radicalized individual in late 2015 and through the early part

25   of 2016.

46

1          Your Honor, the aggravating factor here, I would

2     submit to the Court, is the unpredictability of this defendant.

3     We've heard this morning other arguments, other matters before

4     the Court's docket, and we heard this morning in supervised

5     release and some other sentences, the Court asked the question,

6     what does the future look like?  What is the plan?

7          And I would submit to Your Honor that in this case we

8     have no idea what this defendant's plan is other than his past

9     behavior.  The best evidence of future behavior is past

10    behavior.  And this defendant was significantly radicalized in

11    2015 and 2016.

12         Now, can I stand or can the Government stand before

13    you today and say to a moral certainty that this defendant

14    sitting here today is a radicalized individual?  No, I can't

15    tell you that to a moral certainty.

16         But I can tell you that there is radicalization

17    within him.  That we know to -- that we can say to a moral

18    certainty because the past behavior demonstrates that.

19         Your Honor, one element of jihadism, violent jihad,

20    is the complete and utter rejection of social norms.  And the

21    complete and utter rejection of the rule of law.  Right?

22         So if we are looking to the future, what is the plan?

23    Can this person be rehabilitated?  I would submit to the Court

24    that we need not go any further than this defendant's testimony

25    on June 5 and June 6.  He had 15 months to think about this.

47

1    He took the stand.  He took an oath in a solemn proceeding, and

2    he lied repeatedly.

3         I would submit to you, Your Honor, that that is

4    evidence that this defendant has a radicalized mind.  He does

5    not want to abide by the norms of society.  Which is, when

6    you're asked a direct question on the stand, you've sworn to

7    tell the truth, you tell the truth.  It really is that simple.

8         And I would point to that as one piece of evidence,

9    on top of all the other evidence that we have that this

10   defendant is radicalized, to say that the future does not look

11   good for this defendant in terms of his future conduct and for

12   the future public safety of the community.

13        He has demonstrated nothing in this process that

14   would give the Court any degree of confidence that he will be a

15   law-abiding citizen in the future.  So we have to turn to

16   incarceration, and that supports the crux of our argument that

17   a lengthy sentence is appropriate to specifically deter this

18   defendant.

19        With respect to notions that this defendant was naive

20   or impulsive, once again, the evidence just does not support

21   that.  This was a defendant who understood the mechanisms on

22   how to get into the terrorist organization.  It took a lot of

23   planning.  It took a lot of moxie, right, to get into the

24   Islamic state.

25        So with respect to that, Your Honor, the conduct here

48

1     is aggravated.

2           One other thing -- or another thing that I would like

3     to draw to the Court's attention, it is always helpful, I would

4     respectively submit, in the sentencing process to look at

5     objective factors.  There is some subjectivity within 3553(a),

6     but there also is objectivity.  And the objective factors here

7     are one, the Guidelines.

8           The Guidelines recognize, seven person Sentencing

9     Commission, member commission, statutory authority, delegated

10    by Congress to the Sentencing Commission.  The Guidelines,

11    although now advisory and not mandatory, they are still

12    important.  Gall and Kimbrough tell us that, the Guidelines are

13    still important.

14          And in this case, the Guidelines have recognized that

15    serious punishments for serious conduct are warranted.  The

16    Guidelines in this case, it's an objective measure, recommend a

17    360-month to life sentence.

18          The other objective measurement, Your Honor, would be

19    comparable cases.  The comparable cases that the Government

20    would ask the Court to consider are the Pugh case, the Tairod

21    Pugh case out of the Eastern District of New York.

22          That case, Your Honor, the defendant received

23    post-trial a 35-year sentence.  The case is comparable to this

24    case in that the defendant exercised in that case significant

25    planning, clearly demonstrated his intent to go to the Islamic

49

1   State, and then engaged in obstructive conduct after he was

2   arrested.

3        The key difference, however, Your Honor, is that that

4   defendant was apprehended, his plan was thwarted in Istanbul.

5   He never made it to the United States.  This defendant -- or,

6   excuse me, never made it to the Islamic State.  This defendant

7   made it to the Islamic State.

8        So again, objectively, the Pugh case is a firm

9   sentence based on very comparable facts that we can look at.

10       We can also look at, Your Honor, the Badawi and

11  Elhuzayel case.  Those were co-conspirators tried in the

12  Central District of California.  They each received post-trial

13  30 years.

14       Again, their plan, and that was a two-person

15  conspiracy in which Badawi was -- Badawi radicalized Elhuzayel,

16  and then was getting passage for Elhuzayel into the Islamic

17  State.  They were stopped at the airport, I believe.  Those two

18  defendants received 30 years.

19       So we have the Guidelines, two very comparable and

20  two very recent cases, that objectively lend support to the

21  Government's position that a 35-year sentence is appropriate.

22       Your Honor, with the other factors that the Court,

23  the Supreme Court tells us to look at, we actually -- from the

24  Government's side, I can only speak for the Government.  When

25  the Government goes through this record, we are hard pressed to

50

1   find mitigation in this case.  The seriousness of the offense

2   is at the highest peak, I would submit, in crimes that are

3   adjudicated in this court.

4           The terrorism crimes, it's generational.  It goes to

5   the existence of our values and the security of our country.

6   They are at the highest peak of criminal cases that are heard

7   in this court.  So the seriousness of the offense is very high.

8           Promotion of the respect for the law.  This defendant

9   has demonstrated an utter disregard for the law.

10          Just punishment for the offense.  The defendant

11  himself needs to be deterred.  But the appropriate message,

12  respectfully, Your Honor, is that, I used the phrase "enough is

13  enough" earlier when talking about the Guideline enhancement,

14  but the appropriate message here is, others, don't do this.  If

15  you get caught, you are going to go to prison for a long time.

16          In addition, Your Honor, respectfully, we cannot

17  create the impression that we are in any way going to enable

18  this type of conduct.

19          And for all of those reasons, Your Honor, I believe a

20  35-year sentence is appropriate.

21          With respect to, you know, is this an unusual case,

22  the only reason why this is an unusual case is the fact, as Mr.

23  Parekh has laid out in his response -- the Government's

24  position on the motions, this defendant executed his plan to

25  perfection.  He got into the Islamic State.  He was within

51

1   their machinery.  He was within their program.  He was

2   providing himself and services to the organization.  He did

3   agree to be a suicide bomber.

4          Mr. Zwerling's argument that we have mischaracterized

5   that is not so.  He initially -- on subsequent days he began to

6   walk it back, like he did frequently.  I think he was clever in

7   thinking, how am I going to minimize these things?  But when he

8   went into the Islamic State, he was asked a question and he

9   answered it, he was going to be a suicide bomber for this

10  organization.

11         So for all of those reasons, Your Honor, we don't

12  see, respectfully, the Government doesn't see the mitigation in

13  this case.  There is a mountain of aggravation.  And we feel

14  that a 35-year sentence, not a 40-year sentence, not a 45-year

15  sentence -- the Government, we conscientiously addressed the

16  statutory admonition that the sentence should be sufficient but

17  not greater than necessary.

18         Our position is we have got to get to sufficient

19  first.  When Mr. Parekh and I went through this calculation in

20  consultation with our respective offices, we conscientiously

21  came up with the number of 35, and I think that's appropriate

22  for this case.

23         Thank you very much, Your Honor.

24         THE COURT:  All right, thank you.

25         Mr. Zwerling.

1          MR. ZWERLING:  Judge, I want to -- I hadn't planned

2    on saying this, but I want to deal with this suicide bombing

3    thing first because I think Mr. Fitzpatrick's memory is

4    probably better than mine, but not on one particular subject.

5          I have a 302 from Agent Connelly dated March 13,

6    2016.  This is the first or second day of interviews.  And it

7    says:  An ISIS -- he is quoting now Mr. Khweis:  An ISIS leader

8    entered the residence and inquired of each person.  Khweis told

9    him he was from America.  And the leader asked if he was brave

10   enough to be a suicide bomber.  Khweis said yes, but that was

11   not his intention.

12         So from the very beginning, the first time he

13   mentioned that, he explained the circumstances and what his

14   thoughts were.  It's not something he thought about later on

15   and just added, well, I better soften that statement up.

16         Your Honor, I'm not here to debate Mr. Khweis' guilt

17   on these charges.  He has been found by a jury to be guilty,

18   and we accept that.  But the Court knows full well that you are

19   not only sentencing the crime, you're sentencing the person.

20         And determining an appropriate sentence is

21   probably -- or at least it has been told to me by many jurists,

22   is the hardest part of being a judge.  You are asked to make

23   decisions that require you to really guess at certain things

24   about the future, future behavior.  About things that just

25   weren't resolved.  And it could go either way.  This is as a

1    general rule.

2         But I think when you look at the person, you look at

3    the whole person.  And if you examine the first 26 years of Mr.

4    Khweis' life as set forth in the letters that were submitted by

5    family, friends, and I think we quoted some 302s of employers

6    and co-workers, you come away with a picture of a person who

7    grew up in a stable, loving home.  Hard working.  He lived a

8    fairly ordinary childhood.

9         He always worked.  He provided community service as

10   he was growing up.  Not only would he help take care of the

11   elderly and do things, not for pay, but to help the community.

12   He was generous.  He was caring.  He was always nonviolent.

13   There is no violence in his background.

14        Towards the end of high school he started

15   experimenting with drugs and he started to drift, and

16   eventually was using marijuana virtually every day at the time

17   this happened, and clearly his judgment became clouded.  But he

18   has always been respectful of people, addressed people

19   respectfully.

20        And he was not a particularly religious person, he

21   was very secular, surrounded himself with secular people.  His

22   parents are secular.

23        So it is difficult to understand his travel to Syria.

24   The record is void of what motivated him, what got him to go.

25   And that's very curious because in these cases, that is usually

54

1    not the situation.  There is usually a trail, Facebook entries

2    and Twitter entries, rants and raves, and lectures.  None in

3    this case.

4            So when we look at the crime itself, we don't really

5    know what caused him to travel to Syria.  Whatever it was,

6    whether it was actually to go and fight and die, or a sense of

7    adventure coupled with naivete, or whatever it was, it doesn't

8    matter in respect to whether or not he committed the crime.

9    Going there under these circumstances makes him guilty of

10   conspiracy and providing material support.

11           But, Judge, did he really go there to die?  Did he

12   really want to die?  Is there anything that indicates this is a

13   man who wanted to die?  Is there any indication he really

14   thought he would go to heaven?  That he believed in heaven?

15   That he believed in the 72 virgins and all of these other

16   things?  There is no evidence of that.

17           And while he was there, he did not fight.  He did not

18   do harm to another human being while he was there.

19           So while we understand under the law merely providing

20   yourself, even as an ambulance driver to free somebody else up

21   to be a fighter, furthers the cause and makes you guilty of

22   this crime, there are different levels of providing material

23   support.  There are those people who supply guns, money to buy

24   the guns.  Recruit other people to go.

25           What he did is as benign as what you can do and still

1    be convicted of this crime, I submit, at least based on the

2    evidence.

3           Now, are there reasons to think that he really did

4    not want to die over there?  Yes, there are.  You look at his

5    actions.  He found out after he first arrived that if he didn't

6    have skills -- and this is something he didn't know before he

7    went, there is no evidence of that.  That when he got there, he

8    found out if you didn't have any skills, if you weren't a

9    doctor or you weren't some type of a computer person, you were

10   going to wind up getting military training and becoming a

11   fighter.

12          And my understanding of his complaint, as he tells it

13   to the agents -- it was not that he was wondering when he was

14   going to be moved to military training.  It was when he was

15   going to be moved to English speakers.  He was supposed to be

16   with English speakers because he didn't speak Arabic very well.

17   He didn't speak Russian.  He didn't speak the language of a lot

18   of the people he was thrust in with.  And he was not told, go

19   here.  He was taken from one place to another.  He didn't have

20   much choice.

21          And so, are there any indications that he did not

22   want to die?  Yes.  He fled.  The Government in all of its

23   pleadings and it's argument here today makes no mention of the

24   fact that he made the decision to flee ISIS, to escape.  That

25   he didn't want to die would be consistent with fleeing and

56

1    surrendering to the Peshmerga.

2           What has he done post-surrender that would indicate

3    whether or not he is still a committed jihadist or not?

4    Whether he still wants to advance the purposes of ISIS?  Well,

5    they say he lied, and that shows he still is with ISIS.

6           Let's examine that for a second.  He shows up in

7    Kurdistan.  He was handled somewhat roughly.  The Court has

8    heard the testimony at the suppression hearing.  He is taken to

9    a prison for counterterrorism.  He is housed in a prison full

10   of suspected terrorists.  And he is in the hands of

11   interrogators like Kurdish Official No. 1.

12          And does he want to be there?  Does he want to be

13   charged in Kurdistan with being a member of ISIS?  How is he

14   going to explain it?  The initial reaction is to make up a

15   story.  Is that not natural?

16          The next day he is seen by Agent Connelly and others,

17   but always in the presence of the Kurds.  And it takes him five

18   days to finally get off that story as Agent Connelly develops a

19   sense of trust and gets him to relax and open up to him.

20          And I think Agent Connelly says on March 22, in one

21   of his mailings:  It's been a textbook case of getting a guy

22   from a complete lie to a confession.

23          Now, every prosecutor I know, every defense attorney

24   I know who has had experience with defendants who become

25   cooperators, you can't expect to get the true story the first

57

1    time you talk to them.  You get bits and pieces.  It's as you

2    develop trust that you get more and more.  And that's what

3    happened here.

4            And by the 20th Agent Connelly says, this is the

5    intel's job, obliterate all the lies and get him comfortable

6    with the truth.  He was convinced that he now had the truth.

7            And what did that truth consist of?  It consisted of

8    acts which would support a withdrawal from the conspiracy he

9    entered into.  He provided valuable actionable intelligence to

10   Agent Connelly during the 11 or 12 sessions that they had

11   together.  He told him all of the machinations that he went

12   through to get to Syria.  The things that the Government

13   acknowledges are unique or somewhat unique.  He laid it out,

14   how he did it.

15           He gave them the Twitter accounts so they could look

16   and see what he did.  And that's where the GreenBird comes into

17   play, he told them about that.  And he told them why he used

18   it, because the original name didn't get him anywhere.  And he

19   wanted to -- he admitted he wanted to go to Syria.  So that's

20   where that came from.

21           They were able, with his help, to determine who he

22   was speaking to, what their handle was, and what they did in

23   order to get him into Syria.

24           He told them the route that they took.  The way they

25   were transported.  Things that were said.  He identified the

1   people who were members of ISIS that he saw along the route as

2   best he could.  He told them about the safe house in Raqqah, he

3   described it as best he could, it's location and things.

4          And he told them what happened in there.  How they

5   took his blood to see whether he had serious diseases.  How he

6   was questioned.  And how they filled out these forms that he

7   saw them doing, one on a computer and one in hand.  They found

8   that out from him.

9          And so, it was no surprise what it was that those

10   exhibits that came into our trial were, because he had

11   described them to the T to the Government agents.  He told

12   them, you know, how long it was from there to the place they

13   took him in Mosul, to the mosque that had been converted.  Told

14   them, you know, as best he could how to find it.  Looked at

15   maps.  Helped them try to locate it at a time when it was

16   important.  The procedures that ISIS followed in Raqqah.  The

17   place in Tal Afar.  All of the places he went, what was going

18   on there, who he ran into.

19          But most importantly, he provided accurate

20   descriptions of at least four other Westerners who were being

21   trained to come back to the United States and other

22   jurisdictions in Western Europe to do harm.  He described them

23   well enough that within days or weeks the agents were able to

24   come to him with photo spreads, and he was able to identify

25   these dangers to our country, these individuals who were

59

1    dangerous to us and dangerous to other countries.  He

2    identified them, including the American.

3            Judge, that would qualify for withdrawal from the

4    conspiracy, in my view.  The Government has given him zero

5    credit for any of that.  Zero.  You have not heard them say a

6    word.

7            I submit that that alone is sufficient to warrant,

8    even under 3553 in light of the fact he is not going to get a

9    Rule 35 or a 5K, a serious departure or variance downward

10   because it shows that he has given up the ISIS conspiracy.  He

11   has given up his commitment, to whatever extent it was, to ISIS

12   by doing all that and by putting his life in jeopardy.

13           I mean, he has -- while he was doing this, he was

14   being held with terrorists in a Kurdish prison.  And he will be

15   going into our prison system, and someday hopefully back to the

16   streets as a traitor to ISIS because this is now public

17   information.  That is significant, Your Honor, in my opinion,

18   and needs to be rewarded.

19           He offered to Agent Connelly, according to Agent

20   Connelly, to be proactive.  He was hanging to his leg when

21   things were wrapping up with Agent Connelly.  You know, I'll do

22   anything, I'll help you get on the Internet, I'll do whatever I

23   can to help you fight ISIS.

24           He has never withdrawn his desire to cooperate with

25   the Government.  He has just made himself not worth anything at

60

1    this point for future cooperation because he's gone to trial

2    and he's lied on the stand, and we understand that.  But it

3    doesn't mean he is not willing.

4            So the decision to go to trial.  It was a stupid

5    decision, in my opinion, because he admitted to having

6    committed the crime to the agents and even on the stand.  He

7    admitted every element of the offense.

8            What he didn't want to do, apparently, and what he

9    didn't do and what he lied about at the trial was that he ever

10   wanted to be labeled a terrorist or join a terrorist

11   organization.  And if you read his letter, Your Honor, to you,

12   I think there is an insight that I didn't have until I read

13   that letter as to what may have caused that.  I think it's the

14   shame of admitting in front of his mother that he had an evil

15   purpose that he had joined this group.  He just couldn't do it,

16   couldn't admit he was guilty of that.

17           And his lies on the stand, as pathetic as they were,

18   all went to his mental state, not to what he did.  He never

19   said he didn't travel.  He never said he didn't wind up at the

20   safe house.  He never said he didn't provide the information.

21   He admitted every element of this offense, Your Honor.  The

22   lies were pathetic, but they really weren't particularly

23   material to guilt or innocence.

24           There is no excuse for lying, but the most obvious

25   lie that he told, which I believe goes to the shame issue, is

61

1    at one point he admitted how he handpicked the handle

2    iAGreenBirdiA.  He told it to the agents, he told it on the

3    stand.  But then at one point with his mother sitting in the

4    room, he couldn't repeat that information and came up with

5    this, oh, I saw a blue bird.  Okay.

6            Well, he had to know he wasn't fooling anybody who

7    had heard the other parts of the thing.  He just, I submit, now

8    that I'm thinking about this, it was that he couldn't say it in

9    front of his mom.  That doesn't make it an excuse because he

10   was under oath.  It makes it a little less evil.

11           Since he has been in jail he has done -- and the

12   Court has the documentation.  He has gone to school.  He has

13   taken classes.  He has done everything he can -- and there is

14   ever indication he will continue -- to do things to improve

15   himself so that someday, should he live long enough and he gets

16   back on the streets, he can make something of himself.

17           The question I think that the Court needs to wrestle

18   with is how dangerous is he?  The whole reason, according to

19   the case law and the history of the Guidelines as to why you

20   are considered a Category VI, and in this case we think that

21   overstates the situation, is because how do you reform somebody

22   who has taken the position that God will be pleased if they

23   kill the infidels?  There is no evidence that Mr. Khweis ever

24   took that position, ever.  No evidence.

25           And the Government acknowledges that they don't know

1    whether he is going to be a danger.  Err on the side of

2    caution, I guess, is their statement.

3            But I think there are reasons to think he is no

4    longer dangerous.  There is the cooperation that he has given.

5    The intelligence that he has given.  The lying really doesn't

6    make that different.

7            And the Government cites to these two cases, Pugh and

8    Elhuzayel and his partner Badawi.  There are differences

9    between Mr. Khweis and those individuals, Your Honor.  And I

10   will read parts of the Government's position paper in those

11   cases, if the Court would permit me, that point out the

12   difference.

13           In the Pugh case -- well, first of all, let me say

14   this.  In both of those cases, the only thing that prevented

15   those individuals from going and committing violent jihad and

16   actually killing people or trying to kill people was the fact

17   they were apprehended.

18           Mr. Khweis was prevented from doing it because he had

19   a change of mind and escaped and cooperated.  That's a huge

20   difference as to future dangerousness, in my opinion.

21           The Government respectfully submits -- they write --

22   this letter by the defendant's wife:  I am a Mujahid.  I am a

23   sword against the oppressor and a shield for the oppressed.  I

24   will use my talents and skills given to me by Allah to

25   establish and defend the Islamic State.  There are only two

63

1  possible outcomes for me, victory or martyr.  If Allah gives me

2  a victory, we will have a home in Al-Sham.  I will send for you

3  when it is safe.  You will have a nice home around believers.

4  If I am made a martyr, we will have a mansion of undescribable

5  beauty on a magnificent plot of land.  The land under a whip is

6  worth more than the world and all its contents.  I calculated

7  my worth in Dunya.  I would usually sell myself for a thousand

8  dollars a week, and that would be a half million dollars for

9  ten years.  If I sell myself to Allah, one night guarding the

10  borders for the sake of Allah, it is worth more than the world

11  and all its contents.

12         This is the last words regarding Mr. Pugh and his

13  commitment to the ISIS organization.  Yes, he will be a hard

14  case to reform.

15         Mr. Elhuzayel is even worse.  And first of all, these

16  gentlemen not only sent themselves, but they actively recruited

17  scores of people, or tried to, to go and fight on behalf of

18  ISIS.

19         He encouraged nobody to go but himself.

20         Here are some quotes from the Government's pleading

21  reciting the facts in the other case, Elhuzayel:  Elhuzayel and

22  Badawi expressed their agreement to provide fighters to ISIS

23  and their approval of Allah and joint desire to participate in

24  ISIS' terrorist activities.  Elhuzayel asked Allah to grant him

25  martyrdom and the success to leave the country and fight for

64

1   the cause.

2            And I won't go through all of them, but here is one:

3   ISIS is getting ready to attack Israel.  This is exciting.

4   Looking forward to see some yahoodi heads rolling or dead

5   bodies carrying their own yahoodi heads.  And Jihadi John doing

6   this stance on them.

7            And then he links a picture to Jihadi John

8   decapitating victims.

9            And then:  The only thing more beautiful than rain is

10  homosexuals being thrown off tall buildings.

11           And he attaches a photograph of Middle Eastern

12  looking men being thrown off the top of multistoried roofs.

13           God is great, and may Allah grant us 72 virgins.  May

14  Allah make us among the martyrs.

15           The evidence demonstrates that the defendant

16  Elhuzayel has, for some time, been deeply committed to ISIL's

17  cause and, therefore, is particularly resistant to deterrence.

18  He pledged allegiance to ISIS in a video and to their leader.

19           They have, obviously, multiple Internet

20  communications and informants and undercover agents who

21  witnessed these type of things.  Judge, he got 30 years.

22           I submit that Mr. Khweis is not -- it's not

23  appropriate to give him a sentence anywhere near that under the

24  circumstances.

25           So you take -- the Government says we can't compare

65

1    him to individuals who have pled guilty.  And pleading guilty

2    gives you acceptance of responsibility.  And going to trial and

3    lying gives you obstruction, that is five levels.  The

4    Guidelines take care of that, really.

5            But which shows a greater level of reformation of an

6    individual, getting caught and pleading guilty?  Or

7    surrendering, providing actionable intelligence to thwart ISIS,

8    and going to trial and lying at trial?  Compare those two.  I

9    submit the latter should be given more weight in evaluating

10   whether they have really reformed.

11           So there should be a penalty for going to trial,

12   there should be a penalty for lying, but not decades of

13   punishment, Judge.

14           If he were apprehended when he was in Raqqah by our

15   government and brought here for trial, it would be one thing

16   because the only thing that stopped him from carrying out

17   terrorism himself would be the intervention of the police.  But

18   that's not what happened.  He fled, turned himself into the

19   Peshmerga.  He cooperated in a way that would be a withdrawal

20   from the conspiracy.  And he provided very valuable, actionable

21   intelligence.

22           And so, in the end and in conclusion, the Government

23   says, well, we need to send a message to people who -- young

24   men not to go.  But what about the young men who don't hear

25   that message and do go?  Most, if they go, they think they are

66

1    going to die.  They are not concerned about doing jail time

2    back in the States.  But if they get disillusioned over there,

3    then they will think about, well, what are my options?

4            And we need to send them a message.  If your options

5    are, stay there, fight and die; or come back, surrender,

6    cooperate, and go to prison for multiple decades, you're not

7    giving them much of a choice.

8            So I would submit that you should punish him, but it

9    should be proportionate.  You know, you can't give him as

10   lenient a sentence as Ms. Green, who was an FBI interpreter

11   with a top secret clearance who was working on a case involving

12   a Syrian ISIS higher-up, went to join him, tipped him off that

13   he was under investigation, married him, thought twice about

14   it, and then surrendered and cooperated.  And she got two

15   years.  She didn't have to go trial.  She was offered a plea to

16   false statements.  That wouldn't have required him to admit he

17   was a terrorist.

18           So I submit, we're asking for five years.  I

19   understand the Government is asking for 35 or 45 years,

20   whatever.  The Guidelines call for 30.  Your Honor, I ask you

21   to be measured.  Consider the extenuation of his individual

22   case, the message that you will be sending, and sentence him to

23   no more than is absolutely required under the facts of this

24   case.

25           And whatever that is, Your Honor, we would ask you to

1    give him credit for the time he has served in Iraq from the day

2    that the Government, our Government started interrogating him,

3    which is March 16, until his formal surrender to the U.S. on

4    June 8.

5            And if you can't give him credit for it, then deduct

6    it from the sentence because clearly he was being held for this

7    offense, whether it was in Kurdistan or here.

8            We ask you, if he is eligible, to designate

9    Cumberland because it is close to his home, and recommend him

10   for RDAP.

11           Thank you, Your Honor.

12           THE COURT:  All right.  Thank you, Mr. Zwerling.

13           All right, Mr. Khweis, please come to the podium.

14   This is your opportunity to tell me anything you would like to

15   before I sentence you.

16           MR. ZWERLING:  Judge, I have spoken to Mr. Khweis.

17   He knows that he has that right.  He says he is too nervous.

18   But he would like -- he wrote that letter in lieu of his

19   testimony applying here.  I know the Court has read it.  I

20   would be happy to reread it to the Court.

21           THE COURT:  No, I have it.  I have read it.

22           Okay.  Have a seat.

23           Is that correct, Mr. Khweis?

24           THE DEFENDANT:  Yes.

25           THE COURT:  All right, then certainly I was going to

68

1    tell you that anything you did say could be used against you if

2    there is a future trial in this matter, and also would remind

3    you of your rights to appeal the jury verdict.  And please

4    consult with your counsel about that appeal process.

5            It is an unusual case.  There is no event, no

6    instigation, no friend, no great anger, no suicidal ideations

7    that radicalized you, but there is no question that you did

8    radicalize.  And once you made that decision, you deliberately

9    and methodically and carefully and cleverly planned out your

10   travel in joining ISIL.

11           You are not naive.  You are not intellectually

12   challenged.  You're not gullible.  You're not confused and

13   indecisive in choosing to join ISIL.  Instead, you have got an

14   Associate's degree in criminal justice.  You have had multiple

15   employments.  You have a stable family.

16           It was painful to watch your father and your mother

17   -- your father and brother here almost every day, and your

18   mother some, knowing that they had raised a young man in the

19   United States to become a contributing member of the community.

20   And they worked hard to try and make sure that that occurred.

21   And the pain was obvious every day that they were here when

22   they heard the testimony.

23           And I recall very vividly your father shaking his

24   head, and it was a combination of perhaps the rulings that were

25   being made as well as the testimony that he heard.

1          But you very clearly understand right from wrong.

2    You understood the magnitude of the decision you were making to

3    join ISIL.  I mean, you selected it after doing research on

4    other terrorist organizations.  And then you planned out how to

5    avoid detection, to try and contact a terrorist in England on

6    your way over to get some counseling.

7          The movements between London and finally into Syria

8    and the methods that you used were -- they clearly reflect

9    somebody that absolutely, without question, wanted to join this

10   terrorist organization, even though you were very aware of what

11   they stood for, what would be expected of you when you got

12   there.  I mean, the Paris attacks had just occurred.  You were

13   aware of the horrible atrocities that ISIL members had

14   committed over the intervening years.

15         So there is no question you made that decision and

16   you joined ISIS and ISIL, and you stayed there for

17   two-and-a-half months.  You patiently awaited the process under

18   which you would become eligible to become a fighter.  And

19   before that occurred, you made the decision to leave.

20         So the crime, obviously, is one of the most serious

21   that you can commit.  It's why the Guidelines are what they are

22   and how serious they are.

23         I think Mr. Zwerling absolutely has the right read on

24   the mitigating factors.  You didn't harm anybody, you didn't

25   kill anybody, you left of your own volition.  There is always

70

1    the suspicion that perhaps you left so you could become a mole

2    and operate from the United States.  It's not unheard of that

3    that occurs.  But there is no evidence that you left under

4    those circumstances to come back to the United States and await

5    further orders.

6            So I believe that you left because you became

7    disillusioned with the caliphate, that you were not committed

8    to follow through and be a fighter.

9            You ultimately provided information to the FBI which

10   was valuable, as stated.  And I certainly think that that is

11   evidence of perhaps that there is a chance in the future of

12   rehabilitation, and that the day that you are freed you will

13   make a contribution to your community versus turn, as Dr.

14   Ghannam believes, the longer you stay in prison, the more

15   radicalized you will become.  I don't think that's necessarily

16   the case in your -- with the facts of this case.  I think he is

17   incorrect.

18           But when you look at the 3553 factors, we have a very

19   serious crime.  We need to deter you.  We need to deter others.

20           I looked carefully at the disparity of the sentences

21   that both counsel provided in their sentencing memorandums, and

22   I don't think that a Guideline sentence is necessary, but I

23   think that a significant sentence is necessary under the 3553

24   factors.

25           I am going to sentence you to 180 months on Counts 1

71

1    and 2.   Those sentences will run concurrently.

2              I am going to sentence you to 60 months on Count 3.

3    That must operate consecutively by statute.

4              I am going to sentence you to ten years of supervised

5    release.  As special conditions, I will order that you

6    participate in substance abuse testing and treatment; mental

7    health testing and treatment; waiver of confidentiality; not

8    use a computer outside your residence -- not use a computer

9    without permission by the Probation officer; that you have no

10   contact with any individuals or groups involved in terrorist

11   activities.

12             I will not impose a fine or costs of incarceration

13   because I find you are unable to afford them.

14             I will give you credit for time served from your date

15   of arrest by the Peshmerga on March 16 of 2016.

16             I will ask the Bureau of Prisons to consider the

17   Cumberland facility, and also have you evaluated for the

18   residential drug program while you are incarcerated.

19             As I said, you have a right to appeal.  Please

20   consult with your counsel about that, those appeal matters.

21             The forfeiture, was there any further argument that

22   the parties wanted to make?

23             MR. PAREKH:  Not from the Government.

24             MS. CARMICHAEL:  Not from the defense, Your Honor.

25             THE COURT:  I am going to enter the forfeiture order

72

1     for the reasons previously stated and for the reasons provided

2     by the Government response to the latest submission.

3           Anything else in this case?

4           MR. FITZPATRICK:  No, sir.  Thank you, Your Honor.

5           MR. ZWERLING:  No, Your Honor.

6           THE COURT:  All right.  We're going to take about

7     35 minutes and break for lunch, and we will come back with our

8     civil docket at that time.

9           All right, we're in recess.

10     -------------------------------------------------

                 HEARING CONCLUDED

11

12

13

14

15

16

17

18

19           I certify that the foregoing is a true and

20       accurate transcription of my stenographic notes.

21

22

23                 /s/  Norman B. Linnell

24                Norman B. Linnell, RPR, CM, VCE, FCRR

25