IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | CRIMINAL NO. 1:16-cr-143 |
| MOHAMAD JAMAL KHWEIS, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>Government's Opposition to Defendant's Motion for Compassionate Release</u>

A jury convicted the defendant of conspiring to provide material support to ISIS, in violation of 18 U.S.C. § 2339B (Count 1); providing and attempting to provide material support to ISIS, also in violation of 18 U.S.C. § 2339B (Count 2); and possessing, using, and carrying firearms in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c) (Count 3). The Court then sentenced the defendant to concurrent terms of 180 months' imprisonment on the two material-support counts and a consecutive term of 60 months' imprisonment on the § 924(c) count. On appeal, the Fourth Circuit affirmed the defendant's two material-support convictions on Counts 1 and 2, vacated (on government consent) his § 924(c) conviction on Count 3, and remanded for resentencing. *United States v. Khweis*, 971 F.3d 453, 464–65 (4th Cir. 2020), *cert. denied*, — S. Ct. —, No. 20-7088, 2021 WL 1072984 (U.S. Mar. 22, 2021). Resentencing has not yet occurred.

The defendant has now moved for compassionate release in light of the COVID-19 pandemic. The Court should deny the motion. The compassionate-release statute only permits courts to "reduce [a] term of imprisonment," 18 U.S.C. § 3582(c)(1)(A), and because resentencing has not yet occurred, there is no active term of imprisonment to reduce. In reality, the defendant seeks bail pending resentencing under 18 U.S.C. §§ 3143(a)(2) and 3145(c), but he

cannot satisfy the statutory criteria governing such a request.

In any event, less than four years ago, the Court considered the statutory sentencing factors and concluded that a sentence of 20 years was appropriate. That judgment was correct then, and—as the government intends to argue at resentencing—it remains correct today.[1] While the defendant's mild obesity qualifies as an extraordinary and compelling reason that could justify release in certain circumstances, the statutory sentencing factors—to say nothing of the pending availability of vaccination and the extraordinarily grave nature of the defendant's offenses—weigh heavily against release.

Thus, whether construed as a motion under § 3582 or as a motion for bail pending resentencing, the Court should deny the defendant's motion.

### Factual and Procedural Background

Khweis was born in the United States and was a longtime resident of Fairfax County, Virginia.[2] Trial Tr. 514, 523, 671, 765–66.[3] He first acquired an interest in traveling to Syria to join ISIS in mid-2015. Trial Tr. 525–26, 728. He contacted ISIS-affiliated social media accounts to learn more about how to travel to Syria to join ISIS. Trial Tr. 526. In December

---

[1] It is well established that, following *vacatur* of a § 924(c) conviction, a defendant faces the possibility of a resentencing at which a district court can reconfigure its sentencing package by imposing a higher sentence on the remaining counts. *See United States v. Bermudez*, 82 F.3d 548, 550 (2d Cir. 1996) (explaining that sentencing courts have the discretion to "increase the sentence on a specific count where the original sentence was imposed as part of a package that included a mandatory consecutive sentence which was subsequently found to be invalid"); *accord United States v. Hillary*, 106 F.3d 1170, 1171 (4th Cir. 1997) ("We have already decided that where [precedent] requires reversal of a § 924(c) conviction on direct appeal, we may remand for resentencing on related drug counts, so long as the government agrees to forgo reprosecution on the § 924(c) count.").

[2] The factual recitation appearing below is adapted from the government's response brief on appeal. *See* Gov't Response Br., *United States v. Khweis*, No. 17-4696 (4th Cir. filed Nov. 19, 2019), ECF No. 55, *available at* 2019 WL 6213105.

[3] The trial transcripts appear at ECF Nos. 212–15.

2

2015, he resigned from his job, sold his car, and created a new email account to make overseas travel arrangements, all while lying to his family about his intentions.  Trial. Tr. 536, 680–84, 693, 934, 938.

The defendant sought to join ISIS while fully cognizant of its violent ideology and terroristic tactics.  Trial Tr. 529–31, 954.  Before leaving the United States, he understood that ISIS conducts terrorist operations in Syria and Iraq (Trial Tr. 526), plans and launches attacks against its enemies, including the United States (Trial Tr. 531), and claimed responsibility for the November 13, 2015 attacks in Paris, France, during which ISIS operatives killed nearly 100 civilians (Trial Tr. 532).  He was also aware that ISIS had committed other horrific attacks, including burning a Jordanian pilot alive.  Trial Tr. 529–31.  The defendant nevertheless wanted to "be part of" ISIS and to support its mission.  Trial Tr. 531, 577, 631, 742, 954.

The defendant left the United States on December 16, 2015, by using a one-way ticket to London and listing a non-working phone number on the reservation, which was booked with a newly established email account.  Trial Tr. 983–84, 693–94.  He then traveled to the Netherlands, and from there to Turkey, where he contacted ISIS recruiters who could smuggle him into Syria.  Trial Tr. 699, 984.  While in Gaziantep, Turkey, the defendant entered a taxi around midnight with other ISIS recruits and subsequently agreed to travel in another vehicle with an armed ISIS member in order to enter ISIS-controlled territory.  Trial Tr. 728–30.  The defendant then arrived with other ISIS members at an ISIS safe house in Raqqa, Syria.  Trial Tr. 548–50, 730, 996–997; *see also United States v. Khweis*, No. 1:16-cr-143 (LO), 2017 WL 2385355, at *1–2 (E.D. Va. June 1, 2017).  He was instructed en route to put his phone on airplane mode and to take the batteries out to avoid detection.  Trial Tr. 997.

During his travel to join ISIS, the defendant used encrypted applications to conceal his

activity.  He also downloaded several applications on his mobile phones that featured secure messaging or anonymous web browsing.  Trial Tr. 308–11, 341–42.  He then used these programs to communicate with ISIS and to coordinate his passage into Syria.  Trial Tr. 545–46. A forensic analysis of one of the defendant's phones, recovered at the time of his capture, revealed numerous social media platforms, encrypted applications, and anonymizing software. Trial Tr. 308–11, 340–42.  The defendant's phones also contained images of Abu Bakr al-Baghdadi (the then-leader of ISIS); ISIS fighters wielding firearms; maps of Turkey, Syria, and Iraq; deceased individuals covered in dust and blood; explosives and explosions; the World Trade Center at the moment of impact on September 11, 2001; and the body of a solider engulfed in flames, among other ISIS propaganda.  Trial Tr. 322–49.

After arriving at the Raqqa safe house, the defendant participated in an ISIS intake process.  He was asked by an ISIS member if he wanted to be a suicide bomber, to which he responded "yes."  Trial Tr. 551, 731.  The defendant later traveled to two other ISIS safe houses in Syria.  At the second safe house, he met representatives of an ISIS "commando" group known as Jaysh Kalifa, which trained ISIS members to conduct attacks in their countries of origin.  At the third safe house, the defendant resided with three ISIS members from Iraq who "had recently traveled into Syria to receive military and weapons training in order to go back to Iraq and fight." Trial Tr. 560, 1078–79.

The defendant supported ISIS's mission in a variety of ways.  He "gave himself to ISIS" and agreed to serve as a suicide bomber.  Trial Tr. 551, 630, 731, 769.  He agreed to have his blood drawn by ISIS and was issued ISIS credentials identifying him as "Abu Omar al-Amriki." Trial Tr. 557, 1001–02.  The defendant also participated in ISIS-directed religious training, attended ISIS lectures, watched military videos with his fellow ISIS members for inspiration,

frequently gave money to ISIS members, and cared for wounded ISIS fighters.  Trial Tr. 559, 563–64, 567, 1062, 1095–96.  For example, on one occasion the defendant tended to an injured Libyan fighter, providing him with a Virtual Private Network ("VPN") to help him conceal his online activity and disguise his location.  Trial Tr. 562–66.

Eventually, the defendant traveled with ISIS to Mosul, Iraq, where he lived for nearly a month.  Trial Tr. 561.  During that time, he accompanied injured ISIS fighters to the hospital.  Trial Tr. 562.  He also observed that his fellow ISIS recruits "would eventually go off and be transferred for military weapons training, and some of the recruits were transferred for sniper specific training."  Trial Tr. 562–63, 736, 1085.  An ISIS camp roster that was recovered in Mosul listed the defendant's "current mission" for ISIS as a "fighter."  Trial Tr. 221, 241, 490–500.[4]  In addition, on cross-examination, Khweis admitted that he consistently lied to United States and Kurdish officials about his involvement with ISIS.  He also omitted telling U.S. officials about another American who had trained with ISIS to conduct an attack in the United States.  Trial Tr. 1062–1065, 1068–72, 1093, 1112–13.

After leaving Mosul, the defendant resided in Tal Afar, Iraq for about a month alongside armed ISIS fighters.  Trial Tr. 1089–90.  He spent that time in a "katiba," an "ISIS neighborhood or military battalion," where he cared for wounded ISIS fighters.  Trial Tr. 564–65, 739. Eventually, the defendant came to the realization that he "didn't want to stay" with ISIS and "needed to leave."  Trial Tr. 895.  After exiting ISIS-controlled territory, he deleted his contacts

---

[4] Nearly three months after trial, but before sentencing, the prosecution team received for the first time another ISIS form that reflected the defendant's membership in ISIS but did not identify him as a "fighter."  The defendant relied on the document in moving for a new trial.  *See* Sentencing Tr. (ECF No. 258) 3–5.  The Court denied the motion, ruling "that the power of the initial documents was corroboration that [the defendant] in fact joined ISIS, which he was ambivalent about certainly at trial," thereby demonstrating that ISIS "had him in their system as having registered and become a member."  *Id.* at 15.

5

and communications with ISIS from his one of his phones and burned two other phones and a laptop.  Trial Tr. 554–55, 743, 896.

On March 14, 2016, two and a half months after entering Syria, the defendant was captured by Kurdish Peshmerga fighters near Sinjar Mountain in a Kurdish-controlled region of Iraq near the Syrian border.  *Khweis*, 2017 WL 2385355, at *1.  Over the next several weeks, U.S. government agents conducted a series of interviews with the defendant while he was in Kurdish custody.  The first set of interviews, conducted without *Miranda* warnings, focused on the gathering of intelligence to protect American national security interests.  The second set of interviews, conducted with *Miranda* warnings, was handled by a different team of FBI agents with no knowledge of what occurred in the prior sessions.  During those interviews, the defendant waived his *Miranda* rights and made inculpatory statements about his efforts to join and support ISIS.  The defendant was later charged by superseding indictment in the Eastern District of Virginia with conspiring to provide material support to ISIS, providing and attempting to provide material support to ISIS, and a firearms offense.  ECF No. 72.

After a six-day trial, a jury convicted the defendant on all counts.  This Court then sentenced him to concurrent terms of 15 years' imprisonment on Counts 1 and 2 (the two material-support charges) and a consecutive five-year term of imprisonment on Count 3 (the § 924(c) charge).  ECF No. 246.  On appeal, the Fourth Circuit rejected the defendant's challenge to denial of his pretrial suppression motion, affirmed the defendant's convictions on Counts 1 and 2, vacated his conviction on Count 3 in light of *United States v. Davis*, 139 S. Ct. 2319 (2019), and remanded for resentencing.  *Khweis*, 971 F.3d at 464.

The defendant's compassionate-release motion followed.

6

### The Efforts of the Bureau of Prisons To Combat the Pandemic

The federal Bureau of Prisons ("BOP") has implemented several measures to contain the spread of COVID-19.  In recent months, BOP has made significant progress in distributing and administering vaccines to staff and inmates at its facilities.  BOP has also maintained COVID-19 protocols designed to prevent community spread, including limiting access to prisons, restricting prisoner movement within prisons, requiring screening and testing, providing masks and hand cleaners, and separating ill inmates from the rest of the population.  Further, BOP has devoted substantial resources to placing vulnerable inmates in home confinement.

Since December 2020, BOP has been steadily administering COVID-19 vaccines to inmates and staff.  As of April 27, 2021, BOP has administered a total of 146, 971 doses of the vaccine at its facilities.  *COVID-19 Vaccine Implementation*, BOP, https://www.bop.gov/coronavirus/.  BOP has been distributing the vaccine consistent with guidance issued by the Centers for Disease Control and Prevention ("CDC").  *COVID-19 Vaccine Guidance*, BOP 4 (Mar. 11, 2021), https://www.bop.gov/resources/pdfs/ covid19_vaccine_guidance_20210311.pdf.  BOP has offered the vaccine to all staff members. Becky Sullivan, *All Federal Inmates to Be Offered Vaccine by Mid-May, BOP Director Says*, NPR (Apr. 16, 2021), https://www.npr.org/2021/04/16/988237102/all-federal-inmates-to-be-offered-vaccine-by-mid-may-bop-director-says.  By mid-May, BOP expects that all inmates will have the opportunity to receive the vaccine.  *Id.*

BOP also continues to operate under modified conditions to reduce the spread of COVID-19 in its facilities.  All inmates and staff have been issued facial coverings to use, particularly when it is not possible to social distance.  *Correcting Myths and Misinformation About BOP and COVID-19*, BOP (May 6, 2020), https://www.bop.gov/coronavirus/

7

docs/correcting_myths_and_misinformation_bop_covid19.pdf.  Common areas are sanitized multiple times per day.  *Id.* at 3.  Additionally, medical staff screen every newly admitted inmate for COVID-19.  *BOP Modified Operations*, BOP (Nov. 25, 2020), https://www.bop.gov/ coronavirus/covid19_status.jsp.  Inmates who are asymptomatic and test negative are placed in quarantine for 14 days.  *Id.*  Inmates who are symptomatic and/or test positive are placed in medical isolation.  *Id.*  Medical staff also conduct rounds and check inmate temperatures at least daily.  *Correcting Myths*, at 1.

Inmate movements are "limited" to "prevent congregate gathering and maximize social distancing," with movement "in small numbers" permitted to access the commissary, laundry, showers, and phones.  *BOP Modified Operations*.  Movement is also permitted for mental health and medical care.  *Id.*  Inmates who are transferring between facilities or being released from BOP custody must quarantine for 14 days and test negative before transfer.  *Id.*  BOP will not transfer or release inmates with active COVID-19 "unless absolutely necessary."  *Id.*  For immediate releases where the inmate could not quarantine for 14 days, BOP provides a symptom screen, temperature check, and COVID-19 test on the day of departure and notifies the health authorities in the local jurisdiction if necessary.  *Id.*

BOP also conducts temperature checks and COVID-19 screening for staff, contractors, and other visitors to its facilities.  *Id.*  Anyone who registers a temperature of 100.4 degrees Fahrenheit or higher cannot enter the building.  *Id.*  Staff who exhibit symptoms are sent home. *Correcting Myths*, at 3.

BOP previously suspended social visits but has since reinstated visits, directing each institution to adopt a visiting plan consistent with its resources, including space.  *BOP Modified Operations*.  Visits are "non-contact" and must be socially distant, either using physical barriers

such as plexiglass or physical distancing.  *Id.*  Inmates in quarantine or isolation cannot participate in visits.  *Id.*  Visitors must submit to symptom screening and a temperature check before entering a facility; those who are sick or symptomatic are denied entry.  *Id.*  Both the inmate and the visitor must wear facial coverings at all times and must perform hand hygiene before and after the visit.  *Id.*

### Framework Governing Compassionate-Release Motions

Under the compassionate-release statute, a district court may reduce a term of imprisonment when "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i).  If a district court finds that extraordinary and compelling reasons exist, it must then "consider[] the factors set forth in [18 U.S.C. §] 3553(a) to the extent they are applicable."  § 3582(c)(1)(A).  "[D]istrict court[s] enjoy[] broad discretion in conducting this analysis."  *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021).

The defendant bears the burden of proving that he is entitled to relief under § 3582(c)(1)(A).  *See United States v. Kannell*, 834 F. App'x 566, 567 (11th Cir. 2021) (per curiam); *see also United States v. Kenney*, No. 3:16-cr-143 (REP), 2021 WL 399724, at *1 (E.D. Va. Feb. 4, 2021); *United States v. Watson*, No. 1:07-cr-396 (CMH), 2020 WL 7318269, at *1 (E.D. Va. Dec. 11, 2020).  The Fourth Circuit reviews a district court's denial of compassionate release for abuse of discretion.  *Kibble*, 992 F.3d at 329.

### Argument

The Court should deny the defendant's motion for the reasons appearing below.

## I.    The compassionate-release statute does not apply to a defendant awaiting resentencing.

To begin, the Court should deny the defendant's motion because, in this case's present procedural posture, compassionate release is not available.

Under the text of the governing statute, compassionate release operates to "reduce the term of imprisonment." 18 U.S.C. § 3582(c)(1)(A). But here, the Fourth Circuit has vacated the defendant's conviction on Count 3 and remanded for resentencing. *Khweis*, 971 F.3d at 464. There is therefore no "term of imprisonment" for the Court to reduce.

To be sure, "the phrase 'term of imprisonment' is not defined in 18 U.S.C. § 3582 or the advisory Sentencing Guidelines." *United States v. Yarber*, No. 00-cr-20031 (MPM), 2008 WL 695362, at *2 (C.D. Ill. Mar. 12, 2008). But the common meaning of the word "term" is "[a] fixed period of time." *Term*, Black's Law Dictionary (11th ed. 2019). Because the Court is free to impose whatever sentence (up to the statutory maximum) it deems appropriate on Counts 1 and 2 at resentencing, *see supra* note 1, the defendant's period of imprisonment is not currently "fixed." In a post-remand, pre-resentencing posture, the compassionate-release statute is simply inapposite.

Instead, "[t]he provisions of 18 U.S.C. § 3143 govern release pending sentencing or appeal." Fed. R. Crim. P. 46(c). And indeed, several courts have recognized that a defendant who seeks release while awaiting resentencing on remand must avail himself of that statute. *See United States v. Huber*, 404 F.3d 1047, 1064 n.16 (8th Cir. 2005) (citing § 3143 as the statute governing release where a "defendant must be resentenced"); *United States v. Watkins*, 994 F.2d 1192, 1197 n.7 (6th Cir. 1993) (suggesting that it might be appropriate for a district court "to consider entertaining a motion for release pending resentencing pursuant to Rule 46(c) and 18 U.S.C. § 3143(a)"). As it presently stands, the defendant "remains incarcerated under the bond statute, 18 U.S.C. § 3143(a)(2), in a post-conviction/pre-sentencing status." *United States v. Campbell*, 985 F. Supp. 158, 159 (D.D.C. 1997).

The government recognizes that the Court could reconstrue the defendant's

compassionate-release motion as a motion for bail pending resentencing.  *Cf. United States v. Al-Timimi*, No. 1:04-cr-385 (LMB), 2020 WL 4810120 (E.D. Va. Aug. 18, 2020) (granting a motion for bail pending appeal in light of the COVID-19 pandemic).  But here, the defendant could not possibly satisfy the statutory criteria governing such a motion.  Both of the defendant's extant convictions arise under the material-support statute, 18 U.S.C. § 2339B.  That statute, in turn, is enumerated in the list of offenses appearing at 18 U.S.C. § 2332b(g)(5)(B), which is cross-referenced in 18 U.S.C. § 3142(f)(1)(A).  And under § 3143(a)(2), a "judicial officer shall order that a person who has been found guilty of [such] an offense … and is awaiting imposition or execution of sentence be detained unless":

(A)

    (i)    the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted; or

    (ii)    an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person; and

(B)    the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community.

18 U.S.C § 3143(a)(2).  Here, of course, there is no likelihood of a new trial, given the affirmance of the defendant's convictions, and the government is not recommending a non-incarceration sentence.

There is a safety valve under 18 U.S.C. § 3145(c) whereby "[a] person subject to detention pursuant to section 3143(a)(2) or (b)(2), and who meets the conditions of release set forth in section 3143(a)(1) or (b)(1), may be ordered released, under appropriate conditions, by the judicial officer, if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate."  By virtue of the cross-reference to § 3143(a)(1), "to obtain release under § 3145(c) pending sentencing, a prisoner (1) must demonstrate by clear and

convincing evidence that he is not likely to flee or pose a danger to the safety of others; and (2) clearly show that there are 'exceptional reasons' justifying his release." *United States v. Ashley*, No. 06-cr-34 (RDB), 2020 WL 1675994, at \*3 (D. Md. Apr. 6, 2020); *see also* 18 U.S.C. § 3143(a)(1) (stating that a judicial officer "shall" order post-conviction detention "unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released"). But here, the defendant remains a danger to others and continues to pose a flight risk and cannot satisfy his burden to show otherwise. *See* Fed. R. Crim. P. 46(c) ("The burden of establishing that the defendant will not flee or pose a danger to any other person or to the community rests with the defendant"); *see also infra* Part II.C.3. In any event, the defendant cannot show "exceptional reasons" for release pending resentencing for the same reasons which counsel against compassionate release.

In all the circumstances, the most efficient pathway forward is for the Court to deny the defendant's motion as procedurally improper or, in the exercise of its discretion, as without merit for the reasons appearing below.

## II. Alternatively, whether construed as a motion for compassionate release or a motion for bail pending resentencing, the Court should deny the defendant's motion.

To the extent the Court chooses to reach the merits of the defendant's motion, the Court should deny it. As to compassionate release, the discretionary sentencing factors—both health-related and offense-related—weigh overwhelmingly against release. Likewise, should the Court reconstrue the defendant's request as a motion for bail pending resentencing, the same points counseling against compassionate release foreclose the defendant from demonstrating "exceptional reasons" under § 3145(c) or from demonstrating by clear and convincing evidence that he is no longer a danger to the community or a flight risk.

**A.    The defendant has established at least one medical condition—obesity—that qualifies as an extraordinary and compelling circumstance under § 3582(c).**

Courts have held that the COVID-19 pandemic, by itself, is not a sufficient basis for compassionate release.  *See, e.g.*, *United States v. Thompson*, No. 20-40381, 2021 WL 37493, at *3 (5th Cir. Jan. 5, 2021) ("Fear of COVID doesn't automatically entitle a prisoner to release."); *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release ….").  "Instead, "[i]n the context of the COVID-19 outbreak, courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility."  *United States v. Adamson*, 831 F. App'x 82, 83 (4th Cir. 2020) (per curiam) (quoting *United States v. Feiling*, 453 F. Supp. 3d 832, 841 (E.D. Va. 2020)); *see also United States v. Blevins*, 832 F. App'x 192 (4th Cir. 2020) (per curiam).

The defendant cites three medical conditions which he claims favor release from prison in light of the pandemic:  obesity, hypertension, and PTSD.  Only the first of these merits a finding of extraordinary and compelling circumstances.

According to the CDC, individuals with obesity are more likely to suffer severe illness from COVID-19.  More specifically, the CDC advises that:

> Overweight (defined as a body mass index (BMI) > 25 kg/m2 but < 30 kg/m2), obesity (BMI ≥30 kg/m2 but < 40 kg/m2), or severe obesity (BMI of ≥40 kg/m2), **can make you more likely** to get severely ill from COVID-19.  The risk of severe COVID-19 illness increases sharply with elevated BMI.

*People with Certain Medical Conditions*, CDC (Mar. 29, 2021), https://www.cdc.gov/ coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.  Here, by virtue of the defendant's height of 67 inches and his weight of 213 pounds, his reported BMI

13

exceeds 30.[5]  (ECF No. 265-4 at 2, 8.)  While the CDC's guidance has changed over time as to which medical conditions increase one's risk from contracting COVID-19, the government follows the CDC's most up-to-date pronouncements in responding to compassionate-release motions.  Accordingly, the government acknowledges that obesity qualifies as an extraordinary and compelling circumstance.

Neither of the defendant's other two purported medical justifications for release— hypertension and PTSD—so qualify.  To be sure, the CDC advises that "[h]aving heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly high blood pressure (hypertension) can make you more likely to get severely ill from COVID-19," *People with Certain Medical Conditions*, and if the defendant had made a sufficient showing that he actually suffers from hypertension, the government would concede that hypertension also qualifies as an extraordinary and compelling circumstance under § 3582.  But the defendant has not made such a showing.

According to the American Heart Association, hypertension includes systolic blood pressure readings of 130 and above, as well as diastolic blood pressure readings of 80 and above. *Understanding Blood Pressure Readings*, https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings (last visited Apr. 24, 2021).  But according to the defendant's medical records (which he filed publicly on this Court's docket), beyond his blood pressure reading of 134/82 on February 3, 2021, none of his four prior blood pressure checks registered systolic or diastolic readings that were hypertensive.  *See* ECF No. 265-4 at 2, 5–6, 8 (readings taken on October 7, 2020; September 18, 2020; August 19, 2020; and

---

[5] According to the National Heart, Lung and Blood Institute, the defendant's height and weight correspond to a BMI of approximately 33.4  *See* https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm (last visited Apr. 24, 2021).

December 13, 2017).  Thus, the only evidence of hypertension in the record is a single blood pressure reading.  Nor is there any evidence that the defendant has received a diagnosis of hypertension or that he is currently being treated for such a condition.  That is not an adequate basis to conclude that the defendant actually suffers from hypertension sufficient to constitute an extraordinary and compelling circumstance.

As to the defendant's mental health, while PTSD is undoubtedly a serious condition, the defendant's assertion that it qualifies as an extraordinary and compelling circumstance is without merit.  "Although [the defendant] contends his PTSD condition puts him at greater risk for COVID-19, the CDC has not listed PTSD as a condition that puts people at an increased risk of severe illness from COVID-19."  *United States v. Jimerson*, No. 2:18-cr-131 (RAJ), 2020 WL 6161250, at *5 (W.D. Wash. Oct. 21, 2020).[6]

### B.    In the exercise of its discretion, the Court should nonetheless reject obesity as a standalone reason justifying compassionate release.

The fact that obesity qualifies as an extraordinary and compelling circumstance under § 3582 does not, by itself, entitle the defendant to release.  The Court still must consider the statutory sentencing factors, which direct an inquiry into the defendant's characteristics and any medical care he might need.  *See* 18 U.S.C. §§ 3553(a)(1), (a)(2)(D).  Here, at least five discretionary health-related factors counsel against compassionate release.

*First*, at 31 years old (*see* ECF No. 228 at 3), the defendant is relatively young.  The CDC has reported that younger inmates face less risk from contracting COVID-19.  More specifically,

---

[6] Moreover, to the extent the defendant's PTSD is the result of his misadventure in joining ISIS, it is a foreseeable "consequence of the severity of the offenses he chose to commit." *United States v. Mashburn*, 406 F.3d 303, 310 (4th Cir. 2005); *accord Khweis*, 2017 WL 2385355, at *12 (stating that "the Government cannot be blamed for Defendant's initial detention in a foreign land, far removed from family and friends").  It is therefore doubtful that, setting aside COVID-19, PTSD would qualify as an extraordinary and compelling health-related circumstance on these facts.

the CDC stated on March 29, 2021, that over 80% of deaths from COVID-19 involve persons 65 and older, and over 95% of deaths involve persons 45 and older.  *People with Certain Medical Conditions*.

 *Second*, the availability of vaccines is rapidly accelerating.  The government understands that FCI Cumberland—the defendant's facility of confinement—has received the COVID-19 vaccine and that available doses were provided to all staff who wanted them, with the remaining doses being provided to inmates on a priority basis.  Khweis has not yet been offered the vaccine.  At the same time, the pendency of universal vaccine availability is a factor counseling against early release.  *See, e.g.*, *United States v. Molina*, No. 3:15-cr-31 (REP), 2021 WL 1323402, at *1 & n.1 (E.D. Va. Apr. 8, 2021) (citing "the availability of vaccines at the institution of [the defendant's] confinement" as a reason for denying compassionate release even where the defendant "ha[d] not been vaccinated and no vaccination [was] scheduled").

 *Third*, the CDC's guidance explains that an obese person's risk from COVID-19 increases as BMI increases—and here, the defendant is obese, but not severely so.  Courts "have been reluctant in general to grant compassionate release … where mild obesity is the only risk factor presented."  *United States v. Irizzary*, No. 14-cr-652-13 (MAK), 2021 WL 735779, at *5 (E.D. Pa. Feb. 25, 2021) (emphasis and internal quotation marks omitted).  To be sure, several of the cases to have addressed this issue predated the CDC's most recent guidance, and therefore treated the mildness of a defendant's obesity as a reason not to find an extraordinary and compelling circumstance in the first instance.  Contrary to these early cases, the government concedes such a showing here in light of the CDC's latest directives.  Even so, the CDC has also advised the risk of developing severe COVID-19 increases with BMI, such that the rationale of many of these earlier cases continues to apply to the Court's discretionary review of the

16

defendant's health characteristics.  *See, e.g.*—

- *United States v. Bolton*, No. 1:17-cr-150-1 (MOC), 2021 WL 54023, at *3 (W.D.N.C. Jan. 6, 2021) (finding, where the defendant's weight was "higher than ideal," but he was "not regarded as 'severely obese,'" that he had not shown extraordinary and compelling reasons for release);

- *Irizzary*, 2021 WL 735779, at *6 (concluding that the defendant's BMI of 33.1, "falling near the low end of the obesity spectrum," did not "present an extraordinary and compelling reason for his release" (internal quotation marks omitted));

- *United States v. Pabon*, No. 17-cr-312 (JPC), 2021 WL 603269, at *4 (S.D.N.Y. Feb. 16, 2021) (finding that "obesity—particularly where, as here, the movant's BMI is just barely above 30—does not constitute extraordinary and compelling circumstances calling for relief" (internal quotation marks omitted));

- *United States v. Ruiz*, No. 19-cr-1285 (GPC), 2021 WL 1085715, at *5 (S.D. Cal. Mar. 22, 2021) (finding that the defendant's "slightly elevated BMI of 31.3" did not qualify "as an extraordinary and compelling reason").

Courts have also denied compassionate release where obesity is adequately managed. *See, e.g.*, *Bolton*, 2021 WL 54023, at *3 (observing that, despite defendant's obesity, his medical records showed that "his medical conditions [were] well treated and managed by BOP").  The same is true where (as here) the defendant presents no "evidence he faces any health complications due to his obesity," *Irizzary*, 2021 WL 735779, at *6, or that "his condition impairs his ability to function in the prison or to provide self-care," *United States v. Williams*, No. 3:19-cr-33 (BJD), 2021 WL 1238410, at *2 (M.D. Fla. Apr. 2, 2021).  These rationales continue to apply to the Court's exercise of its discretion even under the CDC's latest guidance.

*Fourth*, the government notes that the defendant's medical records show that he weighed 213 pounds as of February 2021, but he weighed between 183–188 pounds in August 2020 (ECF No. 205-4 at 5) and December 2017 (*id.* at 8).  Courts in this context have also reasoned that obesity may not merit release where it reflects recent fluctuations in weight rather than a chronic

17

condition.  *See, e.g.*, *United States v. Rodriguez-Francisco*, No. 13-cr-233-1 (VB), 2021 WL

326974, at *2 (S.D.N.Y. Feb. 1, 2021) ("[The defendant] claims to be obese, but his medical

records show his weight has fluctuated, and that for most of the time he has been in prison he

was not obese.  Only recently has he become borderline obese, a function of his modest weight

gain in recent months.").

     *Fifth*, the defendant has not shown the existence of an ongoing outbreak at his facility of

confinement that places him at a particularized risk of contracting COVID-19.  As of April 27,

2021, FCI Cumberland is reporting 0 inmates testing positive; 1 staff member testing positive;

0 inmate deaths; 0 staff deaths; 368 inmates having recovered; and 51 staff having recovered.[7]

Thus, the risk of contracting COVID-19 at FCI Cumberland has dramatically abated.

     In summary, while the defendant's obesity qualifies as an extraordinary and compelling

circumstance under § 3582, other discretionary health-related factors continue to counsel against

granting his motion.

*      *      *

     Finally, all of the foregoing points touching on extraordinary and compelling

circumstances under § 3582 apply equally to the question of whether the defendant has shown

"exceptional reasons" for bail pending resentencing under 18 U.S.C. §§ 3143(a) and 3145(c).

*See United States v. Graham*, No. 05-cr-16-1 (JS), 2020 WL 7668902, at *3 (E.D.N.Y. Dec. 23,

2020) (stating that "a fear of contracting COVID-19 alone is not 'a sufficiently compelling

circumstance to justify Defendant's release'" (citation omitted)); *United States v. Morris*, 452 F.

Supp. 3d 484, 490 (N.D. Tex. 2020) ("The fact that Defendant has conditions which place him at

a higher risk alone is insufficient to meet his burden to overcome the presumption of detention in

---

[7] These numbers appear at https://www.bop.gov/coronavirus/ (last visited Apr. 27, 2021).

this case."). As a practical matter, if a medical condition does not merit compassionate release in the exercise of the Court's discretion, it should also fail to qualify as an exceptional reason for granting bail.

### C. Because the statutory sentencing factors weigh heavily against granting the defendant's motion, the Court should exercise its discretion to deny it.

In addition to the discretionary points summarized above, the remaining statutory sentencing factors also weigh overwhelmingly against granting the defendant's motion. That is unsurprising, of course, given that not four years ago the Court sentenced the defendant to 20 years' imprisonment.

### 1. The Nature and Circumstances of the Offense

The seriousness of the defendant's offense conduct undermines any argument in favor of compassionate release. That is so for at least four key reasons.

*First*, it impossible to overemphasize the destructive, terroristic nature of ISIS as an enemy of the United States and its democratic allies. At the instruction of ISIS leaders, ISIS recruits and members have attacked the United States and its Western allies using a variety of means, including bombings and suicide attacks. Trial Tr. 704, 807–09. ISIS "is the most lethal terrorist organization in the world" and has killed over 9,000 individuals annually since 2014. Trial Tr. 799–800.

*Second*, the defendant well understood ISIS's violent nature when he left Fairfax County to join it. More specifically, he understood that ISIS conducts terrorist operations in Syria and Iraq (Trial Tr. 526), plans and launches attacks against its enemies, including the United States (Trial Tr. 531), and claimed responsibility for the November 13, 2015 attacks in Paris, France, during which ISIS operatives killed nearly 100 civilians (Trial Tr. 532). He was also aware that ISIS had burned a Jordanian pilot alive. Trial Tr. 529–31. The defendant nevertheless wanted to

"be part of" ISIS and to support its mission.  Trial Tr. 531, 577, 631, 742, 954.

*Third*, the defendant's conduct overseas made crystal clear that he endorsed ISIS's

mission and was willing to support it.  For example:

- The defendant understood that individuals traveling to ISIS-controlled territory would receive military training.  Trial Tr. 577.

- The defendant went through an intake and screening process with ISIS, which included expressing his willingness to serve as a suicide bomber. Trial Tr. 551, 731.

- The defendant cared for wounded ISIS fighters, including an injured Libyan fighter to whom he provided a VPN to help him conceal his online activity and disguise his location.  Trial Tr. 562–65.

- The defendant completed ISIS-directed religious training in which each sermon ended with "may God destroy America."  Trial Tr. 567.

Nor did the defendant raise a challenge to the sufficiency of the evidence supporting his

material-support convictions on appeal.  As the case stands now, there is no doubt that the

defendant intended to support ISIS's terroristic efforts.

*Fourth*, the defendant's conduct—even after surrendering himself to Kurdish forces—has

not demonstrated remorse for his wrongdoing.  He repeatedly lied to federal agents during his

numerous debriefing sessions, leading this Court to sustain application of an obstruction-of-

justice enhancement under U.S.S.G. § 3C1.1 at sentencing (which the defendant did not

challenge on appeal).  Sentencing Tr. (ECF No. 258) 42 (stating that the defendant repeatedly

lied to the FBI).  He then offered patently incredible testimony at trial, such that the jury must

have concluded he "lied on the stand."  *Id.*  A compilation of the defendant's false statements

appears in the government's sentencing memorandum.  *See* ECF No. 237 at 19–21.  To take just

one example, the defendant told the jury that, when he left the United States, he "wasn't 100

percent sure that [he] wanted to go [to ISIS-controlled territory]," and that at most he wanted to

"just go real quick and come back out."  Trial Tr. 856–57.  But as the Court already concluded,

20

the defendant's "conduct strongly suggests that he did not expect to return home to see his family." *Khweis*, 2017 WL 2385355, at *12.  At no time has the defendant accepted responsibility for his misconduct or seriously acknowledged the gravity of his actions.

Seeking to resist these points, in his current motion the defendant relies on an expert he proffered at his original sentencing to argue that he was never radicalized in support of ISIS's mission.  ECF No. 265 at 3–4.  The government documented at length in its original sentencing submission the myriad reasons why the defendant's expert lacked credibility.  ECF No. 237 at 4–9.  In addition, other courts have noted that the precise nature of a defendant's radicalization can be somewhat beside the point in assessing his culpability on material-support charges. *Cf. United States v. Young*, 916 F.3d 368, 378–79 (4th Cir. 2019) ("Other circuits have recognized that seemingly inconsistent belief in a terrorist group's ideology does not preclude a finding by a court that a defendant either supported that group in a criminal fashion or was predisposed to do so." (citing cases)).  Irrespective of his precise motives, the defendant joined ISIS fully aware of both its horrifying tactics and its desire to impose a caliphate by terroristic violence.

For now, it suffices to say that this Court made a contrary factual finding regarding the defendant's radicalization at sentencing.  Indeed, the Court's own discussion of the seriousness of the defendant's conduct is the best rebuttal to the defendant's present arguments:

> It is an unusual case.  There is no event, no instigation, no friend, no great anger, no suicidal ideations that radicalized you, *but there is no question that you did radicalize*.  And once you made that decision, you deliberately and methodically and carefully and cleverly planned out your travel in joining ISIL.
>
> You are not naive.  You are not intellectually challenged.  You're not gullible. You're not confused and indecisive in choosing to join ISIL.

*       *       *

But you very clearly understand right from wrong.  You understood the magnitude of the decision you were making to join ISIL.  I mean, you selected it after doing research on other terrorist organizations.  And then you planned out how to avoid detection, to try and contact a terrorist in England on your way over to get some counseling.

The movements between London and finally into Syria and the methods that you used were -- they clearly reflect somebody that absolutely, without question, wanted to join this terrorist organization, even though you were very aware of what they stood for, what would be expected of you when you got there.  I mean, the Paris attacks had just occurred.  You were aware of the horrible atrocities that ISIL members had committed over the intervening years.

So there is no question you made that decision and you joined ISIS and ISIL, and you stayed there for two-and-a-half months.  You patiently awaited the process under which you would become eligible to become a fighter.  And before that occurred, you made the decision to leave.

So the crime, obviously, *is one of the most serious that you can commit*.  It's why the Guidelines are what they are and how serious they are.

Sentencing Tr. 68–69 (emphasis added).

## 2.    Respect for the Law, Just Punishment, and Deterrence of Criminal Conduct

At sentencing, the Court stated that the defendant would receive credit for time served since his arrest by Peshmerga forces in Iraq in March 2016.  Sentencing Tr. 71.  The defendant has therefore served approximately five years and two months of his original 20-year sentence.  Excluding the five-year sentence on the now-vacated § 924(c) count, that means the defendant seeks compassionate release having served just 25.8% of the 240-month term of imprisonment available on Counts 1 and 2 at a resentencing.[8]  Given the nature of the defendant's offense, granting compassionate release in this context would be antithetical to the goals of promoting respect for the law, imposing just punishment, and deterring those who would provide material

---

[8] Even assuming (to the defendant's benefit) 15% off for good-time credit, he has served just 30.4% of the 240-month term of imprisonment available on Counts 1 and 2 at a resentencing.

support to ISIS and other terrorist organizations.

Courts in this district "have considered the length of time served an important factor when ruling on motions for compassionate release during the COVID-19 pandemic." *United States v. Evans*, No. 3:00-cr-63 (MHL), 2020 WL 5121331, at *7 (E.D. Va. Aug. 31, 2020); *see also United States v. Lloyd*, No. 2:11-cr-36 (MSD), 2020 WL 4501811, at *3 (E.D. Va. Aug. 5, 2020) (finding, where the defendant "ha[d] served less than half of his sentence even when sentencing credits [were] considered," that "[t]he need to provide adequate deterrence for this Defendant" and "to avoid unwarranted sentencing disparities" weighed against release); *United States v. Hill*, No. 3:14-cr-114 (MHL), 2020 WL 6049912, at *5 (E.D. Va. Oct. 13, 2020) (denying compassionate release where the defendant had "served only 40% of his 188 month sentence, which may not afford adequate deterrence to his criminal conduct"). The Fourth Circuit has affirmed that a defendant's remaining term of imprisonment properly weighs in the balance of § 3553(a) factors. *See Kibble*, 992 F.3d at 331–32.

As the government argued in advance of the defendant's initial sentencing, "[t]he deterrence factor is particularly acute in terrorism cases." ECF No. 237 at 24. That is because it is critically important to signal that aiding ISIS in any way—much less joining ISIS outright—is not worth the risk. For similar reasons, courts routinely recognize that, in the terrorism arena, the imperative of deterrence necessitates the imposition of lengthy sentences. *See, e.g.*, *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) ("[E]ven terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation."); *accord United States v. Ressam*, 679 F.3d 1069, 1091 (9th Cir. 2012) (citing the same reasoning); *United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011) (same).

23

"[T]he Government's interest in combating terrorism is an urgent objective of the highest order." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010). Granting compassionate release on these facts would not further this objective or adequately promote the congressional purposes embodied in § 3553(a).

### 3.     Protecting the Public from Further Crimes of the Defendant, Preventing Danger to the Community, and Avoiding Flight

Shortly after the defendant's arrival in this district, Magistrate Judge Davis ordered him detained pretrial because he had not rebutted the presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community" under 18 U.S.C. § 3142(e)(3)(C). ECF No. 17. The same logic applies today, as the defendant remains both a danger and a flight risk. As a result, the discretionary sentencing factors weigh against compassionate release, and the defendant cannot establish that he is not a danger or a flight risk by clear and convincing evidence under 18 U.S.C. § 3143(a)(1), § 3145(c), and Federal Rule of Criminal Procedure 46(c).

With respect to danger, the Court made all of the following points at sentencing when imposing a 12-level terrorism enhancement under U.S.S.G. § 3A1.4 and when explaining its analysis of the statutory sentencing factors:

- In joining ISIS, there "[was] no question that [the defendant] did radicalize" against the United States. Sentencing Tr. 68.

- The defendant "deliberated on which terrorist organization to join" and "very cleverly got to Syria," where he "was in the process of being trained to be a fighter." *Id.* at 15.

- Even though the defendant may not have been a fighter on the battlefield, "he had joined a terrorist organization where fighting was the first and foremost goal of the organization to, one, create a caliphate; and, two, resist and commit jihad against the United States and other countries." *Id.* at 16.

24

- The defendant "wanted to join this terrorist organization, even though [he was] very aware of what they stood for, [and] what would be expected of [him] when [he] got there." The defendant was "aware of the horrible atrocities that [ISIS] members had committed over the intervening years." *Id.* at 69.

- The defendant "patiently awaited the process under which [he] would become eligible to become a fighter." *Id.*

In short, the defendant demonstrated a commitment to ISIS's mission and a zeal to support its efforts that undercuts any argument in favor of non-dangerousness. Nor did he sincerely attempt to help U.S. officials after his capture, thereby demonstrating remorse for his past conduct. Instead, he repeatedly lied to United States and Kurdish officials about his involvement with ISIS and omitted telling U.S. officials about another American who had trained with ISIS to conduct an attack in the United States. Trial Tr. 1062–1065, 1068–72, 1093, 1112–13.

The defendant likewise remains a flight risk. He was able to travel from the United States, to England, to the Netherlands, to Turkey, and ultimately to ISIS-controlled territory in Syria all while remaining undetected by the American government. Suppression Hr'g Tr. 274.[9] Moreover, throughout his journey, the defendant exhibited an ongoing commitment to concealing his activity and using technologically sophisticated tactics to cover his tracks. *See, e.g.*, Trial Tr. 686–94, 718–19 (explaining that the defendant used multiple one-way flights and used a fake phone number to book airfare); Trial Tr. 353–54, 554–55, 742–43, 753, 896 (the defendant reset some of his phones to factory settings before his capture while destroying other electronic devices); Trial Tr. 309, 341–342 (the defendant used encrypted messaging applications); Trial Tr. 308–09, 562–65 (the defendant possessed VPN software and deployed it to conceal an ISIS fighter's location). Against this factual backdrop, the Court simply cannot

---

[9] The suppression hearing transcripts appear at ECF Nos. 144–46.

have confidence that the defendant will not once again disappear, as he already has once before when he initially left the United States to join ISIS.

### D. The defendant's proffered evidence of rehabilitation is not persuasive.

In response to the foregoing, the defendant attempts to marshal evidence of his present non-dangerousness and rehabilitation. Such evidence, of course, properly bears on the analysis. *Cf. Pepper v. United States*, 562 U.S. 476, 491 (2011) (stating that "evidence of postsentencing rehabilitation may be highly relevant to several of the § 3553(a) factors"). But here, the defendant's proffered evidence of rehabilitation is weak.

The defendant first claims that he never radicalized in support of ISIS. But as summarized above, this Court made a contrary factual finding (Sentencing Tr. 68), thereby foreclosing that argument now.

Next, the defendant points to a lack of disciplinary actions while incarcerated, his record of meaningful participation in substance-abuse programs, and his contributions to suicide-prevention efforts. This is all to be commended. But it does not meaningfully diminish the risk that the defendant—who previously radicalized in support of ISIS and traveled overseas to support its mission—poses to the United States. That is especially so given the likelihood of recidivism and the need for incapacitation in terrorism cases. *See Meskini*, 319 F.3d at 92.[10]

Lastly, the defendant points to his history of educational attainment, including his completion of 14 courses while in custody. But part of what made this defendant's offense conduct especially egregious is that he had *already* obtained an associate's degree (focusing on criminal justice) before joining ISIS (Suppression Hr'g Tr. 335, 572)—a fact on which the Court

---

[10] The government notes that in *Al-Timimi*, the district court granted bail pending appeal in part because the defendant was not "convicted of any terrorism offenses." *Al-Timimi*, 2020 WL 4810120, at *3 n.3. That is not true here, both in terms of the defendant's material-support convictions and in terms of the 12-level terrorism enhancement applied at sentencing.

relied in explaining why the defendant's decision to join ISIS was fully informed and not the result of his gullibility or naiveté (Sentencing Tr. 68).

By statute, "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason" for compassionate release. *Hill*, 2020 WL 6049912, at *5 (quoting 28 U.S.C. § 994(t)). This limitation makes sense because defendants are expected to conduct themselves appropriately and to try to better themselves while incarcerated. *See, e.g.*, *United States v. Logan*, — F. Supp. 3d —, No. 97-cr-993 (PJS), 2021 WL 1221481, at *8 (D. Minn. Apr. 1, 2021) ("Prisoners are *supposed* to follow the rules, take classes, work at a job, and otherwise attempt to improve themselves. That a prisoner does so means that he has met baseline expectations, not that he has done something extraordinary."); *United States v. Martin*, No. 6:06-cr-105 (DCR), 2021 WL 134602, at *2 (E.D. Ky. Jan. 13, 2021) ("[G]ood behavior and education, which are expected of incarcerated individuals, do not constitute 'extraordinary and compelling circumstances' that warrant a sentence reduction."); *see also* Order at 6, *United States v. Ahmad*, No. 1:11-cr-554 (TSE) (E.D. Va. Apr. 8, 2021), ECF No. 75 (finding that the defendant's coursework did not support compassionate release, reasoning that "[i]t is not uncommon for a defendant to take educational classes to pass the time in prison").

Consequently, the defendant's efforts at rehabilitation do not outweigh the seriousness of his crime, his ongoing danger to the community, and the risk of flight that would arise from his release. *Cf. Lloyd*, 2020 WL 4501811, at *4 n.7 ("While the Court commends Defendant for his documented efforts to work toward rehabilitation during his term of incarceration, his good behavior and pursuit of education in an institutional setting is insufficient to tip the scales in his favor based on the consideration of the record as a whole."); *Hill*, 2020 WL 6049912, at *5 ("While Hill's participation in an extensive number of educational and vocational programs

27

[was] commendable," these measures did "not warrant his early release in light of the seriousness of his convictions and the time remaining on his sentence.").

      E.      **The defendant's factual representations about his conditions of confinement and a purported plea offer to a non-incarceration sentence are false.**

Finally, the government notes two instances in which the defendant makes factual statements in his motion that are inaccurate.

First, the defendant asserts that "the Kurds treated him harshly" and "beat[] him" while he was in custody in Iraq. ECF No. 265 at 4. But as the Court is well aware, after a multi-day suppression hearing in this case, the Court concluded as a matter of fact that the defendant's inculpatory statements to government agents were not procured involuntarily because the defendant's "allegations about the coercive effect of his conditions [of confinement] were not supported by the evidence." *Khweis*, 2017 WL 2385355, at *12. While the defendant challenged the denial of his suppression motion on appeal under *Oregon v. Elstad*, 470 U.S. 298 (1985), and *Missouri v. Seibert*, 542 U.S. 600 (2004), he never raised a freestanding challenge to the voluntariness of his confession on appeal and thereby abandoned it. *United States v. Powell*, 666 F.3d 180, 185 & n.4 (4th Cir. 2011). The Court's conclusions about the non-coercive nature of the defendant's Kurdish confinement are therefore law of the case, now further buttressed by the intervening force of the mandate rule. *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999); *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993).

To be sure, when the defendant testified in his own defense, he tried (belatedly) to argue that the Kurds maltreated him. Trial Tr. 1108 (stating that the Kurds "forced" him "to tell some things to the FBI agents that weren't true"). But the defendant's testimony at trial was patently false, as the government summarized in advance of sentencing, *see* ECF No. 237 at 18–21, and this Court agreed, stating that the defendant's testimony was so "incredible" that he must

28

"clearly [have been] found to have lied on the stand by the jury in reaching [its] verdict," Sentencing Tr. 42.  There is no reason, at this late date, to treat the defendant's statements about his conditions of confinement as having any validity at all.

Second, the defendant repeatedly asserts in his motion that the government offered him a plea deal under which he would already have been released.  ECF No. 265 at 1, 5, 18.  The government's trial attorneys have no recollection of such an offer, and the defendant's contrary assertion appears false.  While the government does not believe that plea negotiations ought to bear on the defendant's motion, should the Court wish to weigh the defendant's unsupported assertion, the government respectfully requests the opportunity to submit additional evidence on this issue.

\*      \*      \*

Even where a defendant has shown extraordinary and compelling circumstances supporting compassionate release in light of COVID-19, courts may rely on the discretionary sentencing factors as an independent basis to deny relief.  *See Kibble*, 992 F.3d at 331–32; *see also United States v. Saunders*, 986 F.3d 1076, 1078 (7th Cir. 2021) ("The court did not abuse its broad discretion in finding that the § 3553(a) factors weighed against release despite the threat that Saunders faces from COVID-19."); *United States v. Jones*, 980 F.3d 1098, 1102 (6th Cir. 2020) ("Here, the district court found for the sake of argument that an extraordinary and compelling circumstance existed in Jones's case but that the § 3553(a) factors counseled against granting compassionate release.").  The Court should do so here as well.

**Conclusion**

The defendant has not offered any persuasive reason for compassionate release or bail pending resentencing.  As to compassionate release, the discretionary factors in this case—including those relating to the defendant's obesity and those relating to his offense conduct—weigh overwhelmingly against granting the motion.  And as to bail, the defendant has not satisfied his burden to demonstrate by clear and convincing evidence that he is neither a danger nor a flight risk, nor has he established "exceptional reasons" for bail in light of the pandemic.

This Court previously concluded that the defendant's "crime … [was] one of the most serious that you can commit."  Sentencing Tr. 69.  Exactly so.  The Court should therefore deny the defendant's motion and set this matter for resentencing in due course.

Respectfully submitted,

Raj Parekh
Acting United States Attorney

By:  _____/s/_____
Daniel T. Young
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Office:   (703) 299-3700
Fax:      (703) 299-3980
Email:    daniel.young@usdoj.gov

**Certificate of Service**

I certify that on April 27, 2021, I electronically filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

By:        /s/

Daniel T. Young
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Office:   (703) 299-3700
Fax:      (703) 299-3980
E-mail:   daniel.young@usdoj.gov