# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:16-CR-143 |
| | ) | |
| MOHAMAD KHWEIS | ) | |
| | ) | |
| Defendant. | ) | |

## MOHAMAD KHWEIS' SECOND POSITION ON SENTENCING FACTORS

Mohamad Khweis stands before this Honorable Court significantly matured, less guilty, further rehabilitated, with deepened sentencing disparities, and having served a significant portion of his sentence on lockdown during a global pandemic. For the reasons outlined in more detail below, a sentence of 63 months is sufficient, but not greater than necessary to comply with the factors enumerated under 18 U.S.C. §3553(a).

## OBJECTIONS/CORRECTIONS TO PRESENTENCE REPORT

Mr. Khweis maintains his previous objection to the Court's finding that the USSG §2M5.3(b)(1)(E) two-point enhancement applies,[1] as well as his objection to the application of the twelve-point enhancement under USSG §3A1.4(a) known as the "terrorism enhancement." *See United States v.*

---

[1] In the original PSR, the United States Probation Office did not find this 2-point enhancement to apply.

*Chandia*, 675 F.3d 329, 334 (4th Cir. 2012). He submits that a 2-point minor role reduction should be applied. Finally, Mr. Khweis maintains his prior objection to the Government's selective use of the trial testimony to characterize the offense conduct.[2]

*USSG §2M5.3(b)(1)(E)*

The United States Sentencing Guidelines provide for a two-level enhancement under §2M5.3 (Providing Material Support of Resources to Designated Foreign Terrorist Organizations of Specially Designated Global Terrorists, or For a Terrorist Purpose) when "the offense involved the provision of …(E) funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act." USSG §2M5.3(b)(1).

Because the enhancement applies only to cases where the defendant has an intent or reason to believe his support would be used to a commit violent act, §2M5.3(b)(1) serves as "an internal enhancement mechanism to calibrate the severity of the sentence to the culpability of the conduct and the harm." James P. McLoughlin, Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4*, 28 Law & Ineq. 51, 73 (2010). Courts have applied it in cases where the defendant's conduct unequivocally supported or was

---

[2] For clarification, Mr. Khweis would also just like to note that the images described in ¶36 that were purportedly found on his electronic devices were not pictures he took. The phone did contain a few photos taken by the user with the camera, and those photos were benign. *See* Trial Tr. 364 (describing a picture of a hotel, bazaar, and Turkish tourist site).

intended to support specific acts of violence. For example, in *United States v. Aref*, No. 04-CR-402, 2007 U.S. Dist. LEXIS 17926, at *5 (N.D.N.Y. Mar. 14, 2007, the court applied §2M5.3(b)(1)(E) when the facts at trial showed that the defendant laundered funds from a confidential witnesses' purported importation of surface-to-air missile with the knowledge that it would be used in an attack on the Pakistani Ambassador in New York City "in order to teach the President of Pakistan a lesson."

In this case there is no direct connection between Mr. Khweis and any violent acts. *See e.g.* Sentencing Transcript ("Sent. Tr.") at 37-38 (The Court: "You didn't harm anybody, you didn't kill anybody, you left of your own volition....So I believe that you left because you became disillusioned with the caliphate, that you were not committed to follow through and be a fighter.").[3]

Further, as Mr. Khweis argued at his first sentencing hearing, Sent. Tr. at 37-38, applying this enhancement simply because he provided material support to an organization that commits violent acts means it would apply to every material support case because every material support case involves providing support to a violent terrorist organization that commits violent acts because that's the definition of a foreign terrorist organization. *See also United States v. Nayyar,* 2013 U.S. Dist. LEXIS 79002, at *20 (S.D.N.Y. June 4, 2013) ("Since any organization that is deemed to be a terrorist organization

---

[3] The Court also acknowledged that Mr. Khweis was "not charged with providing material support by being a fighter." *See* Sent. Tr. at 15.

under the statute is, by definition, considered to engage in violent acts, see 8

U.S.C. § 1182, the Weapons Enhancement applies to virtually every

conviction for providing material support to a terrorist organization, without

distinguishing between the ultimate harm caused by the offense conduct.").

Without conceding that *United States v. Dhirane*, 896 F.3d 295, 304 (4th

Cir. 2018) was correctly decided, [4] even the Fourth Circuit's holding in

---

[4] The holding on this point in *Dhirane* is not based on any cited authority and conflicts with the plain reading of the enhancement. *See Dhirane*, 896 F.3d at 304-05. A plain reading of the enhancement indicates that the material support must be provided with the intent or knowledge that it is to be used in the commission of a particular, identified violent act. The enhancement does not say "some" act or "any" act, nor does it even provide for act*s* (plural). It plainly says "*a* violent act." (emphasis added).

As Mr. Khweis argued on appeal, *see* 17-4696, App. Br., Doc. 31 at 59-61, and as Mr. Khweis maintains, this reading of the enhancement – to require a specific act of violence – is reinforced by looking to the surrounding statutes. Section 2339C was adopted as a part of the Terrorist Bombings Convention Implementation Act of 2002. The reason for the amendment section of Sentencing Guideline Amendment 655 states: "The amendment also refers the new offense at 18 U.S.C. §2339C(a)(1)(B) to §2M5.3 (Providing Material Support or Resources to Designated Foreign Terrorist Organizations). Reference to §2M5.3 is appropriate because this offense involves generally providing or collecting funds knowing or intending that the funds would be used to carry out an act which by its nature is a terrorist act (because it is meant to intimidate a civilian population or to compel a government or international organization to do something or to refrain from doing something.)" Federal Sentencing Guidelines Manual, Vol. 2, Appendix C, Amendment 655, *Reason for Amendment*.

The correct manner of implementing §2M5.3(b)(1)(E) becomes even more apparent when 18 U.S.C. §2339C(a)(1)(B) is examined which is the statute to which the guideline commentary connects §2M5.3. The statute reads, "Whoever...unlawfully and willfully collects funds with the intention that such funds are to be used...in order to carry out – (B) any other act intended to cause death or serious bodily injury to a civilian...when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act." Thus, as Mr. Khweis' appellate brief explains, *see* 17-4696, Doc. 31

*Dhirane* does not require application of 2M5.3(b)(1)(E). *Dhirane* still requires "that the defendants be shown to have intended, known, or had reason to believe that their support *would* be used to assist in acts of violence by the terrorist organization." *Id.* (emphasis added). The evidence at trial did not establish that any support Mr. Khweis may have provided *would* be used to assist in acts of violence by the Islamic State. Indeed, as explained *infra* (minor role) he did very little, if anything, during the approximately two months he was in ISIS territory, and then he was finally able to escape. Once he escaped, he provided valuable intelligence information to the FBI, which is the exact opposite of assisting the Islamic State.

Finally, as the Court acknowledged at the prior sentencing hearing, the application of §2M5.3(b)(1)(E) requires the Court to double-count the same factors that have already been accounted for in the other Guidelines provisions. *See* Sent. Tr. at 42 ("Even though it may be really subsumed within 3A4.1 and also may be double counting, it's not the only instance where our Guidelines double count similar behavior."). In a case that held §2M5.3(b) did not impermissibly double count, it did so based on an analysis that the two enhancements (§2M5.3(b) and §3A1.4(a)) constituted distinct characteristics. *See United States v. Banol-Ramos*, 516 Fed. Appx. 43 (2d Cir.

---

at 61, §2M5.3 cannot be applied to §2339C(B) without also requiring that the "act intended to cause death or serious injury" being specially identified. To have §2M5.3(b)(1)(E) then apply differently to §2339B would render §2M5.3(b)(1)(E) without consistency or integrity.

2013) (finding that the application of USSG §§ 2M5.3(b) and 3A1.4 did not constitute impermissible double-counting because conviction for material support of terrorist organization did not necessarily imply that defendant committed offense of terrorism or that she provided firearms to that organization, and each enhancement represented discrete harm (one encompassed her commission of crime of terrorism and other encompassed her provision of firearms and explosives)).

*USSG §3A1.4(a)*

Mr. Khweis objects to the USSG §3A1.4(a) "terrorism enhancement" because knowledge of a foreign terrorist organization's mission when providing material support is insufficient, without more, for its application. *See United States v. Chandia*, 675 F.3d 329, 334 (4th Cir. 2012). In *Chandia*, the Fourth Circuit held that, when applying the terrorism enhancement, the District Court initially "applied the wrong legal standard by equating intent with knowledge." *Id*. (citing *United States v. Chandia*, 395 F. App'x 53, 60 (4th Cir. 2010) ("*Chandia II*")). The court explained that the "[defendant's] knowledge that [the Foreign Terrorist Organization] had a terrorist purpose supported his material support convictions but 'that does not automatically yield an inference of the specific intent required for the terrorism enhancement to apply.'" *Id*. The Fourth Circuit indicated that the District Court must "explain how specific facts indicate that [the defendant's] motive in providing material support constituted the requisite intent for the

6

terrorism enhancement." *Id*. (internal quotations omitted). *See also United States v. Ramirez*, 16 F.4th 844, 853 (U.S. 11th Cir. 2021)("Other circuits have read the phrase 'calculated to' as creating something akin to, or closely resembling, 'a specific intent' requirement.")(citing *United States v. Alhaggagi*, 978 F.3d 693, 699-700 (9th Cir. 2020); *United States v. Ansberry*, 976 F.3d 1108, 1127-28 (10th Cir. 2020); *United States v. Mohamed*, 757 F.3d 757, 759-60 (8th Cir. 2014); *United States v. Wright*, 747 F.3d 399, 408-09 (6th Cir. 2014); *United States v. Hassan*, 742 F.3d 104, 148 (4th Cir. 2014); *United States v. Awan*, 607 F.3d 306, 313-14 (2d Cir. 2010)).

In *United States v. Jumaev*, the district court found, after a jury trial, that the terrorism enhancement did not apply, despite that the defendant providing money to a foreign terrorist organization. *See* No. 12-cr-00033-JLK, 2018 U.S. Dist. LEXIS 119916, at *17-18 (D. Colo. July 18, 2018). The court called the enhancement "draconian," and explained that the "Terrorism Enhancement only applies if I find that [the defendant] had some intent that was not required for the jury to find him guilty. I struggle to find that [the defendant] had either the specific intent to commit crimes that were calculated to influence, affect, or retaliate against a government or the intent to promote another's federal crime of terrorism when the jury's conviction of him could rest only on his knowledge. [The defendant] convincingly argues that he both could have intended to repay his debt … while knowing that the funds would go to support a foreign terrorist organization." *Id*. at *16-17

7

(internal citations omitted).[5] *Id.*

In *United States v. Amer Sinan Alhaggagi*, 978 F.3d 693, 695 (9th Cir. 2020), the defendant participated in chat rooms sympathetic to ISIS. In one chat the defendant was asked if he supported the Caliphate State to which he responded "of course." In another chat with an undercover FBI agent he claimed he could procure weapons and "made disturbing claims suggesting he had plans to carry out attacks against '10,000 ppl' in different parts of the Bay Area by detonating bombs in gay nightclubs in San Francisco, setting fire to residential areas of the Berkeley Hills, and lacing cocaine with the poison strychnine and distributing it on Halloween." *Id.* The defendant opened social media accounts for proclaimed ISIS supporters, accessed a bomb-making manual, and posted "in chatrooms materials about jihadist courses, instructions to build a napalm bomb and chloroform, and links to a training video for ISIS supporters about how to assist in cyberattacks." *Id.* Nevertheless, the court held that the terrorism enhancement did not apply, stating, "The enhancement, therefore, does not automatically apply to all material support offenses. Congress created this distinction in order to punish certain dangerous terrorists more severely than persons who committed non-violent crimes. Thus, to warrant a substantial increase in

---

[5] The district court also found that increasing the 51-year old's criminal history category from I to VI substantially over-represented the seriousness of his criminal history. It therefore departed it back down to category I under U.S.S.G. § 4A1.3(b)(1).

punishment pursuant to the terrorism enhancement, a defendant must have the requisite intent necessary to satisfy the definition of federal crime of terrorism, beyond the intent required to establish a violation of the material support statute." *Id.* at 699.

In reversing the district court's finding that the terrorism enhancement applied, the Ninth Circuit held (and significantly relied on the Fourth Circuit's opinion in *United States v. Chandia* (Chandia I), 514 F.3d 365, 376 (4th Cir. 2008)) that "The district court's 'cause and effect' reasoning is insufficient because the cause—opening social media accounts—and the effect—influencing government conduct by intimidation or coercion—are much too attenuated to warrant the automatic triggering of the enhancement. Instead, to properly apply the enhancement, the district court had to determine that [the defendant] knew the accounts were to be used to intimidate or coerce government conduct." *Id.* at 702. Importantly, the Ninth Circuit found that "While he expressed his support for ISIS in conversations about creating the account, he did not indicate that he hoped or intended that those accounts would be used to spread any specific type of content." (citing *Awan*, 607 F.3d at 317 ("Calculation is concerned with the object that the actor seeks to achieve through planning or contrivance.").

The Ninth Circuit also found that the government could not satisfy the "retaliation prong" because "cases applying the retaliation prong rely on evidence that the defendant intended to respond to specific government

9

action." *Id.* at 703. The court explained, "While providing support to terrorist groups inevitably strengthens their ability to retaliate against government conduct, it is not enough that such support will generally 'lead[] to' more acts of terrorism. That reasoning does not distinguish between conduct that satisfies the material support statute and the specific intent required to establish calculated retaliation for purposes of the terrorism enhancement. We instead look to whether the offense itself is 'calculated . . . to retaliate against government conduct.'" *Id.* at 704 (citing 18 U.S.C. § 2332b(g)(5)(A)); *see also Ramirez,* 16 F.4th at 854 ("To assume an offense listed in § 2332b(g)(5)(B) is per se a 'federal crime of terrorism' without a separate finding as to 'calculated' would render the "calculated" requirement in § 2332b(g)(5)(A) superfluous)(citing *United States v. Fidse,* 862 F.3d 516, 524 (5th Cir. 2017); *Chandia,* 514 F.3d at 376).

The Appellate Court ultimately held that the district court's reasoning focusing on ISIS's conduct of retaliation that was a theme in the chatroom the defendant visited was not enough to satisfy this prong. "Generally assisting a terrorist organization…does not necessarily demonstrate an intention that the [assistance is] to be used to retaliate against a government, and there is no evidence that [defendant] sought revenge on any particular government or for any specific government conduct." *Id.*

Like in *Jumaev,* Mr. Khweis may have been convicted of knowingly supporting a foreign terrorist organization, but there was no showing that his

conduct embodied the specific intent to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. Certainly the jury made no such specific intent finding. It is the government's burden to provide the specific intent element by clear and convincing evidence, and the government cannot meet that burden here. *See Alhaggagi*, 978 F.3d at 700. Like in *Alhaggagi*, Mr. Khweis' crime was non-violent, *see* Sent. Tr. at 37-38, and the terrorism enhancement is meant "to punish certain dangerous terrorists more severely than persons who committed non-violent crimes." *Id.*[6]

Mr. Khweis' case presents an even more clear finding against the terrorism enhancement than *Alhaggagi* because unlike the defendant in *Alhaggagi,* Mr. Khweis did not even utter a word of support for ISIS on social media, much less did he "indicate that he hoped or intended" his conduct would be used to intimidate or coerce government conduct.  *See Alhaggagi,*

---

[6] Mr. Khweis maintains his position that he never intended to be a fighter. Evidence of this lack of intent can be found in the document that leaves the remark blank for Mr. Khweis, but states "fighter" for others. *See* ECF No. 232, *Def's. Mot. for new trial based on newly discovered evidence.* Not only did the fighter document suffer from chain of custody issues, *see* Trial Tr. 226-231, this argument is also inconsistent with the government's theory that Mr. Khweis signed up to be a suicide bomber, a reprised refrain that the government repeated without the proper context, (Khweis immediately followed up that he said that only because was afraid to say no) and in the face of other contradictory statements to the agents about how he wanted to have children and grandchildren. Even if the Court were to find an intent to be a fighter, this is a generalized finding of assistance and would not amount to the specific intent necessary for the application of the terrorism enhancement as explained *supra*.

978 F.3d at 702. He never made any admissions about agreeing or adhering to ISIS ideology. In fact, when he left ISIS, he "ultimately provided information to the FBI which was valuable." *See* Sent. Tr. at 70. Further, as in *Alhaggagi,* though Khweis may have "generally assist[ed] a terrorist organization" – that includes even if the Court were to credit the government's objectionable theory that Mr. Khweis traveled to be a fighter – such conduct "does not necessarily demonstrate an intention that the [assistance is] to be used to retaliate against a government, and there is no evidence that [defendant] sought revenge on any particular government or for any specific government conduct" *id.* at 704, nor does it represent an intent to affect the conduct of government by intimidation or coercion.

*USSG § 3B1.2*

In advocating for these enhancements, the government essentially seeks to hold Mr. Khweis responsible for many acts of the Islamic State that he did not engage in. Given this posture – the argument that Mr. Khweis should be given the same enhancements as someone in ISIS who actually participates in violence and has an intent to intimidate, coerce, or retaliate against a government– then surely Mr. Khweis, who did nothing but sit in ISIS territory for two months before escaping and providing the FBI with valuable intelligence information, had a minor role. The § 3B1.2 factors support this as well:

(i) the degree to which the defendant understood the scope and structure of the criminal activity;

> *It is evident that Mr. Khweis did not understand the scope and structure of the criminal activity given that he tried to escape shortly after arriving, and eventually did escape.*

(ii) the degree to which the defendant participated in planning or organizing the criminal activity;

> *Mr. Khweis did not participate in any planning or organizing of terrorist activity, or any activity at all once arriving in ISIS territory. He was shuttled around by others.*

(iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

> *Mr. Khweis had no decision-making authority within ISIS. In fact he had a difficult time escaping when he wanted to leave.*

(iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

> *Mr. Khweis told FBI agents and testified that he had to do what he was told – he had no discretion. See e.g.* Trial Tr. p. 579 (SA Czekala: "He said that they controlled him. And that basically his decisions were out of his control."); p. 882 (Khweis: "I was trying to figure out like why I was sent here."); p. 891 (Khweis: "I thought I was going to be, you know, free to go, free to roam around. But when they took me to the second house, I felt like I had no freedom to leave. I was like basically trapped. They didn't allow me to leave."); *Further, any "participation" itself was minimal – he was there for approximately two months and did very little, if anything.*

(v) the degree to which the defendant stood to benefit from the criminal activity.

> *Mr. Khweis did not benefit at all from ISIS' activity. In fact, given that he sought to escape shortly after his arrival, a strong, violent ISIS would have been to his detriment. See* Trial Tr. 891 ("I feel if I did say that, or let them know that, then I would have been jailed or possibly killed. I

13

couldn't just say, hey, I don't want to stay here anymore, I'm leaving, you know, I've got to go."); 892 ("Q: And how many times before you finally made it to Kurdistan did you attempt to leave? A. Several times. It was a process.")

Based on this, and on his previous Guidelines arguments (*see* ECF No. 233), Mr. Khweis submits that the proper Guidelines calculation is:

Base Offense Level USSG §2M5.3(a)  26

Obstruction  +2

Minor Role  -2

Offense Level  26

Criminal History Category I

**Guidelines Range  63-78 months[7]**

## ARGUMENT

### I.  Legal Standard

Since the Guidelines were held to be advisory in *United States v. Booker*, 543 U.S. 220, 226 (2005), imposing a sentence is no longer a strictly mathematical exercise. While "a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines," *United States v. Hughes*, 401 F.3d 540, 546 (4th. Cir. 2005), district courts must now make "an individualized assessment based on the facts presented" after calculating the advisory Guidelines range. *Gall v.*

---

[7] Mr. Khweis has been incarcerated for approximately 6.5 years. This effectively amounts to a 96-month sentence with good time credits (not accounting for the covid lockdowns, which should count for more than day-for-day as argued *infra* §II(iv).

*United States*, 552 U.S. 38, 50 (2007). The Guidelines range is but one of several factors a court must consider when imposing a sentence and it is legal error to treat those ranges as default sentences. *See United States v. Mendoza-Mendoza*, 597 F.3d 212, 216-17 (4th Cir. 2010); *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam); *Spears v. United States*, 555 U.S. 261, 263-64 (2009). A court must also weigh the factors enumerated in 18 U.S.C. § 3553(a) when imposing a sentence.

Taking into account the factors enumerated in § 3553(a), which state that a judge must "impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)), courts are not required to point to "'extraordinary' circumstances to justify a sentence outside the Guideline range." *Gall v. United States*, 552 U.S. 38, 47 (2007). A below-Guidelines sentence may be appropriate if the Court determines that the Guideline sentence "falls outside the 'heartland' to which the Commission intends individual Guidelines to apply, perhaps because the Guidelines . . . fails to properly reflect § 3553(a) factors." *Rita v. United States*, 551 U.S. 338, 351 (2007)(citation omitted).

The factors for the district court to consider include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the kinds of sentences available, (3) the Guidelines range, (4) the need to avoid unwarranted sentencing disparities, (5) the need for

restitution, and (6) the need for the sentence to reflect: the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to the defendant and others, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. See 18 U.S.C. § 3553(a). The Court must weigh each of these factors when determining the appropriate sentence with the least amount of imprisonment necessary pursuant to §3553(a). *Id.*

## II. A sentence no greater than 63 months is sufficient but not greater than necessary to achieve the goals of sentencing.

### i. *The balance of equities has tipped in Mr. Khweis' case*

When Mr. Khweis previously appeared before this Honorable Court, he was guilty of three distinct criminal offenses stemming from three different types of conduct. Now he is guilty of two. Fairness and reason follow that an individual guilty of two criminal offenses is less guilty than he who committed three criminal offenses. Thus, balancing shear equities, Mr. Khweis is before the Court less guilty than before. In fact, the Fourth Circuit's decision implicitly acknowledges that vacating a conviction may affect Mr. Khweis' sentence. The Fourth Circuit could have addressed Mr. Khweis' sentencing challenges and affirmed the sentences on the remaining two counts.[8] Instead, the Fourth Circuit chose to remand for re-sentencing on

---

[8] For preservation purposes, Mr. Khweis maintains all of his prior sentencing arguments and challenges. *See* ECF No. 233.

the two remaining counts, thereby implying that its ruling could result in a lower sentence below. And it should. The balance of equities has changed since Mr. Khweis was previously before this Honorable Court.

    *ii.        Mr. Khweis is further rehabilitated.*

Not only is Mr. Khweis legally less culpable, he is further rehabilitated. *See Pepper v. United States*, 562 U.S. 476, 481 (2011) (holding that a district court at resentencing may consider evidence of a defendant's post-sentencing rehabilitation in support of a downward variance). Federal courts, including courts in this Circuit have acknowledged that post-sentencing conduct, including a defendant's disciplinary record, work history, while in prison, "provides the most up-to-date picture of [his] 'history and characteristics,' and thus deserves "great weight" when assessing current dangerousness. *United States v. Decator*, 452 F. Supp. 3d 320, 325 (D. Md. 2020)(quoting *Pepper*, 562 U.S. at 492). Indeed, the Supreme Court has deemed exemplary post-sentencing conduct as conduct which may be taken "as the most accurate indicator of a [defendant's] present purposes and tendencies." *Pepper*, 562 U.S. at 492.

At the time of Mr. Khweis' sentencing hearing almost five years ago, the Court spoke to Mr. Khweis and said, "You ultimately provided information to the FBI which was valuable, as stated. And I certainly think that that is evidence of perhaps that there is a chance in the future of rehabilitation, and that the day that you are freed you will make a contribution to your

community…." Sent. Tr. at p. 70.

Although not freed, Mr. Khweis took the Court's words to heart and has done everything possible within the prison to contribute to his community and to build his skills for similar contribution upon release. He did this without any promise that he would be back before the Court –all while staring down the throat of a 20-year prison sentence. Yet, for the last four-and-a-half years, Mr. Khweis has lived within the four corners of his cell – at times on complete lockdown—not wallowing in self-pity. He resisted this urge and instead used his time to better himself and make amends.

Mr. Khweis' commitment to education has been steadfast and impressive. Prior to his original sentencing, Mr. Khweis completed 2 college level courses at Alexandria Detention Center through Nothern Virginia Community College. Now, as of March 2022, Mr. Khweis has completed over 1,000 hours of vocational training while housed at FCI Cumberland. *See* Def. Ex. A. His classes have included over 500 hours of carpentry, as well as food handling, food management, starting a small business, early American history, life skills, and college preparatory class. Many of these classes are accredited by Allegany college or regulatory bodies such as the National Restaurant Association.

Mr. Khweis' Summary Reentry Plan states that "Khweis has programmed at an accelerated rate in a wide variety of fields. He has concentrated his programming towards attaining employment skills such as

Building Trades Drywall, Carpentry, OSHA training and has worked the Suicide Companion program for four years. **He has adhered to the Unit Team's advice to the highest level and continues to be self motivated**." *Id.* (emphasis added). Mr. Khweis also currently works as a C2 Unit Orderly, a coveted and highly respected position within the Bureau of Prisons. His other work includes mechanical services, housekeeping, and repair work. "Most importantly," his Summary Reentry Plan states, "he continues to be on call as the Suicide Companion through the Psychology Department for the past four years. He has learned a variety of communication skills when dealing with other inmates with mental issues." *Id.*

The importance of this program was recognized by the Director of the Bureau of Prisons himself:

Dear Suicide Watch and Mental Health Inmate Companions,

Of the many valuable inmate programs offered by the
Bureau of Prisons, the Inmate Companion Program is one of which
I am particularly proud. This program is an example of inmates
helping inmates. Those of you who participate in this program
are contributing to your community by providing support and hope
to your peers.

At the same time you are assisting others, you are learning new
skills that will support reentry to your communities and
reunification with your families. These skills include
listening to others, communicating clearly, putting another's
needs before your own, and sticking with a job, even when it is
challenging; these skills will pay dividends for the rest of
your life.

I have great respect and appreciation for the work you do to
prevent suicide and support your peers through their darkest
moments. Your work, in collaboration with the professional
mental health services provided by the Bureau, truly has the
power to save lives.

Sincerely,

Charles E. Samuels, Jr.
Director

Mr. Khweis' Summary Reentry Plan specifically reference Mr. Khweis'

resentencing hearing and states, that "**he has excelled in all areas of**

**programming at FCI Cumberland**." *Id.*(emphasis added).

Mr. Khweis has also received specific praise from the psychology staff for

his work as a member of FCI Cumberland's Suicide Prevention Program

where he is entrusted to observe fellow inmate behavior and work with

facility staff to deter suicide attempts among his peers. *See* Def. Ex. C. His

fellow inmate wrote:

I personally have worked with Mohammed on multiple occasions over the past several months in the position of "Companion" supervising inmates on temporary suicide watch. It is an honor to be accepted into the "Companion" program at all. It is not something anyone can just get into very easily. Only a select few on this compound are selected to be involved in the "Companion" program. Working closely with Mohammed has been very enlightening indeed. He is a calm and collected individual who cares very much about others. He is someone who makes sure the welfare of others is first and foremost his priority and Mohammed carries himself professionally when it comes to working with individuals whom are depressed or have lost all hope/faith in themselves.

The Bureau of Prisons itself has assessed Mr. Khweis' recidivism risk level and assessed it at a minimum recidivism risk level. This minimum risk level is incredibly notable. In 2020, it was assessed to only 3.5% of federal inmates in 2020 in Mr. Khweis' age group (25-34), and to only 1% of "violent offenders" as Mr. Khweis is so categorized by the BOP.[9] *See* Def.'s Ex. A at 1. Mr. Khweis also has minimum security level points (7). *See id.* at 2. In short, there is simply nothing *more* that Mr. Khweis could be doing from the prison to better himself and exemplify rehabilitation. Not only has he followed every rule in an environment fraught with pitfalls and easy missteps, he has thrown himself into academics, programing, and trades while also staying connected to his family, providing what little support he can for them locked up from afar. He followed through on the Court's words at his sentencing hearing in an environment in which it is easy to simply give up.

---

[9] *See* Dept. of Justice, Bureau of Prisons, *Federal Prisoner Statistics Collected under the First Step Act, 2021*, Table 10; p. 22 (https://bjs.ojp.gov/content/pub/pdf/fpscfsa21.pdf) (published Nov. 2021).

The letters submitted on Mr. Khweis' behalf attest to this as well. The common thread throughout these letters is that Mr. Khweis is a family-oriented, hardworking, dedicated young man who made a tragically bad decision when he was twenty-six years old. *See* Def.'s Ex. C. His close family friend writes:

> I have worked with veterans and ex-military for most of my life. I love my country and owe much of my success to those who have served in our great military. I would not want someone out in the world who was a threat despite my relation to them or their family. I can truthfully say that Mohamed has become a finer human being and his lessons learned. Instead of turning bitter or hateful due to his situation he continued to strive to become better. He continues to apply himself to have a life outside and improve his circumstances. I hope you take all this into consideration during his resentencing given these facts. I have no doubt that your decision will be just and fair.

Def.'s Ex. C, *Letter from Alia Majali.*

His longtime friend explained:

> Mohamed would teach me about working hard, staying disciplined, and most importantly family. Mohamed has always been big on family since we were little. The bond he shared with his mother and father was unbreakable. Mohamed has clearly shown in these past years that he is making the most of his situation by gaining several educational certifications to try and spread knowledge. Recently he's been lecturing inmates on suicide prevention and breathing hope into some that might not have had any hope left. Your Honor, I hope you can see that Mohamed deserves a second chance in society and most importantly be reunited with his loved ones.

*Id., Letter from Hussam Ibrahim.*

In fact, two of the letters provide quality employment opportunities for Mr. Khweis. Given that employment is a large contributor to successful re-entry, having these job opportunities is a significant factor weighing in favor

of allowing Mr. Khweis to return home. It is unlikely that two individuals would separately offer Mr. Khweis employment without knowing that he is disciplined, dedicated, and capable. That he has been convicted of a terrorism offense and these individuals are still willing to employ him speaks volumes.

Mr. Khweis' collection of letters, full of experience and knowledge of who Mr. Khweis truly is, should be given considerable weight against the government's monstrous portrayal of their friend/brother/son/colleague/cellmate. For the government's position of Mr. Khweis is like looking at a molecule of a man and assuming that represents the full man. Mr. Khweis is far more than the repetition of sinister verbiage or his 6.5-year-old bad decision. These letters represent who Mr. Khweis truly is, and they show he is kind, caring, diligent, and motivated.

iii.     *Sentencing disparities have deepened since Mr. Khweis was last before this Honorable Court*

Courts across the country are gaining a new perspective when sentencing defendants in these types of cases. Since Mr. Khweis' sentencing hearing, a number of courts have given time-served, or at least significantly less time than 20 years, in material support cases.

**a. other material support cases generally**

The District Judge in *United States v. Doe* recently opined, "Terrorism in support of ideology is not unknown in American history.… Nor is the history of export of American volunteer fighters to foreign wars unusual: we need only recall American individuals' aid to civil wars in Greece, Israel, Italy,

23

Spain, Sri Lanka, the Soviets, and Nazi Germany." 323 F. Supp. 3d 368, 370 (E.D.N.Y. 2018) (citing David S. Reynolds, *John Brown, Abolitionist* 11 (Alfred A. Knopf 2005) ('Whitman sought to provide America with healing and reconciliation through poetic language . . . Brown . . . resorted to terrorist tactics to disrupt the South's peculiar institution.')).

Against this backdrop, the Court in *Doe* made its findings on a strikingly similar set of facts to Mr. Khweis' case. In *Doe*, the defendant pled guilty to material support for a foreign terrorist organization after traveling to Syria and receiving training from ISIS. There he remained for several months until he managed to escape back to Turkey and into the arms of United States authorities. *See id.* Despite his Guidelines range of approximately 30 years, the district court sentenced Doe to time-served, which was approximately two years, stating, "Further incarceration will inhibit defendant's reentry into lawful life and could encourage defendant to re-engage with violent extremism. Rehabilitation will more likely be achieved through a long term of supervised release…." *Id.* at 392.

In *United States v. Dais*, 482 F. Supp. 3d 800, 801 (E.D. Wis. 2020), the defendant engaged in an array of online activity, which included providing advice on how to make explosive devices and poison, prepare for an attack, and select targets. She hacked into social medial platforms to promote ISIS ideology, recruit adherents to ISIS, collect information on how to make explosives and biological weapons and on how to conduct terrorist attacks

and distribute that information to individuals interested in conducting attacks on behalf of ISIS. During undercover communications, the defendant suggested potential targets for attacks, discussing the number of people who should be killed and starting with poisons first (and discussing how to create them). She also discussed the Boston Marathon bombing, stating, "It was very easy to make. All it needs is a pressure cooker, shrapnel and explosives. Join my channel and research." When she was arrested, the defendant stated that she had engaged in this conduct out of boredom. The defendant pled guilty to one count of attempting to provide material support. The government requested a 20-year sentence, and the Court ultimately sentenced her to 90 months.

The fact that Mr. Khweis chose to exercise his Constitutional right to trial should not dissuade this Court from imposing a 63-month sentence. In July 2018 in Colorado, Bakhtiyor Jumaev was convicted of three counts involving material support to a terrorist organization after a 19-day jury trial. Bakhtiyor Jumaev mailed his co-defendant, Jamshid Muhtorov $300 after Mr. Muhtorov informed him that the Islamic Jihad Union (IJU) needed financial support. *United States v. Jumaev*, No. 12-cr-00033-JLK, 2018 U.S. Dist. LEXIS 119916, at *1 (D. Colo. July 18, 2018). "The trial was extensive, lasting seven weeks and involving hundreds of exhibits and tens of witnesses. The resources expended—to bring foreign witnesses and experts here, to depose witnesses abroad, to ensure accurate translations, to sift through

mountains of evidence, and to exhaustively litigate the relevant issues—were great." *Id.* Nevertheless, the court recognized that "Mr. Jumaev was entitled to a fair trial and put forward the type of legitimate defenses that necessitate a trial." *Id.* At sentencing, the court found the guidelines to be "illogical and inadequate." The court called the Terrorism Enhancement a "wrecking ball" and "draconian," and the government's request for a 15- year sentence "absurd." *Id.* The district court sentenced Jumaev to time-served.

### b. Other ex-patriots captured since the fall of the Islamic State

Since Mr. Khweis was last before this Court, and certainly since his travel to Syria, the Islamic State has fallen.[10] As such, there have been a wave of ex-patriots, including Americans, seeking to return to their homelands. Unlike Mr. Khweis, who left on his own volition shortly into his journey, these individuals stayed longer, and chose only to leave when the writing was on the wall. Not only does this show increased culpability, it also presumably leads to far less valuable information if the enemy has been all but defeated at that point. Yet, these other ex-patriots are being punished less harshly than Mr. Khweis.

Consider, for example, Samantha Elhassani, a mother from Indiana who traveled in 2015 with her young children to Syria where her husband and

---

[10] Associated Press, *Timeline of the rise and fall of the Islamic State group*, (Oct. 27, 2019)(https://www.politico.com/news/2019/10/27/baghdadi-islamic-rise-fall-058970)

brother-in-law had joined the Islamic State.[11] There, among other things, she and her husband purchased Yazidi sex slaves, although Elhassani remains defensive of this conduct, alleging that, despite her husband's repeated raping of the young girls, that she "purchased" at least one of them to help, as they were better off with her family:

> Asked if she feels she enabled the girls' serial rape, she said: "In every house that she was in before that was the same situation, but she did not have the support of someone like me. We constantly talked about going to see her mother. I was going to get her out and she was going to go back home."

> [Elhassani] continued: "And no, no one will ever know what it is like to watch their husband rape a 14-year-old girl. Ever. And then she comes to you – me – after crying and I hold her and tell her it's going to be OK. Everything is going to be fine, just be patient."

> "I would never apologize for bringing those girls to my house. They had me and I had them. And we knew that if we were just patient we would stick together. You understand? In any other situation they would be locked in a bedroom and fed tea every day. And the situation I was in with them, we cooked together, we cleaned together. Drank coffee together. Slept in the same room together. I was like their mother."[12]

After Elhassani's husband was killed in late 2017, she fled and was captured by Kurdish forces. Prior to leaving, Elhassani also made several trips to Hong

---

[11] Lila Hassan and Max Green, *American Mom Who Pleaded Guilty to Terrorism Charges Sentenced to 6.5 Years*, FRONTLNIE (Nov. 9, 2020) (https://www.pbs.org/wgbh/frontline/article/american-mom-pleaded-guilty-terrorism-charges-sentenced/)

[12] Nick Paton Walsh and Salma Abdelaziz, *Beaten, tortured, sexually abused: An American ISIS widow looks for a way home* (available at https://www.cnn.com/2018/04/19/middleeast/syria-us-isis-bride-intl/index.html).

Kong to pre-position over $30,000 in cash and gold that she knew her husband and brother-in-law would use to support ISIS. Ms. Elhassani pled guilty to two counts involving material support and the judge sentenced her to six-and-a-half years in prison.

Recently, in this Court, Allison Fluke-Ekren, a woman originally from Kansas, pled guilty to being a leader of a female battalion in Syria. Fluke-Ekren "aided terrorist groups for more than six years while in Iraq, Libya and Syria…."[13] She provided military training to over 100 women and young girls in Syria for ISIS, some of which involved using AK-47 rifles, grenades and explosive suicide belts. Fluke-Ekren also "assisted leaders of Ansar al-Sharia, the terrorist group behind the 2012 attack that killed four Americans in Libya…." *Id.* In her plea, she admitted that "she had ideas for a mass-casualty strike in the United States that were never put into action." *Id.* A government witness "told investigators that Fluke-Ekren had the idea in 2014 to bomb a U.S. college in the Midwest." *Id.* Another government witness "who was with Fluke-Ekren in Iraq and Syria told U.S. investigators how the former Kansas mom 'explained that she could go to a shopping mall in the United States, park a vehicle full of explosives in the basement or parking garage level of the structure, and detonate the explosives in the vehicle with

---

[13] Salvador Rizzo, *Kansas woman who joined ISIS pleads guilty to terrorism charge* Washington Post (available at https://www.washingtonpost.com/national-security/2022/06/07/kansas-mom-pleads-guilty-to-terrorism/)

a cell phone triggering device.'" *Id.*

An expert interviewed by the Washington Post, "called Fluke-Ekren's turn to extremism the 'worst-case scenario we've been talking about since 2011.'" She said, "It is a woman from a Western country, the United States, becoming part of this. She wasn't brainwashed, she wasn't trafficked. … She is someone who absolutely decided to go, and once there, absolutely leaned in." *Id.* For all of this, Fluke-Ekren faces a *maximum* punishment of 20 years incarceration – the same sentence Mr. Khweis originally received.

Another example is *United States v. Jihad Ali*, 1:21-cr-20109-JLK out of the Southern District of Florida. Jihad Ali, like Mr. Khweis, traveled to Syria via the Turkish border. *See* 1:21-cr-20109-JLK, Statement of Facts, ECF No. 33 (SDFL May 4, 2021). Once in Syria he attended ISIS religious and military training, including training on the operation of various weapons including the AK-47 assault rifle, PKC machine gun, and rocket-propelled grenade launcher. *Entirely unlike Mr. Khweis*, he did *not* seek to escape ISIS territory, but instead embraced ISIS's mission and its methods. Jihad Ali joined an ISIS battalion and engaged in combat using his AK-47 assault rifle to fire at U.S.-led coalition forces as well as a local tribe. Jihad Ali stayed in Syria with ISIS for approxiamtely four years, rising through its ranks to become a manager of supplies. In March 2021, he pled guilty to conspiracy to provide material support to a designated foreign terrorist organization and was subsequently sentenced to a period of 60-months incarceration.

29

Perhaps even more starkly, in a situation similar to Mr. Khweis,' Abdulrahman Ahmad AlSheikh, a dual United States and Saudi citizen, traveled through Turkey to Syria in 2014 to join the Islamic State. In fact, his name was on an ISIS intake form designating him as a "fighter," and the twitter account attributed to him shows ISIS involvement.[14] "He spent the next few *years* working for ISIS, first in an administrative role and later as an oil field guard. But Mr. Alsheikh denied that he had done so willingly. Instead, he told interrogators that he went to Syria intending to be a freelance journalist but was instead arrested by the Islamic State, then began working for the group seven months later to get out of prison." *Id.*(emphasis added). In September 2017 he was captured by a Kurdish militia and turned over to the United States military. On him were thumb drives with files about weapons and internal ISIS administrative records. The government announced it was holding Mr. Alsheikh as an enemy combatant, prompting habeas litigation.

---

[14] Charlie Savage, Rukmini Callimachi, and Eric Schmitt, *American ISIS Suspect Is Freed After Being Held More Than a Year*, NYTimes (Oct. 29, 2018) (available at https://www.nytimes.com/2018/10/29/us/politics/isis-john-doe-released-abdulrahman-alsheikh.html.)

After being held by the U.S. military for thirteen months, the government

transported Mr. Alsheikh to Bahrain and simply released him. *Id.*[15]

---

[15] Other sentencing disparities prior to Mr. Khweis' original sentencing hearing are also worth noting:

In *United States v. Balraj Naidu*, 465 F. App'x 264 (4th Cir. 2012), the defendant proceeded to a jury trial and was convicted of material support for attempting to purchase hundreds of thousands of dollars worth of weaponry for the Tamil Tigers in Shri Lanka. *See* https://archives.fbi.gov/archives/baltimore/press-releases/2010/ba121610.htm#:~:text=BALTIMORE%2C%20MD%E2%80%94U.S.%20District%20Judge,to%20a%20foreign%20terrorist%20organization. He received a sentence of 57 months imprisonment.

In *United States v. Thomas*, 521 F. App'x 741, 742 (11th Cir. 2013), the defendant pled guilty to conspiracy to possess an unregistered explosive device after conspiring to obtain a destructive device for the purpose of attacking federal employees and buildings, even going so far as to conducting reconnaissance of two of the government buildings. The court applied the terrorism enhancement and sentenced the defendant to 60 months.

In *United States v. Georgescu*, No. 14-CR-799 (RA) (S.D.N.Y. Dec. 16, 2016) Virgil Georgescu, following a ten-day jury trial, was convicted of one count of conspiracy to murder officers and employees of the United States and one count of conspiracy to provide material support to a terrorist organization. The offense involved a "months-long conspiracy orchestrated by Georgescu to provide military-grade weapons to the Fuerzas Armadas Revolucionarias de Colombia ("FARC"), which is designated as a foreign terrorist organization by the United States. The evidence at trial …indicated that Georgescu and others conspired to acquire and sell more than $15 million worth of guns, grenades and other weapons to the FARC, with the understanding that they would be used to kill Americans." *United States v. Georgescu*, No. 14-CR-799 (RA), 2021 U.S. Dist. LEXIS 95119 (S.D.N.Y. May 18, 2021). Despite Guidelines of life imprisonment, the Court sentenced Georgescu to 120 months.

In *United States v. Ortiz*, 525 F. App'x 41, 42 (2d Cir. 2013), defendant, Anderson Chamapuro Dogirama, was a member of the FARC. He, along with others, held a U.S. citizen captive for approximately ten months. They escaped from the FARC, were extradited to the United States, and charged with taking hostages and conspiring to take hostages. Dogirama was sentenced to 120 months imprisonment.

In *United States v. Akl*, No. 3:10-cr-00251 (N.D. Ohio 2010) Amera Akl and her husband planned to conceal and provide up to $500,000 to Hizballah on behalf of anonymous donors in the United States. They worked with a

### c. sentencing disparities as the result of the First Step Act

Not only have sentencing disparities increased within this category of offense since Mr. Khweis was last before this Court, but the First Step Act was also enacted since then, and it increased the divide among those with the same sentence, but different offenses.

The First Step Act now allows some offenders – mainly white collar offenders – to earn "earned time credits."[16] These "earned time credits" decrease a defendant's sentence up to one year. Thus, if a fraud offender were to come before this Court the same day as Mr. Khweis and if he were to receive the same sentence as Mr. Khweis, the fraud offender would have the opportunity to serve less time.

Although this may not be far from the disparity between those who are RDAP eligible and those who are not, or those who are U.S. citizens (and eligible for programs) and those who are not, it is nonetheless a newly created sentencing disparity. Thus, Mr. Khweis asks this Honorable Court to account for the fact he will be ineligible for "earned time credits," available to other defendants, when fashioning its sentence in this case.

---

confidential source from the FBI to agree to hide the source's money in a vehicle than would then be sent to Lebanon. Akl pled guilty to conspiracy to provide material support and was sentenced to 40 months' imprisonment with three years of supervised release.

[16] *See* https://www.judiciary.senate.gov/imo/media/doc/115.xxx%20-%20First%20Step%20Act%20of%202018.pdf#page=12 listing pages of "Ineligible Prisoners."

iv. *The harsh lockdowns during the COVID-19 pandemic should count for more than a day-for-a-day time.*

The COVID pandemic resulted in a prolonged period in which even ordinary Americans living in their comfortable homes felt trapped and lonely. Magnify these feelings 100-fold, and one may be able to have a small understanding of what life has been like in a prison cell under these austere conditions. "Humans don't just like to be social, we need to be. In fact, people who have weaker social relationships are 50% more likely to die over a given period than those with more robust connections, according to a 2015 meta-analysis including more than 308,000 people. Put another way, being lonely seems to be as deadly as smoking 15 cigarettes a day."[17] In fact, "[t]hat's why depriving yourself of social connections, even temporarily, doesn't feel good: Your body is trying to tell you to mingle so that, long-term, you stay alive." Thus, "'If we think about loneliness as this adaptive response kind of like hunger and thirst, it's this unpleasant state that motivates us to seek out social connections just like hunger motivates us to seek out food,' lead study author Julianne Holt-Lunstad, a professor of psychology and neuroscience at Brigham Young University, told Business Insider." A prison is a particularly awful place to be during a pandemic.

> "Prisons are not health care providers, yet they were tasked with keeping people safe during a global pandemic," said Clinique

---

[17] Anna Medaris, *What months of lockdown does to your body and brain*, Business Insider (Jun 30, 2020), available at https://www.businessinsider.com/how-a-coronavirus-quarantine-affects-your-body-and-brain-2020-3 (last accessed May 10, 2022)

Chapman, associate director for Vera and MILPA's Restoring Promise initiative, which creates prison housing units grounded in dignity. "They leaned on what they know, and they know how to lock people down." Cells designed for punitive solitary confinement—cramped, concrete, windowless, and about the size of a parking space—are no place for ethical medical isolation. In fact, the United Nations has deemed it torture to hold people in such conditions for more than 15 days without meaningful human contact.[18]

It is not just prison reform advocates reporting this. Medical News Today explained, that "According to an article in the Journal of the American Academy of Psychiatry and the Law, isolation can be as distressing as physical torture."[19]

The COVID-19 lockdown at Mr. Khweis' prison was excruciating (and this was after Mr. Khweis had already experience harsh treatment in Kurdish custody). Mr. Khweis lives in a windowless 7' x 13' cell. During lockdown he was only permitted to exit this cell three times per week for 10 minutes to shower and remove the trash that had built up in the cell. The little social interaction he had evaporated entirely. Even something as simple as access to fresh food was gone because no one could work in the kitchen. Laundry services, too, were extinguished causing all the inmates to sleep on dirty linens, and because no one could leave their cell, the inmates were all

---

[18] Bryant, Erica, *Solitary Confinement is Torture, Not COVID Medical Care*, Vera.org, https://www.vera.org/news/solitary-confinement-is-torture-not-covid-medical-care (last visited June 13, 2022).
[19] Jayne Leonard, *What are the effects of solitary confinement on health?,* Medical News Today, https://www.medicalnewstoday.com/articles/solitary-confinement-effects (last visited June 13, 2022).

forced to use the toilet in front of their cellmates. In fact, the health and safety hazards in Maryland prisons – and specifically FCI Cumberland Medium – were raised to the Attorney General himself by Maryland Congressional delegation, explaining that they have "received troubling reports about conditions for prison guards, health staff, and incarcerated individuals at the medium-security FCI Cumberland…." Def.'s Ex. D.

As the court in *United States v. Lizardi*, put it, "[a] day spent in prison under extreme lockdown and in legitimate fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing." No. 11-CR-1032 (PAE), at *7 (S.D.N.Y. Oct. 9, 2020); *see also United States v. Rodriguez*, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020) ("the pandemic, aside from posing a threat to [Defendant's] health, has made [Defendant's] incarceration harsher and more punitive than would otherwise have been the case."); *United States v. Mel*, No. CR TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("The fact that [Defendant] has been incarcerated [] during a serious outbreak of COVID-19 inside the facility sufficiently increased the severity of the sentence beyond what was originally anticipated ...").

This Honorable Court should similarly account for the incredibly harsh conditions under which Mr. Khweis spent much of the last two years and find

that these measures "sufficiently increased the severity of the sentence beyond what was originally anticipated" *id.*

      *v.*        *The Guidelines range is not rooted in empirical evidence*

"[T]he terrorism guideline was enacted pursuant to a congressional directive and absent empirical evidence. *See Alhaggagi*, 372 F. Supp. 3d at 1014-15. Such guidelines do not exemplify the Sentencing Commission's exercise of its characteristic institutional role, *see Kimbrough v. United States*, 552 U.S. 85, 109, (2007), and are generally entitled to less respect. *See United States v. Reyes-Hernandez*, 624 F.3d 405, 418 (7th Cir. 2010)." *United States v. Dais*, 482 F. Supp. 3d 800, 803 (E.D. Wis. 2020). In fact, this Court has noted this lack of empirical basis as well, stating "The guidelines are not based on any empirical research. There has been no study to determine how much time a terrorist should have…" Hon. Gerald Bruce Lee, Symposium, *Convicted Terrorists: Sentencing Considerations and Their Policy Implications*, 8 J. Nat'l Security L. & Pol'y 347, 361 (2016). As such, this Court should give little, if any, weight to the advisory Guidelines range. *See also United States v. Dais*, 482 F. Supp. 3d 800, 802-03 (E.D. Wis. 2020) ("[U.S.S.G. § 3A4.1] is contrary to the purposes of sentencing in 18 U.S.C. § 3553(a), including the notion that sentences should be individualized and proportionate, and that we should distinguish between the worst offenders and those who are less dangerous.") (citing *United States v. Dorvee*, 616 F.3d 174, 186-87 (2d Cir. 2010)).

*The Guidelines range overstates Mr. Khweis' criminal history and inappropriately increases Mr. Khweis's criminal history score based on unsubstantiated assumptions about recidivism.*

Not only is the terrorism guideline itself unsupported by empirical data, the terrorism guideline is "contrary to the theory behind the guidelines: that the offense level will reflect the seriousness of the offense, increasing incrementally based on specific aggravating facts, and the criminal history category will reflect the risk to the public, based on the defendant's prior record.…Terrorism cases are undoubtedly serious, but automatically increasing a defendant's criminal history to reflect the seriousness of the charged offense seems misguided." *United States v. Dais*, 482 F. Supp. 3d 800, 803 (E.D. Wis. 2020)(internal citations omitted).

As the court explained in *United States v. Alhaggagi*, 372 F. Supp. 3d 1005, 1013 (N.D. Cal. 2019)(rev'd on other grounds), the *offense level* reflects the seriousness of the charged conduct. "A defendant's *criminal history category* reflects something different." *Id.* (citing *Martinez*, 931 F.2d at 852 n.1 ("the distinction between the calculation of the offense level and the calculation of the criminal history category is important insofar as 'each calculation concerns a conceptually separate notion related to sentencing.'") (quoting *United States v. Goolsby*, 908 F.2d 861, 863 (11th Cir. 1990)(emphasis in original). A defendant's criminal history score "evaluates the need to increase [the offender's] sentence incrementally to deter him from further criminal activity." *Id.* (citing *United States v. Scroggins*, 880 F.2d

1204, 1210 (11th Cir. 1989); *Nichols v. United States*, 511 U.S. 738, 751 (1994) (Souter, J., concurring) ("Prior convictions . . . serve under the Guidelines to place the defendant in one of six 'criminal history' categories; the greater the number of prior convictions, the higher the category. . . . the Guidelines seek to punish those who exhibit a pattern of 'criminal conduct.'"); U.S.S.G. Chapter Four, Criminal History and Criminal Livelihood, Part A — *Criminal History Introductory Commentary* ("A defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment. . . . Repeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation."); *United States Sentencing Commission*, "A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score, Jan. 4, 2005 at 1-3[20] (goals for criminal history instrument are "to predict recidivism" and "reflect offender culpability" in the form of "harsher punishments for offenders with aggravated prior criminal backgrounds")).

Based on this stated purpose, the *Alhaggagi* court opined, "If terrorism sentences are too low, the Sentencing Commission can recommend increasing the offense level for those crimes. But automatically increasing a defendant's criminal history to reflect the seriousness of the charged offense is inappropriate, as it does not reflect—unlike every other offense—the

---

[20] available at https://www.ussc.gov/research/researchpublications/ comparison-federal-sentencing-guidelines-criminal-history-category-and- usparole-commission-salient

seriousness of the defendant's previous criminal convictions." 372 F. Supp. at 1014.

As the court in *Alhaggagi* explained, "The terrorism enhancement treats all terrorism defendants as if they are career criminals." *Id.* at 1016 (citing U.S.S.G. § 3A1.4(b); James P. McLoughlin Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 Law & Ineq. 51, 57 (2010) ("The shift to Criminal History Category VI ensures that a defendant will be sentenced as if he or she were a career criminal, with no empirical evidence that this is true or fair. . . .")).

However, "Career criminals—individuals who have repeatedly demonstrated their refusal or inability to follow the law—have a higher likelihood of recidivism." *Id.* (citing *United States v. Segura-Del Real*, 83 F.3d 275, 277 (9th Cir. 1996) ("But category VI is different from the other categories. Defendants are placed in category VI because they are the most intractable of all defendants."); *id.* at 279 n.1 ("defendants in Category VI, the highest criminal history category, are, not surprisingly, the defendants who demonstrate the most limited likelihood of successful rehabilitation and the greatest likelihood of recidivism"); *United States v. Bad Marriage*, 392 F.3d 1103, 1117 (9th Cir. 2004) (Callahan, J., dissenting) ("all category VI defendants have lengthy criminal records. 'It is the very circumstances of their recidivism which puts them in this category.'") (quoting *Segura-Del*

*Real*, 83 F.3d at 277)).

Just as Alhaggagi was not a career criminal, neither is Mr. Khweis. In fact, he is in a criminal history category I. "Absent the enhancement, he would have a criminal history category of I. *Id.* (citations omitted). Automatically assigning him a criminal history of VI would be illogical and unjust." However, as *Alhaggagi* states, "Fortunately, the guidelines provide that '[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted.'" *Id.* (citing U.S.S.G. § 4A1.3(b)(1)). "The presumption under U.S.S.G. section 3A1.4 is incompatible with 18 U.S.C. § 3553, which requires that a defendant be evaluated individually to justify his or her sentence." McLoughlin, Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4*, 28 Law & Ineq. at 116.

And a significant downward departure is warranted. The idea that Mr. Khweis' criminal history score should be increased based on an assumption about recidivism is entirely unsubstantiated and misguided. "As James McLoughlin, Jr. noted in his article, 'when U.S.S.G. section 3A1.4 was adopted, the number of [] anti-terrorism cases was tiny, so there could be no analysis of a statistically reliable group of defendants upon which to build a reliable Guideline.'" *Id.* (citing *McLoughlin* at 112; *id.* at 115 ("[t]here is no published statistical data demonstrating that defendants convicted of

violating 18 U.S.C. §§ 2339B, 2339C, or other anti-terrorism statutes . . . are any more likely to be recidivists than any other first offenders. Nothing in the history of U.S.S.G. section 3A1.4 would indicate that any reliable data was used to determine if a person convicted of a material support offense is more likely to be a recidivist."); Sameer Ahmed, *Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror*, 126 Yale L.J. 1520, 1550 (2017) ("no statistically sound evidence was used")).

In fact, though, now we do have more data, and "[o]f the more than 300 prisoners who have completed their terrorism sentences since 2001," there were only "a handful of cases in which released inmates had been rearrested, a rate of relapse far below that or most federal inmates." *Id.* (citations omitted). The Intercept's, "Trial and Terror" series and data project in 2017 revealed that more than half of all people convicted of a terrorism offense since 2001 had been released. *See* Trevor Aaronson and Margot Williams, *Trial and Terror*, The Intercept (May 31, 2019) (noting that 479 terrorism defendants out of 891 have been released from custody).[21] Though the study concedes there is relatively little data on recidivism after a terrorism conviction, it notes that "[N]one of the convicted Islamist terrorists released from federal prison have been charged with new terrorism-related offenses or have been alleged to be part of a terrorist plot in the United States." Trevor

---

[21] Available at https://trial-and-terror.theintercept.com/

Aaronson, *Is "Terrorist Recidivism" Real?* The Intercepts (May 27, 2019).[22] A more recent study "by Dr. Omi Hodwitz—Assistant Professor in the Department of Sociology and Anthropology at the University of Idaho and a Research Affiliate of the National Consortium for the Study of Terrorism and Responses to Terrorism at the University of Maryland—collected data for terrorist offenders and analyzed their postrelease criminal histories. Only 1.6% of terrorist offenders released between 2001 and 2018 recidivated, and none of the crimes which they committed postrelease were clearly politically motivated." *United States v. Ceasar*, 388 F. Supp. 3d 194, 214 (E.D.N.Y. 2019)(internal citations omitted).

An example of this lack of recidivism, even in terrorism cases, is the group referred to as "Liberty City Seven," a group former Attorney General Alberto Gonzales said wanted to wage "a full ground war" against the United States.  Members of this group have all been freed. Their purported leader, Narseal Batiste, is now a painter in Houston. *Id.* Similarly, Bryant Neal Vinas, who was captured in Pakistan and admitted to discussing specific plots against Americans with al-Qaeda members, including blowing up the Long Island Rail Road was sentenced to three months in prison after being confined for eight years during his cooperation. He now lives in New York while trying to find odd jobs to support himself. He also engages in interviews

---

[22] Available at https://theintercept.com/2019/05/27/terrorist-recidivism-john-walker-lindh/

to discuss his case. *See* Adam Goldman, *He Turned on Al Qaeda and Aided the U.S. Now He's on Food Stamps and Needs a Job*, New York Times (March 6, 2018).[23]

> *vii. A sentence of 63-month will achieve specific and general deterrence and protect the public.*

Mr. Khweis had never served a day in jail prior to this case. Thus, a sentence of 63 months has a substantial deterrent effect. As the Second Circuit noted, a defendant who has previously been sentenced to minimal incarceration, might very well be deterred by a lesser amount of incarceration than someone who has shown themselves to be undeterred by a lengthy sentence. *See United States of America v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001).

Both specific and general deterrence in the criminal justice context are primarily achieved through the act of being caught, not through lengthy prison sentences. Research has proven this axiom time and time again. *See United States v. Courtney*, 76 F. Supp. 3d 1267, 1304 n.13 (D.N.M. 2014) ("An avalanche of criminological studies have determined that this theoretical

---

[23] Available at https://www.nytimes.com/2018/03/06/us/politics/bryant-neal-vinas-terrorism-cooperation-fbi-witness-protection.html

symmetry between severity of punishment and certainty of detection does not

exist in the real world.").[24] "[I]ncreases in severity of punishments do not

[24] For support on this point, *Courtney*, 76 F. Supp. 3d at n.13 cites the following studies and research:

Isaac Ehrlich, *Participation in Illegitimate Activities: A Theoretical and Empirical Investigation*, 81 J. Pol. Econ. 521, 544-47 (1973)(finding that the certainty of punishment was a more important indicator than severity in deterring murder, rape, and robbery); Harold G. Grasmick & George J. Bryjak, *The Deterrent Effect of Perceived Severity of Punishment* 59 Soc. Forces 471, 472 (1980)(reviewing twelve deterrence studies and explaining that "nearly all these researchers conclude that perceived certainty of legal sanctions is a deterrent, [while] only one (Kraut) concludes that perceptions of the severity of punishment are part of the social control process"); Jeffrey Grogger, *Certainty v. Severity of Punishment* 29 Econ. Inquiry 297, 304 (1991)(studying California arrestees and concluding that "increased certainty of punishment provides a much more effective deterrent than increased severity" and that a "six percentage point increase in average conviction rates would deter as many arrests as a 3.6 month increase in average prison sentences"); Steven Klepper & Daniel Nagin, *The Deterrent Effect of Perceived Certainty and Severity of Punishment Revisited*, 27 Criminology 721, 741 (1989)(surveying graduate students about tax evasion scenarios and finding that certainty of punishment is an effective deterrent); Daniel S. Nagin, *Criminal Deterrence Research at the Outset of the Twenty-First Century*, 23 Crime & Just. 1, 13 (1998)(reviewing the literature and concluding that "cross-sectional and scenario-based studies have consistently found that perceptions of the risk of detection and punishment have negative, deterrent-like associations with self-reported offending or intentions to offend"); Daniel S. Nagin & Greg Pogarsky, *An Experimental Investigation of Deterrence: Cheating, Self-Serving Bias, and Impulsivity*, 41 Criminology 167 (2003)(testing whether students would cheat on a trivia quiz to earn a cash bonus and finding that cheating decreased when the certainty of detection was higher but not when the perceived severity of punishment increased); Ann Dryden Witte, *Estimating the Economic Model of Crime with Individual Data*, 94 Q. J. Econ. 57, 79 (1980)(studying men released from the North Carolina prison system and demonstrating that "a percentage increase in the probability of being punished has a relatively larger effect on the number of arrests or convictions than does a percentage increase in the expected sentence"); Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* 47 (1999); Robert Apel & Daniel S. Nagin, *General Deterrence: A Review of Recent Evidence, in Handbook on Crime and Criminal Justice* (Michael Tonry ed.)(2011); Alfred Blumstein &

yield significant (if any) marginal deterrent effects. Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion. (Blumstein, Cohen, and Nagin 1978; Blumstein, Cohen, Roth, and Visher 1986; Reiss and Roth 1993), as has every major survey of the evidence (Cook 1980; Nagin 1998, 1999; von Hirsch et al. 1999; Doob and Webster 2003)." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28- 29 (2006).

The research shows that lengthier prison sentences do not prevent recidivism either, and that a lengthier sentence can actually increase the chance of reoffending. *See id.* ("The weight of the research indicates that incarceration -- imposing it at all or increasing the amount imposed --either has no significant correlation to recidivism or *increases* the defendant's likelihood to recidivate.")(emphasis in original).[25] "[H]aving pulled together

---

Daniel Nagin, *The Deterrent Effect of Legal Sanctions on Draft Evasion*, 29 Stan. L. Rev. 241, 269 (1977)(studying draft evasion and finding a significant negative association between the probability of conviction and the draft evasion rate, leading the authors to conclude that their "findings are consistent with the work of other investigators who have argued that the certainty of punishment has a stronger deterrent effect on crime than the severity of punishment"); Aaron Chalfin & Justin McCrary, *Criminal Deterrence: A Review of the Literature*, 55(1), 5–48 J. Econ. Literature (2017)
[25] For support on this point, *Courtney*, 76 F. Supp. 3d at n.13 cites the following studies and research:
Lin Song & Roxanne Lieb, *Recidivism: The Effect of Incarceration and Length of Time Served* 4-6, Wash. St. Inst. for Pub. Pol'y (Sept. 1993), available at http://wsipp. wa.gov/ReportFile/1152/Wsipp_Recidivism-The-Effect-of-Incarceration-and-Length-of-Time-Served_Full-Report.pdf (summarizing available studies on the correlation between incarceration and recidivism); T. Bartell & L.T. Winfree, *Recidivist Impacts of Differential Sentencing Practices for Burglary Offenders*, 15 Criminology 387 (1977)(outlining the results of a

the best available evidence, we have been persuaded that prisons do not

reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al.,

*Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91

Prison J. 48S, 50S-51S (2011). "Among low-risk offenders, those who spent

less time in prison were 4% less likely to recidivate than low-risk offenders

who served longer sentences. Thus, when prison sentences are relatively

short, offenders are more likely to maintain their ties to family, employers,

and their community, all of which promote successful reentry into society.

Conversely, when prisoners serve longer sentences they are more likely to

become institutionalized, lose pro-social contacts in the community, and

become removed from legitimate opportunities, all of which promote

recidivism." Valerie Wright, *Sentencing Project, Deterrence in Criminal*

New Mexico-based study and concluding that offenders placed on probation were less likely to be reconvicted than similarly situated offenders who were incarcerated); D.M. Gottfredson, M.G. Neithercutt, J. Nuttfield & V. O'Leary, *Four Thousand Lifetimes: A Study of Time Served and Parole Outcomes, Nat'l Council on Crime & Delinquency* (1973)(outlining the results of a study of over 100,000 male parolees and finding that similarly situated offenders who served longer periods of incarceration were more likely to recidivate than those who received shorter periods of incarceration); T. Orsagh & J.R. Chen, *The Effect of Time Served on Recidivism: An Interdisciplinary Theory*, 4 J. Quant. Criminology 155 (1988)(concluding that similarly situated robbery convicts' recidivism rates rose with rising length of incarceration, while burglars and some other criminals had a "sweet spot" length of incarceration -- 1.2 to 1.3 years for younger offenders and 1.8 years for older offenders -- deviations from which increased recidivism); David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes* 33 Criminology 587 (1995).

*Justice: Evaluating Certainty v. Severity of Punishment* 7 (2010).[26]

Even the Sentencing Commission itself acknowledged this fact. "There is no correlation between recidivism and guidelines' offense level. Whether an offender has a low or high guideline offense level, recidivism rates are similar." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (2004). And perhaps most notably, the Department of Justice has tacitly acknowledged this fact, "[C]onfinement or increased length of incarceration served the crime control purpose of incapacitation but had little or no effect as a 'treatment' with rehabilitative or specific deterrent effects" Don M. Gottfredson, U.S. Department of Justice, National Institute of Justice, *Effects of Judges' Sentencing Decisions on Criminal Cases*, Research in Brief 9 (Nov. 1999). Based on all these reasons and findings, the significant deterrent effect in Mr. Khweis' case has already been achieved because he was caught. Neither specific nor general deterrence increases further with the length of sentence later imposed.

Finally, with respect to protecting the public, Mr. Khweis has been determined by DOJ itself through the Bureau of Prisons to be a minimum risk, both on the general and violent scores, and a minimum recidivism risk. *See* Def.'s Ex. A at 1. Lengthy incarceration is far more severe than necessary

---

[26] available at http://www.sentencingproject.org/doc/Deterrence%20Briefing%20.pdf.

because supervised release can achieve this same aim. Mr. Khweis has shown

over the last six-and-a-half years that he is able to follow directions, be

accountable, and contribute to his community. His criminal history score

places him in criminal history category I, has no history of violence, and now

cannot lawfully own a firearm even if he sought to. Supervised release can

cover any beneficial drug treatment (and is more equipped to do so than a

prison), drug testing, and can perform routine home checks.  He has also

personally shown the Court that he has learned his lesson:

> Going through many years reflecting on my regrettable past I fully acknowledge that my actions were totally unacceptable and I dont blame anyone but myself. Not only did my actions effect me but it effected my family as well. I have hurt them in many ways including embarrassing them which has scarred them for life. I am totally ashamed to have been associated with a terrorist organization.
>
> I strongly condemn the so called "Islamic State" as an organization and its ideology. I fully acknowledge that my actions were disgraceful. I am very disappointed in myself and the decisions I made were totally irresponsible and immature of me. It will be something I will regret for the rest of my life and will never forgive myself.

> My mindset is very different than it was years ago. My incarceration has improved me to view life in a very mature and responsible way. I believe I am ready for a new start in life which would include pursuing a career I enjoy and to continue furthering my education. I would like to fill that new chapter with accomplishments my family and I will be proud of.
>
> I truly apologize for my despicable actions and I promise to never get myself in any trouble ever again. I ask for your mercy and a second chance on the day of resentencing. I truly appreciate your time.

Mr. Khwies' post-sentencing conduct has been exemplary as explained *supra* §II(ii), conduct which "provides the most up-to-date picture of [his] 'history and characteristics,' and thus deserves "great weight" when assessing current dangerousness. *Decator*, 452 F. Supp. 3d at 325 (quoting *Pepper*, 562 U.S. at 492). Mr. Khweis is not the same person he was six-and-a-half years ago. He has matured noticeably. Even the authorities at his prison have commented on Mr. Khweis' maturity:

> Mohamad Khweis (#90109-083) has been a member of our Suicide Prevention Program from November 2018 through present. During that time, he assisted FCI Cumberland in our suicide prevention efforts. It was required that he maintained clear conduct 3 years prior to and during his involvement with our program to be considered for this position. He has shown and continued to show the necessary maturity to be utilized as a Suicide Prevention Companion.

...

It is required that he work with staff members and peers in a successful manner in a stressful environment. He was required to work a four hour shift, 2 or 3 times a week, often at inconvenient times to include A.M. shifts. This is in addition to his numerous other responsibilities. He was also required to undergo constant training including 4 hours of initial training, 4 hours of semi-annual training, and 1 hour of quarterly training. He managed all duties without incident.

Def.'s Ex. A.

In fact, science provides a basis for his significant change. "It takes, often, into your early 20s and possibly late-20s and, you know, maybe even beyond for the brain to fully mature to adult levels," explains neurologist Dr. Frances Jensen.[27] "And one of the main drivers of this is the way our brain connects regions to each other inside the brain. These connection tracts have to be insulated for very fast signaling. And we have a natural insulation that's similar to the insulation around an electrical wire, which is usually a, you know, rubber insulation. We have something - a natural insulation - called myelin. It's a fat, and it takes time - cells have to build myelin, and they grow it around the outside of these tracts. And that takes years. It's interesting - it goes from the back of your brain to the front, so the last place to be connected, to be fully myelinated, is the front of your brain. And what's in the front? Your prefrontal cortex and your frontal cortex. These are areas where we have insight, empathy. These executive functions, such as impulse control, risk-taking behavior, is suppressed by activity in your frontal lobes."

---

[27] Terry Gross, *Why Teens Are Impulsive, Addiction-Prone And Should Protect Their Brains*, Fresh Air, National Public Radio, (April 15, 2016) (available at https://www.npr.org/2016/04/15/474348291/why-teens-are-impulsive-addiction-prone-and-should-protect-their-brains)

In other words, Mr. Khweis' brain, and specifically the part that relates to impulse control and risk-taking behavior – i.e. judgment – is physically improved now in his 30's than from when he was in his mid-20's. This maturity is evident though the marked change in Mr. Khweis' thought processes, his attitudes, his language, and most importantly, his actions.

Thus, in keeping with §3353(a) supervised release is the least restrictive method to achieve the enumerated sentencing goals, with lengthy incarceration far greater than necessary to protect the public.

## CONCLUSION

These years of Mr. Khweis' life are worth saving. At age 32, Mohamad Khweis is not the person he was when he was a 26. He has demonstrated that change in every possible way, both through his words and his actions. He has the strong support of family and friends who love and miss him. A sentence of 63 months achieves the goals of sentencing and would show that this a country that believes in equity and redemption.

Respectfully submitted,
MOHAMAD KHWEIS
By Counsel
　　　/s/
Jessica N. Carmichael (Va Bar 78339)
CARMICHAEL ELLIS & BROCK, PLLC
108 N. Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 684-7908
jessica@carmichaellegal.com

51

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of June 2022 I filed the foregoing pleading through the ECF system, which shall then send an electronic copy of this pleading to all parties in this action.

_____/s/_____
Jessica N. Carmichael