IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:16-cr-143 |
| | ) | |
| MOHAMAD JAMAL KHWEIS, | ) | Hon. Liam O'Grady |
| | ) | |
| *Defendant.* | ) | Resentencing: June 28, 2022 |

## UNITED STATES' POSITION ON RESENTENCING

*"He was asked whether he would be a suicide bomber. To which [Khweis] replied yes."* (Trial Tr. 731)

*"Khweis spent the next several months training with and supporting ISIL fighters and leaders."* (United States v. Khweis, 971 F.3d 453, 455 (4th Cir. 2020), cert. denied, 141 S. Ct. 1712 (2021))

*"So the crime, obviously, is one of the most serious that you can commit. It's why the Guidelines are what they are and how serious they are . . . .[W]hen you look at the 3553 factors, we have a very serious crime. We need to deter you. We need to deter others."* (Sentencing Tr. 69-70)

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

In 2017, Mohamad Khweis became the first individual to face a jury trial in the United States after having joined the terrorist organization known as the Islamic State of Iraq and al-Sham (ISIS) in ISIS territory. During his time in the Islamic State, Khweis agreed to serve as a suicide bomber, assisted ISIS fighters, funded ISIS's reign of terror, and served with ISIS operatives who were training to conduct attacks in the United States and elsewhere. Khweis betrayed our country and was prepared to sacrifice his life for the most lethal terrorist organization on the planet. Before traveling from Alexandria to Raqqa, he was fully aware of ISIS's unrivaled cruelty. When he left the United States, he understood that ISIS conducts

1

terrorist operations in Syria and Iraq (Trial Tr. 526), plans and launches attacks against its enemies, including the United States (Trial Tr. 531), and claimed responsibility for the November 13, 2015, attacks in Paris, France, during which ISIS operatives killed over 100 civilians (Trial Tr. 532).  Khweis was also fully aware that ISIS had committed other horrific attacks, including burning a caged Jordanian pilot alive.  Trial Tr. 529-31.  He nonetheless wanted to "be part of" ISIS and to support its mission.  Trial Tr. 531, 577, 631, 742.

Rather than deter him, the innumerable atrocities committed by ISIS emboldened this defendant.  At ISIS's near-zenith, Khweis bought a one-way ticket overseas to engage in terrorism.  Not even land mines and bombs near the Turkish-Syrian border deterred him.  Upon arrival, he agreed to become a suicide bomber, participated in ISIS training in which each sermon ended with "may God destroy America," surrounded himself with ISIS snipers and other operatives who trained to commit attacks against America and any enemies of ISIS (yet Khweis incredulously claimed during trial that he was not one of them notwithstanding his agreement to serve as a suicide bomber), and tended to wounded ISIS fighters, including helping a fighter conceal his online activity and disguise his location.

When he was captured in March 2016, Khweis did what he does best—he lied.  The defendant fabricated stories to falsely exculpate himself, which led to "the FBI running around on goose chases."  Sentencing Tr. 42.  And when he was given the chance to come clean on the witness stand, he continued to obstruct justice, resulting in several hours of perjured testimony that this Court recognized "was absolutely incredible" and replete with lies to the jury.  *Id.*[1]

---

[1] Following a six-day trial in this Court, the jury unequivocally denounced the defendant's contempt for the rule of law by quickly convicting him on all three counts charged—conspiracy to provide material support to ISIS, in violation of 18 U.S.C. § 2339B (Count 1); providing and attempting to provide material support to ISIS, also in violation of 18 U.S.C. § 2339B (Count 2); and possessing, using, and carrying firearms in furtherance of a crime of violence, in violation of

Less than five years ago, this Court concluded that a 20-year sentence was appropriate in this case. That judgement was correct then—and it remains correct today. ISIS is as dangerous and depraved a criminal organization as exists in the world, a fact that Khweis unmistakably knew. The United States and the international community have a vital interest in ensuring that the criminal law serves as an effective deterrent against others advancing ISIS's goals. The deterrence value in imposing a 20-year sentence for this exceptionally serious conduct in this historic and globally recognized case is significant. It continues to serve as a model not only to other courts nationwide faced with such serious criminal conduct, but also to other jurisdictions considering how to handle terrorists held in their custody.

The absence of the defendant's firearms conviction in no way diminishes his offense conduct. That charge was based solely on *Pinkerton* co-conspirator liability. There is little evidence in the record that the Court even took that conduct into account when imposing its 20-year sentence, beyond the fact that it was required to impose a minimum of five years consecutive to the other convictions. The Court will recall that before the defendant traveled on a one-way ticket overseas, offered to serve as a suicide bomber, and supported ISIS fighters, he exhibited many of the same positive characteristics as an educated 26-year-old with a degree in criminal justice. The defendant's rehabilitation arguments are substantially outweighed by his crimes. The Court's sentence must continue to deter impressionable individuals from providing

---

18 U.S.C. § 924(c) (Count 3). The Court sentenced the defendant to 20 years in prison in October 2017. On appeal, the Fourth Circuit affirmed the defendant's two material support to ISIS convictions. *See United States v. Khweis*, 971 F.3d 453 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 1712 (2021). Following the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019), the government filed a motion to vacate the defendant's firearms-related conviction on Count 3 and asked the Court to remand for resentencing. The Fourth Circuit agreed and remanded for resentencing. *Khweis*, 971 F.3d at 464-65.

aid to terrorist organizations that indiscriminately murder innocent civilians and commit the most horrific crimes imaginable.

## II.     FACTUAL BACKGROUND

The Court is well aware of the facts, having presided over the jury trial and extensive pretrial hearings during which witnesses from Iraq and elsewhere testified, and having adjudicated numerous motions that have been filed in this case since 2016.  The Presentence Investigation Report ("PSR") also contains a fulsome accounting of the defendant's conduct. *See* ¶¶ 15-43.  The government therefore offers the following abbreviated factual summary.

Mohamad Khweis was born in the United States and was a longtime resident of Fairfax County until mid-2015, when he traveled on a one-way ticket to Syria to join ISIS.  Trial Tr. 514, 523, 671, 765-66, 983-84.  Prior to leaving the United States, the defendant knew of ISIS's violent ideology and terrorist tactics.  PSR ¶ 26.  During his travel to join ISIS, the defendant took extensive measures to conceal his activity.  A forensic analysis of one of the defendant's phones, recovered at the time of his capture, revealed numerous social media platforms, encrypted applications, and anonymizing software.  Trial Tr. 308-11, 340-42.

The defendant's phones also contained images of Abu Bakr al-Baghdadi (the then-leader of ISIS); a mass grave, individuals holding assault rifles, and what appear to be people that have been killed; ISIS fighters wielding firearms; maps of Turkey, Syria, and Iraq; deceased individuals covered in dust and blood; explosives and explosions; the World Trade Center at the moment of impact on September 11, 2001; and the body of a solider engulfed in flames, among other ISIS propaganda.  Trial Tr. 322-49.

After arriving at a safe house in Raqqa, Syria, the defendant participated in an ISIS intake process.  He was asked by an ISIS member if he wanted to be a suicide bomber, to which he

4

responded "yes."  Trial Tr. 551, 731.  The defendant later traveled to two other ISIS safe houses.

At the second safe house, he met an ISIS "commando" group known as Jaysh Kalifa, which

trained ISIS members to conduct attacks in their countries of origin.  At the third safe house, the

defendant resided with ISIS members from Iraq who "had recently traveled into Syria to receive

military and weapons training in order to go back to Iraq and fight."  Trial Tr. 560, 1078-79.

The defendant provided ISIS in numerous ways.  He "gave himself to ISIS" and agreed to

serve as a suicide bomber.  Trial Tr. 551, 630, 731, 769.  As the Fourth Circuit stated, the

defendant "spent the next several months training with and supporting ISIL fighters and leaders."

*Khweis*, 971 F.3d at 455.  He agreed to have his blood drawn by ISIS and was issued ISIS

credentials identifying him as "Abu Omar al-Amriki."  Trial Tr. 557, 1001-02.  The defendant

also participated in ISIS religious training in which each sermon ended with "may God destroy

America," watched military videos with his fellow ISIS members for inspiration against the

enemies of ISIS, "frequently gave money to other ISIS members," and cared for wounded ISIS

fighters.  Trial Tr. 559, 563-64, 567, 1062, 1095-96.  For example, on one occasion the defendant

tended to an injured Libyan fighter, providing him with a Virtual Private Network ("VPN") to

help him conceal his online activity and disguise his location.  Trial Tr. 562-66.

Eventually, the defendant traveled with ISIS to Mosul, Iraq, where he lived for nearly a

month.  Trial Tr. 561.  During that time, he accompanied injured ISIS fighters to the hospital.

Trial Tr. 562.  After leaving Mosul, the defendant resided in Tal Afar, Iraq for about a month

alongside armed ISIS fighters.  Trial Tr. 1089-90.  He spent that time in a *katiba* (an "ISIS

neighborhood or military battalion"), where he also cared for wounded ISIS fighters.  Trial Tr.

564-65, 739.  Eventually, the defendant claimed that he supposedly came to the realization that

he "didn't want to stay" with ISIS and "needed to leave."  Trial Tr. 895.  After exiting ISIS-

controlled territory, he deleted his contacts and communications with ISIS from his one of his phones and burned two other phones and a laptop.  Trial Tr. 554–55, 743, 896.  On March 14, 2016, two and a half months after joining ISIS, the defendant was captured by Kurdish Peshmerga fighters in a Kurdish-controlled region of Iraq near ISIS-controlled territory.

## III.    SENTENCING GUIDELINES

The U.S. Probation Office has correctly determined that the defendant's total offense level is 42, his criminal history category is VI, and the advisory Guidelines range is 360 to 480 months' imprisonment.  PSR at ¶¶ 95-96.

### 1.    The Twelve-Level Terrorism Enhancement Applies

The government concurs with the U.S. Probation Office that the terrorism adjustment set forth in U.S.S.G. § 3A1.4(a) applies because the defendant's offenses of conviction are felonies that involved, or were intended to promote, a federal crime of terrorism.  PSR ¶ 54.  The government may prove the first prong of the enhancement "with evidence that a defendant gave material aid to a foreign terrorist group knowing and supporting that group's goals of coercing or avenging government conduct."  *United States v. Elshinawy*, 781 F. App'x 168, 174 (4th Cir. 2019) (citations omitted).  Second, the offense must violate an enumerated statute, one of which is 18 U.S.C. § 2339B.  *See* 18 U.S.C. § 2332b(g)(5)(B).

The Government agrees with the Court's assessment at sentencing "that the intent and motive necessary for the 3A1.4 [adjustment] is clearly met by the facts of the case."  Sentencing Tr. 41.  The second prong is easily satisfied—the defendant's convictions on Counts 1 and 2 are violations of 18 U.S.C. § 2339B.  The defendant focuses his arguments, as he did before, on *United States v. Chandia*, 514 F.3d 365 (4th Cir. 2008) (*Chandia I*).  The PSR in *Chandia*, however, did not include factual allegations supporting the enhancement and the district court

did not make any related factual findings.  As a result, the Fourth Circuit remanded the case for

the district court to make any required findings before applying the enhancement, which it did on

remand.

Here, there is no question that Khweis intended to advance ISIS's purpose in providing

material support.  *United States v. Young*, 818 F. App'x 185, 193 (4th Cir. 2020) (citing *Chandia*

*III*, 675 F.3d at 340).  The evidence established that ISIS holds destructive intentions towards the

United States (Trial Tr. 811), that ISIS thinks that violent acts against military personnel and

civilians will influence government conduct (*Id.* at 801), and that ISIS believes such attacks are

justified retaliation against governments whose fundamental values are antithetical to the

subjugation of all people to Sharia law (*Id.* at 795, 818).  The evidence also showed that the

defendant endorsed ISIS's mission and intended to further its goals.  For example:

- Before he departed the United States, the defendant knew that ISIS expanded its caliphate by violence, and he nonetheless wanted to "be part of it."  Trial Tr. 531, 577, 631, 742, 954.

- The defendant understood that ISIS recruits in ISIS-controlled territory would receive military training and was willing to do so.  Trial Tr. 577.

- The defendant was asked by an ISIS member if he wanted to be a suicide bomber, to which he responded "yes."  Trial Tr. 551, 731.

- The defendant cared for wounded ISIS fighters, including an injured Libyan fighter to whom he provided a VPN to help him conceal his online activity and disguise his location.

- The defendant "frequently gave money to other ISIS members" and interacted with ISIS fighters in multiple safe houses, including with another American who had trained to conduct in attack in the United States—critical intelligence that the defendant initially withheld from the FBI upon capture.  Trial Tr. 559, 563-64, 567, 1062, 1095-96.

- The defendant participated in ISIS religious training in which each sermon ended with "may God destroy America," and watched military videos with his fellow ISIS members "to get inspired against ISIS' enemies."  Trial Tr. 564, 736.

The government is unaware of any case in which a court did not apply the § 3A1.4 terrorism adjustment for a defendant who successfully joined and trained with ISIS overseas.  In fact, the evidence here is consistent with facts that the Fourth Circuit later deemed sufficient for applying the adjustment in Chandia's own case.  *See Chandia III*, 675 F.3d at 335, 340; *see also United States v. Benkhala*, 530 F.3d 300, 313 (4th Cir. 2008) (holding that enhancement was proper because the defendant "attended a jihadist training camp abroad, was acquainted with a network of people involved in violent jihad and terrorism, and lied about both.").

2.   The Two-Level Material Support Enhancement Applies

The government concurs with the U.S. Probation Office that an additional two-level increase applies in this case because the defendant's § 2339B convictions "involved the provision of . . . material support or resources with the intent, knowledge, or reason to believe that they are to be used to commit or assist in the commission of a violent act."  U.S.S.G. § 2M5.3(b)(1)(E); PSR ¶ 53.  The phrase "'[m]aterial support or resources' has the meaning given that term in 18 U.S.C. § 2339B(g)(4)."  U.S.S.G. § 2M5.3, comment. (n.1).  That provision cross-references to 18 U.S.C. § 2339A, which lists "personnel" as a form of material support. 18 U.S.C. § 2339A(b)(1).

The defendant objects to application of the enhancement on grounds that there is no direct connection between the defendant and an actual violent act.  That argument is foreclosed by *United States v. Dihrane*, 896 F.3d 295 (4th Cir. 2018).  There, the Fourth Circuit held that the enhancement "does not require . . . that support be traced to or be designed to lead to a *specific* act of violence.  *Id.* at 304 (internal emphasis).  Instead, the enhancement merely requires "that the defendants be shown to have intended, known, or had reason to believe that their support would be used to assist in acts of violence by the terrorist organization."  *Id.*

8

The evidence at trial firmly established that the defendant knew about ISIS's use of violence.  With that knowledge in mind, he nonetheless traveled to ISIS-controlled territory, agreed to serve as a suicide bomber, frequently provided money to ISIS members (which certainly helps ISIS's reign of terror), and tended to wounded ISIS fighters, among other terrorist acts contained in the trial record.  Trial Tr. 728-30, 551, 731, 564-65, 739.

        i.    The Two-Level Minor Participant Adjustment Does Not Apply

The defendant now argues, for the first time ever in this case, that the two-level minor participant adjustment found in U.S.S.G. § 3B1.2 applies.  It clearly does not.  A defendant must show by a preponderance of the evidence that his role in the offense "makes him substantially less culpable than the average participant."  *United States v. Hassan*, 742 F.3d 104, 150 (4th Cir. 2014) (citing *United States v. Powell*, 680 F.3d 350, 358-59 (4th Cir. 2012)).  The aggravating factors that distinguish the defendant's offense conduct are well known to the Court.  The defendant actually succeeded in joining ISIS in ISIS-controlled territory.  The Court previously found that he traveled there under the impression that he would not be returning home.  *See United States v. Khweis*, No. 1:16-CR-143, 2017 WL 2385355, at *12 (E.D. Va. June 1, 2017) ("His conduct strongly suggests that he did not expect to return home to see his family.").

Khweis agreed to serve as a suicide bomber, among providing numerous other acts of material support to ISIS.  And when he was captured, the defendant tried to cover for ISIS by lying to investigators and withholding key intelligence from them.  In fact, the defendant asks this Court to consider intelligence that he did provide to the FBI—information that he only possessed because he was entrenched in ISIS's violent and terroristic operations in Syria and Iraq.  The government is unaware of any case in which a court applied the two-level minor participant adjustment to a defendant who successfully made it to ISIS territory and trained with

ISIS overseas.  The U.S. Probation Office is correct that this adjustment does not apply here.

## IV.    SECTION 3553(a) FACTORS

A sentencing court must review the appropriate Guidelines range in conjunction with the statutory sentencing factors set forth in 18 U.S.C. § 3553(a).  *See United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006).  It is well established that, following vacatur of a § 924(c) conviction, a defendant faces the possibility of a resentencing at which a district court can reconfigure its sentencing package by imposing a higher sentence on the remaining counts.  *See Greenlaw v. United States*, 554 U.S. 237, 253–54 (2008) (describing with approval the application of the sentencing package doctrine to district courts resentencing a defendant to the same aggregate sentence after vacatur of one count among several); *United States v. Ventura*, 864 F.3d 301, 308–11 (4th Cir. 2017) (affirming a district court's resentencing increase of 60 months to the same aggregate sentence following vacatur of one of seven counts); *see also United States v. Bermudez*, 82 F.3d 548, 550 (2d Cir. 1996) (explaining that sentencing courts have the discretion to "increase the sentence on a specific count where the original sentence was imposed as part of a package that included a mandatory consecutive sentence which was subsequently found to be invalid").  The Court must, however, use the advisory Guidelines range, and not the original sentence, as the initial starting point in its analysis.  *See United States v. Abed*, 3 F.4th 104, 118 (4th Cir. 2021).

The Government submits that a 20-year term of imprisonment adequately addresses the following considerations: (1) the seriousness of the defendant's two separate federal terrorism offenses; (2) the critical need to deter similar individuals from joining ISIS; (3) the need to incapacitate an individual who has proven himself to be untrustworthy, deceptive, and willing to commit "absolutely incredible" perjury; and (4) the importance of avoiding unwarranted

sentencing disparities in similar and arguably less aggravated ISIS cases.

The maximum statutory sentence available for each § 2339B conviction is 20 years' imprisonment.  The Court could theoretically sentence the defendant to an aggregate term of 40 years by running his two § 2339B convictions consecutively.  The government recognizes the mitigating factors present, including the Court's statements during the initial sentencing as well as the defendant's progress to date while in prison.  With those considerations in mind, the government strongly believes that a 20-year sentence is a fair and just outcome in this case.

**A.      The Nature, Circumstances, and Seriousness of the Offenses**

There are at least four reasons why the Court should resentence the defendant to 20 years' imprisonment based on the nature, circumstances, and seriousness of his crimes.

*First*, the defendant betrayed his own country to join ISIS overseas with full awareness that the terrorist organization is renowned for its brutality and murderous agenda.  Before leaving the United States, he knew that ISIS conducts terrorist operations in Syria and Iraq.  Trial Tr. 526.  He knew that ISIS plans and launches attacks against its enemies, including the United States and its allies. Trial Tr. 531.  He knew that ISIS claimed responsibility for the November 2015 Paris attacks during which over 100 civilians were killed.  Trial Tr. 532.  Finally, he admitted to watching horrifyingly violent ISIS videos, including the burning to death of a Jordanian pilot in a cage.  Trial Tr. 529-31.  The defendant nevertheless wanted to "be part of" ISIS and to support its mission.  Trial Tr. 531, 577, 631, 742, 954.

*Second*, the defendant's conduct after successfully joining ISIS demonstrates that he was fully committed to ISIS's mission.  Before traveling to Syria, he knew that ISIS recruits would receive military training.  Trial. Tr. 577.  He went through an intake and screening process upon arrival where he expressed his willingness to serve as a suicide bomber.  Trial Tr. 551, 731.  The

defendant subsequently attended ISIS religious training in which each sermon ended with "may God destroy America."  Trial. Tr. 567.  He watched military videos with his fellow ISIS members for inspiration against the enemies of ISIS and frequently gave money to other ISIS members.  Trial Tr. 559, 563-64, 567.  He also cared for wounded ISIS fighters, including an injured Libyan fighter whom the defendant provided a VPN to help the fighter conceal his online activity and disguise his location. Trial Tr. 562-65.  There is no doubt that the defendant was a willing participant in ISIS's unprecedented campaign of violence and reign of terror.

*Third*, the defendant's § 924(c) firearms conviction did not reflect any additional criminality beyond that already encompassed by Counts 1 and 2.  The government proceeded solely on a *Pinkerton* co-conspirator theory of liability for Count 3.  The defendant's vacated § 924(c) conviction was only relevant because he joined a violent terrorism conspiracy by providing material support to ISIS.  There is little evidence in the record that the Court even took the conduct underlying Count 3 into account when imposing its 20-year sentence, beyond the fact that it was required to impose a minimum of five years consecutive to Counts 1 and 2.  The absence of the § 924(c) conviction does nothing to change the breadth and scope of Khweis's terrorist conduct, all of which still points to a 20-year sentence.

*Fourth*, after careful consideration of the § 3553(a) factors, the Court previously determined that a total sentence of 20 years' imprisonment was the right punishment in this case. The Court configured the sentencing package with the five-year mandatory minimum in mind so that it would result in an aggregate 20-year sentence.  Otherwise, the Court could have sentenced the defendant to a total of 15 years' imprisonment, for example, by imposing 10 years on the material support counts and a consecutive five years on the firearms count.  But it decided otherwise based on weighing all of the § 3553(a) factors, the evidence in the record, and the

mitigating circumstances.  The factors that pointed this Court towards a 20-year sentence—the need to punish this defendant, to deter individuals like him from joining ISIS, to send a message that providing material support to terrorists is one of the most serious crimes that one can commit—have not changed, notwithstanding any new information from the Bureau of Prisons proffered by the defendant.  In re-imposing the same aggregate sentence of 20 years, this Court would be "simply ensur[ing] that the sentence will suit not merely the offense but the individual defendant."  *Greenlaw*, 554 U.S. at 254 (internal quotation marks omitted).

Any suggestion that Khweis played an inconsequential role in the ISIS hierarchy is firmly rebutted by the evidence presented at trial.  He joined the most lethal terrorist organization on the planet, agreed to be a suicide bomber, and performed a plethora of services for ISIS as summarized above, all of which certainly made terrorism attacks more likely to occur.

### B.       History and Characteristics of the Defendant

Terrorism defendants exhibit a unique and violent criminal predisposition.  Echoing other courts of appeals, the Ninth Circuit instructed in *United States v. Ressam*, "[t]errorists, even those with no prior criminal behavior, are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation."  679 F.3d 1069, 1091 (9th Cir. 2012) (quoting *United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011)).

#### i.      The Defendant was Radicalized in Support of ISIS's Mission

Mohamad Khweis fully embraced ISIS's vicious ideology.  The ease with which the defendant gravitated towards a sworn enemy of the United States that has murdered American citizens overseas and that has taken credit for numerous lethal attacks on U.S. soil—is deeply alarming.  The defendant was not a disaffected young person with nothing to lose.  He grew up in a stable and loving home.  Sentencing Tr. 53.  He volunteered his time in the community.  *Id.*

He earned an associate's degree in, among all things, criminal justice. Sentencing Tr. 68. The fact that he sacrificed a fairly ordinary upbringing in the United States to join an exceedingly violent terrorist organization shows the level of danger that he poses. As support, the Court need only look to its own factual findings made at sentencing:

> It is an unusual case. There is no event, no instigation, no friend, no great anger, no suicidal ideations that radicalized you, *but there is no question that you did radicalize*. And once you made that decision, you deliberately and methodically and carefully and cleverly planned out your travel in joining ISIL.

> You are not naive. You are not intellectually challenged. You're not gullible. You're not confused and indecisive in choosing to join ISIL.

>               \*       \*       \*

> But you very clearly understand right from wrong. You understood the magnitude of the decision you were making to join ISIL. I mean, you selected it after doing research on other terrorist organizations. And then you planned out how to avoid detection, to try and contact a terrorist in England on your way over to get some counseling.

> The movements between London and finally into Syria and the methods that you used were -- they clearly reflect somebody that absolutely, without question, wanted to join this terrorist organization, even though you were very aware of what they stood for, what would be expected of you when you got there. I mean, the Paris attacks had just occurred. You were aware of the horrible atrocities that ISIL members had committed over the intervening years.

Sentencing Tr. 68 (emphasis added).

    ii.    <u>The Defendant Repeatedly Obstructed Justice, Including in This Court</u>

        Prior to his travel overseas, the defendant took extensive steps to avoid detection. He relied on encrypted applications that allowed for secure messaging and anonymous web browsing. Trial Tr. 308-11, 341-42. He then used those programs to communicate in a clandestine manner with ISIS and to coordinate his passage into Syria. Trial Tr. 545-46. The jury heard testimony that the defendant purposefully deleted his contacts and communications with ISIS from one of his phones, and that he burned a laptop and two other phones before he

left ISIS-controlled territory.  Trial Tr. 555, 743, 974-975.

The defendant continued to demonstrate a propensity to obstruct justice by repeatedly deceiving investigators after his capture in Iraq.  The defendant could have acknowledged the seriousness of his actions by providing then-FBI Assistant Legal Attaché Michael Connelly and others with actionable intelligence when it was most valuable—immediately upon his capture. Instead, he sent the FBI on wild "goose chases" tracking down leads he knew did not exist. Trial. Tr. 1066-67; Sentencing Tr. 42.  During the suppression hearing, Agent Connelly testified that the defendant repeatedly told him that he was not truthful in his responses to questions.  The defendant's "multiple resets" significantly obstructed and impeded the intelligence-gathering process because at that point, the FBI is "reporting this information which [they] don't know to be truthful or not.  Dedicating all this effort to collecting intelligence.  And he basically resets the entire timeline."  Hearing Tr. 293.

On cross-examination, Khweis admitted that he consistently lied to United States officials, to include statements that he was not with ISIS, but rather in Mosul with a fictitious female named Zubayda Hussein, and that he knew the FBI was looking for this woman to verify his story, but he nonetheless continued to tell them in multiple interviews that she exists.  Trial Tr. 1066-1067.  He omitted telling U.S. officials about another American who had trained with ISIS to conduct an attack in the United States.  *Id.* at 1062-1065, 1068-72, 1093.  He also failed to disclose that he had attended a presentation by Jaysh Kalifa, the ISIS "commando" group that trained ISIS members to conduct attacks in their countries of origin.  *Id.* at 1064, 1069.

Remarkably, the defendant's obstructionist conduct did not end there.  When given the opportunity to tell the truth 15 months after his capture, he again chose ISIS over the rule of law by committing perjury over the course of two days on the witness stand.  As the Court noted at

sentencing, the defendant's testimony was so "absolutely incredible" that he "was clearly found to have lied on the stand by the jury." Sentencing Tr. 42. The following examples are just a few of the many outrageous false statements that the defendant made under oath:

- After being asked by his own counsel when he decided to travel to the Islamic State, the defendant testified, "*Well, I wasn't 100 percent like sure that -- like when I -- **like when I made my trip, when I started traveling, I wasn't 100 percent sure that I wanted to go there** . . . . So when I arrived to Turkey, I started going to those bars. And after drinking and stuff like that I was like, you know, I want to go, **I want to go real quick and come right -- like just go real quick and come back out.**" Trial Tr. 856-857. Before he left the United States, the defendant quit his job, closed online accounts, concealed and lied to his family about where he was going, sold his car just days before his departure, and traveled on a series of one-way tickets.

- Rather than truthfully admit that he booked a return flight to Turkey, while he was in Turkey (even booking a one-way ticket to Greece before he left the United States, which is indicative of an attempt "to create an alibi or a way out" and mask his "actual intent for travel." Trial Tr. 693), the defendant falsely testified that he did not know that he was booking a return flight to Turkey because he was "***new at booking flights.***" When challenged on cross-examination and presented with evidence of his prior experience booking a series of one-way flights just a few weeks prior, the defendant changed his story yet again and claimed that he "***was drinking at the time.***" Trial Tr. 1014-1017.

- When asked about the creation of his "iAGreenBirdiA" Twitter account, the defendant testified, "***Well, I thought of GreenBird because Twitter, the Twitter icon is a Bluebird.***" Trial Tr. 860. As the Court knows, the defendant previously told the FBI during a Mirandized interview that ISIS and other terrorist organizations frequently use this term [Greenbird] to show their support for violent jihad, and particularly suicide operations and to become a martyr. Trial Tr. 540.

- When asked why he brought five phones with him to ISIS-controlled territory, the defendant testified, "*Ever since I was little, I would have more than one phone. Like, for example, when I was in high school, I would have – I had Nextel, and I had -- Nextel you could change the phones -- there is a SIM card, you could remove your SIM card and use it on another phone.*" Trial Tr. 871. The defendant did not bring five phones with him because of his childhood habits. Rather, he clearly sought to minimize the risk that he would be caught while he was desperately trying to connect with ISIS members to take him across the Turkish-Syrian border and into their terrorist safe houses.

- The defendant further testified that he destroyed and burned his laptop shortly before his capture because he "*had like a lot of personal information, I would access my credit cards, **my credit score**, like a lot of personal information.*" Trial

16

Tr. 896.  The notion that the defendant burned his laptop as a member of ISIS (who had already provided personal information by voluntarily handing over his passport) because he was worried about his credit score was preposterous.

- When asked on cross-examination whether he gave money to ISIS while in Iraq, the defendant testified, "*I kept on saying no, but at the end I said yes, and it's not true. I did give – I did give – I did buy an ice cream bar for a little kid. But the little kid told me, don't tell my father.  I think he was having cavities, he is not supposed to have sweets.  **So I did – there was a time where I did buy an ice cream bar for a little kid.***"  Trial Tr. 1097.

The defendant repeatedly and flagrantly violated the oath he took before the jury in complete disregard for the solemnity of the judicial process.  *See United States v. Grayson*, 438 U.S. 41, 52 (1978) ("[T]he defendant's readiness to lie under oath—especially when . . . the trial court finds the lie to be flagrant—may be deemed probative of his prospects for rehabilitation.").  The defendant's lies should serve as an aggravating factor in his sentencing calculation.  Even if his conduct would otherwise warrant a slightly shorter than 20-year term of imprisonment, the defendant's obstructionist actions strongly counsel in favor of imposing a 240-month sentence.

### iii.   The Defendant's Proffered Evidence of Rehabilitation is Not Persuasive

The government anticipates that the defendant will claim that his supposed present non-dangerousness and rehabilitation should garner leniency at resentencing.  Any such arguments are substantially outweighed by other sentencing factors in this case—namely, the seriousness of his crimes, the ongoing danger to the community, and the need for adequate deterrence.

A defendant's characteristics, including any indications of rehabilitation, are just one of many factors to consider in resentencing.  A sentencing court may put greater emphasis on particular § 3553(a) factors when crafting a sentence.  *See United States v. Jeffery*, 631 F.3d 669, 679 (4th Cir. 2011) ("[D]istrict courts have extremely broad discretion when determining the weight to be given to each of the § 3553(a) factors."); *see also United States v. Ford-Bey*, 705 F. App'x 175, 176-77 (4th Cir. 2017) (per curiam) (holding that a resentencing judge may reject

17

evidence of rehabilitation if aggravating factors outweigh mitigating circumstances).  The

deterrence rationale is particularly crucial in cases where "the government's interest in

combating terrorism is an urgent objective of the highest order."  *Holder v. Humanitarian Law

Project, et al.*, 561 U.S. 1, 28 (2010).

The defendant points to his lack of disciplinary infractions to date while incarcerated as

evidence of rehabilitation.  But good behavior does not necessarily equate to reformation.  There

is a distinction between self-motivated rehabilitation and "rehabilitation" that occurs under threat

of added hardship.  *Cf. United States v. Henshaw*, No. 16-cr-30049-SMY, 2018 WL 3240982, at

*10 (S.D. Ill. July 3, 2018) ("[P]ost-arrest rehabilitation should be entitled to less consideration

than the pre-arrest rehabilitation.") (citing *United States v. Robertson*, 662 F.3d 871, 878 (7th

Cir. 2011)).  Inmates are plainly required to conduct themselves appropriately.  There is also the

ever-present threat of additional punishment or the loss of privileges due to noncompliance.  The

defendant should not be rewarded for doing what is already expected of him.  *See, e.g.*, *United

States v. Mumuni Saleh*, 946 F.3d 97, 112 (2d Cir. 2019) ("[C]ompliance with institutional

regulations has no bearing on the sentencing factors a district court must consider under 18

U.S.C. § 3553(a).");  *United States v. Logan*, 532 F. Supp. 3d 725, 735 (D. Minn. 2021)

("Prisoners are *supposed* to follow the rules, take classes, work at a job, and otherwise attempt to

improve themselves.  That a prisoner does so means that he has met baseline expectations, not

that he has done something extraordinary.").

The defendant also cites his participation in prison activities—such as substance abuse

programs, suicide-prevention efforts, and educational offerings.[2]  The government asks the

---

[2] The defendant made similar arguments during his initial sentencing and provided the Court at
that time with certificates showing classes, workshops, and other education programs in which
he participated while incarcerated for approximately one year at the Alexandria Adult Detention

Court to consider the defendant's claims of rehabilitation in context of his conduct when he was free to choose from "a different menu of opportunities." *United States v. Blagojevich*, 854 F.3d 918, 920 (7th Cir. 2017) ("[T]he court was entitled to impose punishment that reflects how [the defendant] behaved when he had a different menu of opportunities[.]").  When the defendant was a free member of society, he had the freedom to choose with whom to associate and how to spend his time.  He decided to focus his efforts on traveling to Syria to join and train with ISIS. Today, he is presented with an entirely different (and drastically more limited) set of opportunities.  Rehabilitative programming serves an important purpose, but it is also one of the few distractions from the boredom and monotony of serving a 20-year prison sentence. Participation in such programming should not be used as a conclusive indicator of rehabilitation.

In *United States v. Allmendinger*, No. 3:10-cr-248 (E.D. Va. 2019), Judge Payne faced a similar scenario in resentencing a defendant who had taught GED classes to other inmates and had generally avoided prison discipline.  Christian Allmendinger was convicted of defrauding over 800 victims via a falsified investment scheme.  While recognizing Allmendinger's positive efforts post-incarceration, the Court nevertheless believed that the rehabilitation evidence was outweighed by the need to punish and deter investment fraud.  The Court resentenced the defendant to the same term of 45 years' imprisonment nearly eight years after the original sentencing date notwithstanding the fact that three counts of conviction (out of seven in total) had been vacated.  Judge Payne's resentencing decision was affirmed.  *See United States v. Allmendinger*, 838 F. App'x 757, 759 (4th Cir. 2020), *cert. denied*, 142 S. Ct. 165 (2021).

The Fourth Circuit held that the district court did not abuse its discretion when it imposed same sentence of 540 months for mail fraud and securities fraud imposed on remand following

---

Center.  *See* Dkt. 233 at 20-21 and Ex. A (Letter from Mohamad Khweis) at 4.

vacatur of convictions and sentence for money laundering. *Id.* at 759.  As the Fourth Circuit

recognized, "[i]ndeed, during Allmendinger's resentencing, the district court noted that it

previously 'devised a sentence that [it] thought was appropriate' but that the money laundering

charges were not 'the driver of the sentencing'" and "that the sentence was dictated by 'the

egregious conduct in which [Allmendinger] engaged . . . .'" *Id.*

Similarly, the vacated five-year mandatory firearms conviction that was based solely on

the conduct of Khweis's co-conspirators was certainly not "the driver of the sentencing" when

the Court imposed a 20-year sentence.  Allmendinger's fraud crimes were certainly serious, as

reflected in Judge Payne's 45-year initial sentence and the identical sentence on remand.  But

Khweis engaged in terrorism and turned his back on the United States to join ISIS.  His sentence

must reflect the gravity of his offenses, and the Fourth Circuit's decision in *Allmendinger*

demonstrates that this Court is firmly within its right to impose the same 20-year sentence here.

### C.    The Need to Afford Adequate Deterrence

Mohamad Khweis became the first member of ISIS to face a jury trial in the United

States after successfully joining the terrorist organization in ISIS territory.  The Court's initial

20-year sentence sent a strong message to other individuals in the Eastern District of Virginia

and elsewhere who may have been thinking of doing the same.  The absence of the defendant's §

924(c) conviction does not change the essential need to deter radicalized individuals from aiding

foreign terrorist organizations.  Multiple courts of appeals have recognized that the difficulty of

deterrence in terrorism cases necessitates lengthy prison sentences.  *See United States v. Meskini*,

319 F.3d 88, 92 (2d Cir. 2003); *United States v. Ali*, 799 F.3d 1008, 1031 (8th Cir. 2015).

Terrorism offenses pursuant to § 2339B, particularly those that involve American citizens

who successfully join and support the violent aims of terrorist organizations overseas, are among

the most serious crimes prosecuted before this Court.  They implicate the security of our country and its citizens both at home and abroad.  The material support statutes play a particularly vital role in this Nation's efforts to combat terrorism.  They operate as preventative measures by criminalizing aid that increases the likelihood of a successful attack.  *See Holder*, 561 U.S. at 35. For the statutes to operate effectively, their enforcement must be accompanied by substantial prison sentences that send an unambiguous warning to anyone who believes that aiding ISIS in any manner is worth the risk.

The need for adequate general deterrence is enhanced by ISIS's devastating brutality. The organization routinely targets civilians and is responsible for tens of thousands of deaths. Trial Tr. 799-800.  It is indisputable that the organization remains a deadly threat, both in the United States and overseas.  Just yesterday (June 20, 2022), ISIS claimed responsibility for a terrorist attack that killed 13 individuals and was purportedly carried out by "Islamic State sleeper cells" in Raqqa – the same city in Syria where Khweis joined ISIS and agreed to serve as a suicide bomber.  *See* https://www.reuters.com/world/middle-east/least-13-killed-attack-bus-syrias-raqqa-state-media-2022-06-20.  And, ISIS continues to inspire attacks on U.S. soil, as evidenced by an alleged foiled plot as recent as March 2022 to assassinate former President George W. Bush.  *See United States v. Shihab Ahmed Shihab Shihab*, 2:22-mj-00366, ECF No. 1 (S.D. Ohio).  Those who seek to support foreign terrorist organizations, whether now or in the future, must know that doing so will lead to them spending decades in federal prison.

### D.    The Need to Avoid Unwarranted Sentencing Disparities

The defendant's guideline range remains 30 to 40 years' imprisonment.  PSR at ¶¶ 95-96. Many courts have explained that "[a] sentence within a Guidelines range 'necessarily' complies with § 3553(a)(6)."  *United States v. Franklin*, 785 F.3d 1365, 1371 (10th Cir. 2015) (quoting

*United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009)).  Of course, a court is not required to impose a guideline sentence, and the Supreme Court has held that, "when a district court 'correctly calculated and carefully reviewed the Guidelines range, [the district court] necessarily gave significant weight and consideration to the need to avoid unwarranted disparities.'" *United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021) (quoting *Gall v. United States*, 552 U.S. 38, 54 (2007)).  In light of *Gall* and the role of the guidelines, Khweis has no basis to claim that he is harmed by a sentencing disparity when he is sentenced below the advisory guideline range.

In claiming that a 20-year sentence would create unwarranted sentencing disparities, the defendant draws a number of flawed comparisons to other cases.  For example, he compares cases where defendants pleaded guilty, including pre-indictment, and signed cooperation agreements with the government.[3]  But "individuals who opt to go to trial are not similarly situated to those who plead guilty and cooperate with the government for purposes of § 3553(a)(6)." *United States v. Gillespie*, 27 F.4th 934, 945 (4th Cir. 2021) (citing *United States v. Susi*, 674 F.3d 278, 288 (4th Cir. 2012)).  Likewise, a "disparity arising from [the] exercise of prosecutorial discretion [is] not unwarranted." *Pepper v. United States*, 562 U.S. 476, 503

---

[3] The defendant filed his Position on Resentencing earlier today.  *See* ECF No. 277.  The government will counter the defendant's arguments during next week's sentencing hearing.  The government strongly disagrees with the defendant's characterization of its proposed comparable cases.  The defendant cited numerous cases that are entirely inapposite.  For example, he relies heavily on *United States v. Doe*, 323 F. Supp. 3d 368 (E.D.N.Y. 2018), but inexplicably fails to mention a single time that the defendant provided "extraordinary cooperation" to the government over the course of four years (including proactive cooperation), which earned him a 5K1.1 sentencing reduction.  Undersigned counsel previously met with *Doe* in connection with an unrelated matter and is prepared to generally discuss the circumstances of his case and post-arrest cooperation, which is very different from Khweis's overall conduct in this case.  The defendant also cited cases involving defendants who never successfully joined a terrorist organization and attempted (but failed) to send a few hundred dollars to ISIS.  And, aside from including the obstruction of justice enhancement in its proposed sentencing calculation, the defendant does not once acknowledge in his resentencing memorandum the numerous lies and omissions that he made on over the course of two days on the witness stand in this Court.

(2011) (citing *United States v. LaBonte*, 520 U.S. 751, 761–62 (1997)).  The defendant cannot therefore claim that there is an unwarranted sentencing disparity because the government chose to bring a different array of charges in an entirely different case.

The Fourth Circuit has also reiterated that "[c]ourts have repeatedly made clear that comparisons of sentences may be treacherous because each sentencing proceeding is inescapably individualized." *United States v. Friend*, 2 F.4th 369, 382–83 (4th Cir. 2021) (quoting *United States v. Rivera-Santana*, 668 F.3d 95, 105–06 (4th Cir. 2012)).  The Fourth Circuit has also warned that "comparing the sentences of other defendants with dissimilar offenses, circumstances, and criminal histories is unavailing."  *United States v. Chandia*, 675 F.3d 329, 341–42 (4th Cir. 2012) (citing *United States v. Abu Ali*, 528 F.3d 210, 267 (4th Cir. 2008)).

But to the extent the Court wishes to compare the 20-year sentence request here with other terrorism prosecutions, the Court should consider: (1) Bernard Raymond Augustine was sentenced to **20 years** in prison in the Eastern District of New York on April 6, 2022; (2) Zakaryia Abdin was sentenced to **20 years** in prison in the District of South Carolina on June 10, 2019; and, (3) Nader Salem Elhuzayel and Muhanad Elfatih M.A. Badawi were each sentenced to **30 years** in prison in the Central District of California on October 16, 2016.

1. *United States v. Bernard Augustine*, 1:18-cr-00393-SJ-RML (E.D.N.Y. 2022)

Bernard Augustine was convicted by a jury of one count of attempting to provide material support to ISIS.  In February 2016, Augustine, a 20-year-old U.S. citizen, traveled from San Francisco to Tunisia with the goal of joining ISIS.  But before he could make it to ISIS-controlled territory in Libya, he was apprehended by local authorities and was later returned to the United States.  Prior to his travel, Augustine consumed ISIS propaganda, including videos that glorified ISIS's tactics.  The Court recently sentenced Augustine to 20 years in prison.

Similar to Augustine, Khweis was fully aware of ISIS's violent ideology after he watched videos of violent acts committed by ISIS prior to arranging his travel overseas.  Both evinced a clear loyalty to the organization—Augustine testified that he maintained his interest in supporting ISIS; Khweis continued to withhold information about the organization even after being captured and interrogated by the government, and committed perjury about his terrorist conduct during trial testimony.  Unlike Augustine, however, Khweis made it to ISIS-controlled territory using a sophisticated travel route.  The fact that Khweis successfully evaded detection while making his way to the ISIS heartland and provided numerous forms of material support to the terrorist organization in Syria and Iraq for over 2.5 months are aggravating circumstances that justify, at a minimum, an equivalent 20-year sentence.

    2.  *United States v. Zakaryia Abdin*, 2:17-cr-00283-RMG (D.S.C. 2021)

Zakaryia Abdin pleaded guilty to one count of attempting to provide material support to ISIS.  Beginning in early 2017, Abdin, an 18-year-old U.S. citizen who did not graduate high school, began seeking a recruiter to join ISIS in Syria or Egypt.  Abdin had extensive conversations with an undercover FBI agent, whom he believed to be an ISIS handler, in which he expressed his continued devotion to the organization and its caliphate.  He also requested to serve in combat.  Abdin was arrested while attempting to board an airplane to Jordan before he could join ISIS.  The Court sentenced him in 2019 to 20 years' imprisonment.

The similarities between Abdin and Khweis are striking.  Both were young American citizens at the time of their crimes.  Both were fully cognizant of ISIS's status as a foreign terrorist organization.  Both expressed a willingness to engage in terrorist acts: Abdin requested to serve in combat; Khweis agreed to become a suicide bomber.  The differences, however, strongly suggest that Khweis deserves a sentence that is no shorter than Abdin's sentence.

24

Notably, Khweis was eight years older than Abdin and had completed much more schooling, including obtaining an associate's degree in criminal justice.  Unlike Abdin (or Augustine), Khweis successfully entered ISIS-controlled territory.  In addition, whereas Abdin pleaded guilty, Khweis insisted on going to trial.  Defendants who plead guilty accept responsibility for their criminal conduct in open court.  In a terrorism case, particularly in a matter involving a callous terrorist organization that vehemently rejects the validity of American law, the act of accepting responsibility demonstrates a willingness to rehabilitate.  Khweis did no such thing before or during trial and instead committed egregious acts of perjury over the course of two days on the witness stand about his service to ISIS.

3.  *United States v. Elhuzayel and Badawi*, 8:15-cr-00060-DOC (C.D. Cal. 2016)

Elhuzayel and Badawi were each convicted of conspiring to provide and attempting to provide material support to ISIS, as well as bank fraud.  Both were convicted by a jury and sentenced to 30 years' imprisonment.  The Court chose to run the defendants' two 15-year sentences on the conspiracy and attempt convictions consecutively, with the bank fraud counts running concurrent to the material support convictions.  Unlike Khweis, Elhuzayel and Badawi never joined ISIS overseas.  Their material support scheme centered on Badawi's efforts to get Elhuzayel into the Islamic State.  Badawi was the radicalizer, recruiter, and facilitator, and Elhuzayel was the prospective fighter.  Both defendants desired to ultimately die as martyrs fighting for ISIS, but they failed to enter ISIS-controlled territory.

In Khweis's trial, the Court heard extensive testimony concerning the role of martyrdom as it relates to ISIS and the defendant's conduct.  The defendant's interest in serving as a suicide bomber for ISIS was corroborated by his Facebook and Twitter records that showed the creation of the username "iAGreenBirdiA" while the defendant was in

25

Turkey, which the defendant acknowledged is used by ISIS and other violent terrorist groups to reference martyrdom, violent jihad, and suicide operations.  Trial Tr. 540; Gov. Exs. 61-62. Khweis added that "ISIS and other terrorist organizations frequently use this term [Greenbird] to show their support for violent jihad, and particularly suicide operations and to become a martyr.  It is with that context that [Khweis] said he used that term 'GreenBird.'  When we asked him what was the iAGreenBirdiA, the iA portion, he explained that it's Arabic for inshallah, which means God willing.  So essentially he was trying to advertise online that God willing I'll die fighting for ISIS or die as a suicide bomber."  Trial Tr. 540.

Considering the sentences imposed on Augustine, Abdin, Elhuzayel, and Badawi, a 20-year sentence for Mohamad Khweis is certainly just and appropriate.  Khweis is the only defendant among that group to have succeeded in traveling to ISIS territory and supporting ISIS in numerous ways, yet the other four defendants who fell short of their aspirations were still sentenced to 20 years or longer.  **As this Court observed during sentencing: "So the crime, obviously, is one of the most serious that you can commit.  It's why the Guidelines are what they are and how serious they are . . . .[W]hen you look at the 3553 factors, we have a very serious crime.  We need to deter you.  We need to deter others."**  Sentencing Tr. 69-70.

## CONCLUSION

For the foregoing reasons, the government believes that a sentence of **240 months (20 years)** of imprisonment would be sufficient, but not greater than necessary, to satisfy the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

Jessica D. Aber
United States Attorney

By: RAJ PAREKH

Digitally signed by RAJ PAREKH
Date: 2022.06.21 23:56:57
-04'00'

Raj Parekh
First Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2022, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record in this matter.

/s/  Raj Parekh
Raj Parekh
First Assistant U.S. Attorney