IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| MOHAMAD JAMAL KHWEIS, | ) | |
| | ) | |
| Movant, | ) | 1:16-cr-143 (LMB) |
| v. | ) | 1:24-cv-1972 (LMB) |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Respondent. | ) | |

MEMORANDUM OPINION

Mohamad Jamal Khweis ("Khweis" or "movant"), through counsel, has filed a Motion to

Vacate Convictions under 28 U.S.C. § 2255 ("Motion") [Dkt. No. 306], in which he argues that

he received constitutionally ineffective assistance from his appointed counsel, Jessica N.

Carmichael and John Zwerling (collectively, "trial counsel" or "defense counsel"). The

government has responded to the Motion [Dkt. No. 322] and Khweis has filed a reply [Dkt. No.

325]. Having reviewed the entire record, the Court finds that there is no need for an evidentiary

hearing and, based on the submitted materials, the Motion will be dismised.

I.

The following description of the facts comes from the Fourth Circuit's summary of the

trial evidence. See United States v. Khweis, No. 22-4406, 2023 WL 4993685, at *1-2 (4th Cir.

Aug. 8, 2023); United States v. Khweis, 971 F.3d 453, 455-56 (4th Cir. 2020). Khweis was

born and raised in the United States. When he was 26 years old, he became interested in joining

the Islamic State of Iraq and the Levant ("ISIL"), quit his job, sold his car, and bought a one-way

ticket to London. He left Virginia in December 2015, one month after ISIL attacks killed more

than 100 people in Paris. From London, Khweis traveled to the Netherlands and then to Turkey.

He took measures to hide his travel, booking flights through a new email account, and using

encrypted applications to communicate.

While in Turkey, Khweis contacted ISIL recruiters over Twitter, who smuggled him into Syria. Once in ISIL territory, he spent the next several months training with and supporting ISIL fighters and leaders. In March 2016, Khweis decided that he "needed to leave" ISIL and walked into Peshmerga-held territory, where he was captured by Kurdish Peshmerga fighters and transported to a Kurdish Counter-Terrorism Directorate detention center in Erbil, Iraq. At the detention center, the FBI Assistant Legal Attaché for Iraq interviewed Khweis to gather intelligence about ISIL without providing Miranda warnings. Ten days after those interviews concluded, a different team of FBI agents interviewed Khweis for purposes of a potential U.S. criminal prosecution and advised him of his Miranda rights. Khweis waived his rights and made inculpatory statements.

In November 2016, Khweis was indicted for conspiring to provide material support or resources to ISIL in violation of 18 U.S.C. § 2339B; providing material support or resources to ISIL in violation of 18 U.S.C. § 2339B; and possessing, using, and carrying firearms during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A). Khweis's trial counsel moved to suppress statements that Khweis made to the second team of FBI agents, claiming, among other things, that they were the result of government coercion and obtained in violation of his right against self-incrimination and right to counsel. After a multiday hearing, the Court denied the motion in a 32-page memorandum opinion and order.[1] [Dkt. No. 185].

---

[1] This case was initially assigned to Judge Liam O'Grady, who presided over the jury trial. After Judge O'Grady retired, this case was randomly reassigned to Judge Claude M. Hilton in November 2024. After Judge Hilton retired, this case was randomly reassigned to the undersigned.

2

Having been unsuccessful on the motion to suppress, trial counsel retained an expert on false confessions, Dr. Anita Boss, whom they intended to call as a witness at trial to "testify as to 'the current scientific literature on Miranda waivers and confessions' and the unreliability of confessions and related topics (broadly referred to as 'false confessions' for ease of reference)." [Dkt. No. 188] at 1. On May 19, 2017, defense counsel provided the government with a written summary of Dr. Boss's testimony and information about her methodology for evaluating confessions. The Court heard the parties' positions on the admissibility of Dr. Boss's testimony at a pretrial hearing on May 26, 2017, [Dkt. No. 173], and requested more information from defense counsel regarding her testimony. On May 29, 2017, Dr. Boss provided a more detailed summary of her proposed testimony. That same day, the government filed a motion to exclude Dr. Boss's testimony in which it attacked the reliability of her testimony as substantially derivative of the research of another expert in this area, Dr. Richard A. Leo, whose testimony has been excluded by some courts. [Dkt. No. 178]. The government also argued that Dr. Boss' testimony should be excluded under Fed. R. Evid. 403 because it would be unfairly prejudicial to the government and risk confusing the issues and misleading the jury.

On the morning of the third day of trial, outside the presence of the jury, the Court took up the government's motion to exclude Dr. Boss's testimony. Mr. Zwerling argued that Dr. Boss's testimony was reliable, pointing out that many of the cases cited by the government in which Dr. Leo's testimony was excluded were from 20 years ago. He explained that Dr. Boss's testimony was also based on more recent statistical studies showing that false confessions were involved in a large percentage of exonerated defendants. [Dkt. No. 303-3] at JA 0461-62. He urged the Court to admit her testimony because it would be helpful to the jury to understand why

3

someone might falsely confess to or exaggerate their involvement in a crime:

> [T]hat's important information for a jury to have so that they don't just say, well, you know, nobody would admit to a serious crime unless they had done something wrong or exaggerate on themselves. In this case, we will be able to provide them with an incentive that the defendant had to exaggerate his involvement. But if they're not receptive to that, or understand that this is something that is not unique to this case, they are less likely to be able to appreciate the situation and the specific facts of our case. Dr. Boss is not going to opine that in this case that's what the defendant did. That's the jury's function. But she is going to, as she stated in her last submission, give them information which might make it easier for them to evaluate the facts and make their own conclusion[s].

Id. at JA 0462.

The Court asked about Dr. Boss's application of her methods to the facts of this case, voicing concern that she had not met with Khweis. Mr. Zwerling explained that Dr. Boss' testimony was admissible for the same reason that the government's expert witness on ISIS techniques for radicalizing young men was admissible—although neither expert had met with Khweis, they would testify generally to the circumstances that make a person susceptible to such behavior. The Court rejected defense counsel's arguments and found that "much of Dr. Boss' report is not based on scientific principles that rise to a level where they should be admitted under 702." [Dkt. No. 303-3] at JA 0463. Specifically, the Court was critical of Dr. Boss's heavy reliance on Dr. Leo's scholarship. Id. The Court also found that Dr. Boss's testimony was different from the government's expert witness's testimony because "they're different analyses. And I don't think giving a broad brush to what somebody may think without having any idea what the characteristics of the defendant in this case are is helpful to the jury. I think it instead is confusing." Id. at JA 0463-64.

The Court issued a written order fully explaining the reasons why it excluded Dr. Boss's testimony. First, as stated in open court, the Court found that "Dr. Boss's testimony [was]

4

unreliable for purposes of Rule 702. Although the Court recognizes that false confessions do happen, there is simply no reliable science for determining how likely they are to happen." [Dkt. No. 188] at 4 (emphasis in original). Second, the Court found that "there [was] no evidence that Dr. Boss would 'reliably apply her principles and methods to the facts of the case,'" because there was "no suggestion that Dr. Boss kn[ew] the defendant or [was] familiar with his history. Thus, it would be impossible for her to 'establish that Khweis was interrogated under circumstances that could produce a false confession.'" Id. (cleaned up). Finally, the Court found that "the admission of Dr. Boss's testimony would be unhelpful to the jury, which is fully capable of assessing the truthfulness of Khweis's alleged confession" and that such testimony would "usurp[] a critical function of the jury." Id. at 5.

At trial, Khweis took the stand and testified that he was mostly interested in ISIL's nonviolent activities and, while he was in Turkey, he decided to briefly visit Syria "to see" the ISIL caliphate. He further testified that once he was with ISIL, he feared being "jailed or possibly killed" if he asked to leave. Khweis explained that he repeatedly tried to escape from ISIL. Much of Khweis's trial testimony contradicted what he told the FBI agents who interviewed him in Iraq, and he was impeached heavily by the government. He tried to explain his inconsistent statements as follows:

> [S]ome of the things I said to the FBI, you know, it wasn't 100 percent the truth. I just -- some of the things I just -- I said yes to just so -- I just said yes to some of the questions they were asking because I felt like I needed to get charged by the U.S. and get extradited back to the U.S. The Kurds, they threatened me. They said, if I didn't talk to the agents, that they are going to send me -- they are going to send me to prison in another location and no American will be allowed to visit me, not even the agents. And my family won't even be allowed to come and see me. And I remember Mike saying -- one of Kurds said, your family won't even be allowed to even come to this country to come visit you.

5

[Dkt. No. 214] at 31.  After a six-day trial, the jury convicted Khweis on all counts and he was sentenced to 240 months' imprisonment.

In his appeal of his convictions and sentence, Khweis challenged the denial of his motion to suppress, arguing that his § 924(c) conviction was invalid and that the Court had not made adequate factual findings to support two terrorism-related sentencing enhancements.  He did not challenge the Court's exclusion of Dr. Boss's testimony.  The Fourth Circuit vacated Khweis's § 924(c) conviction after concluding that the conspiracy offense was no longer a predicate crime of violence, but otherwise affirmed his convictions, and remanded for resentencing.  See United States v. Khweis, 971 F.3d 453, 464 (4th Cir. 2020).  At the resentencing hearing, the Court imposed concurrent 168-month sentences on the two remaining counts.  Khweis appealed that sentence and the Fourth Circuit affirmed.  The Supreme Court denied his petition for a writ of certiorari on October 7, 2024, and the instant Motion was timely filed on November 24, 2024.

II.

In his Motion, Khweis alleges constitutionally ineffective assistance of counsel based on his trial counsel's failure to establish the reliability of Dr. Boss's testimony and the applicability of her testimony to the facts of the case by not arranging for her to interview Khweis.  He claims that these failures resulted in the exclusion of his "key witness," who would have "corroborated [his] testimony and diminished the weight of the government's evidence."  [Dkt. No. 306].

To establish ineffective assistance of counsel, Khweis must show both (1) that "counsel's performance was deficient" and (2) that he was prejudiced by that deficient performance. Strickland v. Washington, 466 U.S. 668, 687 (1984).  As to the first prong, deficient performance occurs when "counsel's representation fell below an objective standard of reasonableness" as

6

established by "prevailing professional norms." Id. at 687–88. Because it "is all too tempting for a defendant to second-guess counsel's assistance after conviction or [an] adverse sentence" and because a wide range of legitimate defense strategies are possible in a given case, there is a "strong presumption" that counsel's conduct was within the wide range of reasonable professional assistance and "scrutiny of counsel's performance must be highly deferential." Id. at 689–90. In keeping with this standard, a court is to assess counsel's conduct not with the benefit of hindsight, but from the perspective of counsel at the time of the relevant action or decision. Strickland, 466 U.S. at 689–690.

As to the second prong, a movant can show prejudice when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A showing that "the errors had some conceivable effect on the outcome of the proceeding" is not enough; a reasonable probability requires that the errors are "sufficient to undermine confidence in the outcome," id. at 693-94, or that the results of the proceeding were fundamentally unfair, Lockhart v. Fretwell, 506 U.S. 364, 369 (1993). Assessing prejudice "requires the court deciding the ineffectiveness claim to 'consider the totality of evidence before the judge or jury.'" Elmore v. Ozmint, 661 F.3d 783, 858 (4th Cir. 2011) (quoting Strickland, 466 U.S. at 695). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." Strickland, 466 U.S. at 700.

A.

The government argues that defendant's Motion should be denied because defendant has not asserted a viable claim of ineffective assistance of counsel. Specifically, he has not shown

7

either constitutionally defective performance by his trial counsel in seeking the admission of Dr. Boss's testimony or any resulting prejudice from the Court's exclusion of such testimony.

The government's argument that Khweis has not asserted a viable claim of ineffective assistance of counsel because he is complaining about the expert's performance, and not his trial counsel's performance, is unavailing. Although it is true that Dr. Boss did not examine the defendant—which the trial court found problematic—the decision to forgo such an examination was made by defense counsel and not Dr. Boss. Defense counsel made the decision based, in part, on their limited resources as well as their professional judgment that testimony from a "teaching expert" on false confessions would be admissible at trial without the need to interview the defendant. The following email exchanges show this was a tactical decision by counsel—

---

From: Jessica N. Carmichael
To: John Zwerling
Wednesday, May 3, 2017, at 12:11 p.m.

Another mental health expert to examine client and review the materials will not be approved (I don't think it will be welcomed by the client either). . . . The only thing that would possibly be approved, and what I was thinking of Dr. Boss for, is a "confession expert" for trial. A teaching witness, who would speak generally to the psychological effects of the two-step interrogation and stockholm [sic] syndrome. Just generally, under the circumstances of this case. In essence, we do not have any more funds left for "investigation," only for prepping a witness for trial and the trial testimony. What are your thoughts?

---

From: John Zwerling
To: Jessica N. Carmichael
Wednesday, May 3, 2017, at 12:34 p.m.

She does not need to see client to render an objective opinion[.]

8

---

From: John Zwerling
To: Anita Boss
Cc: Jessica N. Carmichael
Wednesday, May 3, 2017, at 1:22 p.m.

Hi.
We would like you to do this as a teaching expert on confessions to explain what effect the demonstrable facts would have. If that changes your estimate of hours please revise. Also include trial testimony[.]

---

From: Anita Boss
To: John Zwerling
Cc: Jessica N. Carmichael
Wednesday, May 3, 2017, at 3:29 p.m.

I'm sure you know this already, but I feel obligated to mention that this type of testimony is excellent to help the court understand the issue, why people confess in general, and how these circumstances could reasonably have contributed to a confession that was not reliable. However, I can't offer specific opinions about how the situation affected this defendant directly without examining him.

[Dkt. No. 315] at 4-5. As this evidence shows, trial counsel's decision to limit Dr. Boss's testimony to educating the jury on false confessions and not have Dr. Boss opine on how Khweis's specific circumstances affected him was a strategic decision.

## B.

To support his argument that trial counsel's failure to successfully counter the government's motion to strike Dr. Boss's testimony was constitutionally deficient performance, Khweis alleges that his trial counsel should have (1) rebutted the criticism of Dr. Leo by showcasing his significant professional accomplishments in the area of false confessions; (2) argued the applicability of United States v. Hall, 974 F. Supp. 1198 (C.D. Ill. 1997), which applied the Daubert standard to specialized knowledge in social sciences (as opposed to scientific knowledge) in finding that false confession expert testimony was admissible; (3)

9

argued that the government's concern regarding Dr. Boss's methodology was an issue of weight rather than admissibility; and (4) hired Dr. Boss to examine Khweis and opine as to how the FBI's interrogation affected him. At its essence, Khweis' argument is that because there is case law in other circuits supporting the admission of false confession expert testimony under Rule 702, his trial counsel should have been able to persuade the Court to allow Dr. Boss to testify at trial. This kind of argument is an example of classic second-guessing that is not permitted under Strickland's highly deferential standard for examining trial counsel's strategic decisions on collateral review. Although some courts have found false confession expert testimony to be reliable under Daubert,[2] other courts have not.[3] That courts across the country have disagreed

_____

[2] See, e.g., United States v. Hall, 974, F. Supp. 1198 (C.D. Ill. 1997) (finding that expert testimony on false confessions was admissible as "other specialized knowledge" even though "hard" evidence from laboratory experiments was not available because "the field involving the use of coercion in interrogations[] is sufficiently developed in its methods to constitute a reliable body of specialized knowledge under Rule 702"); United States v. Raposo, 1998 WL 879723 (S.D.N.Y. 1998) (finding that Daubert was satisfied where the expert would testify on the defendant's psychological characteristics that might render him more prone to making a false confession than the general population); United States v. Antone, 412 Fed. Appx. 10 (9th Cir. 2011) (finding that expert testimony on false confessions met Daubert's reliability test but was properly excluded due to the danger it would usurp the jury's function);

[3] See, e.g., Austin v. Brown, 2024 WL 1602968, at * 14 (D. Colo. Feb. 22, 2024) (excluding false confession expert testimony under Tenth Circuit precedent and explaining that the "Tenth Circuit has specifically addressed expert false-confession testimony in three cases and has disapproved of such testimony each time."); Kogut v. County of Nassau, 2013 WL 3820826 (E.D.N.Y. 2013) (finding that defendant was not entitled to a new trial based on the exclusion of expert testimony regarding false confessions where social psychologist's testimony was not the product of reliable principles and methods); United States v. Jacques, 784 F.Supp.2d 59 (D. Mass. 2011) (finding that although "in the area of false confessions the kind of strictly mathematical support available in other areas may be lacking[,] … some objective basis other than say-so must be offered, and none was."); Green v. City of Wenatchee, 2003 WL 26089744 (E.D. Wash. 2003) (excluding Dr. Leo's testimony because, although "the study of false confessions is a legitimate subject of social and scientific inquiry, it has not reached the level of being able to accurately predict the frequency and causes of false confessions or whether a

about the reliability of false confession expert testimony supports a finding that trial counsel's performance did not fall below an objective standard of reasonableness—that is, it was not guaranteed that, even if counsel took every act that the defendant suggests in his Motion, the Court would have allowed Dr. Boss to testify. See also Holmes v. United States, Nos. 4:09-cr-85 and 4:13-cv-113, 2015 WL 402957, at *12 (E.D. Va. Jan. 28, 2015) (denying defendant's § 2255 motion for ineffective assistance of counsel where the court found that even if defense counsel had timely and properly filed a notice of intent to call a false confession expert witness, "it [was] not at all clear that 'but for counsel's [] errors, the witness's testimony would have been allowed'" because some courts have found such testimony inadmissible).

Moreover, the decision to propose Dr. Boss only as a teaching expert on false confessions was certainly within the "wide range of reasonable professional assistance" provided by counsel. Other courts have allowed experts to testify regarding the existence of factors that can increase the risk of false confessions without examining the person who confessed. See, e.g., Ezell v. City of Chicago, 2023 WL 5287919, at *24 (N.D. Ill 2023) (finding there was no need for the false confession expert to examine the plaintiffs because she would testify only as to risk factors that increase the probability of false confessions and how they applied to plaintiffs' interrogations) (citing Caine v. Burge, No. 11 C 8996, 2013 EL 1966381, at *2-3 (N.D. Ill. May 10, 2013) ("Dr. Leo will be permitted to testify as to various factors that can cause false confessions, and to their presence in this case.")). And as explained above, deciding not to have Dr. Boss examine Khweis and offering her only as a teaching expert was a strategic decision

---

certain technique of interrogation with a certain type of confessor will result in a predictable rate of false confessions.").

11

based in part on trial counsel's funding limitations. Accordingly, trial counsel's performance did not fall below an objective standard of reasonableness as established by prevailing professional norms.

C.

Even if the Court found that trial counsel's failure to establish the admissibility of Dr. Boss's testimony was constitutionally deficient performance, which it does not, defendant has not shown that he was prejudiced by that performance. Khweis took the stand and was able to explain why he made certain false statements to the FBI. Specifically, he explained that he made such statements under duress because the Kurds had threatened to imprison him and not allow him any visitors; therefore, "he felt like [he] needed to get [criminally] charged by the U.S. and get extradited back to the U.S." [Dkt. No. 214] at 31.

Moreover, as the government correctly points out, the prosecution presented significant evidence to the jury that Khweis had committed the offenses charged in the indictment. At trial, the government called 14 witnesses who testified about Khweis' travels and his activities overseas and introduced more than 70 exhibits consisting of cell phone extractions, travel documents, social media and email records, bank records, and other documents and electronic and physical evidence. The government did not rely solely on Khweis's confession to prove its case; rather, it presented ample other evidence to show that Khweis had, in fact, committed the crimes with which he was charged. Although Dr. Boss's testimony might have bolstered the credibility of Khweis's defense that he falsely confessed, the jury was fully capable of making its own assessment of this claim when he took the stand. Given the substantial evidence the government presented at trial to show Khweis's guilt—separate and apart from his statements to

12

the FBI—Khweis has not shown a reasonable probability that the outcome of his trial would have been different had Dr. Boss been allowed to testify.  Accordingly, he has also failed to satisfy the prejudice prong of Strickland.

III.

For the reasons stated above, Khweis's Motion to Vacate Convictions under 28 U.S.C. § 2255 [Dkt. No. 306] will be DISMISSED by an Order to be issued with this Memorandum Opinion.

Entered this 12th day of June, 2026.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge